# EXHIBIT A

Elston L Stephenson (Plaintiff)
Case 3:19-cv-08268-DLR
P.O. Box 129
Grand Canyon, AZ 86023
December 2, 2019

U.S. District Court Clerk's Office
Sandra Day O'Connor U.S. Courthouse, Suite 130
401 W. Washington Street, SPC 1
Phoenix, AZ 85003-2118

Dear Court,

Please receive and consider this **STIPULATION FOR EXTENSION OF TIME TO ANSWER** (First Request) in the case of **STEPHENSON V DRAPEAUX** corrected to supersede version dated November 27, 2019.

Thank You

Sincerely,

Elston L Stephenson

## REQUEST FOR EXTENSION

Your Honor, respectfully, I seek a 30-day Extension in this case in order to secure professional legal counsel.

Your Honor, this case meets elements (1)(A)(i)(ii) and (2)(A)(B) of 18USC §2261A and is ripe for a fair hearing before a Finder of Fact.

There is a *prima facie*. In the Motion-to-Dismiss and 'other instances' Defendant and others admit to at least (2)(B) "place under surveillance". Plaintiff is a (1)(A)(i)/(1)(A)(ii) "person and family [placed] in reasonable fear"...(1)(B) "caused [by]" Defendant's (2) "surveillance". Plaintiff asserts at least that Defendant's actions (1)(B) "caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to a person in clauses (i) and (ii) of subparagraph (A) *and* (2) "with [at least] the intent to harass, intimidate, *and* place under surveillance with intent to [at least] harass or intimidate another person *used* [at least] computer service or electronic communication service or electronic communication system...to engage in a course of conduct that [at least] (B) "causes , attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clauses (i) and (ii) of paragraph (1)(A).

This is a question and controversy for Finder of Fact.

The Court will also discover that there are interests compelling that this case should see its day in court.

1

While the decision before the Court at this stage is the Motion-to-Dismiss it is hoped that the Court considers the information below a measure of the merit to seeing this case through to verdict.

Evidence such as the key witness statement regarding not only the stalking incident but also the hostility and attacks on Plaintiff by Defendant and others in retaliation for Whistleblowing and reporting potentially deadly safety hazards and resisting pressures to participate in frauds demonstrates the risk of harm to Plaintiff by the Defendant. (Exhibit A-1)

This case—this Court is the only jurisdiction for immediately stopping the stalking and protect Plaintiff.

Whistleblower complaints sent directly to two Secretaries of Interior, two DOI Inspectors General, and two Directors of the National Park Service include 18+ years of uranium exposure of workers and the public at Grand Canyon National Park (GRCA), attempts to cover it up ('secret pacts'), other life-threatening health hazards, worker intimidation, specific instances of fraud, and peddling in false statements and falsified official documents by senior-most GRCA Park officials. This includes the most recent submitting of knowingly falsified official statements and creating and submitting knowingly falsified official documents to OSHA on June 19, 2019 in an attempt to fraudulently defeat OSHA citations issued in the uranium case.

Professional counsel will prove that Government's Title VII rationale is, itself, race-based and discriminatory.

The Court will notice that as a non-lawyer 'pro se' I am greatly out matched by facing off against not only the Department of Justice U.S. Attorney's Office, but the Department of the Interior Solicitor's Office as well. This is an overwhelmingly one-sided legal fight.

In the interest of justice and fairness, I respectfully ask that the Court postpones the Plaintiff response/opposition deadline to the U.S. Attorney's Office's Motion-to-Dismiss for 30 days so that I may secure professional legal counsel.


## POINT OF LAW/CONTROVERSY

Government's *"appears* to allege Title VII claims of a hostile work environment arising from "stalking" by [Defendant]" reflects a belated third-party entry and is contradicted by not only facts but DOI and NPS' immediate and contemporaneous actions upon notification of Defendant's stalking actions.

*"Appears"* is not a legal standard. The facts of DOI and NPS' immediate response are dispositive and not in dispute.

Plaintiff did not file and EEO action in this instance, DOI did not file an EEO response. Government's EEO inference is Government's alone, conflicts with evidence, conflicts with the response of other Divisions in the Attorney General's Office (Exhibit E-1), and is without a client.

Government's Title VII rationale is made entirely based on my race. If I were white ('unprotected class') Government would not be able to make this argument to deny my access to 18USC 2261A and Injunction/ Restraining order. Hence Government's Motion seeks to deny my access to 18USC 2261A remedies based on my race, and is therefore un-Constitutional.

Exhibit C demonstrates that in addition to the 18USC §2261A prima facie case question and controversy being ripe for Finder of Fact listed above; Plaintiff's July 25, 2019 notification to NPS and DOI Headquarters was entitled "URGENT : Need Help Getting Safe Space Away from [Defendant]". Plaintiff mentions safety

concerns throughout (in writing and in person). Plaintiff never mentioned race. Nor does the responding GRCA Superintendent 2. This is a stalking case.

Exhibit E-1 the Court will find is an Assistant U.S. Attorney detailing my outreach to U.S. Attorney's Office to report the 'secret pact' and the hiding of the uranium readings, the refusal to notify workers and the public (violation of 'Right to Know'), and other frauds such as 'doctoring' reports. Clearly, the AUSA notes my complaint of retaliation for coming forward about the uranium and other safety issues—not Title VII.

While it is true that I have an ongoing EEOC case; these are separate and distinct. I would insist on stopping stalking and other harassing, retaliatory attacks regardless of the adjudication of the EEOC case.

Further, evidence will also show that Plaintiff and Defendant have met 1-on-1 only once for 30 minutes in the last 1 ½ years. Other than the reported stalking, witnesses will confirm that Defendant has only been seen once in at least 2 years on Plaintiff's residential street. Defendant has been removed as Plaintiff's supervisor as a result of this escalation in harassment on August 27, 2019. These have resulted in no impairment to Park function or its administration. Government's professed concerns otherwise in its Motion are unfounded.

What's more; Government's *Thornbill* assertion is predicated on Defendant acting in a legitimate government capacity. Plaintiff asserts that stalking is not a legitimate government capacity. Stalking under the 'color of authority' is not legitimate capacity. And Defendant may have perjured himself when he stated in the Motion that "he had been directed by his own supervisor". This is based on the supervisor's own contemporaneously filing the 16E Complaint against Defendant upon notification of his stalking.

With professional counsel I will demonstrate to the Court that contrary to Government's assertion; this is a stalking case. Similar to *Saldana*, *Schaeffer*, and *Letterman*, Defendant's time and energy spent on planning, targeting me, and executing—over two years demonstrates what can only be describe as a dangerous fixation and obsession fitting a tragic pattern. This is precisely the type of case (similar to *Saldana*, *Schaeffer*, and *Letterman*) for which 2261A was written and whose only remedy begins with a Court ordered Injunction Against Harassment.

Likewise, U.S. Attorney's recent expression that 'It can't be a safety issue because time has passed and he hasn't done anything else, has he?' holds no merit as Defendant has been very publicly chastened and all eyes are on him. Defendant's history shows that he will repeat when he believes he has 'gotten away with it'.

Luckily, Defendant was caught by an NPS employee (witness) working in the area (Exhibit A-1). No one can assure the Court that this was the only time or whether Defendant (who has access to keys) entered Plaintiff's home, or whether he confined himself to only peering through windows in the day or the night. Indeed, Defendant lists coming to work in the dark of 5:30 am as a reason for suspending Plaintiff--admitting that he was either watching, tracking, or surveilling Plaintiff in the forest at these dark morning hours.

Subpoenaing and deposing DOI and NPS witnesses (current and former) at all levels before this Court will firmly demonstrate the predicate, motivation, and pattern of attempts to harm Plaintiff culminating in Defendant stalking Plaintiff's home. Once caught Defendant—with no formal training as a detective or law enforcement claimed to be staking out Plaintiff's home approved by Superintendent 2 even though Superintendent 2 immediately filed a DOI/NPS 16E complaint and investigation once notified of the stalking. Again these can all be sussed out by subpoenaing, deposing, and examining DOI and NPS witnesses.

Subpoenaing and deposing is something that this non-lawyer, pro-se, Plaintiff does not know how to do.

In the end, Title VII is a years-long process which does not provide for the immediate safety for the stalked. This Court is the only venue to impose the immediate legally enforceable safety provided by Injunction/ restraining order.

The EEOC is inarguably not equipped to answer the 18USC §2261A question.

With respect to Extension/Postponement; it is abundantly clear that this non-lawyer, pro-se, Plaintiff is the *David* versus the DOJ U.S. Attorney's Office plus DOI Solicitor's Office *Goliath*. The Courts are "The Great Levelers".


## PERJURY BEFORE THIS COURT

Your Honor, having professional legal counsel will help Plaintiff best demonstrate Defendant is guilty of multiple instances of perjury before this Court.

The Court will find that the U.S. Attorney has unwittingly filed a Motion which is founded upon materially knowingly falsified statements by Defendant which may well constitute perjury. Upon discovery, Plaintiff duly notified the U.S. Attorney's Office on November 19, 2019.

Plaintiff warned the U.S. Attorney of Defendant's long-demonstrated fragile, fluid, and transactional relationship with the truth in advance.

Perjury alone should be call into question the entire Motion and should be reason to 'Deny'.

If Defendant had a case, he would not have attempted to defraud the Court by repeatedly lying.

Exhibit F will demonstrate to the Court a few easily provable instances where Defendant submitted materially knowingly falsified statements to the Court in order to defraud the Court.

Plaintiff respectfully asks that the Court rigorously examine Government's (Defendant's) claims. Principally Defendant states that he was stalking Plaintiff's home (Plaintiff was not home) to see if Plaintiff was using his government vehicle on his off hours. In Defendant's recently contrived IG complaint he complained that Plaintiff misused his government vehicle by taking it home. If this were true why didn't Defendant (a GRCA Superintendent) simply order that the vehicle not be kept at the home? Exhibit M shows that when Plaintiff—brand new to the NPS and viewing several government vehicles in his neighborhood made the assumption based on the 'at all hours' response nature of his job; it made sense to bring his vehicle home. And when Plaintiff (brand new to NPS) asked Superintendent 2 (28 years in NPS) for a memo clearing Plaintiff to take vehicle home, Superintendent 2 did not know what the rules were. It took the 28-year Superintendent nearly 2 weeks to research and find the answer.

Defendant knew—everyone knew that Plaintiff brought his vehicle home—from the very moment he took possession of the vehicle more than 2 years earlier. If Defendant was truly concerned about these rules, he would have counseled Plaintiff, and documented it. Respectfully, Court should insist on that documentation. It does not exist because Defendant was 'saving it up' to use later.

Defendant testifies (in Motion) that he stopped at a coffee shop 1 hour away from Grand Canyon and confronted Plaintiff about the vehicle. The Court will find that there is nothing but mountains 1 hour outside Grand Canyon. Respectfully, Court should insist on the name of the coffee shop and the date along with the documentation.

Defendant testifies (in Motion) that Plaintiff set his own hours and was difficult to find. If true, this sounds like a classic the verbal, written, disciplinary action case. Court should insist on the documentation.

Defendant testifies that he was stalking Plaintiff's home with Superintendent 2's approval. Court may examine Superintendent 2's actions—immediately filing a 16E upon notification of Defendant's stalking. He would not have done this if he had approved of Defendant's stalking at Plaintiff's home. Court may insist on documentation. Superintendent 2 should be subpoenaed, deposed, and examined as a witness.

Defendant did not correct/address the vehicle situation after more than 2 years because he was 'saving it up' for use when he needed it—the IG complaint. The other instances did not happen or Defendant would have documentation. These are knowingly falsified testimony. Perjury.

Defendant was stalking Plaintiff's home because he meant harm (digging up dirt, spying on, perhaps entering the home) to Plaintiff.

Again, these are just a few instances in the very brief Motion packed with so much knowingly falsified testimony that the Motion should be thrown out.


## PERJURY-FRAUD HABIT/PERJURY-FRAUD CULTURE

Plaintiff (a retired senior military officer and arguably NPS' most expert, formally trained safety expert) arrived to NPS to find and resist a relentless culture of falsifying statements, documents, and fraud. This included pressure by Defendant to knowingly process fraudulent tort claims. (Exhibit N). Defendant even lied about the death of a Park visitor (Exhibit K).

Exhibits C, D, D-2, F, G,H, I, J, K, and N will demonstrate that peddling in falsified statements and creating knowingly falsified documents—fraud is a pattern and near-ethos of Defendant, and a GRCA, IMR, NPS/DOI culture where Superintendents are given deferential, impunity and whose actions are unquestioned.

Exhibit P is Defendant pressuring Plaintiff to falsify the official DOI/NPS review of GRCA's safety program—each statement a count of fraud. Plaintiff resists. Defendant threatens with 'disciplinary action'. Extortion.

Exhibit K documents falsified statements and documents to the DOI Chief Medical Officer regarding poorly maintained and discontinued AEDs. The DOI Chief Medical Officer was so concerned by the danger to health and liability of visitors and workers that she recommended pulling all public AEDs from the walls of Grand Canyon National Park. The fraud was intended to change her mind as 13 of 53 AEDs were found defective.

Exhibit C demonstrates that the once GRCA Superintendent 2 and NPS Intermountain Region Headquarters realized that a thorough 16E investigation would have cataloged evidence and extent of Defendant's stalking; no witnesses were interviewed a more than a month later. No attempts were made to follow-up even though Plaintiff 'pushed' documents and evidence their way. GRCA Superintendent 2 and IMR essentially 'faked' the 16E in order to avoid documenting Defendant's guilt. DOI/NPS' failures and fraud necessitated going to court and filing for an Injunction Against Harassment.

Exhibit J demonstrates how the same GRCA Superintendent 2 submitted falsified official statements and even went through the effort of creating falsified worksheets to fool—defraud OSHA into believing it had accomplished training in order to fraudulently defeat an OSHA citation on June 19, 2019. Because the documents were sent via mail or email, it invokes felony mail and wire fraud. If there are others; conspiracy.

Superintendent 2's telling consciousness of guilt—his mens rea is that, evidence (Exhibit I) shows that he very deliberately left the Plaintiff—the Park Safety Manager out of the loop to conjure up the letter, falsify the worksheet, and send them to OSHA because he knew that Plaintiff would not stand for it. This was a complex, very deliberate official Agency to Agency fraud by Superintendent 2 and perhaps others.

Respectfully, the Court may order U.S. Attorney to pursue this latest, warm Agency to Agency felony fraud.

A check of the Exhibits will show that Plaintiff reported all instances of fraud directly to the Secretary(s) of the Interior and DOI Inspectors General.

The integrity of the Court may demand some sanction such as summarily denying the Motion-to-Dismiss as the Motion is rife with deliberately falsified statements by Defendant. This should offend the Court.


## RETALIATION/INTIMIDATION

Evidence—DOI IG's Report 18-1188 (Exhibits G and H) shows that Defendant began targeting Plaintiff from the moment he became Plaintiff's supervisor in September 2017.

Evidence will also show that workers were intimidated in to silence regarding the uranium.

In Exhibit D-1 Plaintiff clearly expresses his fear of retaliation to the Secretary(s) of the Interior and invokes that this was a Whistleblower Law complaint with all its protections.

Evidence will also show that rather than legitimately and contemporaneously addressing issues such as taking the work vehicle home. Defendant 'saved them up' to be used as fodder for bogus IG complaints. This fits the *modus operandi* he used against the previous GRCA Superintendent 1—often recruiting others to participate as 'witnesses'. As a demonstration of the lengths Defendant would go through; Plaintiff has been targeted in this way 4 or 5 times since reporting the uranium, other potentially deadly hazards, and fraud. Defendant is suspected of recruiting witnesses just as he did in his contrived IG complaint (DOI IG 18-1188) against the former GRCA Superintendent 1 and several times before that (Exhibit L). Evidence will show that Plaintiff spoke with Superintendent 1's attorney after reading about the reasons (Defendant targeting her with bogus IG complaints) Superintendent 1 resigned in an *Outside Magazine Online* article (Reference 3). Plaintiff was forewarned that Defendant would do the same with him. *Modus operandi.*

Evidence (Exhibit B) lists 'prior acts' which include Defendant inspiring others to stalk Plaintiff and others such that they caused an American Heart Association contract First Aid CPR instructor to be so fearful for her safety that she brought along a former U.S. Army Ranger, a gun, and a Taser to protect herself as she provided Grand Canyon life-saving training.  All of this is in an environment where Plaintiff's office building was recently placed under lock-down because of workplace violence, and a discharge of a firearm at GRCA's Flagstaff office.

Exhibit A-1 shows that the witness was so afraid by Defendant's stalking actions that he not only banged on Plaintiff's door to warn him, but went to Plaintiff's office 3 days later to warn him.

Evidence will show that Defendant intensified his actions of stalking, reconnaissance, and tracking only when Plaintiff notified him that he was going to Phoenix to meet with OSHA and the U.S. Attorney's Office to report the lawbreaking. Along with attempting to force Plaintiff to reveal 'Protected Communications'. Workers were intimidated into silence with OSHA and other Agencies. (Exhibit O)

Nothing demonstrates Defendant's animus and desperation for retaliation against Plaintiff like Defendant's (under the color of authority and "legitimate government capacity") of suspending Plaintiff in part for coming to work early. Plaintiff was to single-handedly instruct two classes for 5 hours; confined spaces and respiratory protection beginning at 8:00am. Plaintiff had to show up early to get the classroom ready, prepare audio and visual systems, prep PowerPoints, cue video clips, get ice, get and layout food and drink, travel to various parts of the park to get cooler, coffee, and hand's on 'sniffer' devices, and conduct hasty rehearsals. Defendant suspended Plaintiff, in part, because he showed up early—this even though Plaintiff never clocked in. Plaintiff, a 10-year OSHA certificated instructor, was tasked to give the instruction. Setting up took time and logistics to set up. Plaintiff's experience told him exactly how much time and sequencing it would take to set up. In fact, a lack of air conditioning required time enough for Plaintiff to return to his home and retrieve his own personal fans to provide a comfortable space for his students. Defendant, desperate to find any opening to retaliate against Plaintiff cited Plaintiff's coming to work early as grounds for suspending Plaintiff. Plaintiff appealed to Superintendent 2. Superintendent 2 let the charge stand—again, even though Plaintiff was tasked with giving the course and time records show that Plaintiff did not clock in for extra/Comp-Time.

Defendant, by his actions of very precisely and accurately citing 5:30am admits to precisely the "place under surveillance...result of such travel or presence...uses any active computer service or electronic communication service or electronic communication system" per 18USC 2261A to stalk, track, surveille Plaintiff in the dark in forest neighborhood and Grand Canyon National Park South Rim Village. Plaintiff immediately raised his safety concerns to Superintendent 2 in his appeal. They were ignored.

Defendant's stalking actions—particularly as Plaintiff was on his personal time placed weighty stress of fear and intimidation on Plaintiff and also interfered with his travel and enjoyment of this federal land.

Never mind that any employer recommending suspension a worker for coming to work early to make sure things are ready is bizarre, telling, and is evidence of a mindset of desperately conjuring up anything to 'get' Plaintiff, but Defendant also attempted to falsify another AWOL charge in the suspension action. He literally also attest to seeing Plaintiff in a parking lot, yet attempted to charge him with AWOL. He was only stopped when Plaintiff presented a 'table map' (something he does at all meetings) of attendees of a meeting he attended at the cited time.

*Modus operandi* again shows itself as Defendant 'saves up' the suspension attempt. He does not dare try it under no-nonsense Superintendent 3. But waits until Superintendent 2 returns—confident that Superintendent 2 will 'have his back'. Just as Superintendent 2 does with the fraudulent 16E.

Superintendent 2 is also implicated in the refusal to notify exposed workers in the uranium incident. Superintendent 2 is also implicated in the OSHA fraud.

Defendant and Superintendent 2 have very clear, demonstrated motive to Whistleblower retaliate against Plaintiff.


## WEAPONIZING IG and OTHER INVESTIGATIONS

The Court will find Exhibit G and H instructive as the DOI Inspector General herself documented Defendant's *modus operandi* of outright lying, weaponizing IG (and other) investigations when the heat was on, then say 'aw my mistake' when he is finally caught. Exhibit H demonstrates Defendant's falsified sworn statement to

EEO investigators about the same subject. And that these interviews were being conducted near-simultaneously. Exhibit G-2 shows how Plaintiff kept his head down and worked so missed the Report's release. Plaintiff did not read the report until July 4, 2019. A contemporaneous text to a colleague traces this.

In Exhibit G-1 Defendant admits to filing multiple IG complaints against former GRCA Superintendent 1.

When Plaintiff was informed of Defendant's stalking, he went door-to-door to neighbors to ask them to be on the lookout as he would be away for extended time. The neighbor across the street (a maintenance worker) informed Plaintiff that Defendant out of nowhere contacted him and repeatedly attempted to get him to provide negative information about the Superintendent 1 regarding a housing project which was the subject of one of Defendant's IG complaints against Superintendent 1 in DOI IG Complaint 18-1188. This active recruiting of witnesses and pressing for information to help his cause is another *modus operandi* that Defendant would repeat.

In the vehicle IG complaint investigators presented the names of 'witnesses' for events that had allegedly taken place nearly 2 years earlier. The witnesses named had long since either moved or were working at other parks. It was clear that they did not spontaneously call the IG 2 years later.  Examination will likely determine that Defendant dropped their names in order to make his 'complaint' seem more legitimate.

It is highly unusual and suspicious for a supervisor—let alone a Park Deputy Superintendent to file an IG complaint against their subordinate rather than take supervisor or Superintendent action.

Examination of the 4 or 5 other complaints/investigation will likely find that Defendant either recruited others or provided the list of 'witnesses' to the IG, or recruited them to file IG complaints.

In the 'uranium investigation', Plaintiff was the only witness voice recorded by the DOI/NPS investigation team. The team seemed tasked with finding negative information about Plaintiff. This was a conspicuous part of their 'Report'. This so-called scientific report appeared designed more to repudiate Plaintiff than provide scientifically sound information.  Examination will likely find that Defendant provided them the witness list for the targeting phase of this 'investigation'.

Exhibit G-3 shows the current 'investigation' targeting Plaintiff.  Attempts were made to trick Plaintiff into participating and making self-incriminating statements. Most witnesses are those implicated by Plaintiff in frauds or failures. The 'investigator' with no ID or business cards said that this was not an IG investigation. Plaintiff views this and its timing as just another last minute desperate attempt to 'get dirt/retaliation. There will be more. Timing suggests that this is retaliation for Plaintiff filing against Defendant in this Court.

These multiple instances of *weaponizing* the Inspector General and 'other' complaint and investigation process went undetected by the Department of the Interior Inspector General. Defendant's manipulation and *weaponization* of the IG complaint system was the primary reason cited by the former Grand Canyon National Park Superintendent 1 for resigning in the *Outside Magazine* article (Reference 3).

While Plaintiff was investigated by the IG for parking in a fire zone, notably; no IG investigation or report has been issued regarding the uranium incident. This alone is worthy of Congressional Hearings.

These are among the reasons that Plaintiff seeks an Injunction Against Harassment against Defendant.

## WHISTLEBLOWING

Each time that Plaintiff discovered potential loss of life situations he immediately brought them to the GRCA Superintendent(s). When the Superintendent(s) failed or refused to take action Plaintiff alerted the Secretary of the Interior and DOI Inspector General directly. These were all Whistleblower Complaints.

The uranium (Exhibit D, D-1) and the dead AEDs/falsified AEDs documents (Exhibit K) were the most notable.

In Exhibit D-1 Plaintiff—clearly worried about retaliation explicitly wrote his concerns and clearly and explicitly insisted to the Secretary of the Interior that he was invoking Whistleblower Complaint protections.

Yet Plaintiff was never contacted by the IG for follow-up about the 'secret pact', refusal to notify workers in violation of the Right-to-Know Law, attempts to hide the uranium readings, or the doctored report by IMR Regional Headquarters.

No statement addressing the dangerously high radiation readings in the IMR report and the dangers those levels posed to workers and Grand Canyon National Park visitors is ever mentioned in the 'Report'.

No answer was ever given to the falsified AED inspection reports even though the DOI Chief Medical officer was so alarmed that had recommended the dangerous program be ripped off the walls and boxed up (Exhibit K). This appears nowhere in the 'Report'. Plaintiff documented 13/53 dead AEDs. Report mentions only five.

Plaintiff was concerned that the 'Report' issued by DOI/NPS in the wake of the uranium episode was a PR document timed (delayed) to run out the statute of limitations for civil litigation rather than a scientifically rigorous review to assure the safety and health of exposed GRCA workers and public.

Allowing Plaintiff to retain professional legal counsel will allow Plaintiff to demonstrate that retaliation for Plaintiff's thoroughness and persistence is the reason Plaintiff has been 'investigated' so many times since first reporting the uranium and AEDs. It is the reason Defendant was stalking Plaintiff's home.

Despite all this Whistleblower retaliation no action by DOI has been taken to investigate the retaliation, prompting Plaintiff to seek court action.

Along with the manipulation and weaponization of the IG complaint system, this campaign of Whistleblower retaliation is also ripe for Congressional Hearings.


## CLOSE

Your Honor, it is my hope that the Court will see that as a former U.S. Army field-grade officer, attack helicopter pilot, and leader; matters of integrity and duty are almost second nature. But I am ill-equipped to self-represent against a team of U.S. Attorney's Office and DOI Solicitor's Office lawyers and their staffs.

With proper counsel I will be able, for instance, to professionally make the case that Defendant's perjury should result in summary Denial of the Motion-to-Dismiss as well as result in sanctions and diminished credibility in all matters before this or any other Court, and even prosecution.

Most importantly, subpoenaing and deposing DOI and NPS witnesses is both vital to justice and beyond my non-lawyer, pro-se ability.

This case has compelling interests with widespread implications such as the rights of workers in co-located work/living arrangements (such as National Parks), and the division between legitimate duties of employees and illegitimate law breaking (18USC §2261A) under the color of 'legitimate duties'. And public safety at one of the nation's—the world's most notable, iconic, premier destinations.

A healthy, safe Grand Canyon National Park free of intimidation and fraud is the most compelling of interests.

It is hoped that the material above has demonstrated to the Court that Defendant has targeted me from the very first instance that Defendant was designated my supervisor. And that I repeatedly resisted Defendant's attempts to implicate and draw me in to Defendant's (and others') frauds. Most importantly, Defendant has expended an extraordinary amount of time and energy plotting, collaborating, and executing plots to harm me as I went about doing my job of finding, reporting, and fixing potentially life threatening dangers in the Park. But a bold line of danger was crossed when Defendant took his desire to harm me to my home.

This sense of impunity to harm me is only matched by the impunity with which Defendant felt as he peddled materially knowingly falsified evidence (testimony) to the U.S. Attorney and to this Court.

It is my hope that the Court agrees that although the question before the Court is the narrow Injunction Against Harassment, this case should be followed by litigation, investigation, and prosecution of the other issues such as fraud. The uranium 'secret pact', the violations of 'Right to Know' were fraud, faking the 16E, the falsified OSHA submissions were fraud—all of them likely felony fraud and/or conspiracy. I would not go along. This is why Defendant was stalking me. He was up to no good. He meant me harm. Once I obtain counsel, examination will prove these assertions. Respectfully, the most pressing concern is our safety—the matter before this court at this time, your Honor.

Changes to my life such as closing the blinds to my windows when I'm in a room, turning out the lights before entering a hall so as to not silhouetting myself in a room, varying my driving route, my young daughter never coming here are all a result of Defendant's stalking and harassing.

DOI/NPS' most recent (November 21, 2019) attempts to dictate and impose what it thinks my case preparation rations should be (Exhibit Q), remoteness of Grand Canyon National Park requiring 1 ½ hours drive to the nearest reliable Post Office, and GRCA P.O. Box mail sorting system (taking 12 days to receive court documents) compared to near co-location of Government to the Court its e-filing privileges all also beg for professional legal representation in the name of leveling the playing field and basic fairness.

A 30-day Extension/Postponement will allow an opportunity to adequately present the Finder of Fact the facts in a manner consistent with justice based on the law and fairness.

Thank You, Your Honor.

Respectfully Submitted,

Elston L Stephenson, OHST
Safety Health & Wellness Manager
Tort Claims Officer
Grand Canyon National Park
928-255-8727

## REFERENCES

1. Cornell Law Library (2019). Legal Information Institute. 18 U.S. Code §2261A. *Stalking*. Retrieved from https://www.law.cornell.edu/uscode/text/18/2261A

2. *Thornbill Pub. v. General Telephone Electrical*, 594 F.2d 730 (9th Cir. 1979). Retrieved from https://casetext.com/case/thornhill-pub-v-general-telephone-elec

3. McGivney, A. (2019). Outside Magazine. *Grand canyon superintendent announces resignation*. Retrieved from https://www.outsideonline.com/2391433/grand-canyon-superintendent-christine-lehnertz-oig-report

## EXHIBIT LIST

Exhibit A – Case-in-Chief

Exhibit A-1 Stalking Witness Audio Recording (MP4 audio file thumb drive)

Exhibit B – PowerPoint Briefer, Injunction Against Harassment

Exhibit C – DOI/NPS 16E Filing and Correspondence

Exhibit D – Original Uranium Whistleblower Letter (Secretary Zinke, Bernhardt, IG Kendall)

Exhibit D-1 Follow-Up Whistleblower Letter (Secretary Zinke, Bernhardt, IG Kendall)

Exhibit D-2 Doctored Uranium Report

Exhibit D-3 Un-Doctored Uranium Report

Exhibit E – U.S. Attorney Referral of Emails to 'Criminal Division'

Exhibit E-1 U.S. Attorney Documentation of Investigation

Exhibit F – Notification of Defendant Perjury to U.S. Attorney

Exhibit G – DOI IG Report 18-1188

Exhibit G-1 Defendant Admitting to Multiple IG Complaints v. Superintendent

Exhibit G-2 Text of Plaintiff First Reading of IG Complaint 18-1188 and Realizing He is "Senior Official's Subordinate"

Exhibit G-3 HR Request for 'Interview' and Reaction to 'Witness' List Disclosure

Exhibit H – DOI IG Report 18-1188 Excerpt Defendant False Statements to EEO Investigator

Exhibit I – EEO Agreement Violation Decision Defendant False Statements, Falsified Documents

Exhibit J – GRCA Falsified OSHA Citation Response

Exhibit K – Falsified Statement GRCA to DOI AEDs

Exhibit L – Defendant Admitting to Weaponizing Multiple IG Complaints Against GRCA Superintendent

Exhibit M – Request to Superintendent for GOV to Home Use

Exhibit N – Fraudulent Tort Claim

Exhibit O – Defendant Forcing Plaintiff to Reveal Protected Communications/Intimidating Workers into Silence

Exhibit P – Defendant extorting Plaintiff to Falsify DOI/NPS Safety E-Tool Data

Exhibit Q – DOI/NPS Dictating Plaintiff's Preparation

Elston L Stephenson (Plaintiff)
Case 3:19-cv-08268-DLR
P.O. Box 129
Grand Canyon, AZ 86023
December 2, 2019

U.S. District Court Clerk's Office
Sandra Day O'Connor U.S. Courthouse, Suite 130
401 W. Washington Street, SPC 1
Phoenix, AZ 85003-2118

Dear Court,

Please receive and consider this request for STIPULATION FOR EXTENSION OF TIME TO

ANSWER (First Request) in the case of STEPHENSON V DRAPEAUX corrected to reflect *Local*

*Rules for Civil Procedure* and to supersede version dated November 27, 2019.

Thank You


Sincerely,


Elston L Stephenson




## REQUEST FOR EXTENSION

Your Honor, respectfully, I seek a 30-day Extension in this case in order to secure professional legal

counsel.

Your Honor, this case meets elements (1)(A)(i)(ii) and (2)(A)(B) of 18USC §2261A and is ripe for a fair

hearing before a Finder of Fact.

1

# EXHIBIT A-1

# (Witness Voice Recording)

# EXHIBIT B

# STEPHENSON REQUEST INJUNCTION AGAINST HARASSMENT

- Respectfully request Injunction Against Harassment
- At least 4 'Acts'
- Increasing in frequency
- Increasing in severity
- Latest co-worker spotted Defendant circling Plaintiff's home then stopping to scope it out
- Worker so worried that he stopped work knocked on door to warn Plaintiff
- Defendant has keys to all homes on Grand Canyon
- GRCA undergoing increased security (locked buildings) because of workplace violence

# Acts

- April 23, 2019  Stalking of First Aid/CPR training

- June 3, 2019 Defendant (own admission) watching/ survielling/tracking Plaintiff at 5:30am

- July 22, 2019 (July 25, 2019) Co-worker warned Plaintiff that Defendant was spotted circling block stopping to scope out Plaintiff's home

- July 31, 2019 IG shows Plaintiff picture taken by Defendant of Plaintiff sitting in his truck

# Background

- Plaintiff is the GRCA Safety Health & Wellness Manager
- Plaintiff found and reported 'uranium'
- Plaintiff found and reported GRCA AED system failures implicated in death of visitor
- Plaintiff unearthed and reported falsified statements and falsified evidence by Defendant in AED case, others in uranium case
- Plaintiff has open formal EEOC Complaint against Defendant which is likely to find in Plaintiff's favor
- Considering filing federal criminal Stalking complaint

# Legal Action Taken

- Reported each incident to NPS Director DC, Regional Headquarters, GRCA Superintendent

- No let up in harassment/stalking

- Open NPS 16E 'Investigation'

- No investigator assigned (more than 3 weeks)

- No one has spoken with Plaintiff about complaint or investigation

- No one has spoken with key Witness

- Repeated request (9 in last year) requesting change of supervisor because of retaliation/reprisal concerns. All ignored. Last (9th) denied

# Close

- Defendant's actions have only become emboldened after no corrective action/leadership by NPS

- Defendant's actions clearly violate A.R.S. §13-2923 and 18USC §2261A

- Defendant's actions escalating to the point that confrontation and violence are what's next

- In the current climate, this is alarming

- Respectfully request that the Court stops this trend before it ends in violence by issuing an Injunction Against Harassment

- Thank You Your Honor



NATIONAL PARK SERVICE
DRAPEAUX STALKING TEXT
Verizon LTE
10:21 AM
PT
Hey PT. Thank You for the heads up about Brian scoping out my place. Like we spoke, this is the 'Valley of the Weird'. I would like to stomp this out very forcefully. I'm going to go to the Courthouse and get s restraining order.
...would You be willing to write out a statement?
Curious on retraining orders if that's enough, he'll just claim he was working, I would write it down for now. I don't think it'll stick there's no threat and he'll just claim it as checking on his employee he'll win that. Patience
Knowing is a big part and he doesn't know u know so be smart
Actually it's called an 'Injunction Against Harassment' between employees. And PT..... You're the 2nd person to tell me this in about a month!
Verizon LTE
10:21 AM
PT
Knowing is a big part and he doesn't know u know so be smart
Actually it's called an 'Injunction Against Harassment' between employees. And PT.......You're the 2nd person to tell me this in about a month!
Wow that's not good. And being that high up makes it a problem. Do you have an attorney?
No attorney for this. I will self represent. I think a statement from You and her would help immensely
Problem is they will bury me I'm just an 8
Hey, no worries. I'll figure out something. Thank You for giving me the heads up! Very important to know!!!
Delivered
I'll watch and listen for ya and if it goes south I'll talk






















Stephenson, Elston <elston_stephenson@nps.gov>

---

## URGENT; Need Help Getting Safe Space Away from Brian Drapeaux

**Stephenson, Elston <elston_stephenson@nps.gov>**                        Thu, Jul 25, 2019 at 4:47 PM
To: Woody Smeck <woody_smeck@nps.gov>
Cc: "Raymond (David) Vela" <david_vela@nps.gov>, Chip Jenkins <chip_jenkins@nps.gov>, Roosevelt Wilson
<roosevelt_wilson@nps.gov>

Woody,

Sir, Good Afternoon.

I had a worker stop into my office about an hour ago to warn me that Brian Drapeaux was suspiciously making loops
around the block looking, in on my place on Monday morning, July 22, 2019.

This is the second worker to warn me like this in the last month or so.

This is that "safety concern" that I mentioned to You soon after the first reporting.

And the reason that my family did not come to stay during the 4th of July week.

Also among the reasons that have requested 8 times in the last 9 months to have me returned to direct report to the
GRCA Superintendent.

Respectfully, we are now deep into harassment, stalking, creepy, weird territory.

Please consider this a Complaint.

Please let's do the return to direct report to the Superintendent and put some space between me and Mr. Drapeaux. And
take the burden of managing this off me.

And have someone warn Drapeaux to stay away from my home.

Thank You.


Sincerely,

Elston
928-255-8727
[Quoted text hidden]



Stephenson, Elston <elston_stephenson@nps.gov>

# EEO Complaint - Please Stop Humiliation, Embarrassment and Undermining of First Aid Training

**Stephenson, Elston** <elston_stephenson@nps.gov>                     Tue, Apr 23, 2019 at 6:34 AM
To: "Creachbaum, Sarah" <sarah_creachbaum@nps.gov>
Cc: Mary Kendall <mary_kendall@doioig.gov>, NPS GRCA Executive Team <grca_executive_team@nps.gov>

Sarah,

Good Morning.

This is not a pleasant email.

This is a report to You of bizarre, harassing behavior which crosses the legal threshold of stalking (18 U.S.C. §2261 A) of me and the instructors that I have hired to conduct the first aid/CPR/AED training. And to prevent an escalation which may end up in non-NPS civilians calling the police on NPS persons.

I will include the Inspector General along with PSET because the potential escalation and potential criminal and civil liabilities extend beyond the gates of GRCA. And I should not be burdened with resolving these.

I want it to stop----cease and desist immediately.

I do not want anyone 'showing up' and 'watching my instructors' as I've experience and outlined below.

Immediately following this email, I am going to head down to Flagstaff to welcome the instructors and ensure that they have what they need to provide the best training to our people.

Ma'am, this is an IG Complaint in the making. I will file a formal complaint with the IG when I get back and settled.


On Tuesday night April 16, 2019 I received an unusual text (attached) from Dep Superintendent Brian Drapeaux. The text ordered me to limit the class size of the First Aid/CPR/AED class the next day.  Surprisingly, it went on to tell me that although we have plenty of first aid mannequins that are not being used at all, that I would not be allowed to use them in the upcoming training.

It also went on to describe in great detail the composition of the Tusayan Fire Department (who was providing the training) instructors and their capabilities.

This level of meddling by a Superintendent struck me as strange and inappropriate. Brian never took any interest in the training from start to finish. Never offered to help plan or facilitate it. Worse, his telling me that I would not be able to use GRCA mannequins decidedly sought to limit the size of my class, when typically Superintendents role is to go out of their way to maximize training.

He then instructed me to put out an email which would have humiliated me and turned away perspective attendees.

Of course I ignored it.

He also appears to have sent the text to SRM Chief for some reason.


On Wednesday, April 17, 2019 LE Deputy Chief Dana Sullivan showed up at the First Aid/CPR/AED class. She said that the was ordered by the Acting Chief to either watch me or watch my class.  She could not tell me what she was watching for.

She then demanded to know who it was that I had hired to teach the remaining courses.

I told her firmly that this was my training event it was not her concern what the arrangements were, and to not get in the way.

This was very unusual and disconcerting and embarrassing for the instructors. One mentioned that he had never had anyone 'watch' him before.

Yesterday Monday, April 22, 2019 as I met with the instructor that I arranged to give the Flagstaff class, she told me that someone called her and interrogated her on the class that she is giving to us.

She too was made to feel uncomfortable. And like the folks from the fire department, remarked that she had been instructing for decades and never ever had anyone interrogate or 'check' on her before.

Tracking her down and hounding her really took quite a bit of effort.

This clearly meets the criminal code for stalking, 18 U.S.C. §2261 A.

The instructor has every right to call the police and make a criminal complaint as I have apologized profusely to her, and assured her that it will not happen again.

The criminal and civil liabilities that the NPS folks have engaged in is bizarre.

Please. I would like this to cease and desist.

It is very humiliating and embarrassing as a GS-13 to have a GS-12, GS-5 or 7 'checking on me'.

It is very humiliating, embarrassing, and undermining in my relationship with the instructors that I have found, vetted, and contracted to have them subjected to hounding, stalking, interrogation, being watched.

It is embarrassing to the Park to have to report to instructors who are helping us out that we cannot support them by giving them mannequins---and would rather have them sitting in a closet somewhere doing no good whatsoever.

So that I don't have to endure any more humiliation in front of either the class attendees, or the instructors that I've contracted, or so that no one 'shows up' and 'watches' my instructors at this morning's (or any future classes) I am asking You to make this cease and desist.

Let's cease and desist the GS-5s, GS-7s or whoever checking on me, harassing, or stalking my instructors.

Let's cease and desist any and all interference, meddling, and undermining of the training that I have arranged.

Ordinarily you would expect support for safety training from the Superintendent's Office not this.

Sarah, I've simply never heard of anything like this.

Let's find a way to support the potentially life saving training.

Again, I will wrap this all up in (at least) a formal IG complaint and insist on a formal investigation.

I want it to stop. Now.

Thank You.


Sincerely,


Elston
928-255-8727


Reference

Cornell Law (2019). Title 18 *crimes and criminal procedure. part 1 crimes. chapter 110A. domestic violence and stalking section 2261A. stalking* Retrived from https://www.law.cornell.edu/uscode/text/18/2261A



**IMG_1887.png**
**795K**

8/11/2019        DEPARTMENT OF THE INTERIOR Mail - EEO Complaint - Please Stop Humiliation, Embarrassment and Undermining of First Aid Training



Stephenson, Elston <elston_stephenson@nps.gov>

# EEO Complaint - Please Stop Humiliation, Embarrassment and Undermining of First Aid Training

Creachbaum, Sarah <sarah_creachbaum@nps.gov>                    Tue, Apr 23, 2019 at 1:07 PM
To: "Stephenson, Elston" <elston_stephenson@nps.gov>, Mary Kendall <mary_kendall@doioig.gov>, Matt Vandzura
<matt_vandzura@nps.gov>

Dear Elston,

I have received your email. Prior to beginning any investigation of your claim, my first step has been to ask Chief
Vandzura to ensure that no member of his staff observe or contact any instructor of any future first aid training you have
organized.  This action should address your immediate concern while the matter is investigated.

I am concerned for your well being and want you to know that I am available for further conversation or of course the
employee assistance program (espyr I-800-969-0276) is available 24 hours a day and 7 days a week.

Sincerely,
Sarah


On Tue, Apr 23, 2019 at 6:35 AM Stephenson, Elston <elston_stephenson@nps.gov> wrote:
[Quoted text hidden]


--
M. Sarah Creachbaum
Acting Superintendent
Grand Canyon National Park
P.O. Box 129
Grand Canyon, AZ 86023
928-638-7945

DRAPEAUX FIRST AID INTEFERENCE
INSTRUCTOR STALKED - ARMED
NATIONAL PARK SERVICE
Verizon
5:50 AM
GRCA Brian...
GCNP Jeann...
Brian, Good Afternoon. I am going to put in for 2 hours work today. I had to remove the 'uranium buckets' from the Museum Collections building. Just finished up. Thank You.
Hi Elston. For tomorrow training it will be capped at 12 people because only two instructors are available. Tusayan has 2 instructors and 4 mannequins so class is capped at 12 students total. 6 per instructor. This is same for both tomorrow and the class scheduled for 4/26. GRCA doesn't have instructors or mannequins to spare.
Notifications should go out prior to the 8 am start so staff know.
Verizon
7:49 AM
CPR Instruct Teri Tallent
You'll see this sign as soon as You make the left off Hwy 64 onto Center Road...
The sharp left will come up in like 1 block after the sign. Then just follow the S curving road, pass by the Airfield, then You'll see this FMD building...the Conference Room is on the bottom floor right thru the double doors...
Please don't forget to leave your pistol and your taser in the car
Eric went through the gate and they didn't charge him and we will call





# EXHIBIT C

7/30/2019                    DEPARTMENT OF THE INTERIOR Mail - URGENT; Need Help Getting Safe Space Away from Brian Drapeaux



                                                    Stephenson, Elston <elston_stephenson@nps.gov>

---

## URGENT; Need Help Getting Safe Space Away from Brian Drapeaux

**Stephenson, Elston <elston_stephenson@nps.gov>**                    Thu, Jul 25, 2019 at 4:47 PM
To: Woody Smeck <woody_smeck@nps.gov>
Cc: "Raymond (David) Vela" <david_vela@nps.gov>, Chip Jenkins <chip_jenkins@nps.gov>, Roosevelt Wilson
<roosevelt_wilson@nps.gov>

Woody,

Sir, Good Afternoon.

I had a worker stop into my office about an hour ago to warn me that Brian Drapeaux was suspiciously making loops around the block looking, in on my place on Monday morning, July 22, 2019.

This is the second worker to warn me like this in the last month or so.

This is that "safety concern" that I mentioned to You soon after the first reporting.

And the reason that my family did not come to stay during the 4th of July week.

Also among the reasons that have requested 8 times in the last 9 months to have me returned to direct report to the GRCA Superintendent.

Respectfully, we are now deep into harassment, stalking, creepy, weird territory.

Please consider this a Complaint.

Please let's do the return to direct report to the Superintendent and put some space between me and Mr. Drapeaux. And take the burden of managing this off me.

And have someone warn Drapeaux to stay away from my home.

Thank You.


Sincerely,

Elston
928-255-8727
[Quoted text hidden]



Stephenson, Elston <elston_stephenson@nps.gov>

## Harassing Conduct Complaint Receipt

**Anti-Harassment Tracking** <anti_harassment_tracking@mailer.itc.nps.gov>        Fri, Jul 26, 2019 at 4:15 PM
Reply-To: anti_harassment_tracking@mailer.itc.nps.gov
To: elston_stephenson@nps.gov

Greetings,

This email serves as a receipt that a harassing conduct complaint was submitted, and assigned to the appropriate representatives. We at the National Park Service take discrimination and harassment very seriously. We appreciate your due diligence as a National Park Service employee. If the National Park Service employee relations or other designated official has any questions or clarification about this complaint, they will contact you directly.

**Complaint/Case Information Summary:**

Case Subject: Intermountain Region-GRCA-Race
Case Number: 868

Date Submitted: 07/26/2019.

## NATIONAL PARK SERVICE

## HARASSING CONDUCT ALLEGATION ACKNOWLEDGEMENT FORM NOTIFICATION OF RIGHTS AND RESPONSIBILITIES

**Employees who believe they have been subjected to harassing conduct have the <u>right</u> to:**

1. Report the matter immediately to any NPS supervisor or management official, any employee relations specialist, or the Office of Inspector General;

2. In addition to filing a report, they also have additional avenues for individual relief and remedies and access to non-filing support options (see below);

3. Present and pursue the allegation of harassing conduct free from restraint, interference, coercion, harassment, and reprisal (see below);

8/11/2019                          DEPARTMENT OF THE INTERIOR Mail - Rights and Responsibilities Notification



Stephenson, Elston <elston_stephenson@nps.gov>

## Rights and Responsibilities Notification

**Smeck, Woody** <woody_smeck@nps.gov>                          Fri, Jul 26, 2019 at 4:13 PM
To: Elston Stephenson <elston_stephenson@nps.gov>

Elston,

As we discussed today, I have entered your complaint into the DO16E Anti-Harassment Tracking System.  The complaint
has been transmitted to the Regional HPOC for processing.

Attached please review and sign the Notification of Rights and Responsibilities Statement.  I will need your signature on
the Notification today if possible, or no later than Monday morning when we meet at 8am in my office.

Thank you for your time today.


Woody Smeck
Acting Superintendent
Grand Canyon National Park
P.O. Box 129
Grand Canyon, AZ 86023
---
(928) 638-7945 office
(559) 788-9247 mobile


 **DOC.pdf**
    491K



## NATIONAL PARK SERVICE
### HARASSING CONDUCT ALLEGATION ACKNOWLEDGEMENT FORM
### NOTIFICATION OF RIGHTS AND RESPONSIBILITIES

Employees who believe they have been subjected to harassing conduct have the <u>right</u> to:

1. Report the matter immediately to any NPS supervisor or management official, any employee relations specialist, or the Office of Inspector General;

2. In addition to filing a report, they also have additional avenues for individual relief and remedies and access to non-filing support options;

3. Present and pursue the allegation of harassing conduct free from restraint, interference, coercion, harassment, and reprisal.

4. Have their allegations taken seriously and handled appropriately,

Employees reporting harassing conduct have the <u>responsibility</u> to:

1. Fully cooperate with the presentation of information, to include scheduling of interviews or meetings, responding to correspondence, and providing requested material or information, in the processing of their allegations of harassing conduct.

2. Keep the Agency informed of their contact information.

3. Notify NPS of any questions or concerns about the Anti-Harassment Process.

I understand my rights and responsibilities. I have been given a copy of RM-16E which explains, among other things, other avenues for relief and support.

| | | |
|---|---|---|
| *Eileen LeVas Stephens* | 7/28/2019 | GRCA |
| Employee Reporting Harassment Conduct | Date | Unit |
| *Wendy Smell* | 7/26/19 | GRCA |
| Person taking the complaint | Date | Unit |



Stephenson, Elston <elston_stephenson@nps.gov>

## Harassing Conduct Complaint Receipt

Anti-Harassment Tracking <anti_harassment_tracking@mailer.itc.nps.gov>          Fri, Jul 26, 2019 at 4:15 PM
Reply-To: anti_harassment_tracking@mailer.itc.nps.gov
To: elston_stephenson@nps.gov

Greetings,

This email serves as a receipt that a harassing conduct complaint was submitted, and assigned to the appropriate representatives. We at the National Park Service take discrimination and harassment very seriously. We appreciate your due diligence as a National Park Service employee. If the National Park Service employee relations or other designated official has any questions or clarification about this complaint, they will contact you directly.

**Complaint/Case Information Summary:**

Case Subject: Intermountain Region-GRCA-Race
Case Number: 868

Date Submitted: 07/26/2019.

## NATIONAL PARK SERVICE

## HARASSING CONDUCT ALLEGATION ACKNOWLEDGEMENT FORM NOTIFICATION OF RIGHTS AND RESPONSIBILITIES

**Employees who believe they have been subjected to harassing conduct have the right to:**

1. Report the matter immediately to any NPS supervisor or management official, any employee relations specialist, or the Office of Inspector General;

2. In addition to filing a report, they also have additional avenues for individual relief and remedies and access to non-filing support options (see below);

3. Present and pursue the allegation of harassing conduct free from restraint, interference, coercion, harassment, and reprisal (see below);

4.  Prompt notification upon completion of the anti-harassment process that the fact-finding has been completed but will not receive a copy of the resulting report or information about any disciplinary actions taken against any other employees(in accordance with RM 16E Section (2)(10));

5.  Have their allegations taken seriously and handled appropriately.

**Employees alleging harassment have the <u>responsibility to</u>:**

1.  Fully cooperate with the presentation of information, to include scheduling of interviews or meetings, responding to correspondence, and providing requested material or information, in the processing of their allegations of harassing conduct.

2.  Keep the Agency informed of their contact information.

3.  Notify NPS of any questions or concerns about the Anti-Harassment Process.

**What you need to know about retaliation.**

A manager or supervisor may not fire, demote, harass, or otherwise take any personnel action against an individual for reporting an allegation of misconduct under this policy. Retaliation might deter a reasonable person from opposing prohibited activities and discrimination, providing information about an allegation, or participating in an established complaint process. Protected activity under this policy could include reporting alleged misconduct, being a witness in an inquiry or investigation, complaint, or lawsuit, communicating with a supervisor or manager about employment discrimination or harassment, resisting sexual advances or harassing behavior from a supervisor or manager, or intervening to protect others who may have suffered discrimination. Participating in a complaint process is protected from retaliation under all circumstances.

Engaging in protected activity under this policy does not shield an employee from all personnel actions. Supervisors and managers can take personnel actions, including discipline and removal, if they are motivated by *non-retaliatory and non-discriminatory* reasons that would otherwise result in such consequences (e.g., transferring an employee for legitimate business reasons, closely monitoring the performance of an employee who is having performance issues).

The following are examples of personnel actions that would be unlawful retaliation if they were taken because of, or were motivated by, an employee's protected activity:

- Transferring the complainant or witness against his or her will;
- Ignoring or not communicating with the complainant or witness;
- Changing work assignments of the complainant or witness without a valid work-related rationale;
- Withholding work-related information from the complainant or witness;

- Disciplining the employee or giving a performance evaluation that is lower than it should be based on the employee's actual work performance;
- Engaging in verbal or physical abuse or other activities prohibited by this policy;
- Threatening to make, or actually making reports to authorities without a valid reason; and
- Increased scrutiny of work performance or conduct.
- 
- **Additional Avenues for Relief or Remedies**

DO16E is designed to stop harassing conduct that has occurred as soon as possible and to deter its occurrence in the future. However, corrective action under DO 16E does not provide the remedies (*e.g.*, compensatory damages) that may be available through the EEO, grievance, or other processes.

If you believe you have experienced harassing conduct and want to seek relief or remedies, you should know that filing a report under 16E does *not* satisfy the requirements for filing an EEO complaint, negotiated grievance, or other procedure and obtaining remedies pursuant to them. Nor does it delay the time limits for initiating those procedures. If you wish to pursue statutory, administrative, or collective bargaining remedies for unlawful harassment, the following avenues are available.

**For an EEO complaint pursuant** to **29 C.F.R. § 1614** (available for all claims of illegal harassment other than those based on status as a parent, marital status and political affiliation), contact an EEO counselor in the NPS's Equal Employment Opportunity Offices within 45 days from the most recent incident of alleged harassment (or personnel action, if one is involved), as required in 29 C.F.R. § 1614.105(a)(1).

**For a negotiated grievance claim,** contact your local union representative to file a grievance in accordance with the provisions of the applicable Collective Bargaining Agreement.

**For an administrative grievance claim,** file a written grievance in accordance with the provisions of 370 DM 771, Administrative Grievance Procedures. For more information, ask your Employee Relations Specialist.

**For an appeal to the Office of Special Counsel (OSC)** regarding claims of harassment related to marital status and political affiliation, pursuant to 5 U.S.C. §2302(b)(1) and (b)(10), you may file a written appeal with the OSC as described in 5 C.F.R. §1800.1 and on www.osc.gov.

**For an appeal to the Merit Systems Protection Board** pursuant to 5 C.F.R. § 1201.22, file a written appeal with the Board within 30 days of the effective date of an appealable adverse action as defined in 5 C.F.R. § 1201.3, or within 30 days of the date of receipt of the agency's decision, whichever is later.

## Additional Support Resources Available To Employees

Experiencing harassing conduct can be a very serious, somber, and perhaps emotional experience. Employees who have experienced harassing conduct have multiple resources available that can provide assistance and advice, including:

- Speaking with the Ombuds

    **Scott Deyo, 844-288-7046 (toll free),     scott_deyo@contractor.nps.gov**
    **Sigal Shoham, 844-775-7726 (toll free), sigal_shoham@ios.doi.gov**

    or consulting with or engaging in alternative dispute resolution procedures through a
    **CORE PLUS neutral;**

    Employees are encouraged to contact the Ombuds or other CORE PLUS neutrals to discuss any workplace related concerns, including those related to harassing conduct. An Ombuds is impartial, informal, and confidential resource that works independently from management's chain of command to explore and aid in the resolution of individual and systemic issues affecting an organization. Conversations with Ombuds and other CORE PLUS neutrals are confidential and informal, and provide the employee a safe place to explore options for addressing their concerns. Ombuds and CORE PLUS neutrals are not obliged to report discussions (outside of imminent risk of harm), and as a result, engaging with an Ombuds or other CORE PLUS neutral does not constitute a report under this policy.

- Engaging the services provided by the Employee Assistance Program, call (800) 869-0276 or go to espyr.com, login:  interioreap;

- Consulting with a union representative, if covered by a bargaining unit

- Informal networks and support available through the various Employee Resource Groups

Engaging with these resources *does not* constitute a report under this policy, as these entities <u>do not</u> have an obligation to inform management of allegations of harassing conduct.

For more information on the National Park Service Anti-Harassment Policy, select here for the Reference Manual 16E.

8/5/2019 DEPARTMENT OF THE INTERIOR Mail - Harassing Conduct Complaint Receipt



Stephenson, Elston <elston_stephenson@nps.gov>

## Harassing Conduct Complaint Receipt

**Anti-Harassment Tracking** <anti_harassment_tracking@mailer.itc.nps.gov>           Fri, Jul 26, 2019 at 4:15 PM
Reply-To: anti_harassment_tracking@mailer.itc.nps.gov
To: elston_stephenson@nps.gov

Greetings,

This email serves as a receipt that a harassing conduct complaint was submitted, and assigned to
the appropriate representatives. We at the National Park Service take discrimination and
harassment very seriously. We appreciate your due diligence as a National Park Service
employee. If the National Park Service employee relations or other designated official has any
questions or clarification about this complaint, they will contact you directly.

**Complaint/Case Information Summary:**

Case Subject: Intermountain Region-GRCA-Race
Case Number: 868

Date Submitted: 07/26/2019.

### NATIONAL PARK SERVICE

### HARASSING CONDUCT ALLEGATION ACKNOWLEDGEMENT FORM NOTIFICATION OF

### RIGHTS AND RESPONSIBILITIES

**Employees who believe they have been subjected to harassing conduct have the right to:**

    1.  Report the matter immediately to any NPS supervisor or management official, any
employee relations specialist, or the Office of Inspector General;

    2.  In addition to filing a report, they also have additional avenues for individual relief
and remedies and access to non-filing support options (see below);

    3.  Present and pursue the allegation of harassing conduct free from restraint,
interference, coercion, harassment, and reprisal (see below);



## OFFICE OF
# INSPECTOR GENERAL
### U.S. DEPARTMENT OF THE INTERIOR

### GENERAL
### Hotline Complaint Form

**Your Hotline Complaint Form E003625 has been submitted for review by the OIG. Please retain this reference number and a copy of your complaint for your records. Thank You.**

If you suspect fraud, waste, abuse, misconduct, or mismanagement involving the U.S. Department of the Interior, please complete and submit this form by pressing the SUBMIT button below. If you are unable to submit this form directly online, you may select one of the alternative methods listed at the bottom of this form.

*By submitting this complaint, I understand I am providing my name and I agree that the DOI OIG can disclose my name and other information I provide, if necessary, to ensure my issues are addressed.*

Fields marked with * are required.

**Your Contact Information**

| | |
|---|---|
| First Name * | **Elston** |
| Last Name * | **Stephenson** |
| Select Your Current Status | **DOI Employee** |
| | |
| If select 'Tribal Member', please include Tribal Affiliation: | |
| Title/Grade | **GS-13** |
| Address | **1616 Barry Hance Circle** |
| City | **Grand Canyon National Park** |
| State | **Arizona(AZ)** |
| Zip Code | **86023** |



Stephenson, Elston <elston_stephenson@nps.gov>

## Update on investigation

**Smeck, Woody <woody_smeck@nps.gov>**                                    Thu, Aug 15, 2019 at 12:37 PM
To: Mark Rubic <mark_rubic@nps.gov>, Annette Martinez <annette_martinez@nps.gov>
Bcc: elston_stephenson@nps.gov

Annette,

As you know, I submitted a DO-16E complaint in the anti-harassment tracking system containing allegations made by Elston Stephenson against his supervisor, Brian Drappeaux.

Elston has asked for an update on the investigation and when he should expect to be contacted. Can you provide an update, or direct him to the appropriate ER specialist? Sean Quinn is on annual leave.

Also, for awareness, Elston will be on annual leave in September.


Woody Smeck
Acting Superintendent
Grand Canyon National Park
P.O. Box 129
Grand Canyon, AZ 86023
---
(928) 638-7945 office
(559) 788-9247 mobile

10/22/2019                          DEPARTMENT OF THE INTERIOR Mail - Update on investigation



Stephenson, Elston <elston_stephenson@nps.gov>

## Update on investigation

**Stephenson, Elston** <elston_stephenson@nps.gov>                          Fri, Aug 16, 2019 at 6:50 AM
To: Annette Martinez <annette_martinez@nps.gov>, Mark Rubic <mark_rubic@nps.gov>

Annette Martinez, Mark Rubic,

Good Morning.

My name is Elston Stephenson. I am the Safety Manager at Grand Canyon National Park. I

Back on July 25, 2019 a worker went out of his way to stop by my office to warn me that while working on July 22, 2019 he spotted GRCA Dep Superintendent Brian Drapeaux slowly suspiciously driving around my street in a Government vehicle, then stopping to scope out my house. (text and emails attached). In a July 26, 2019 meeting with Woody Smeck and Sean Quinn I was told that this was being handled by IMR. I asked that a third-party investigator be assigned, and was told one would be. I have not heard from anyone at all in the 3 weeks since.

No one has contacted me to do an interview, pass along evidence. Nothing in 3 weeks.

I received a 16E Harassing Conduct Complaint Receipt on July 26, 2019

A spouse say something similar to me about Drapeaux about a month earlier. I cannot find her as this was during the summer break and parents that were out and about have changed their patterns and no longer out in the neighborhoods with their kids as school has begun.

This has me deeply worried, and scared for my family's safety, and is the escalation of a pattern of harassment which is increasing in tempo, brazenness, hostility, aggressiveness, and most alarmingly proximity to my person and my family space. This pattern is clearly escalating soon to confrontation and violence.

Earlier incidents include somehow watching, tracking, surveilling, and stalking me at 5:30am in the morning.

Earlier Drapeaux aggressively inserted himself into First Aid/CPR training that I was organizing. Inexplicably and inappropriately---not to mention unheard of for a Superintendent imposed himself down to the level of telling me the capabilities of the neighboring fire department that I had contacted to conduct one of the trainings. He then ordered me to limit the size of the classes and denied me the use of mannequins vital to increasing the number of attendees that we could train. Unknown to him I had several instructors standing by to respond to the numbers of students that we had. On the day of the class LE Dep Chief Dana Sullivan showed up to the class. So there she was, this armed person standing foreboding and authoritatively at the door of this training. Not only did attendees remark to me about it, but so did the instructors---saying that they had never been "watched" before. When I confronted her, she said that she was ordered to watch me and the class.

He also ordered me to limit the size of other classes by American Heart Association instructors that I had contracted. As I met with her to settle final details, she told me with alarm of how several people had tracked her down and called to grill her on her curriculum, her qualifications, etc. This means that someone went through the AHA and likely contacted others before getting to her. She was so scared by this stalking that she brought along a former U.S. Army Ranger, a gun, and a Taser for her protection. The only way I was able to calm her down was to assure her that I would be present at every moment of the training. Clearly, this had the possibility of being dangerous.

As DOIIG report 18-1188 details, I was originally assigned direct report to the Superintendent. I have repeatedly begged DOI, NPS, successive GRCA Superintendents for safe separation (re-assigning me to direct report to the Superintendent) for nearly a year specifically because I could foresee retaliation and reprisal (attached). All were ignored.

The entire Lehnertz confrontation over me and its revelations alone should have been reason enough to re-assign me. This sick, conflicted arrangement---an clear pattern of nearly a year's worth of pretext probing, hostility, lying, undermining, and stalking; and lack of legally required leadership action make decision makers culpable in the abuse that I have endured and what's to come.

The brazenness of coming to my home crosses a dangerous, arrogant threshold. A look at a map (attached) clearly shows that my street loops into what is essentially a dead end. Drapeaux was not just passing by. He was not on his way

to somewhere. He was targeting me and my family.

It was the earlier aggressive patter of stalking and harassment which had me call off plans to have my family stay for July 4th week.

I have guest coming soon. I am concerned for their safety as well.

This is one of those situations where something goes tragically wrong, then everyone is left muttering "How did this happen?" "How could we have not seen or acted on the red flags and warning signs?"

Respectfully, I have no faith in the 16E process.

Perhaps another process will get it done.

Thank You.


Sincerely,

Elston L Stephenson, OHST
Safety Health & Wellness Manager
Tort Claims Officer
Grand Canyon National Park
928-255-8727
[Quoted text hidden]

---

**6 attachments**

📄 **Stephenson EEO Drapeaux Stalking Text.pdf**
   391K

📄 **Stephenson Affidavit 36 - Drapeaux Inspired Stalking Resulting in Fire Arm Carry.pdf**
   227K

📄 **Stephenson Request Remove re Retaliation 1-28-2019 Denied.pdf**
   66K

📄 **Stephenson Request Remove re Retaliation 5-20-2019 Denied.pdf**
   118K

📄 **Stephenson GRCA DOIIG Report 18-1188 Lehnertz.pdf**
   520K

📄 **Stephenson Affidavit - Drapeaux Stalking Stephenson's Home.pdf**
   140K



Stephenson, Elston <elston_stephenson@nps.gov>

## Update on investigation

**Rubic, Mark** <mark_rubic@nps.gov>                                          Mon, Aug 19, 2019 at 10:34 AM
To: "Stephenson, Elston" <elston_stephenson@nps.gov>

Mr. Stephenson,
I have received your email.  I attempted to call you but there was no answer and your voicemail was not available.
Please call me at your convenience and I will provide you a status update on the 16E matter.
Thank you.
Mark
[Quoted text hidden]
--
Mark J. Rubic
Employee Relations Officer
Intermountain Region
National Park Service
U.S. Department of the Interior
12795 W. Alameda Parkway
Lakewood, CO 80228
303-969-2749 office
303-594-1463 cell
mark_rubic@nps.gov

10/22/2019                    DEPARTMENT OF THE INTERIOR Mail - Return to Supervision under Deputy Superintendent



                                                          Stephenson, Elston <elston_stephenson@nps.gov>

## Return to Supervision under Deputy Superintendent

**Smeck, Woody** <woody_smeck@nps.gov>                         Thu, Sep 12, 2019 at 5:42 AM
To: Elston Stephenson <elston_stephenson@nps.gov>
Cc: Sean Quinn <sean_quinn@nps.gov>, Mark Rubic <mark_rubic@nps.gov>, Annette Martinez
<annette_martinez@nps.gov>, Brian Drapeaux <brian_drapeaux@nps.gov>

September 12, 2019

Memorandum

To:      Elston Stephenson, Occupational Safety and Health Program Manager

From:    Woody Smeck, Acting Superintendent

Subject:   Return to Supervision under Deputy Superintendent

On July 29, 2019 we met in my office to discuss allegations of harassment made by you against your supervisor, Deputy
Superintendent Brian Drapeaux. I informed you that I had entered the allegation into the NPS Anti-Harassment Tracking
System for further investigation and that the Regional HPOC would investigate the allegations.

I also informed you that I would temporarily assume supervision of your position until I received an opinion from the
regional office on whether a "no contact" order was required.

On August 13, 2019 I received direction from the regional office to return you to your previous supervisor. Therefore,
effective immediately, you will return to the supervision of Brian Drapeaux.

Please contact Sean Quinn, Employee Relations Specialist, if you have any questions regarding this matter.


Woody Smeck
Acting Superintendent
Grand Canyon National Park



Stephenson, Elston <elston_stephenson@nps.gov>

# Stephenson US Attorney Contact / Formal IG Complaint Failed 16E (Stalking), Falsified Statements Docs (OSHA)

**Stephenson, Elston** <elston_stephenson@nps.gov>                                    Tue, Oct 22, 2019 at 8:24 AM
To: David Bernhardt <dwbernhardt@ios.doi.gov>, Mark Greenblatt <mark_greenblatt@doioig.gov>

Mr. Secretary, General

Please consider this an update and formal IG complaint for fraudulent DOI/NPS 16E 'investigation' and false official statements and falsified documents by then GRCA Superintendent submitted to OSHA in an attempt to fraudulently 'beat the rap' on OSHA citations.

Sir, I was contacted by the U.S. Attorney's Office, Phoenix on Friday October 18, 2019. This made me recall that there was still these outstanding issues here at Grand Canyon National Park.

I also notified IMR that I would not be participating in the 16E process due to clear 'irregularities', lack of legitimate responsiveness, and actions which come nowhere close to resembling the protocols expressed in the DOI/NPS DO 16E policy. And after they showed up 3 months after the complaint to begin their 'investigation'. (attached)

Sir, the Stephenson Family is now officially in 'Default' on its home mortgage as a result of several requests being denied and forced to pay for professional training out of pocket (and forced to burn leave to attend) needed to maintain proficiency and OHST certification in violation of DOI/NPS 50B Chapt 5, Page 5. (attached)

Please also find that several attempts at getting training were denied by not responding and allowing the start dates to expire, then resorting to the common tactic of waiting until the last minute to feign an offer of alternatives. I became suspicious early.

My suspicions were already raised when the GRCA Superintendent knowingly and willfully submitted false statements and falsified documents to OSHA in order to 'beat the rap' on one of the OSHA citations issued in the 'uranium incident'--- OSHA 1366108 Notice 1, Item 2. (attached) by stating that GRCA had conduct the training required for abatement in the citation when he knew we had not. This (and other occasions) clearly demonstrated a propensity and willingness to not only falsify but to violate (felony) the law which made me weary.

Fraud in the DOI/NPS 16E is in regard to my complaint of stalking of my home (and other stalking events) by the GRCA Deputy Superintendent on XXX as witnessed by another GRCA worker.

Sir, please recall that that worker was so alarmed that he waited until the 'coast was clear' to come to my home and bang on the door in order to warn me. I was out of town. But the worker was still so concerned that he went out of his way to stop by my office to warn me days later.

When I first reported the stalking of my home by the Deputy Superintendent--witnessed by the GRCA worker, I had already expressly communicated to the GRCA Superintendent several earlier stalking incidents and my "deep concern" for my safety and for that of my family---particularly my young daughter. Those earlier concerns went ignored.

When he notified me of the opening of a formal DOI/NPS 16E Case 868 complaint (attached), he repeatedly and emphatically volunteered himself to conduct the 'investigation'. His ignoring my earlier pleading for my "deep concern" for my and my family's safety, the false official statements and falsified documents to other Government Agencies, and several instances that he was in cahoots with the stalking Deputy Superintendent had me forcefully insist on having a 'third party' conduct the investigation.  In a meeting with the HR representative, I showed him contemporaneous texts between me and the witness where the witness clearly expresses fear of retaliation for coming forward. I verbally told him as much along with the fact that this fear is spread across the GRCA workforce. But he insisted on knowing the worker's name. I gave it to him.

Approximately 3 weeks later, no one had contacted me. I got the feeling that I was being 'played' that the whole 16E was a farce, a ruse. And that efforts were being made by the GRCA Superintendent to bury the Deputy Superintendent's being caught red-handed stalking my home. After about the 2 week, I made preparations to go outside the DOI/NPS 'system' because I had no faith in it. My case strongly resembled the 'responses' called out in the DOI IG's report on the  rampant

sexual harassment onclave culture that went on here for years. In fact, my sense was this was exactly how it was allowed to endure.

I stopped in to see the GRCA Superintendent on approximately August 13, 2019 to inform him that no one had contacted me and to request an update. He told me that he had not heard anything and that Intermountain Region (IMR) had the case and that he would forward my update request. He again implored me that he could and should conduct the investigation himself. This concerned me. I again forcefully expressed that I wanted a 'third-party' to investigate. He 'cc'd' me on an email to IMR on August 15, 2019.

In preparation for filing for a restraining order against the Deputy Superintendent, I found not only was the witness/victim in the Deputy Superintendent inspired stalking---the contract First Aid/CPR trainer who was so afraid for her safety that she brought a former US Army Ranger escort, a gun and a Taser for her protection, too afraid to testify; but so was the GRCA worker witness to the Dep Superintendent's stalking of my home. What was most concerning was that in 3 weeks no one (DOI/NPS 16E investigation) had reached out to either of them. Being an investigator myself and knowing perishability of witness accounts, I found this alarming. My sense that the 16E was a fraudulent ruse was strengthened. I filed for the restraining order.

On August 16, 2019 I also 'pushed' investigation material---witness texts, email, etc to IMR since no one seemed to be doing ANY investigating.(attached). I received no receipt or acknowledgement of my material. This further increased my suspicion.

Concurrently, the entire pleading for professional training vital to maintaining my hard earned OHST certification was also showing itself to be a ruse. My initial requests back in April and May for June trainings were ignored. And the GRCA Superintendent waited until the last minute---to late to find alternatives, to tell me that he would not only deny funding for the training.  At first he played the 'I'm really concerned about the tuition cost. I don't want 'people' complaining about my spending more for your tuition that for others." game. I went back to the course headquarters with his concern. The waived all tuition costs. When I told the GRCA Superintendent this, he seemed disappointed, disoriented, confused. Then blabbered out that he would 'support' my burning leave and paying out of pocket for the training. He and the Dep Superintendent went through a lot of effort---likely burning more in staff hours than the entire cost of sending me to the course to confect 'other alternatives' which were not only 'beginners' safety courses (I'm an OSHA certificated instructor + BCSP OHST), but ultimately more costly than the course I had selected---revealing that this too was a ruse, and that the ultimate goal was to harm me---to have me lose my OHST certification.

Likewise, the GRCA Superintendent expressly refusing to grant Administrative Leave for the training was unnecessary and intended to inflict further harm to me. It also violated OPM guidelines for the use of administrative leave (attached)

The sure indication to me of the fraud of the 16E process was that while I attended the training, I stopped by the nearest NPS facility, Fort Pickens National Park to access my email and to check SMIS to see if workers were injured while I was away. In my email I found a letter from the GRCA Superintendent informing me that the Deputy Superintendent who had been removed as my supervisor as a 16E protocol had been ordered reinstated as my supervisor on August 13, 2019 by IMR. This was shocking because by this date not only had no investigator contacted or interview either me or the witness to the stalking, but what was more telling was that this was days before I stopped in to request an update and he forwarded his update request to IMR-- August 15, 2019.

Clearly there was fraud in the guise of a DOI/NPS 16E complaint and investigation going on---at least: 1. GRCA Superintendent was defrauding me when he feigned concern and offered to himself 'investigate' when IMR had already ordered the Dep Superintendent restored as my supervisor days earlier and/or 2. IMR had already come to its conclusion (evidence reinstating the Dep Superintendent as my supervisor) after purportedly conducting its 'investigation' without interviewing either me or the stalking witness and came to a conclusion by deliberately excluding our testimony---IMR frauding an 'investigation'. But either way at least the GRCA Superintendent was clearly trying to dupe and mislead me.

It became clear that no serious, legitimate 16E investigation was going to be done. And worse, that there was a lot of effort being put into duping me that there was.

Lastly, Sir, as a demonstration of the risk and the harm that these attacks, fraudulent behavior, retaliation, and discrimination pose for Service; not 1 week after returning from the training, I am being called on to investigate a possible aviation mishap---a contract helicopter possibly contacting a powerline with its slingload and causing disruption to the SCADA computerized control to the GRCA water distribution system---possibly contributing to the prolonged water outage that Grand Canyon recently suffered. (attached)

That I am now being called on to use the very skills of the training that I was forced to burn leave and pay out of pocket for clearly serves as proof that NPS should have funded the training instead of forcing the Stephensons missing 2 house payments and going into Default.

As I shared with the then GRCA Superintendent; GRCA is about to engage in its own 'Berlin Airlift' with the upcoming Pipeline project. There will be accidents. GRCA is NOT ready or positioned to prevent those accidents.

The video graphically shows that this incident may have been just moments from being catastrophic. We are not ready. Had I not stayed the course and paid out of pocket, not only would I have endangered losing my OHST; but we would likely never be ready.

My 'white papers' from the training are literally the ONLY planning done to address this fast-approaching onslaught.

Sir, respectfully, the fraud of the OSHA citations and attempts to implicate me in them are unfair. I should be entitled to run a Safety Program free of fraud and felony activity.

Sir, respectfully, I regard the stalking and forcing us to go into Default on our home in order to obtain professional training as an attack on our Family. I can't even bring my daughter her because of this stalking business.

No one in DOI or NPS has stepped up or done anything to help---on any of this.

Again, please regard the GRCA submitting fraudulent statements and falsified documents to OSHA in order to beat the rap on the OSHA citations; and the dubious '16E Investigation' formal IG complaints.

I intend to pursue the restraining order in the federal court system.

Thank You.

Sincerely,

Elston

Elston L Stephenson, OHST
Safety Health & Wellness Manager
Tort Claims Officer
Grand Canyon National Park
928-255-8727

---

**15 attachments**

📄 **Stephenson GRCA False StatementsFalsified Documents v OSHA Citation 1363108.pdf**
520K

📄 **Stephenson - 16E 'Update' and Return to Drapeaux Supervision.pdf**
129K

📄 **Stephenson - Bogus Training Offer.pdf**
413K

🎵 **Stephenson - Audio of Drapeaux Stalking Witness to Stephenson.m4a**
9959K

📄 **Stephenson - Complaint Drapeaux Stalking Home (DOI Harassing Conduct Complaint 16E 868).pdf**
55K

📄 **Stephenson - Drapeaux Stalking Stephenson's Home DOI-NPS 16E Case 868.pdf**
193K

📄 **Stephenson - DOINPS 16E Complaint Notice - Drapeaux Stalking - Case E003625.pdf**
97K

📄 **Stephenson - Drapeaux Stalking Stephenson's Home.pdf**
140K

📄 **Stephenson - Drapeaux Stalking Text.pdf**
391K

📄 **Stephenson - GRCA DOI-NPS 50B Excerpt Req Required Cert Safety Officer's Training Pro**

88K

**Stephenson - GRCA Request Professional Training.pdf**
63K

**Stephenson - OPM Administrative Leave Policy.pdf**
205K

**Stephenson - GRCA IMR Receipt 16E Case 868.pdf**
33K

**Stephenson - GRCA False StatementsFalsified Documents v OSHA Citation 1363108.pdf**
520K

**Stephenson - White Paper Pipeline Aviation Safety.pdf**
421K

# EXHIBIT D

1/30/2019                    DEPARTMENT OF THE INTERIOR Mail - URGENT HELP: Uranium Exposure at Grand Canyon National Park



Stephenson, Elston <elston_stephenson@nps.gov>

## URGENT HELP: Uranium Exposure at Grand Canyon National Park

**Stephenson, Elston** <elston_stephenson@nps.gov>                          Thu, Dec 20, 2018 at 5:07 AM
To: Secretary Zinke <secretary_zinke@ios.doi.gov>
Cc: David Bernhardt <dwbernhardt@ios.doi.gov>, Mary Kendall <mary_kendall@doioig.gov>

Secretary Zinke,

Sir Good Morning.

I was sorry to hear of your imminent departure. But, Sir, I'm respectfully asking you, as an Operator, to 'service' one more
target before you go.

Please consider this a continuation of my Formal Complaint.

Sir, 1000s of Grand Canyon National Park (GRCA) workers and visitors---particularly young children appear to have been
exposed to uranium levels that appear to be 100s of times the NRC limits for the general public as they attended tours
and shows here. The same is likely true for our workers.

Sir, in pictures (attached) you will see a large case with taxidermied animals. Just to the left (facing) of the case is where
three 5 gallon buckets of uranium were stashed. One bucket was piled so high with uranium that it could not be
completely closed. On the floor just in front of the case is where tours of children would sit to take in animal shows---just a
few inches to a few feet (at most) from the buckets of emitting uranium.

At least one NPS employee working in the vicinity of the material contracted cancer and survived. At least one NPS
employee working in the vicinity of the material contracted cancer and died.

The three 5 gallons buckets of uranium were stashed away in the GRCA Museum Collections building back in 2000.  I
started working here June 26, 2017, It was reported to me on June 11, 2018. I instantly contacted the InterMountain
Regional Headquarters (IMR) for help. They sent out an NPS IMR uranium 'expert'. Immediately upon his arrival, the
GRCA Superintendent, the IMR Safety Manager, and the responding IMR uranium expert made a pact to explicitly secret
and hide any of their findings, measurements, etc from me---and from the employees working in the building---in violation
of the OSHA 'Right-to-Know Law'.

Please receive this report that I just received last night (pdf). It was hidden from me until now.

Sir, when you compare the numbers on page 1 to the Nuclear Regulatory Commission's (NRC) limits on their webpage
10CFR §20.1302 Compliance With Dose Limits For Individual Members of the General Public; You will see that the 0.02
mSv/hr hourly limit listed in 10CFR §20.1302(b)(2)(ii) is exceeded several thousand times over---especially as you
consider the kids sitting there on the floor for the show.

But, Sir, it gets worse when you consider that NRC's webage 10CFR §20.1207 Occupational Dose Limits for Minors
states that minor-aged children are limited to just 1/10th the exposure of adults.

Sir, between 2000 and June 18, 2018 we have likely exposed 1000s of Americans to excessive levels of uranium at
Grand Canyon National Park.

Beyond the retaliation and hostility that I have faced as a result of trying to bring this forward and protect my workers---in
violation of the Whistleblower Law; the attempts to cover this up, and the amateurish IMR response may be criminal.

I have already described the secret pact made between the GRCA Superintendent and IMR personnel---there may be
others in IMR beyond just these three that I know of. Please receive this other 'report' (MSWord) that the IMR responding
'expert' forwarded 2 weeks ago when pressed. Clearly, you can see that he deliberately delated items 4 thru 7 in an
attempt to hide those potentially deadly exposure readings.

Respectfully Sir, what may be just as criminal is that the GRCA Superintendent and the IMR personnel knew of these
exposures to our workers for thes past 6 months and did nothing to inform, advise, or care for them. In fact, the departing
IMR uranium expert told them that they had nothing to worry about---they were "good".

The workers were also told that they had nothing to worry about when the uranium was first dumped on them back in 2000.

My concerns were raised when not only did it take the IMR uranium expert 4 days to get here (June 14, 2018), but he had to divert to another park to borrow a radiation measuring device (Ludlum). As you may know, Sir, uranium 'off-gasses' radon. Yet he brought no radon measuring equipment. He brought his wife who is also a non-NPS uranium expert. Although she assisted him, she does not appear anywhere in the 'report'. Neither of them had what would be expected personal protective equipment (PPE). It was such an amateurish response that they had to go to the tourist General Store here at the Park and purchase several pairs of common dishwasher gloves as their PPE. They resorted to tearing off the head of a mop and using the mop handle to move the buckets of uranium (pic).

Between the June incident and August, I kept pestering for information in order to inform my workers, but received none. I was told to await the report.

In an August EEO federal mediation session, the GRCA Superintendent slipped and revealed the secretive pact that she made with the IMR Safety Manager and IMR responding uranium expert.

When I found this out, I decided to call OSHA, the NRC, and notified Congress with a formal complaint in order to get the help and information I needed to help my workers. OSHA responded like pros. They even came with a detachment of active duty USAF uranium experts fully equipped and clad to measure and ensure our safety (November 29, 2018). However this was 6 months after the fact. The uranium had already been removed and dumped at a local mine. There was little for them to measure—except for the fact that the amateurish IMR crew brought the buckets back to the office space where they continued emitting.

Sir, respectfully, I know and understand that you are busy. I know your're leaving.

Respectfully, your country needs you to do one more thing before you go; take care of this.

Sir, I need your help. Please. My workers need your help. The 1000s of Americans who were exposed for over 18 years to uranium—particularly the children need your help.

Thank You.

And, Sir, Thank You for Your Service.


Very Sincerely & Respectfully,

CW4(ret) Elston "Swede" Stephenson, OHST
Safety Health & Wellness Manager
Grand Canyon National Park
928-255-8727


References

NRC (2018). Nuclear Regulatory Commission, *Regulation of radioactive materials*. Retrieved from
https://www.nrc.gov/about-nrc/radiation/protects-you/reg-matls.html

NRC (2018). Nuclear Regulatory Commission, 10CFR §20, *Standards for protection against radiation*. Retrieved from
https://www.nrc.gov/reading-rm/doc-collections/cfr/part020/

NRC (2018). Nuclear Regulatory Commission 10CFR §20.1207, *Occupational dose limits for minors*. Retrieved from
https://www.nrc.gov/reading-rm/doc-collections/cfr/part020/part020-1207.html

NRC (2018). Nuclear Regulatory Commission 10CFR §20.1302, *Compliance with dose limits for individual members of the public*. https://www.nrc.gov/reading-rm/doc-collections/cfr/part020/part020-1302.html

NRC (2018). Nuclear Regulatory Commission 10CFR §20.1801 *Control and storage of licensed material*.  Retrieved from https://www.nrc.gov/reading-rm/doc-collections/cfr/part020/part020-1801.html

NRC (2018). Nuclear Regulatory Commission 10CFR §20.1802 *Control of material not in storage*.  Retrieved from
https://www.nrc.gov/reading-rm/doc-collections/cfr/part020/part020-1802.html

1/30/2019 DEPARTMENT OF THE INTERIOR Mail - URGENT HELP: Uranium Exposure at Grand Canyon National Park

Translater's Café (2017). TranslatorsCafe.com. *Unit converter*. Retrieved from https://www.translatorscafe.com/unit-converter/en/radiation/27-24/milliroentgen-hour-microsievert/hour/?mobile=1

**17 attachments**



**Stephenson GRCA Uranium 1.jpg**
703K



**Stephenson GRCA Uranium 2.jpg**
525K



**Stephenson GRCA Uranium 3.jpg**
1010K



**Stephenson GRCA Uranium 4.jpg**
893K

**Stephenson GRCA Uranium 6.jpg**
913K





**Stephenson GRCA Uranium 7.jpg**
894K



**Stephenson GRCA Uranium 8.jpg**
904K



**Stephenson GRCA Uranium 9.jpg**
654K



**Stephenson GRCA Uranium 10.jpg**
585K

**Stephenson GRCA Uranium 11.jpg**
601K





**Stephenson GRCA Uranium 12.jpg**
665K



**Stephenson GRCA Uranium 13.jpg**
622K



**Stephenson GRCA Uranium 14.jpg**
595K



**Stephenson GRCA Uranium 15.jpg**
582K

**Stephenson GRCA Uranium 16.jpg**
606K

1/30/2019          DEPARTMENT OF THE INTERIOR Mail - URGENT HELP: Uranium Exposure at Grand Canyon National Park



📄 **Stephenson GRCA - Trip Report - GRCA Radiation Concerns - June 2018.pdf**
71K

📄 **Stephenson Grand Canyon - Rad Resp- Uranium report (1).docx**
183K



Stephenson, Elston <elston_stephenson@nps.gov>

## Notice of Exposure to Uranium per the "Right to Know Law'

**Stephenson, Elston** <elston_stephenson@nps.gov>                    Mon, Feb 4, 2019 at 5:32 AM
To: NPS GRCA All Employees <grca_all_employees@nps.gov>, Woody Smeck <woody_smeck@nps.gov>

Good Morning Everyone.

The very first thing that I want to say is "I'm sorry." And You'll understand why in just a bit.

Please consider this a much belated formal Notification in accordance and your rights under the OSHA, HAZCOM 'Right to Know Law'.

If You were in the Museum Collections Building (bldg 2C) between the year 2000 and June 18, 2018, You were 'exposed' to uranium by OSHA's definition.

Please understand, this doesn't mean that You're somehow contaminated, or that You are going to have health issues. It merely means essentially that there was uranium on the site and You were in its presence.

There were three 5 gallon buckets of uranium ore stashed in a small space in the building since 2000. It was dumped on them. This was a top management failure. It came from the GRCA Headquarters building. So there may be exposure issues with that building as well.

Identifying who was exposed and your exposure level gets tricky and is our next important task.

The radiation readings of the uranium, at first blush, exceeds the Nuclear Regulatory Commission's (NRC) safe limits (rates and yearly total) for the general public (attachments and links below). This does not mean You were harmed. The readings may or may not exceed the occupational limits. Here's why:

Determining whether or not your exposure exceeds limits is based primarily on the level of emission at the source,  your distance from the source, and your time duration in that exposure. Other factors may include whether or not there was dust, if the dust was airborne---if it was ingested, inhaled, or landed on uncovered skin.

All of this must be determined on an individual basis.

But, if You were in that building at that time (between 2000 and July 18, 2018); by OSHA definition, You were exposed. And by Law we are supposed to tell You.

In several communications to You, I've shared my very personal belief that "A Safe Workplace is a Human Right."

In addition to that very Human Right, You have other rights. These are established law. You have a 'Right to Know'. And I mean You have a right to know *everything* surrounding your exposure. You have a right to take legal action for any harm You may have suffered as a result of that exposure. And You have the right to not have your Rights taken away from You.

I began by apologizing to You. That is because it has been more than 7 1/2 months (233 days) since the discovery of the uranium and this official, formal, and explicit notification. That is why I am sorry. You deserve better---sooner. You are entitled to more detailed information.

Many of You have been 'pinging' me from the very outset, whether You worked there, passed through, had minor-aged teenagers working as interns, or are parents of school trip-aged kids. You have very serious, very genuine concerns and questions that You have the right to insist on answers to. I am sorry that I could not provide You answers then. But they are coming in.

Please know that I have burned every bit of energy and resource within me to break an opening to access information and assistance and get it to You; I communicated this directly to DOI Secretary Zinke and now to Secretary Bernhardt, I filed an OSHA complaint to get them to come here, I contacted every single member of the U.S. Congress and the U.S. Senate (it is in all of their 'inboxes' and committee' inboxes), several generals, NRC, WASO, University of Arizona, Arizona State University and others colleges/universities, I contacted the FBI, serious solid safety professionals throughout the profession at the highest levels, DOI Inspector General---directly, I filed an IG Complaint, 2 former Directors of OSHA, NRC's state equivalent the Arizona Department of Health Services - Radiation Control Unit (they'll be

coming tomorrow), the Office of Special Counsel, some of You have seen me escorting or introducing You to Congressional staffers, and I am heading down to Phoenix to meet with the U.S. Attorney's office to discuss this, in fact.

This is all by way of saying that your safety, the safety of your families, friends, and the people that come to visit us here is and always has been my biggest concern. There's not even a close second.

Please know that You will get all of the information, medical care, medical surveillance, emotional and mental care, and resources that You may want or need. And that every one of your questions will be answered.

I have asked Congress (individual members and committees) to insist that DOI do a few things such as pulling together a Serious Accident Investigation Team (SAIT) to investigate this and other more prominent safety issues that we've discussed over the last year or so, such as AEDs. I am working with Congress and others to see if Congressional oversight and/or hearings can help us get to where we need to be in our commitment to doing what 'right looks like'. So more to follow.

I've attached the 'report' from the IMR response team that came here at my '9-1-1' when we first discovered the uranium. I've attached links so that You have the information and can decide for yourself how the measurements stack up against NRC's safe limits.

Most Importantly; please remember that just because that number appears; it does not necessarily mean that You were exposed at that level/rate. Again, much has to do with your proximity, duration of time, whether You inhaled, ingested, or touched the uranium or dust. As You know, in safety, when we do risk assessments, we rely on worst case scenarios or values. It's the same with this. We have to in the abundance of caution---particularly where minors and children are concerned.

In the effort to share as much information as possible, I've include a PowerPoint of what I've found so far in my own investigation. Please look forward to updates.

The uranium was taken out and dumped at the Orphan Mine on June 18, 2018. So any assessments or assertions made after that which are not based on the numbers in the report are conjecture. Likewise accounting for conditions in the building going back 18+ years will also be challenging. For instance, was an oscillating floor fan running in the area back on August 16, 2004? But models can be made using the report numbers.

Please know that very, very serious people are helping me to help You.

Please also know that You will get everything information-wise.

This will get fixed.

Once more, the next big step is identifying who among us was in the building during that span. So please be preparing a sort of sketch which retraces your footsteps and patterns. There will be a time, soon, when we will be collecting that information and acting on it.

Please feel free to share your concerns with me.

Please engage in discussion with your fellow Team members and supervisors.

Please remember that any form of workplace safety communications--this email, for instance; is a "Protected Communication" under the law. Please let me know of any effort to retaliate.

A Safe Workplace really IS a Human Right.

And again, I am deeply sorry that it's taken this long.

Thank You,


Very Sincerely,

Elston

Elston "Swede" Stephenson, OHST
Safety Health & Wellness Manager
Grand Canyon National Park
928-255-8727

**3 attachments**

**GRCA Uranium Exposure v3.pptx**
7054K

**Stephenson GRCA - Trip Report - GRCA Radiation Concerns - June 2018.pdf**
71K

**Stephenson OSHA 'It's The Law' Poster.pdf**
764K

# EXHIBIT D-1

Case 3:19-cv-08268-DLR   Document 18-1   Filed 12/03/19   Page 59 of 71

11/23/2019          DEPARTMENT OF THE INTERIOR Mail - Update (12/28/2018): URGENT HELP: Uranium Exposure at Grand Canyon National Park



Stephenson, Elston <elston_stephenson@nps.gov>

## Update (12/28/2018): URGENT HELP: Uranium Exposure at Grand Canyon National Park

**Stephenson, Elston** <elston_stephenson@nps.gov>                Mon, Dec 31, 2018 at 11:38 AM
To: Secretary Zinke <secretary_zinke@ios.doi.gov>
Cc: David Bernhardt <dwbernhardt@ios.doi.gov>, Mary Kendall <mary_kendall@doioig.gov>

Mr. Secretary,

Good Morning, Sir.

Please receive this update to the uranium exposure at Grand Canyon National Park as of December 28, 2018.

Conferring with the NRC, and the state of Arizona's equivalent nuclear regulatory body, Arizona Department of Health Services - Bureau of Radiation Control (ADHS) has determined that dangerous levels of uranium radiation were emitted onto an unknowing public---particularly children, NPS minor-aged workers, and NPS adult workers as they toured, conducted research, and worked at the Museum Collections Building, Grand Canyon National Park between the year 2000 and June 18, 2018.

Please recall that I am also working with Fed OSHA. Their report is still due.

However, Sir, I have not conferred with any professional or expert who does not concur, or who is not alarmed.

Sir the numbers (facts) are not going to change. According to IMR's 'expert' the uranium in the three 5 gallon buckets (one bucket so full that the lid could not be closed) were emitting between 1,400 and 4,000 times the NRC safe rate limit per hour for general public children ([800 mR/hr ÷ 0.02 mSv/hr] x 10, [230mR/hr ÷ 0.02 mSv/hr] x 10) and between 140 and 400 times the NRC safe rate limit per hour for adults (800 mR/hr ÷ 0.02 mSv/hr, 230mR/hr ÷ 0.02 mSv/hr) . The animal shows that they were attending lasted between 30 minutes to 1 hour. The shows were a routine feature of the tours to the general public. There were between 800 to 1000 persons attending tours every year. While children and show attendees are relatively easy to assess because they were captivated in the confined area just inches away from uranium (at the taxidermied animal case), the workers are more difficult to determine because of their changing proximity and time duration to the uranium in the course of their work---some for the entire 18+ years that the uranium was stashed in their office space. NRC and ADHS confirm those numbers (stated in the report) and that interpretation.

One expert said "I've never seen exposure readings that high."

Please find the report and applicable links to NRC (along with conversion app) attached and below.

Sir, regrettably, it is not hyperbole to say that based on exposure rates and number of victims; Grand Canyon National Park may have suffered one of worst nuclear incidents in the Nation's history.

To date; No workers have been informed of the rates or the potential impacts to their health in accordance with the Right-to-Know law. No public notification has been made.

As such, and given what I have discovered and sought to solve and bring forward as serious safety issues

Regional Headquarters, the death of a visitor in the botched AED incident at DesertView, the expired, obsolete, and discontinued AEDs across the Park and NPS-wide, the near fatality with the saw to the face of a worker because of a GRCA history of ignoring OSHA JHA requirements---just to name a few, years of having no safety program (audit attached), the fact that I had to resort to an EEO settlement to force the leadership to comply with the most fundamental safety requirements as a result of the audit (attached), because of the enormous litigation issues that may lay ahead---and because of what Grand Canyon National Park means to the Nation and to the World; perhaps it is time for a more intensified Congressional involvement and Congressional oversight.

Otherwise, my fear is that rather than owning up and addressing this tragedy, efforts will be made to discredit or re-write the report, discredit me, or minimize the incident by 'switcheroo'---"see, we check last week and there's no uranium, so we're good", ignoring/denying it and moving on.

Sir, because of this, I respectfully insist that all Whistleblower provisions (by all respective Agencies and Congress) remain in full effect.

Finally Sir, I made a mistake in the earlier email as I stated "...1000s of Americans who were exposed...". As You know, Sir, it was not just Americans who were exposed, but people---particularly little kids visiting Grand Canyon National Park from all over the world who were exposed to uranium by us.

Sir, Thank You.

Congratulations on your tenure.

Happy New Year.

And, especially, Thank You for Your Service.

Very Sincerely,

CW4(ret) Elston "Swede" Stephenson, OHST
Safety Health & Wellness Manager
Grand Canyon National Park
928-255-8727

References

NRC (2018). Nuclear Regulatory Commission, *Regulation of radioactive materials*. Retrieved from https://www.nrc.gov/about-nrc/radiation/protects-you/reg-matls.html

NRC (2018). Nuclear Regulatory Commission, 10CFR §20, *Standards for protection against radiation*. Retrieved from https://www.nrc.gov/reading-rm/doc-collections/cfr/part020/

NRC (2018). Nuclear Regulatory Commission 10CFR §20.1207, *Occupational dose limits for minors*. Retrieved from https://www.nrc.gov/reading-rm/doc-collections/cfr/part020/part020-1207.html

NRC (2018). Nuclear Regulatory Commission 10CFR §20.1302, *Compliance with dose limits for individual members of the public*. https://www.nrc.gov/reading-rm/doc-collections/cfr/part020/part020-1302.html

NRC (2018). Nuclear Regulatory Commission 10CFR §20.1801 *Control and storage of licensed material*.  Retrieved from https://www.nrc.gov/reading-rm/doc-collections/cfr/part020/part020-1801.html

NRC (2018). Nuclear Regulatory Commission 10CFR §20.1802 *Control of material not in storage*.  Retrieved from https://www.nrc.gov/reading-rm/doc-collections/cfr/part020/part020-1802.html

Translater's Café (2017). TranslatorsCafe.com. *Unit converter*. Retrieved from https://www.translatorscafe.com/unit-

**20 attachments**



**Stephenson GRCA Uranium 1.jpg**
703K



**Stephenson GRCA Uranium 2.jpg**
525K



**Stephenson GRCA Uranium 3.jpg**
1010K



**Stephenson GRCA Uranium 4.jpg**
893K



**Stephenson GRCA Uranium 6.jpg**
913K



**Stephenson GRCA Uranium 7.jpg**
894K



**Stephenson GRCA Uranium 8.jpg**
904K



**Stephenson GRCA Uranium 9.jpg**
654K



**Stephenson GRCA Uranium 10.jpg**
585K



**Stephenson GRCA Uranium 11.jpg**
601K

**Stephenson GRCA Uranium 12.jpg**
665K



 **Stephenson GRCA Uranium 13.jpg**
622K

 **Stephenson GRCA Uranium 14.jpg**
595K

          **Stephenson GRCA Uranium 15.jpg**
582K

 **Stephenson GRCA Uranium 16.jpg**
606K

 **Stephenson GRCA Uranium 17.jpg**
692K

 **Stephenson GRCA - Trip Report - GRCA Radiation Concerns - June 2018.pdf**
71K

 **Stephenson Grand Canyon - Rad Resp- Uranium report (1).docx**
183K

 **Stephenson Settlement Agreement_NPS-18-0460_GRCA FINAL (signed).pdf**
254K

 **Stephenson - GRCA 2018 Safety Audit Findings and Final Report.pdf**
833K

# EXHIBIT D-2



# United States Department of the Interior



NATIONAL PARK SERVICE
Intermountain Regional Office
12795 W. Alameda Parkway
P.O. Box 25287
Lakewood CO. 80228-2822

IN REPLY REFER TO:
IMR-SHW

Memorandum

To:        Superintendent, Grand Canyon National Park

From:     IMR Occupational Safety & Health Manager

Subject:  **Radiation Program Assistance**

On or about June 11, 2018 this office received a request for assistance with a radiation issue at
your location. After reviewing supplied documents NPS-GCNP-RMC-01 Dated June 20-22,
2000, and Revision #1 Dated July 18, 2000 a decision was made to deploy. I departed
Lakewood, CO on June 13, 2018 and traveled to Southeast Utah Group Headquarters (SEUG)
Moab, UT. to pick up equipment. I arrived at GRCA on June 14, 2018 at approximately 11:00
AM and proceeded to the Museum Warehouse and met with Colleen L. Hyde and Kim Besom.
GRCA Safety Manager Elston Stephenson arrived shortly afterward. After in-briefing with
Colleen and Kim, and short interview, I started a radiation survey as described below. After
confirming the presence of radioactive ore samples in the Museum Collection, the Parks decision
was to remove and dispose of the items of concern. Permission was received, to return these
items to the Lost Orphan Mine where they originated. This was accomplished on June 18, 2018.

## Museum Collection:

A hasty survey was conducted of Archives Room cabinets, and three plastic buckets stored in the
warehouse. Results were positive for radioactivity above background as noted below:

1.  2.02 mR/hr   Outside building, sunny day background
2.  1.85 mR/hr   Inside building
3.  13.9 mR/hr   Between cabinet NB16 and NB18

A further survey of the rest of the Museum Collection Building, offices and storage areas were
negative for radioactivity above background. On Friday June 15, 2018 a second survey was
conducted to identify and segregate the items of concern from the museum Collection. Readings
were in keeping with the report of July 18, 2000 and these items were prepared for transport and

disposal.

## Basement of Headquarters Building:

An in-depth survey of the basement area where Radioactive Ore samples were originally stored was negative for radioactivity above background. No radiation issue noted.

## Power House

An in-depth survey of the Grand Canyon Power House was conducted and was negative for radioactivity above background. No radiation issue noted.

## Conex Adjacent to Fee's Building

This container is the storage location for Ore samples that are part of a legal proceeding. This location has signage stating it is a Radiation Storage Area. There is minor activity above background on contact of outside container wall. A key was not available for access so radiation levels inside are unknown. Container offers good shielding and protection to employees.

## Trail of Time

Trail of Time has several rock displays along its length. Entire trail was surveyed and was negative for radioactivity above background. No radiation issue noted.

## Recommendations:

As defined in Title 10, Section 20.1003, of the Code of Federal Regulations (10 CFR 20.1003 ), **ALARA is an acronym for "as low as (is) reasonably achievable.** This should be the standard for exposure to any radioactivity. Grand Canyon by its location and surrounding geology has an abundance of naturally occurring radioactivity.

By the nature of the items stored in the museum collection, there is still low levels of radioactivity. Core samples stored in one of the cabinets should be controlled for exposure. Some recommendations are:

1. No one under 18 years of age should be allowed to handle or work with these core samples or anything known or believed to be radioactive.
2. Consider relocating Core samples to an outdoor metal cabinet.
3. Real time digital Radon monitor for the Museum Collection archive room.

In addition to recommendations for the Museum Collection, I also recommend that the Conex

storage site be limited to Sample storage only, and not a combined use area. Access should be limited/controlled.

All survey and monitoring was conducted with the following equipment:

Ludlum Model 3001 Serial Number # 25015388
Ludlum Detector Model 44-2 Serial Number # PR369634
Ludlum Detector Model 44-9 Serial Number # PR368091
Check Source Cs-137, CS72 Jan 2017
Certificate of Calibration Dated 6 OCT 2017, Calibration due 6 OCT 2018 Ludlum Industries.

_____          _____
Bill Bouley,                                              Date
IMR Occupational Safety & Health Manager
Radiation Safety Officer

# EXHIBIT D-3



# United States Department of the Interior

NATIONAL PARK SERVICE
Intermountain Regional Office
12795 W. Alameda Parkway
P.O. Box 25287
Lakewood CO. 80228-2822



IN REPLY REFER TO:
IMR-SHW

Memorandum

To:          Superintendent, Grand Canyon National Park

From:       IMR Occupational Safety & Health Manager

Subject:    **Radiation Program Assistance**


On or about June 11, 2018 this office received a request for assistance with a radiation issue at your location. After reviewing supplied documents NPS-GCNP-RMC-01 Dated June 20-22, 2000, and Revision #1 Dated July 18, 2000 a decision was made to deploy. I departed Lakewood, CO on June 13, 2018 and traveled to Southeast Utah Group Headquarters (SEUG) Moab, UT. to pick up equipment. I arrived at GRCA on June 14, 2018 at approximately 11:00 AM and proceeded to the Museum Warehouse and met with Colleen L. Hyde and Kim Besom. GRCA Safety Manager Elston Stephenson arrived shortly afterward. After in-briefing with Colleen and Kim, and short interview, I started a radiation survey as described below. After confirming the presence of radioactive ore samples in the Museum Collection, the Parks decision was to remove and dispose of the items of concern. Permission was received, to return these items to the Lost Orphan Mine where they originated. This was accomplished on June 18, 2018.

## Museum Collection:

A hasty survey was conducted of Archives Room cabinets, and three plastic buckets stored in the warehouse. Results were positive for radioactivity above background as noted below:

1. 2.02 mR/hr    Outside building, sunny day, background
2. 1.85 mR/hr    Inside building
3. 13.9 mR/hr    Between cabinet NB16 and NB18
4. 800 mR/hr depending on the sample  On contact with the ore sample inside the bucket
5. 280 mR/hr to 320 mR/hr    On contact with outside of bucket - lid sealed
6. 0 above background    Distance of 5 ft. from bucket
7. 2.5 mR/hr - 3 mR/hr    On contact with outside of metal cabinet, on a seam

A further survey of the rest of the Museum Collection Building, offices and storage areas were negative for radioactivity above background. On Friday June 15, 2018 a second survey was conducted to identify and segregate the items of concern from the museum Collection. Readings were in keeping with the report of July 18, 2000 and these items were prepared for transport and disposal.

## Basement of Headquarters Building:

An in-depth survey of the basement area where Radioactive Ore samples were originally stored was negative for radioactivity above background. No radiation issue noted.

### Power House

An in-depth survey of the Grand Canyon Power House was conducted and was negative for radioactivity above background. No radiation issue noted.

### Conex Adjacent to Fee's Building

This container is the storage location for Ore samples that are part of a legal proceeding. This location has signage stating it is a Radiation Storage Area. There is minor activity above background on contact of outside container wall. A key was not available for access so radiation levels inside are unknown. Container offers good shielding and protection to employees.

### Trail of Time

Trail of Time has several rock displays along its length. Entire trail was surveyed and was negative for radioactivity above background. No radiation issue noted.

### Recommendations:

As defined in Title 10, Section 20.1003, of the Code of Federal Regulations (10 CFR 20.1003 ), **ALARA is an acronym for "as low as (is) reasonably achievable.** This should be the standard for exposure to any radioactivity. Grand Canyon by its location and surrounding geology has an abundance of naturally occurring radioactivity.

By the nature of the items stored in the museum collection, there is still low levels of radioactivity. Core samples stored in one of the cabinets should be controlled for exposure. Some recommendations are:

1. No one under 18 years of age should be allowed to handle or work with these core

samples or anything known or believed to be radioactive.

2. Consider relocating Core samples to an outdoor metal cabinet.

3. Install real time digital Radon monitor for the Museum Collection archive room.

In addition to recommendations for the Museum Collection, I also recommend that the Conex storage site be limited to Sample storage only, and not a combined use area. Access should be limited/controlled.

## Equipment:

All survey and monitoring was conducted with the following equipment:

Ludlum Model 3001 Serial Number # 25015388
Ludlum Detector Model 44-2 Serial Number # PR369634
Ludlum Detector Model 44-9 Serial Number # PR368091
Check Source Cs-137, CS72 Jan 2017
Certificate of Calibration Dated 6 OCT 2017, Calibration due 6 OCT 2018 Ludlum Industries.

Bill Bouley,
IMR Occupational Safety & Health Manager
Radiation Safety Officer

Aug. 13, 2018
Date