# EXHIBIT E

                                                    **Stephenson, Elston <elston_stephenson@nps.gov>**

---

# [EXTERNAL] Stephenson: discussion w/ Mr. Stephenson regarding case, Other Matters

---

**Tinsley, Laurence (USAAZ) <Laurence.Tinsley@usdoj.gov>**                          Fri, Nov 1, 2019 at 11:20 AM
To: "Stephenson, Elston" <elston_stephenson@nps.gov>
Cc: "Tinsley, Laurence (USAAZ)" <Laurence.Tinsley@usdoj.gov>, "Yim, Deborah" <deborah.yim@sol.doi.gov>

Mr. Stephenson:

I have referred your email below and the others to our Criminal Division.
Thank you.

[Quoted text hidden]

# EXHIBIT E-1

11/22/2019                    DEPARTMENT OF THE INTERIOR Mail - [EXTERNAL] Complaint of criminal conduct



Stephenson, Elston <elston_stephenson@nps.gov>

## [EXTERNAL] Complaint of criminal conduct

**Galati, Frank (USAAZ)** <Frank.Galati@usdoj.gov>                    Fri, Nov 8, 2019 at 3:18 PM
To: "elston_stephenson@nps.gov" <elston_stephenson@nps.gov>

Good afternoon Mr. Stephenson—

In July of this year, I was the duty attorney who fielded a call from you.
During that call, you reported to me your concerns regarding the Park
Service's and DOI's investigations into, and reporting about, uranium that
was found at the Grand Canyon Museum. You also told me that you
believe that your superiors were retaliating against you. I referred your
complaint to the FBI. In August, the FBI reported to me that it was
satisfied that there were no criminal violations for the FBI to assess. I
passed the FBI's conclusions on to you in a telephone conversation we
had on August 20, 2019.

I am aware of the recent email message that you sent to AUSA Tinsley. I
know that you are aware that the United States Attorney's Office is not an
investigative agency. So, to the extent you believe that message contains
new facts or new allegations of criminal conduct, I again urge you to
report your concerns to an investigative agency, such as the FBI.

Best regards,

**FRANK T. GALATI**

Assistant United States Attorney

District of Arizona

40 North Central Avenue Suite 1800

Phoenix, AZ 85004

(602) 514-7500

# EXHIBIT F



Stephenson, Elston <elston_stephenson@nps.gov>

## Stephenson US Attorney Contact / Formal IG Complaint Failed 16E (Stalking), Falsified Statements Docs (OSHA)

Stephenson, Elston <elston_stephenson@nps.gov>                                      Tue, Nov 19, 2019 at 11:23 AM
To: "Tinsley, Laurence (USAAZ)" <Laurence.Tinsley@usdoj.gov>, "Yim, Deborah" <deborah.yim@sol.doi.gov>

Mr. Tinsley, Ms Yim,

Good Morning.

Please, I just recently opened and reviewed the Motion to Dismiss.  The tenor and falsified statements in the document are disappointing and require me to adjust my approach to this engagement and re-evaluate what I considered good faith.

Mr. Tinsley, I am quite confident that Drapeaux perjured himself---materially lied to You. And that this has resulted in the lies being entered in your Motion to Dismiss and forwarded to the Court.

Please find in the email below that I explain how I caught Smeck and Co. frauding a DOI/NPS 16E Harassment Complaint---the Complaint filed as a result of Drapeaux's stalking my home.

I immediately let the IMR/NPS/DOI leadership know that Drapeaux was stalking my home almost as soon as the witness worker left my office. (attached)

In short, Smeck immediately contacted me (email chain in attachments) and told me that he generated a 16E Complaint in the DOI/NPS system.  We did a preliminary interview. He insisted on having it investigated by a third-party. (attached)

As the email below details, he and others at IMR essentially 'faked' a 16E.

This is now the subject of an IG investigation, currently underway.

The excuse given in the Motion to Dismiss for Drapeaux's stalking my home is that "Defendant Drapeaux investigated Plaintiff because he had been directed by [Smeck] to confirm that Plaintiff was not using the GOV during the time Plaintiff was suspended and off duty." (ref. MTD pg 3, line 1)

Respectfully, if Smeck had directed Drapeaux to scope out my home, he would have piped up as soon as the stalking allegation came to him. And the three times that I met with him on the subject. He knew the dates. He would never have filed the 16E if he had ordered Drapeaux to stake out my home. He would have said, "Elston, this isn't quite what it seems..."

And he would never have followed up with an email to IMRegional Office.

Respectfully, I believe one of 2 things is true; Drapeaux lied outright and invoked Smeck's name without Smeck knowing it, or Drapeaux and Smeck got together once they found out about my filing for Injunction (after filing the 16E) and concocted a story---likely conspiracy and fraud.


Also not true:

"He personally saw the GOV at a coffee shop parking lot an hour away from Grand Canyon and contacted Plaintiff inside the shop..." (ref. MTD pg 3, line 10)

An hour from Grand Canyon is nothing but mountains and forest. Drapeaux had also concocted an IG investigation against me on this. As You can imagine, I take tons of pics and video in the course of my work.  I readily admit---and admitted to the IG investigators that I would take my truck to Starbucks 2 miles outside the main gate and park in front to use their WiFi to send work safety pics and vids from my phone to my work computer because there is no WiFi on the Park. Many others do the same thing. It would take hours (between the speed and re-do's after getting 'Failed to Send' messages just to send a handful of pics---forget about sending vid clips. I don't go into Starbucks I just send my pics and

return to the Park. Clearly Drapeaux lied to make it seem like I was out joy-riding in the GOV when I was actually doing government work.

"Plaintiff had a history of often using the GOV without checking it out under proper protocols..."  (rer. MTD pg 3, line 3)

There are no check out protocols. Drapeaux knows this. I showed up here. They gave me a vehicle. I noticed other GOVs parked at homes. I was the Safety Manager with duty to respond at all hours. I took the vehicle home.

"Plaintiff often used the GOV when he had no legitimate business reasons, including taking it home and driving to destinations outside the park when he was not on authorized travel." (ref. MTD pg 3, line 6)

I used the vehicle at Grand Canyon, to go to our other headquarters office in Flagstaff, or to go to Kinko's Flagstaff to do binding. Drapeaux obviously knows that we have a Flagstaff Office that I go to. He knows that I typically 'bundle' my Kinko's binding with visits to the Flagstaff office.  And that we do not get Authorized Travel to go to Flagstaff, or for the Flagstaff personnel to come to GRCA.

Drapeaux---everyone knew this for more than 2 years. Ask Drapeaux to produce a single counseling statement, warning, correction---anything, and he will not be able to do it.

"Plaintiff had misused the vehicle and received discipline for the misuse and Drapeaux was following up to ensure that Plaintiff was not violating the terms of his discipline." (ref. MTD, pg 6, line 2)

I was never disciplined for misuse of my vehicle. Period.  Drapeaux should be able to produce documentation of such misuse and discipline. He won't be able to because this is a lie.

Again, Drapeaux knew of my actions with the vehicle for 2 years, yet did nothing as a supervisor or Deputy Superintendent to correct me if I were doing anything wrong. What he did, instead, was noted them and saved them up, then use them by calling the IG when he figured that I was going to the U.S. Attorney's office and OSHA to report the falsifying documents, false statements, etc. In fact, the very first action that Drapeax took was to write a memo after I texted him that I was going to the U.S. Attorney and OSHA office.

This is why in the MTD statement "Drapeaux thus exercised his legitimate managerial oversight over Plaintiff when Drapeaux checked the whereabouts of the GOV" begs the question (and undermines the assertion)..."If taking the GOV violated any policy known by Drapeaux. And Drapeaux knew that the vehicle was at my home; as my supervisor and Grand Canyon National Park Deputy Superintendent, why didn't he just order that the vehicle not be at my home?"

As I shared earlier, Drapeaux recently filed an IG complaint against me about the alleged vehicle misuse. I am sure that if You contact the IG Investigator, they will validate that I told them everything just as I explain it here. As he did with Lehnertz, he invoked the names of others (without their knowledge) to make it sound as if they had spontaneously and contemporaneously lodged some sort of complaint for events 2 years old in order to swindle investigators into taking HIS contrived complaint seriously and legitimately.

Drapeaux was not "exercis[ing] his legitimate managerial oversight". His legitimate managerial oversight was to correct me if taking the vehicle home was in violation of policy or practice. He was up to no good.

Again, in the Motion to Dismiss, it appears that the rationale for Drapeaux stalking my home was that he was directed there by Smeck. Based on Smeck's (16E actions and 3 face-to-face meetings) that does not appear to be the case.

Also, "Plaintiff also alleged in his Petition that NPS management interfered with First Aid classes he taught, when his supervisor limited his use for the classes and managers attended the classes as part of routine oversight of its employees' work related activities"

This too is knowingly falsified---perjury. The manager was the Deputy Chief Ranger for Law Enforcement. A quick look at the roster of attendees shows that there were no LE in attendance. 16 of 19 were Science and Resource Management, 2 were from Albright Learning Center, and 1 was from Commercial Services (attached).

These fit with Drapeaux's lying pattern. He typically takes a kernel of truth and drums up a hum-dinger.

And he typically tells lies which demonstrate an arrogance that no one will check or cross-check what he says. A quick look at just the most recent EEOC statements also reveal a canoe of easily documentable false statements and perjury intended to not only fraudulently defeat the EEOC system, but my Constitutional Rights under Title VII.

11/22/2019          DEPARTMENT OF THE INTERIOR Mail - Stephenson US Attorney Contact / Formal IG Complaint Failed 16E (Stalking), Falsified State…

Ms Yim, as I reviewed the recent EEOC material; there are nearly two dozen flat out lies by Drapeaux. All of them easily documented.

It will take a while to list them all, but a few quick examples include Drapeaux's Formal Investigation Supplemental statement to the EEO Investigator (Exhibit F-2, page 3 line A) where he states "No. To my knowledge no safety plan was submitted for approval."

A quick look to Superintendent Woody Smeck's statement (Exhibit F-3, page unknown, line 11) states "Mr. Stephenson had prepared a draft plan prior to my arrival. The plan was reviewed by the deputy superintendents. They provided to me a copy of their handwritten comments and notations..."

In the very same document Superintendent Sarah Creachbaum includes not only Lehnertz's email on the subject (if I sent Lehnertz the document, I sent it to Drapeaux); but she attaches emails regarding the Plan that I had sent to the entire Park Senior Executive Team (PSET), and most importantly and email exchange between Drapeaux and me on a version (I have submitted 4 or 5 of them) of the Plan that submitted with his instructions and comments. You can even see the little MS Word attachment icon at the end of the email. (attached)

Another obvious one is the read of DOI IG report 18-1188. A bogus complaint that Drapeaux filed against Lehnertz. He weaponized the IG Complaint system against her as she sought to discipline him (Senior Official) for not conducting DOI, NPS, and OPM performance counseling and EPAP on me (Senior Official's Subordinate). Clearly in the document he lies and swindles Lehnertz for nearly a year---repeatedly telling her that he had conducted the counseling and that I had signed it---when clearly he did not. I did not know this until I read this report this past July 4th. This is important because while Lehnertz's was pressing him to do it (unknown to me) from one end, I a former supervisor who knows such counseling must be done was bugging him to do it from the other end.

A look at the NPS EEO Report of Counseling shows that he, again lied to that investigator when he not only said that the first time that I asked for training was June 2018, but that my asking was the first time such counseling had ever occurred to him. Never mind that it is not the subordinate's responsibility to initiate the counseling; but in his role as Dep Superintendent Drapeaux was haranguing PSET near-weekly to get their counseling/EPAPs done.

A more detailed look would show that the DOI IG and EEO Investigator's interviews were being conducted near simultaneously. This wasn't a slip of the mind.

Also a problem for Agency's case; Drapeaux clearly states that Lehnertz's actions against me were race-based. He insinuates this in DOIIG Report 18-1188 as well. He also clearly states the fact that he had so weaponized the IG system against her that he had filed "several complaints against Ms. Lehnertz". (attached)

Mr. Tinsley, respectfully, You---the U.S. Attorney's Office unwittingly submitted to the Court a document 'Swiss cheesed' with material knowingly false statements. Likely perjury.

Ms. Yim, respectfully, there is/are just so much fraud, knowingly falsified statement---perjury in Drapeaux's statements that it's taking me weeks to draft a rebuttal.

Reading the tone and the accusations in the Motion to Dismiss is so offensive that it has me needing to 'take a knee' and consider what guardrails and protective measures any sort of potential Agreement may have to include to address a situation where someone so determined to do me harm and so unreliable as a 'party' to any agreement would require or make sense.

Please allow me a moment to 'recage my attitude indicator'.

Please receive the outlines of a framework for your consideration.

If these are not do

Framework

Same Agreement that Agency violated
All Drapeaux paperwork in my personnel file deleted
Refund for all professional schooling paid out of pocket (to include travel, car rental, airline, hotel, per diem)
I decide which professional safety courses to attend in order to meet 50B CEU requirements
Self-approve CompTime

11/22/2019          DEPARTMENT OF THE INTERIOR Mail - Stephenson US Attorney Contact / Formal IG Complaint Failed 16E (Stalking), Falsified State…

No one-on-one contact with Drapeaux
Drapeaux stay away from my home
CompTime/Overtime rejected restored
Leave/CompTime spent on professional training returned

Also, as we spoke last week, some person was here wanting to conduct an 'interview' with me. They tried to trick me into thinking that I was a "witness" when they let it slip that I was actually the Subject. They said that they were here on the direction of DOI Headquarters. Ms. Lim, I believe You as You expressed that "the highest levels of DOI want to get this done".

This is like the 4th or 5th investigation of some sort against me since I reported the uranium.

Please, this is incompatible with the Highest Level's expression of Detente, and must be addressed.

Mr. Tinsley, respectfully, please consider this my opening tranche of Discovery---GRCA Stalking witness audio included, with more to follow.

Incidentally and to the central argument of the Motion to Dismiss; I have not met with Drapeaux one-on-one for nearly a year and a half (except to write the EPAP ordered by the failed Agreement). As far as I know, he has not been on my circle block at all other than stalking my home. And Grand Canyon National Park has not fallen.

Please let me get with EEOC and others as I consider these latest developments and their implication to any Agreement.

Thank You.


Respectfully,


Elston

Elston L Stephenson, OHST
Safety Health & Wellness Manager
Tort Claims Officer
Grand Canyon National Park
928-255-8727



---------- Forwarded message ---------
From: **Stephenson, Elston** <elston_stephenson@nps.gov>
Date: Tue, Oct 22, 2019 at 8:24 AM
Subject: Stephenson US Attorney Contact / Formal IG Complaint Failed 16E (Stalking), Falsified Statements Docs (OSHA)
To: David Bernhardt <dwbernhardt@ios.doi.gov>, Mark Greenblatt <mark_greenblatt@doioig.gov>


[Quoted text hidden]

**15 attachments**

 **Stephenson GRCA False StatementsFalsified Documents v OSHA Citation 1363108.pdf**
520K

**Stephenson - 16E 'Update' and Return to Drapeaux Supervision.pdf**
129K

**Stephenson - Bogus Training Offer.pdf**
413K

**Stephenson - Audio of Drapeaux Stalking Witness to Stephenson.m4a**
9959K

**Stephenson - Complaint Drapeaux Stalking Home (DOI Harassing Conduct Complaint 16E 868).pdf**
55K

Case 3:19-cv-08268-DLR   Document 18-2   Filed 12/03/19   Page 11 of 45

11/22/2019          DEPARTMENT OF THE INTERIOR Mail - Stephenson US Attorney Contact / Formal IG Complaint Failed 16E (Stalking), Falsified State...



**Stephenson - Drapeaux Stalking Stephenson's Home DOI-NPS 16E Case 868.pdf**
193K

**Stephenson - DOINPS 16E  Complaint  Notice - Drapeaux Stalking - Case E003625.pdf**
97K

**Stephenson - Drapeaux Stalking Stephenson's Home.pdf**
140K

**Stephenson - Drapeaux Stalking Text.pdf**
391K

**Stephenson - GRCA  DOI-NPS 50B Excerpt Reg Reguired Cert Safety Officer's Training Pro Development.pdf**
88K

**Stephenson - GRCA Request Professional Training.pdf**
63K

**Stephenson - OPM Administrative Leave Policy.pdf**
205K

**Stephenson - GRCA IMR Receipt 16E Case 868.pdf**
33K

**Stephenson - GRCA False StatementsFalsified Documents v OSHA Citation 1363108.pdf**
520K

**Stephenson - White Paper Pipeline Aviation Safety.pdf**
421K



**Stephenson, Elston <elston_stephenson@nps.gov>**

---

# Stephenson US Attorney Contact / Formal IG Complaint Failed 16E (Stalking), Falsified Statements Docs (OSHA)

**Stephenson, Elston** <elston_stephenson@nps.gov>                    Tue, Nov 19, 2019 at 12:07 PM
To: "Tinsley, Laurence (USAAZ)" <Laurence.Tinsley@usdoj.gov>, "Yim, Deborah" <deborah.yim@sol.doi.gov>

Mr. Tinsley, Ms Yim,

Please receive these 5 attachments intended for the original send.

Please accept my apology for missing our 'meeting' along with my apology for mistakes in the email (e.g. Ms Lim instead of Ms. Yim). I have been pulling all-nighters going through the material.

Again, please allow me to re-group, get some rest, and get back with You.

Thank You.


Very Sincerely,

Elston

Elston L Stephenson, OHST
Safety Health & Wellness Manager
Tort Claims Officer
Grand Canyon National Park
928-255-8727
[Quoted text hidden]

---

**20 attachments**

📄 **Stephenson GRCA False StatementsFalsified Documents v OSHA Citation 1363108.pdf**
520K

📄 **Stephenson - 16E 'Update' and Return to Drapeaux Supervision.pdf**
129K

📄 **Stephenson - Bogus Training Offer.pdf**
413K

🎵 **Stephenson - Audio of Drapeaux Stalking Witness to Stephenson.m4a**
9959K

📄 **Stephenson - Complaint Drapeaux Stalking Home (DOI Harassing Conduct Complaint 16E 868).pdf**
55K

📄 **Stephenson - Drapeaux Stalking Stephenson's Home DOI-NPS 16E Case 868.pdf**
193K

📄 **Stephenson - DOINPS 16E  Complaint  Notice - Drapeaux Stalking - Case E003625.pdf**
97K

📄 **Stephenson - Drapeaux Stalking Stephenson's Home.pdf**
140K

📄 **Stephenson - Drapeaux Stalking Text.pdf**
391K

📄 **Stephenson - GRCA  DOI-NPS 50B Excerpt Reg Required Cert Safety Officer's Training Pro Development.pdf**

**Stephenson - GRCA Request Professional Training.pdf**
63K

**Stephenson - OPM Administrative Leave Policy.pdf**
205K

**Stephenson - GRCA IMR Receipt 16E Case 868.pdf**
33K

**Stephenson - GRCA False StatementsFalsified Documents v OSHA Citation 1363108.pdf**
520K

**Stephenson - White Paper Pipeline Aviation Safety.pdf**
421K

**Stephenson GRCA DOI NPS Settlement Agreement_NPS-18-0460_GRCA FINAL (signed).pdf**
254K

**Stephenson GRCA EEO Report of Investigation Witness Statements.pdf**
510K

**Stephenson GRCA EEO Report of Investigation.pdf**
77K

**Stephenson GRCA First Aid - CPR - AED Training (as of 4-2-2019).xlsx**
19K

**Stephenson GRCA Motion to Dismiss (Highlights).pdf**
207K

# EXHIBIT G

**INVESTIGATION**



OFFICE OF
**INSPECTOR GENERAL**
U.S. DEPARTMENT OF THE INTERIOR

# UNFOUNDED ALLEGATIONS OF IMPROPER LEADERSHIP DECISIONS AND HOSTILE WORK ENVIRONMENT AT GRAND CANYON NATIONAL PARK

**This is a revised version of the report prepared for public release.**

## SYNOPSIS

We investigated allegations that Grand Canyon National Park (GRCA) Superintendent Christine
Lehnertz proposed a 1-day suspension for a GRCA senior official for an improper purpose; that
she created a hostile work environment and engaged in bullying and retaliatory behavior against
senior leaders, particularly male leaders, at the GRCA; and that she wasted nearly $180,000 in
renovations to a park residence.

We found that Lehnertz legitimately proposed a 1-day suspension for the GRCA senior official
for "Failure to Follow Supervisory Instruction" because the official did not provide Lehnertz a
copy of an Employee Performance Appraisal Plan (EPAP) for one of his subordinate employees,
despite multiple requests; did not provide written reports as requested by Lehnertz related to a
high-priority initiative at the GRCA; and did not attend a scheduled meeting related to that
initiative.

We found no evidence that Lehnertz created a hostile work environment or that she wasted
nearly $180,000 in unnecessary renovations to a park residence.

We provided this report to the National Park Service Deputy Director Exercising the Authority
of Director for any action deemed appropriate.

## DETAILS OF INVESTIGATION

We investigated allegations that questioned Grand Canyon National Park (GRCA)
Superintendent Christine Lehnertz' leadership at the GRCA. The allegations stated that Lehnertz:

- Proposed a 1-day suspension for a GRCA senior official for an improper purpose

- Created a hostile work environment and engaged in bullying and retaliatory behavior
  against senior leaders, particularly male leaders, at the GRCA

- Wasted nearly $180,000 in renovations to a park residence

**Lehnertz Proposed Suspension of a GRCA Senior Official for Legitimate Disciplinary
Reasons**

We found that on August 31, 2018, Lehnertz proposed a 1-day suspension without pay against
the GRCA senior official for "Failure to Follow Supervisory Instruction." According to
Lehnertz, the senior official did not:

1. Provide an employee performance appraisal plan (EPAP) for a subordinate employee as
   requested

2. Provide Lehnertz written progress reports regarding a high-priority park initiative as
   directed

3. Attend a required meeting to discuss development options for the initiative or request

approved leave

*The Senior Official Did Not Provide an EPAP for a Subordinate Employee as Requested*

The GRCA hired the senior official's subordinate employee on June 25, 2017, with a 1-year probationary period. The employee initially reported to Lehnertz but was transferred under the senior official's supervision in September 2017. Lehnertz said that at that time, she told the senior official he needed to complete a performance review and create an EPAP for the subordinate employee.

The DOI Performance Management System (370 DM 430) requires that a supervisor establish a subordinate's EPAP within 60 days of the beginning of the appraisal period, the employee's entrance on duty, the assignment of an employee to a new position, the assignment of an employee to a new or different supervisory position, or the assignment of an employee to a detail or temporary promotion scheduled to exceed 120 days.

Lehnertz said she asked the senior official for a copy of the subordinate employee's EPAP during meetings on June 25, 2018, and June 29, 2018, and by email and text message on July 2, 2018. Lehnertz said the senior official responded to each of her requests that he had an EPAP for the employee.

In the July 2 email, Lehnertz asked the senior official to provide her a copy of the signed EPAP "first thing this morning." Lehnertz said the senior official told her he was "working on it," but the signed EPAP was not on her desk when she arrived at the office on July 3. Later that day, Lehnertz asked the senior official again in an email if he had a signed EPAP for the subordinate employee.

The senior official responded to Lehnertz on July 6, stating, "After further review, I do not have a signed EPAP [for the employee]. . . . In our discussions, I was sure that I had one signed. . . . I was quite sure I had him sign the EPAP developed. Yes Chris, you did direct me to provide you a copy of a signed EPAP. My apologies for not complying with your directive."

On July 10, 2018, Lehnertz emailed an NPS regional manager stating she (Lehnertz) needed to take a disciplinary action against the senior official because he was not truthful about the signed EPAP. Later that same day, the senior official emailed the NPS regional manager, stating his belief that Lehnertz had lost objectivity regarding the subordinate employee.

The NPS regional manager said she talked to the senior official in July 2018 and told him to sign an EPAP for the subordinate employee immediately and that Lehnertz could hold the senior official accountable if the subordinate employee did not have a signed EPAP. According to the NPS regional manager, the senior official never completed the EPAP in response to Lehnertz' requests.

*The Senior Official Did Not Provide Lehnertz Written Progress Reports Regarding a High-Priority Park Initiative*

Lehnertz said developing this high-priority initiative was important not only to the GRCA but

also to the NPS. She said she assigned the senior official to lead the initiative in November 2017 and authorized and directed him to work with human resources to hire someone to fill a 1-year detail to help him develop it.

Lehnertz said that in February 2018, she had not seen any progress on the initiative, so she told the senior official they needed to meet every Monday to discuss the status. In addition, Lehnertz requested that the senior official provide her with written progress reports each week when they could not meet in person. Lehnertz said that over the next several weeks and months, the senior official inaccurately represented that the initiative was moving forward and that he did not complete the written reports as directed. Lehnertz said the senior official did not provide written reports on seven or eight dates; the Notice of Proposed Suspension listed February 5, 2018; April 2, 2018; April 9, 2018; April 16, 2018; April 30, 2018; May 14, 2018; June 25, 2018; and July 23, 2018.

According to Lehnertz, because the senior official did not make progress on developing the initiative, she hired an NPS regional director on a detail to the GRCA in September 2018 to develop it.

### The Senior Official Did Not Attend a Required Meeting or Request Approved Leave

On May 16, 2018, Lehnertz emailed the senior official stating that he had not completed progress reports for the initiative for May 7 and May 14. She directed him to prepare to discuss options for development at their next regularly scheduled meeting on May 21. According to Lehnertz, the senior official did not attend the meeting, so she emailed him on May 22 stating that he did not attend the scheduled meeting and did not send her any text messages, voicemails, or emails regarding his absence. Lehnertz also wrote that the senior official must submit written updates to her and asked him how she could help or if there were barriers in their communication and understanding. The senior official did not reply to Lehnertz' email. Lehnertz stated that when she talked to the senior official about his absence from the May 21 meeting, he said, "I don't recall that."

### Lehnertz Proposed a 1-Day Suspension for the Senior Official

In August 2018, Lehnertz discussed her concerns about the senior official with a GRCA human resources specialist. The human resources specialist provided Lehnertz three different notices, with discipline ranging from a written reprimand to a 3-day suspension.

Lehnertz said that before taking action against the senior official, she met with the senior official on August 31, 2018, to give him an opportunity to explain his actions related to his subordinate employee's EPAP and progress reports for the high-priority initiative. According to Lehnertz, the senior official said he had not completed the EPAP because he did not think it was his responsibility. Consistent with the advice the NPS regional manager had provided to the senior official in early July, Lehnertz said she reminded the senior official that the standard supervisory element of his performance plan required him to complete an EPAP for each of his subordinate employees. We found that the senior official's 2017 EPAP stipulated that he communicate performance standards that reflect job requirements to subordinates, give appraisals in a timely manner, and establish performance plans for the current year according to human resources

guidance.

Lehnertz said the senior official also told her he did not provide updates for the initiative because he did not think the GRCA needed it.

Based on the senior official's responses during the August 31 discussion, Lehnertz said she decided to propose a 1-day suspension for the senior official.

*The Senior Official's Response to the Proposed Suspension*

On October 3, 2018, the senior official met with an NPS regional director to orally respond to the proposed suspension. According to the regional director, the senior official said he did not provide a signed EPAP for his subordinate employee to Lehnertz because he believed Lehnertz would use the EPAP to terminate the employee. During his oral response, the senior official said, "I did not, would not, and will not, provide it to her so that she can use it as a weapon."

The senior official also told the regional director that he had reported his concerns about Lehnertz' requests for the EPAP to the U.S. Office of Special Counsel (OSC). According to the senior official, Lehnertz proposed the 1-day suspension because the senior official did not provide the EPAP to further the subordinate employee's termination. The senior official provided us copies of two OSC pre-determination letters, dated October 10 and October 15, 2018. In both letters, the OSC determined that an order to prepare an EPAP would not require the senior official to violate a law because it is routine for supervisors to prepare such documents. The letters also stated it was speculation by the senior official that Lehnertz would use the EPAP for an improper purpose. In each of the two letters, the OSC made a preliminary determination to close its inquiry into the senior official's complaint.

When we interviewed the senior official, he confirmed that Lehnertz had asked him for his subordinate employee's EPAP in June 2018. He said he initially told her he had it, but later told her he did not. The senior official stated he did not want to give the EPAP to Lehnertz because he thought Lehnertz would use the EPAP to terminate the subordinate employee.

We also asked the senior official about the progress reports for the high-priority initiative. The senior official told us he had previously admitted to the NPS regional director that he provided verbal updates but did not always provide the written reports to Lehnertz as directed. When asked why he did not provide the reports, the senior official replied, "I just didn't get to them at the time of the meeting."

Finally, in his oral response to the proposed suspension, the senior official stated his calendar indicated he was in Flagstaff, AZ, on May 21, 2018, at an annual review for the concessioners and that Lehnertz' calendar did not have any appointments scheduled for that date. The senior official said he did not recall if he took leave that day. When we asked the senior official about this meeting, he stated, "I'm still confused of the date, the circumstance of what may or may not have happened." The senior official later provided a copy of his calendar for May 21, 2018, which showed a meeting scheduled at 4:00 p.m. for updates related to the initiative in "Chris's Office."

We confirmed that the senior official was not on leave on May 21, 2018, and that he claimed 8 regular work hours on that day.

**Lehnertz Did Not Create a Hostile Work Environment at the GRCA**

We interviewed 20 GRCA employees who worked directly with Lehnertz. Of those 20 employees, 15 were senior managers and 5 were nonsupervisory employees. Most of the employees indicated that Lehnertz was generally liked at the park and reported that Lehnertz did not treat men or women differently and held everyone to the same standard.

During our interviews, five employees—four managers and one nonsupervisory employee—expressed they had encountered differences and conflict with Lehnertz on occasion. Despite these occasions, four of these five employees identified positive aspects of Lehnertz' leadership and acknowledged that she championed an "inclusive and respectful" environment. The fifth employee stated that she had expressed concerns about her first-level supervisor to GRCA management and said the way Lehnertz handled her concerns caused her to mistrust GRCA management. Some managers observed that Lehnertz "drilled down" for information, explaining that she continuously asked questions to gather information if the presenter seemed ill-prepared or provided incorrect information, which made them feel "intimidated" at times.

Lehnertz said a colleague from the Pacific West Region made her aware that when she drilled-down for information, it felt like an accusation, rather than an inquiry. She added that a manager at the GRCA felt nervous when she asked many detailed questions. Lehnertz said that instead of discussing it with the manager individually, she discussed her management style with the GRCA management team and conveyed that "when I'm really getting into something, I'm gonna ask more and more detailed questions. And that it's okay to say, 'I don't have that information, but I'll get it.'" Lehnertz added that one of her personality traits is to drill "really deep on a question" when she is stressed and that she told the GRCA management team that she would try to "check" herself.

**Lehnertz Did Not Authorize Unnecessary Renovations to a Park Residence**

On July 20, 2017, Lehnertz emailed GRCA managers informing them that she had toured the residence at 45 Kaibab Street in preparation for advertising the position for a deputy superintendent for operations. In the email, Lehnertz stated the home would be an important recruitment tool for the position. Lehnertz listed 19 deficiencies that she had identified during her walk-through, ranging from smaller issues like removing a coat rack in the entry hall, to larger projects like updating the kitchen and removing all carpet from the house. Lehnertz said that after informing the managers of the deficiencies, she was no longer involved in the renovations, except to request that the GRCA architect assist with the kitchen redesign.

An NPS housing official told us he managed the renovation project, to include resources, materials, personnel, and budget, and he did not have to obtain higher supervisory approval. The housing official said he inspected the house after the previous occupant moved out and made a list of necessary renovations. He recalled that Lehnertz' July 20 email included a list of updates for the house and that it instructed the housing official to coordinate with another NPS manager, who was on detail assignment. The housing official said most of the items referenced in

Lehnertz' email matched the list he had generated.

The housing official said he did not receive any further direction from Lehnertz about the renovation after receiving the July 20 email. He said he provided weekly status reports to management, which included Lehnertz, about all maintenance projects. He said neither the incoming deputy superintendent nor Lehnertz attempted to direct him to complete any aspect of the renovation.

According to the housing official, the renovation at 45 Kaibab Street began in August 2017 and ended in April 2018. He explained that the renovation took longer than anticipated because of unexpected safety issues, such as out-of-code electrical wiring, an underrated circuit breaker box, no fire alarm system, structural issues, and a sagging roof and doorways. The housing official estimated the house was built in 1978, and said it appeared to have been built in stages because one side of the house was heated with a propane furnace and the other was heated by electric baseboards. He said he used his staff, trail personnel (for landscape work), an electrician, and a seasonal carpenter (former NPS employee) to complete the renovation. The housing official provided documentation showing that the labor costs for the renovation were $135,192.83 and the cost of materials was $30,733.07, for a total renovation cost of $165,925.90.

When asked, the housing official told us that the renovations to 45 Kaibab Street impacted his employees' ability to work on other houses. He explained that he tried to keep the number of vacant homes below 35, and that when this renovation was completed, the number of vacant homes totaled approximately 50. The housing official noted, however, that because of the number of vacancies and hiring problems at the GRCA, he did not recall employees contacting him about needing a house during that time.

A GRCA maintenance employee, who worked directly on the housing project, told us that 45 Kaibab Street was "decent" and "livable" before the renovations, but he noted that after the renovations began, the maintenance crew found structural damage that needed repair. The maintenance employee said the renovations were needed to replace original work that had been completed in 1972. The renovations included installing a new kitchen, hardwood floors throughout the house, new stairs, vanities in two of the three bathrooms, and new toilets and tiles in all three bathrooms, and replacing the wiring throughout the house. He said the work also included opening the walls and ceiling in the kitchen, during which they identified and repaired structural deficiencies. The maintenance employee said all renovations were needed and none were unusual. He added that the costs were reasonable based on the work performed.

## SUBJECT

Christine Lehnertz, Superintendent, Grand Canyon National Park, National Park Service.

## DISPOSITION

We provided this report to the National Park Service Deputy Director Exercising the Authority of Director for any action deemed appropriate.

# <u>Report Fraud, Waste, and Mismanagement</u>



Fraud, waste, and mismanagement in Government concern everyone: Office of Inspector General staff, departmental employees, and the general public. We actively solicit allegations of any inefficient and wasteful practices, fraud, and mismanagement related to departmental or Insular Area programs and operations. You can report allegations to us in several ways.



| | | |
|---|---|---|
| **By Internet:** | www.doioig.gov | |
| **By Phone:** | 24-Hour Toll Free: | 800-424-5081 |
| | Washington Metro Area: | 202-208-5300 |
| **By Fax:** | 703-487-5402 | |
| **By Mail:** | U.S. Department of the Interior | |
| | Office of Inspector General | |
| | Mail Stop 4428 MIB | |
| | 1849 C Street, NW. | |
| | Washington, DC 20240 | |

# EXHIBIT G-1

# UNITED STATES DEPARTMENT OF

# THE INTERIOR

# NATIONAL PARK SERVICE

# REPORT OF INVESTIGATION

**Investigation conducted by:**
**The Law Offices of Stuart L. Plotnick**
**Neil Jacobs - Investigator**
**51 Monroe Street, Suite 701**
**Rockville, Maryland 20850**
**301.251.1286 (phone)**
**301.762.8539 (fax)**

**COMPLAINANT'S NAME: Elston L. Stephenson**
**COMPLAINT NUMBER: NPS-18-0460**

This document is for **OFFICIAL USE ONLY**. Neither it nor its contents are to be distributed outside of your Agency, nor duplicated, without proper authorization. You should be advised that any unauthorized use of this document **might** subject you to penalties provided by law.

more favorably than the Complainant under similar circumstances?

Rebuttal:
Once the Complainant has established a *prima facie* case of discrimination then management has the burden to articulate a legitimate non-discriminatory reason for its action.

Pretext:
Once management has articulated a legitimate non-discriminatory reason its action, then the burden shifts back to the claimant to establish that the agency's articulated reason is a pretext for unlawful discrimination.

Defense:
Whether the Agency official(s) responsible for the employment action at issue articulate a legitimate, non-discriminatory reason (s) for the action at issue.

Pretext:
Whether the articulated reason(s) is pretext for prohibited discrimination.

## III.   DESCRIPTION OF THE INVESTIGATION

| | |
|---|---|
| Places of Investigation: | Grand Canyon, AZ |
| Dates of Investigation: | June 14, 2019 |
| Date ROI Submitted: | August 5, 2019 |
| Investigative Method Used: | Telephone interviews |

## IV.   BACKGROUND AND SUMMARY OF EVIDENCE

### Background

**Elston Stephenson** (African American) hereafter Complainant, is a Safety Health and Wellness Manager, grade GS-0018-13, United States Department of the Interior (DOI), National Park Service (NPS), Grand Canyon National Park, Grand Canyon, AZ. He has been in his position since June 26, 2017, the same period he has worked for the Agency. His first level supervisor is Brian Drapeaux, Deputy Superintendent. He has worked for Mr. Drapeaux since January 2018. Former Superintendent Christine Lehnertz is Complainant's second level supervisor. Complainant worked for Ms. Lehnertz until she left the Agency in 2019.[1]

**Brian Drapeaux** (American Indian) responsible management official, is Deputy Superintendent, United States Department of the Interior (DOI), National Park Service (NPS), Grand Canyon National Park, Grand Canyon, AZ. He has been in his position

---

[1] Numerous efforts were made requesting that Complainant provide testimony including an interview, a completed and signed affidavit and a rebuttal. To date, no response has been received from Complainant. Additionally, former Superintendent Christine Lehnertz declined to provide testimony. See Exhibit G-9.

since June 2014.  Mr. Drapeaux is familiar with Complainant as his first level supervisor .
He is aware from visual observation that Complainant is an African American.

**Matthew Vandzura** (White) responsible management official, is Chief Ranger, grade
GS-14, United States Department of the Interior (DOI), National Park Service (NPS),
Grand Canyon National Park, Grand Canyon, AZ.  He has been in his position since
March 2016, and has worked for the Agency since 1989.  Mr. Vandzura is familiar with
Complainant as the Safety Officer at Grand Canyon National Park.  He is aware that
Complainant is African American from visual observation of him.

**Charles Erikson** (Caucasian) witness, is a Visitor Use Assistant; grade GS-5, United
States Department of the Interior (DOI), National Park Service (NPS), Grand Canyon
National Park, Grand Canyon, AZ.  He has been in his position since April 2016 and has
worked for the Agency since 2011.  Mr. Erikson is aware that Complainant is African
American from visual observation of him.

**David Kane** (Caucasian) witness, is Chief of Safety, Health and Wellness; grade GS-14,
United States Department of the Interior (DOI), National Park Service (NPS), Grand
Canyon National Park, Grand Canyon, AZ.  He has been in his position since August,
2016, and has worked for the Agency since 2008.  Mr. Kane is aware of Complainant
being African American from visual observation of him.

<u>Summary</u>

**Whether the complainant was subjected to harassment and discriminated
against on the basis of race (African American) when:**

1. **He was not given a performance appraisal during his entire tenure at
   GRCA (Grand Canyon National Park).**

<u>Management Testimony</u>

**Mr. Drapeaux** states that Complainant was not provided with a performance work plan
prior to the period November 9, 2019 to December 19, 2019.  According to Mr.
Drapeaux, former Superintendent Lehnertz wanted to fire Complainant during his
probationary period.  He states that she utilized words in describing Complainant that led
him to believe that she was basing her feelings toward him on his race rather than
performance.  Mr. Drapeaux states that he did not want to prepare a performance work
plan for Complainant because he believed that Ms. Lehnertz would want material placed
in it that could be used to justify his termination.  He states that he himself had filed
several complaints against Ms. Lehnertz.  Mr. Drapeaux states that Ms. Lehnertz was
subsequently suspended, and voluntarily resigned from her position last Spring.

Mr. Drapeaux states that Complainant has since requested a performance work plan
and/or appraisal from him both in writing and verbally.  He states that he has
attempted to meet with Complainant on multiple occasions to design his performance

5

# EXHIBIT G-2

# EXHIBIT G-3

11/27/2019                          DEPARTMENT OF THE INTERIOR Mail - Lack of Response



                                                    Stephenson, Elston <elston_stephenson@nps.gov>

## Lack of Response

**Stephenson, Elston** <elston_stephenson@nps.gov>                         Tue, Nov 26, 2019 at 8:27 AM
To: "Risser, Mary" <mary_risser@nps.gov>
Cc: "Quinn, Sean" <sean_quinn@nps.gov>

Mary,

There are legal issues involved here.

I shared this two weeks ago.

As I am preparing to go to court with the U.S Attorney, EEOC, and DOI legal, there are questions of legal jeopardy---
particularly as most of the witnesses that Quinn shared are implicated in my case(s).

The effort to dupe me 2 weeks ago was noted and a point of these ongoing discussions.

These are matters for legal professionals.

Respectfully, I will not be participating in any 'interviews' until these legal matters are resolved and I am no longer in legal
jeopardy, or compromising my rights.

Thank You.


Sincerely,

Elston
928-255-8727


[Quoted text hidden]



Stephenson, Elston <elston_stephenson@nps.gov>

# Elston Stephenson Grand Canyon Nat Park Assist: Violation of EEOC and US Attorney Complaints

**Quinn, Sean <sean_quinn@nps.gov>**                                         Wed, Nov 13, 2019 at 8:43 AM
To: "Stephenson, Elston" <elston_stephenson@nps.gov>
Cc: whanda.gerardo@eeoc.gov, lucila.rosas@eeoc.gov

Mr. Stephenson,

How did you obtain a copy of the witness list?  I am the only person in the park that has a copy of that witness list and I have not printed any paper copies of it nor I have not shared it with anyone.

As such, if you were able to obtain a copy, then there has been an electronic security breach of some sort and IT will need to be looped in to investigate how this information was accessed and disseminated to you.

-Sean


[Quoted text hidden]
--
-Sean Quinn
**Employee Relations Specialist**
**NPS Regional Office Serving Interior Regions 6, 7, & 8**
**928-638-7783**
**sean_quinn@nps.gov**

# EXHIBIT H



# United States Department of the Interior

### NATIONAL PARK SERVICE
### INTERMOUNTAIN REGION
12795 West Alameda Parkway
PO Box 25287
Denver, Colorado 80225-0287



IN REPLY REFER TO:
P4217 (IMDE-EEO)

**May 22, 2019**

### *CONFIDENTIAL: TO BE OPENED BY ADDRESSEE ONLY*
*By U.S. Certified Mail #: N/A*

Elston Stephenson
41551 Ventana Drive
Palmdale, California 93551

Mr. Stephenson:

In accordance with Department of Interior regulations, enclosed is a copy of the *Report of Counseling* for Equal Employment Opportunity Complaint # NPS-18-0460. This is a report of inquiry prepared by EEO Counselor Mr. Ron Chen, on behalf of the Intermountain Region, into the allegations you brought forth on June 11, 2018. This matter is also in relation to your allegation of a Settlement Agreement breach/non-compliance you brought forth on October 29, 2018 in connection with your original complaint (NPS-18-0460), where the Department of the Interior -- Office of Civil Rights ruled that the Agency was in non-compliance of said Settlement Agreement.

You will receive or may have already received further information from the National Park Service, Office of Equal Opportunity Programs in Washington, D.C., concerning your formal complaint of discrimination. In the meantime, you should be aware that the *Report of Counseling* may contain information about other individuals that is subject to the non-disclosure provision of the Privacy Act of 1974 (Public Law 93-579). You must ensure the privacy of those persons. Violation of the privacy act could result in criminal penalty.

Should you have any questions, please feel free to contact me at 303-969-2598.

Sincerely,

*Roosevelt T. Wilson*
Roosevelt T. Wilson
Regional Equal Opportunity Manager

Enclosure: Report of Counseling, w/attachments

*[handwritten top of page:]* The rest of PSET (crisis) to continue the very same comment on their subordinates. Lastly, this was not misplacing dates or simply forgetting. This EEO interview would have been happening at the same proximate time as the IG interview! He was lying to the EEO investigator just as he was lying to Lehnertz!

*[left margin handwritten, vertical:]* to ensure cover-up is falsified statements racist discrimination were petty pressure on

*[red highlight margin:]* Drapeaux

*[left margin handwritten, vertical:]* Not only is this not true but it is conducted. Again another example of del/deceboth/knowingly the subordinates responsible for the EEO process and keep the Superintendent. Also, during this time the practices in place to defraud

*[right margin handwritten, vertical:]* Drapeaux is clearly lying here when compared to the orders Drapeaux to conduct and EPAP & performance transferred direct report to Lehnertz to Drapeaux (Doug Kraft page 3). He spun a web of deliberate lies telling her that it was done when it had never been done. He says that he

attributable to that. However, Deputy Superintendent Drapeaux cited an email from the AP to her dated May 22, 2018 and she replied to it that same day. Deputy Superintendent Drapeaux stated Superintendent Lehnertz's reply was that the AP needed to submit some references so that the documentation would be complete and in order for her to sign the appointment letter.

### d. Evaluation and Appraisal;

1) Deputy Superintendent Drapeaux acknowledged the AP first began working at GRCA in June of 2017. However, Deputy Superintendent Drapeaux said he only became the AP's supervisor at the end of September of 2017.

*[highlighted]* Deputy Superintendent Drapeaux stated the AP first asked for an EPAP (performance appraisal) from him in June of 2018 and not previously. Deputy Superintendent Drapeaux said he had also provided the AP with performance counseling beginning in October of 2018 and it has been ongoing.

**Issue 2:** Whether Complainant was subjected to retaliation for his prior EEO activity when he was subjected to an investigation on or about 06/15/18.

Deputy Superintendent Drapeaux reiterated he is the AP's first-line supervisor and that the AP is a member of GRCA's senior executive staff. Deputy Superintendent Drapeaux noted the AP is therefore a part of the management. Deputy Superintendent Drapeaux explained that the senior executive management staff is especially sensitive to and proactive in fostering a respectful and, inclusive workforce and workplace given GRCA's history. Deputy Superintendent Drapeaux stated the management consequently endeavors to be extremely aware of any practices or behavior that might be construed as antithetical to this.

Deputy Superintendent Drapeaux stated it was against this background that he had an informal discussion with the AP about his behavior towards women in June of 2018. Deputy Superintendent Drapeaux said he had at least seven complaints from different women about the AP's behavior towards them going back to September of 2017. Deputy Superintendent Drapeaux stated these complaints have been ongoing. Deputy Superintendent Drapeaux said that as a supervisor, when he becomes aware of any employee complaints of potential harassment then it is incumbent upon him to look into them and he did so with each of these complaints. Deputy Superintendent Drapeaux stated none of them triggered a formal administrative investigation or inquiry. Nonetheless, Deputy Superintendent Drapeaux reported that in looking into these complaints it became apparent that multiple women view the AP's behavior towards them as either bullying or treating or regarding them in a subordinate manner. Deputy Superintendent Drapeaux said this has been problematic on a few levels.

Deputy Superintendent Drapeaux said he did not find the AP's behavior in each of these instances warranted disciplining him, but it raised a number of issues that meant he needed to engage in with the AP in an ongoing dialogue to make him aware of how his behavior is perceived and what he needs to do in order to modify it. Deputy Superintendent Drapeaux said there were a number of reasons for this.

Deputy Superintendent Drapeaux noted that as a preliminary matter, it is the particular responsibility of the members of GRCA's senior executive staff, of which the AP is a member, to promote a respectful,

*[bottom handwritten, inverted:]* 13  July 2, 2018. Firstly, I did not ask for counseling a month before this hurtful EEO interview! I honestly so ... make it seem ... as Lehnertz was clear ... as clear ... press with 1145 ... so fabricated & so ... so ... my to report years hurt IG the ... Clear, ... PD ... 2017. ... Counseling began ...



OFFICE OF
**INSPECTOR GENERAL**
**U.S.DEPARTMENT OF THE INTERIOR**

# UNFOUNDED ALLEGATIONS OF
# IMPROPER LEADERSHIP DECISIONS
# AND HOSTILE WORK ENVIRONMENT
# AT GRAND CANYON NATIONAL PARK

**This is a revised version of the report prepared for public release.**

approved leave

*The Senior Official Did Not Provide an EPAP for a Subordinate Employee as Requested*

The GRCA hired the senior official's subordinate employee on June 25, 2017, with a 1-year probationary period. The employee initially reported to Lehnertz but was transferred under the senior official's supervision in September 2017. Lehnertz said that at that time, she told the senior official he needed to complete a performance review and create an EPAP for the subordinate employee.



The DOI Performance Management System (370 DM 430) requires that a supervisor establish a subordinate's EPAP within 60 days of the beginning of the appraisal period, the employee's entrance on duty, the assignment of an employee to a new position, the assignment of an employee to a new or different supervisory position, or the assignment of an employee to a detail or temporary promotion scheduled to exceed 120 days.

Lehnertz said she asked the senior official for a copy of the subordinate employee's EPAP during meetings on June 25, 2018, and June 29, 2018, and by email and text message on July 2, 2018. Lehnertz said the senior official responded to each of her requests that he had an EPAP for the employee.

In the July 2 email, Lehnertz asked the senior official to provide her a copy of the signed EPAP "first thing this morning." Lehnertz said the senior official told her he was "working on it," but the signed EPAP was not on her desk when she arrived at the office on July 3. Later that day, Lehnertz asked the senior official again in an email if he had a signed EPAP for the subordinate employee.

The senior official responded to Lehnertz on July 6, stating, "After further review, I do not have a signed EPAP [for the employee]. . . . In our discussions, I was sure that I had one signed. . . . I was quite sure I had him sign the EPAP developed. Yes Chris, you did direct me to provide you a copy of a signed EPAP. My apologies for not complying with your directive."

On July 10, 2018, Lehnertz emailed an NPS regional manager stating she (Lehnertz) needed to take a disciplinary action against the senior official because he was not truthful about the signed EPAP. Later that same day, the senior official emailed the NPS regional manager, stating his belief that Lehnertz had lost objectivity regarding the subordinate employee.

The NPS regional manager said she talked to the senior official in July 2018 and told him to sign an EPAP for the subordinate employee immediately and that Lehnertz could hold the senior official accountable if the subordinate employee did not have a signed EPAP. According to the NPS regional manager, the senior official never completed the EPAP in response to Lehnertz' requests.

*The Senior Official Did Not Provide Lehnertz Written Progress Reports Regarding a High-Priority Park Initiative*

Lehnertz said developing this high-priority initiative was important not only to the GRCA but

# EXHIBIT I



**United States Department of the Interior**

OFFICE OF THE SECRETARY

Washington, DC 20240

## OFFICE OF CIVIL RIGHTS

| | | |
|---|---|---|
| **Elston L. Stephenson,** | ) | |
| Complainant, | ) | |
| | ) | Agency Case No.: DOI- NPS-18-0460 |
| v. | ) | |
| | ) | |
| **David Bernhardt,** | ) | |
| Acting Secretary, | ) | |
| U. S. Department of the Interior, | ) | |
| Agency. | ) | |

## AGENCY DECISION ON COMPLIANCE-BREACH OF SETTLEMENT AGREEMENT ALLEGATION

## I. **INTRODUCTION**

Elston L. Stephenson, Complainant, is employed as a Safety, Health and Wellness Manager, GS-0018-13, by the United States Department of the Interior (DOI), National Park Service (NPS), at the Grand Canyon National Park, in Grand Canyon, AZ. On September 13, 2018, and September 18, 2018, the Agency and Complainant executed a Settlement Agreement (SA) resolving the above-numbered EEO Complaint. The SA became effective on September 25, 2018. (**Attachment 1**).

In a letter received in the Departmental Office of Civil Rights (OCR) on October 31, 2018, Complainant alleged that the Agency breached the Settlement Agreement in the instant case, specifically Paragraph 19. Complaint requested that his EEO Complaint be reinstated for further processing from the point at which processing ceased. (**Attachment 2**).

An Acknowledgment Letter was issued to Complainant by OCR on December 3, 2018, confirming receipt of Complainant's Breach of Settlement Agreement Allegation. (**Attachment 3**). Also on December 3, 2018, OCR issued a Notice of Agency Non-Compliance Allegation to Rick Frost, Deputy Regional Director, Inter-Mountain Region, NPS (the authorized representative who signed the SA on behalf of the Agency), requesting a Response and any supporting documentation. (**Attachment 4**).

Management's Response to Notice of Agency Non-Compliance Allegation was received in OCR on December 18, 2018. (**Attachment 5**). The record also includes an e-mail, dated October 25, 2018,



● Page 2

from Rick Frost to Complainant, accompanied by a copy of a signature page from the COOP, with an a signature and approval date of October 23, 2018. (**Attachment 6**).

On December 22, 2018, OCR Employees were furloughed due to a Partial Government Shutdown, which lasted until January 25, 2019. OCR Employees returned to duty on January 28, 2019, the first workday following termination of the furlough.

The Agency is taking final action on this Alleged Breach of Settlement Claim by issuing this Decision in accordance with the Equal Employment Opportunity Commission's (Commission, EEOC) regulation at 29 C.F.R.§ 1614.504. The following analysis and findings represent the final decision of the Agency.

## II. ANALYSIS METHODOLOGY

The EEOC's regulation, at 29 C.F.R. § 1614.504, provides that if the complainant believes that the agency failed to comply with the terms of a settlement agreement, the complainant should notify the director of the Equal Employment Opportunity Office, in writing, of the alleged noncompliance with the settlement agreement, within thirty (30) days of when the complainant knew or should have known of the alleged noncompliance. The complainant may request that the terms of the settlement agreement be specifically implemented or, alternately, that the complaint be reinstated for further processing from the point at which processing ceased. The agency shall resolve the matter and respond to the complainant, in writing. If the agency has not responded to the complainant, in writing, or the complainant is not satisfied with the agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination as to whether the agency has complied with the terms of the settlement agreement or the final decision.

Additionally, 29 C.F.R. § 1614.504(a) provides that any settlement agreement knowingly and voluntarily agreed to by the parties, reached at any stage of the complaint process, shall be binding on both parties.

The Commission has held that a settlement agreement constitutes a contract between the employee and the Agency, to which ordinary rules of contract construction apply. *See Herrington v. Dep't of Def.*, EEOC Request No. 05960032 (December 9, 1996). The Commission has further held that it is the intent of the parties as expressed in the contract, not some unexpressed intention, that controls the contract's construction. *Eggleston v. Dep't of Veterans Affairs*, EEOC Request No. 05900795 (August 23, 1990). In ascertaining the intent of the parties with regard to the terms of a settlement agreement, the Commission has generally relied on the *Plain Meaning Rule.* See *Hyon O v. U.S. Postal Serv.*, EEOC Request No. 05910787 (December 2, 1991). This rule states that if the writing appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature. See *Montgomery Elevator Co. v. Building Eng'g Servs. Co.*, 730 F.2d 377 (5th Cir. 1984).

● Page 3

Additionally, the Commission has stated that it is "not generally concerned with the adequacy or fairness of the consideration in a settlement agreement, as long as some legal detriment is incurred as part of the bargain." See *Terracina v. Dep't of Health & Human Services*, EEOC Request No. 05910888 (March 11, 1992). When, however, one of the contracting parties incurs no legal detriment, the settlement agreement will be set aside for lack of consideration. See *Morita v. Dep't of the Air Force*, EEOC Request No. 05960450 (Dec. 12, 1997).

Finally, the EEOC's Regulation at 29 C.F.R. § 1614.504 (c) provides that allegations that subsequent acts of discrimination violate a settlement agreement shall be processed as separate complaints under 29 C.F.R. §1614.106 or 29 C.F.R. §1614.204, as appropriate, rather than under this section.

## III. DISCUSSION AND ANALYSIS

Complainant submitted a letter, received in OCR on October 31, 2018, alleging as follows:

1. The Department of the Interior (Agency) has violated-is in Non-Compliance with Clause 19 of the Mediation Settlement Agreement.
2. Per Clause 19, "The Agency agrees that the [Grand Canyon National Park (GRCA)] Superintendent will designate as an essential position the Safety, Health, and Wellness Manager in the Continuity of Operations Plan [COOP] no later than September 30, 2018."
3. Agency failed to do this by the September 30, 2018 deadline. As of this writing, Agency has still failed to comply with Clause 19.
4. Further, Agency attempted to fraudulently knowingly and wittingly dupe the Complainant into believing that it had complied with Clause 19 with portrayals, when it had not.
5. The text of the COOP document makes no mention of the Safety Health and Wellness Manager designated as essential position. Nor is it treated equally to other positions in the document (e.g. Public Information Officer, Liaison, Logistics Section Chief, etc.) . Although "Safety" is inserted 3 times in the document, this does not constitute "designating" the Safety Health and Wellness Manager as "essential."
6. Most importantly, the document is never signed by the GRCA Superintendent-a requirement for the document to be in full effect.
7. The document is 130 pages. Please receive the Page 4 Review and Approval (scanned October 1, 2018) with the Superintendent's required signature notably missing.
8. Please receive Page 6 of the Table of Contents with the Safety Health and Wellness Manager position notably missing.
9. Please note that there is no document designating the Safety Health and Wellness Manager as "essential" because none was ever produced by Agency. (**Attachment 2**).

The Agency responded to Complainant's allegation as follows:

1. Pursuant to the agreement, the Superintendent's office at Grand Canyon National Park directed its chief ranger to update the COOP plan to reflect this part of the agreement.

● Page 4

2. On pages 11 and 12 of the updated plan there are three references to the park safety officer being part of the Continuity of Operations Incident Management Team (IMT).

3. The COOP document states that the park has identified key personnel that will be required to provide direction and technical expertise for the reinstatement of critical and normal business functions.

4. In the eyes of the agency key personnel are all essential positions in an IMT.

5. The document goes on to list "The positions that will be staffed when fully activated." Among those key positions is the park safety officer.

6. It is the intention of the agency that the park safety officer is the park Safety, Health and Wellness Manager.

7. The safety officer is identified in three places in the document as a key person on the COOP IMT team:

8. The position is part of a list of key personnel: it is located on an organizational chart of key personnel: and it is listed in Figure 2 on page 12 as one of the key personnel. I have attached the relevant pages of the plan with this letter.

9. The plan was signed by both Deputy Superintendents at Grand Canyon on September 28, 2018.

10. The superintendent was not in the park at that time. Due to the absence of the superintendent from the office for an extended period of time, one of the acting deputy superintendents, Brian Drapeaux, signed the document as acting superintendent on Oct. 23, 2018. I have attached that signature page to this letter as well. (**Attachment 5**).

In determining whether the Agency breached the Settlement Agreement, we must first determine whether the Settlement Agreement is governed by the aforementioned plain meaning rule. See *Hyon O v. U.S. Postal Serv.*, EEOC Request No. 05910787 (December 2, 1991). As indicated in the Analysis Methodology Section (II) of this Decision, the plain meaning rule states that if the writing appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature. See *Montgomery Elevator Co. v. Building Eng'g Servs. Co.*, 730 F.2d 377 (5th Cir. 1984).

In reviewing the Settlement Agreement (**Attachment 1**), I discovered the following four (4) provisions pertinent to this matter:

1. **Effective Date.** This Settlement Agreement shall become effective as of the date the Agreement is signed by all parties and after expiration of the revocation period as outlined in Paragraph 6 of this Agreement.1

2. **Effect of Signatures.** The signatures affixed to this Settlement Agreement establish that Complainant and the Department of the Interior (a) have read this entire document, (b) have knowingly, voluntarily, and in good faith entered into this Settlement Agreement, (c) have not been induced by or through fraud, misrepresentation, duress, threat, or coercion, (d) fully

---

1 Paragraph 6 permits Complainant to revoke the SA, "no later than seven (7) days following the date on which he signs this Settlement Agreement"

● Page 5

understand all terms and conditions described in this Settlement Agreement, (e) agree with all terms and conditions described in this Settlement Agreement, and (f) agree to satisfy and perform, in good faith, the terms and conditions described in this Settlement Agreement.

15.   **Process Related to Allegations of Agency Non-Compliance.** Complainant and the Agency enter into this Settlement Agreement consistent with and guided by the authority contained in 29 C.F.R. §§ 1614.504 and 1614.603, and agree that the terms of this Settlement Agreement shall bind Complainant, the Agency, their respective employees, officials, agents, representatives, successors, and assigns.  If Complainant believes that the Agency has failed to comply with the terms of this Settlement Agreement, he shall, in accordance with 29 C.F.R. § 1614.504(a), provide written notice to the Department's Director of the Office of Civil Rights, U.S. Department of the Interior, of the alleged noncompliance within thirty (30) days of the date on which he knew or should have known of the alleged noncompliance. Complainant may request (a) that the terms of the Settlement Agreement be specifically implemented, or (b) that the Complaint be reinstated for further processing from the point at which processing ceased.  Complainant agrees that if he elects to reinstate the Complaint from the point at which processing ceased, he shall return to the Agency, within thirty (30) days of reinstatement of the Complaint, all benefits and consideration which he received pursuant to the terms and conditions of this Settlement Agreement.

19.   **The Agency agrees** that the Superintendent will designate as an essential position the Safety, Health and Wellness Manager in the Continuity of Operations Plan (COOP) no later than September 30, 2018.

I find that the Settlement Agreement, signed by the Agency on September 13, 2018, and Complainant on September 18, 2018, is clear and unambiguous, and subject to the application of the plain meaning rule.  Since the Settlement Agreement is plain and unambiguous on its face, its meaning must be determined from the four corners of the Settlement Agreement without resort to extrinsic evidence of any nature.  I will determine the parties' intention from the Settlement Agreement alone.

Meanwhile, in the Settlement Agreement, Complainant and the Agency agreed, among other terms, to the four (4) aforementioned Terms and Conditions.  Those aforementioned Terms and Conditions clearly demonstrate the clear and unambiguous nature of the Settlement Agreement.

Following a thorough review of the record in this matter, I find the following:

    A.  Pursuant to Paragraphs 1 and 6 of the instant Settlement Agreement, it became effective September 25, 2018, following expiration of a seven (7)-day revocation period after the date Complainant signed the SA (September 18, 2018).

    B.  Paragraph 15 required Complainant to submit to the Agency, written notification of noncompliance within 30 days of the date on which Complainant knew or should have known of the alleged noncompliance.

    C.  Complainant complied with Paragraph 15, and timely submitted to the Departmental Office of Civil Rights, Complainant's Notice of Agency Noncompliance with the SA.

● Page 6

    D. Paragraph 19 required the Superintendent, Grand Canyon National Park (GRCA) to designate, as an essential position the Safety, Health and Wellness Manager in the Continuity of Operations Plan (COOP) no later than September 30, 2018.

    E. The Agency failed to timely comply with Paragraph 19 of the SA by September 30, 2018 as follows:

        1. While the Agency agreed to designate Complainant's position Safety, Health and Wellness Manager, as "essential" in the COOP, the Superintendent, Grand Canyon National Park failed to do so, and provided no evidence of such inclusion.

        2. The Agency's use of the term *Safety Officer* in three (3) locations of the COOP did not constuitute designation of Complainant's position, Safety, Health and Wellness Manager as "essential" in the COOP.

        3. The Agency's submission of a signature page (*Review and Approval*) from the COOP to Complainant as proof of compliance with Paragraph 19 can best be described as bad faith based on the following:

           a. The *Review and Approval* page contained purported signatures of the Chief Ranger (*9/21/18*); Deputy Superintendent Operations (*9/28/18*); and Deputy Superintendent Business (*9/28/18*), recommending the COOP for approval by the Superintendent, GRCA.

           b. The *Review and Approval page* in question lacked the signature of the Superintendent, GRCA.

        4. Following Complainant's expression of displeasure with the lack of compliance to Management, the Agency produced a second *Review and Approval* page containing the signature of the Deputy Superintendent Business, supposedly approving the COOP on behalf of the Superintendent, GRCA, on October 23, 2018.

        5. The supposed approval by the Deputy Superintendent Business, who recommended approval on September 28, 2018, is highly questionable, since he initially recommended approval, then subsequently approved the COOP.

        6. Management's Response to Complainant's Noncompliance Allegation included the statement, "In the eyes of the agency key personnel are all essential positions in an IMT." This statement ignores the fact that the Agency agreed to to *designate, as an essential position the Safety, Health and Wellness Manager in the Continuity of Operations Plan (COOP) no later than September 30, 2018.*

        7. Management's claim, *It is the intention of the agency that the park safety officer is the park Safety, Health and Wellness Manager* does not absolve the Agency from its obligligation to comply with Paragraph 19 of the SA.

● Page 7

## IV. <u>CONCLUSION</u>

After analyzing the entire record and applying the aforementioned legal standards, we find that the Agency failed to comply with the Settlement Agreement, specifically Paragraph 19, as alleged in Complainant's Allegation of Agency Non-Compliance. The Agency is ordered to process Complainant's EEO Complaint in accordance with 29 C.F.R. Part 1614, from the point processing ceased.

The Agency shall acknowledge to Complainant within thirty (30) calendar days of the date this decision was issued, that the complaint in question has been reinstated and is being processed. Complainant must return to the Agency, within thirty (30) calendar days of reinstatement of his complaint, all benefits and consideration which he received pursuant to the terms and conditions of the Settlement Agreement. The Agency shall submit to OCR a Compliance Report within thirty (30) days of the issuance of this Decision, confirming compliance with this Decision.

This is the United States Department of the Interior's Final Decision on Compliance, and the final action in this matter.  If the Complainant is dissatisfied with this action, he has the following appeal rights.

## APPEAL RIGHTS TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

29 C.F.R. §1614.402(a) provides that an appeal of the agency's final decision to the Equal Employment Opportunity Commission (EEOC) must be filed by an appellant within thirty (30) days of receipt of an agency's or Administrative Judge's dismissal, final action, or decision.  If the appellant is represented by an attorney of record, the 30-day time limit shall begin to run from the date of receipt by the attorney of the notice of dismissal, final action, or final decision without a hearing. All such appeals must be filed with the EEOC (Commission) at the following address:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> P.O. Box 77960
> Washington, D.C. 20013

As an alternative to mailing, appeals may be hand-delivered to:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> 131 M Street, N.E., Fifth Floor
> Washington, D.C. 20507

As a further alternative, appeals that are 10 pages or less may be sent by facsimile fax to: (202) 663-7022. The appeal shall be deemed filed on the day it is postmarked, or in the absence of a postmark, on the date it is received by the EEOC.

● Page 8

Complainant shall furnish a copy of the appeal to the agency at the same time it is filed with the Commission at the address below:

> U.S. Department of the Interior
> Office of Civil Rights
> Tanisha M. Edmonds, Esq., Acting Director
> 1849 C Street, N.W., Suite 4353
> Washington, D.C. 20240

In or attached to the appeal to the Commission, the Appellant must certify the date and method by which service was made to the opposing party. The Appellant should use EEOC Form 573, Notice of Appeal/Petition (copy enclosed).

If the appeal is not filed within the thirty (30)-calendar day time limit, the appeal may be dismissed by the EEOC. However, the EEOC may, at its discretion, extend the time limits and accept the appeal based upon a written statement that there was no actual notification of the time limit, or that a timely Notice of Appeal could not be filed, due to extenuating circumstances.

Any statement or brief in support of the appeal must be submitted to the EEOC within 30-calendar days of filing of the Notice of Appeal. The EEOC, Office of Federal Operations, accepts statements or briefs in support of appeals by facsimile transmittal, provided that they are not more than ten (10) pages long. Any statement or brief in opposition to the appeal must be submitted to the EEOC and served on the Appellant (or the attorney of record, if represented by an attorney) within 30-calendar days of receipt of the statement or brief supporting the appeal, or if no statement or brief supporting the appeal has been filed, within sixty (60) days of receipt of the appeal.

It is the responsibility of the U.S. Department of the Interior to submit the entire complaint file to the EEOC, Office of Federal Operations, within 30-calendar days of initial notification that an appeal has been filed.

## CIVIL ACTIONS

In lieu of an appeal to the Commission, you may file a civil action in an appropriate United States District Court within 90 calendar days of receipt of the final decision.

If you file an appeal with the Commission, and you are not satisfied with the Commission's decision, you may file a civil action in a United States District Court within 90 calendar days of receipt of the Commission's final decision.

You may also file a civil action any time after 180 calendar days from the date of filing an appeal with the Commission, if there has been no final decision by the Commission. If you decide to file a civil action and are unable to afford Counsel, the Civil Rights Act gives the Court discretionary authority to appoint Counsel without payment of fees or costs by you. The granting or denial of your request is

● Page 9

within the sole discretion of the Court. Your request and the civil action <u>must be filed within 90 days</u> of the date the final decision is received.

If you file a civil action involving this complaint, <u>**you must specifically name the Acting Secretary of the Department of the Interior, David Bernhardt, as Defendant**</u>. Failure to do so may result in the loss of any judicial redress to which you may be entitled.

It is important to note that 29 C.F.R. §1614.409 states, "Filing of a civil action under §1614.408 or §1614.409 shall terminate Commission's processing of the appeal. If private suit is filed subsequent to the filing of an appeal, the parties are requested to notify the Commission in writing."

_____
Tanisha M. Edmonds, Esq.
Acting Director
Office of Civil Rights

March 29, 2019
Date

Attachments:

1. Settlement Agreement Signed September 13, 2018 (Agency), and September 18, 2018 (Complainant)
2. Complainant's Letter Alleging Breach of Settlement Agreement, Received October 31, 2018
3. Acknowledgment Letter Issued to Complainant by OCR, December 3, 2018
4. Notice of Agency Non-Compliance Allegation, Dated December 3, 2018. to Agency Management Official
5. Management's Response to Notice of Agency Non-Compliance Allegation, Received in OCR December 18, 2018
6. E-mail from Rick Frost to Complainant, Dated October 25, 2018, and Copy of Signed Review And Approval Page of COOP

Enclosure: EEOC Appeal Form

cc:
Complainant: Elston L. Stephenson, 41551 Ventana Drive, Palmdale, CA 93551; Certified Mail Number (**9414 7266 9904 2969 6702 75**)

Rose Blankenship, EEO Officer, National Park Service (Inter-Office Mail)