Elston L Stephenson (Plaintiff, Pro Se)
Case 3:19-cv-08268-DLR
P.O. Box 129
Grand Canyon, AZ 86023
January 21, 2020

FILED        LODGED
RECEIVED        COPY

FEB 24 2020

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ BilB DEPUTY

U.S. District Court Clerk's Office
Sandra Day O'Connor U.S. Courthouse, Suite 130
401 W. Washington Street, SPC 1
Phoenix, AZ 85003-2118


Dear Court,

Please receive and consider this Plaintiff's REPLY to U.S. Attorney's REPLY to Plaintiff's

RESPONSE TO MOTION TO DISMISS in the case of STEPHENSON V DRAPEAUX.

Thank You.


Sincerely,

Elston L Stephenson



REPLY

          Your Honor, in U.S. Attorney's *Reply*, Counsel lists the Court's jurisdictions. Respectfully, the Court will

notice that Counsel overlooks the fact that discerning whether or not a party or witness is lying before the Court

is not only the jurisdiction of *all* courts and weighs on whether or not any or all of that party's or witness'

testimony should be thrown out, but is an indispensable pillar of the entire 'third branch' and the American

Justice System itself. Defendant's many demonstrated instances of materially lying to this Court—perjury (to

which Counsel is now desperately trying to distract) is sufficient grounds to Deny *Motion to Dismiss*.


1

Again, it is respectfully asked that the Court please accept and reference evidence—Exhibits already before the Court.

Counsel's *Reply* argument that "whether or not [Defendant] is untruthful as Plaintiff claims is legally irrelevant" is not only absurd and wrong, but should be viewed by the Court as a haunting admission of guilt in his numerous perjuries.  Unfortunately U.S. Attorney embraced Defendant without ascertaining his character.

*Falsus in uno, falsus in omnibus*

Defendant's testimony is the foundation of his attempt to fend off Plaintiff's restraining order remedy (Injunction Against Harassment) for his 18USC §2261A stalking and serves as the foundation of his claim of 'legitimate managerial oversight' and 'scope of duties'. Respectfully, then, his truthfulness before this Court should be thoroughly examined--tested in court. If it is found that Defendant committed perjury, not only should the Court summarily issue the Injunction remedy or deny *Motion to Dismiss*, but Defendant should be prosecuted for perjury.

To briefly review; in Counsel's *Motion to Dismiss* Defendant testifies to the U.S. Attorney and the U.S. Attorney testifies to this Court that "He personally saw the GOV at a coffee shop parking lot an hour away from the Grand Canyon and contacted Plaintiff inside the shop." This perjury is easily proved by the fact that an hour's drive from Grand Canyon National Park (driving the speed limit) is Holy Dove Chapel, Hwy 180 mile marker 236,  58.4 miles away (starting at the GRCA intersection of Center Road and Market), a small patch of private homes, and miles of Coconino Forest (Exhibit X-1). Although the tiny church is unique, picturesque, and welcoming; no one would mistake it for "a coffee shop". Plaintiff measured and timed the trip on 2-19-2020. Defendant should be examined on the stand before this Court to provide the name of the "coffee shop", provide the date, describe where and how the vehicle was 'parked' when he "saw the GOV in the parking lot" at "a coffee shop" "an hour away from the Grand Canyon".  Perhaps we could all pile into a van and Defendant can drive the Court to the "coffee shop" for a re-enactment.

2

In *Motion to Dismiss* Defendant testifies to this Court that "Plaintiff had a history of often using the GOV without checking it out under proper protocols". This knowingly deliberate material perjury can easily be proved. Defendant—Plaintiff's then-supervisor before he was removed for stalking and never returned, should be put on the stand and examined as to what those so-called protocols are. As Plaintiff's supervisor, has he ever required Plaintiff to sign out his vehicle? Did he put the so-called protocols place? If so when? Documentation of such protocols should be readily available. Can Defendant provide documentation? When was Plaintiff informed, trained, or educated on them? Are there any such protocols required of Plaintiff to this day?

In *Motion to Dismiss* Defendant testifies to U.S. Attorney and U.S Attorney testifies to this Court that Defendant was stalking Plaintiff's home "to check whether or not Plaintiff was misusing a government owned vehicle (GOV)." Defendant should be put on the stand and examined as to being not only Plaintiff's supervisor, but Deputy Superintendent of Grand Canyon National Park, why for more than 2 years of knowing Plaintiff bringing his vehicle home like others in the neighborhood—why didn't he simply order that the vehicle not be brought home if it violated any policy or procedure? Where is documentation that Defendant ever notified or counseled Plaintiff that he could not take the vehicle home as others in the neighborhood did? Did Defendant stalk or 'stake out' their homes as well? How many homes has Defendant 'staked out'? For what reasons?

In *Motion to Dismiss* Defendant attempts to hide behind the shield of the '*suspension*'. What Counsel conceals from the Court is that this 'suspension' is also in part the product of fraud as Defendant tried desperately to build up enough of a case for suspension consistent with other instances of suspension in the Park. To this end Defendant, even after seeing Plaintiff earlier in the day falsified a charge of AWOL hoping that it would stick, and even included the outrageous charge of 'coming to work early' as a way to fatten up his suspension proposal. Also, Defendant did not attempt the 'suspension' contemporaneously, but waited. The reason he waited is because he did not dare try it with temporary Superintendent 3 at the helm because he knew that she would not stand for it. So knowing that Superintendent 4 would soon be arriving, so he waited. He knew that Superintendent 4 would 'have his back'. But this backing would only go so far.

In *Motion to Dismiss* Defendant testifies to U.S. Attorney and U.S Attorney testifies to this Court that "Defendant...*investigated* Plaintiff because he had been directed by his own Supervisor".  Your Honor this perjury is not only easily provable; but may expose others to charges of perjury and suborning perjury. This is because demonstrably, 'Defendant's Supervisor', Superintendent 4 not only immediately and contemporaneously filed the DOI/NPS DO-16E Harassment Complaint against Defendant but removed Defendant as Plaintiff's supervisor instantly when Plaintiff notified him of the stalking. He would not have done this if he had "directed" the Defendant's stalking. Evidence already before this Court (Exhibit X-4) clearly demonstrates that at no time—nearly 3 months of opportunities before Superintendent 4's departure did he ever state directing this or take any action consistent with having directed Defendant to stalk Plaintiff's home.

In *Motion to Dismiss* Defendant testifies to this Court that Plaintiff was disciplined for misuse of his government vehicle. What was the discipline? When? Like the others, this perjury is easy to prove by simply ordering Defendant to produce the documentation of such discipline. It does not exist. It does not exist because Defendant is lying—another count of perjury.

Finally, *Motion to Dismiss* Defendant testifies that "managers attended classes as part of routine oversight of its employees" to rebut charges that he inspired others to stalk.  If this utterance by Counsel feels to the Court out oddly of place in *Motion*—an afterthought, it is because it is a *consciousness of guilt* tell. Defendant knows that this is a problem in his story that had to be addressed.  This perjury can easily be proved. First of all, only one manager showed up. Defendant knows the manager. Records—attendance roster show (Exhibit X-6) that none of the manager's subordinates ("employees") attended the training. Therefore, the manager had no "oversight of its employees". Defendant knows this. Armed, and posted forbiddingly at the entrance—even making even the instructors uncomfortable; when confronted by Plaintiff she responded that she was ordered "to watch" Plaintiff. Not only should Defendant be examined on the stand but so should the manager.  It has to be addressed because Defendant's inspiring others to stalk had such bizarre consequences.

Respectfully, the Court will be reminded that also in evidence (Exhibit X-5) is Defendant's inspiring others to stalk in this instance to the extent that they so hounded a non-NPS, civilian first aid/CPR instructor— going to the extremes of finding her, finding her phone number, then harassing, and hounding her that she was so afraid that she brought along a former U.S. Army Ranger as an escort, a gun, and a Taser as she conducted training for her own safety.

Your Honor, there are other questions in these regards which Plaintiff respectfully preserve for when Defendant is on the stand which will further, indelibly prove this perjures.

Plaintiff appreciates Counsel in *Reply* taking note of the "voluminous" evidence of deadly dangers doggedly detected and reported to include video of preventable potentially deadly helicopter accidents, nearly 20 years of uranium exposures, a fleet of dead or dying AEDs representing such risk that the DOI Chief Medical Officer urged yanking the entire system off the walls and boxed up; the many many frauds ranging in falsified material sent to OSHA, deleting injured workers form databases (likely insurance fraud), falsifying helicopter accident investigations, falsifying DOI/16E investigation—just to name a few. "Voluminous" is the evidence of 'Culture of Fraud' from which Defendant comes and attempts to bring into this Court—to defraud this Court.

The Court will find that Denying *Motion to Dismiss* will allow compelling evidence to be brought before this Court as it keeps coming in. For just a few days ago, 2-17-2020 Plaintiff was provided a map of Grand Canyon National Park with colors and of a bull's eye-like deep red center (Exhibit X-2). The map is entitled "Surface Gamma Dose Rates". The center of the bull's eye is the Ophan Mine where Plaintiff was sent to chauffer Regional NPS employees as they buried the three 5-gallon buckets of uranium of the 'uranium incident' in shallow pits throughout the land in violation of CERCLA law. The dangers of the gamma radiation and his exposure were concealed from Plaintiff—never revealed in violation of the law until this past President's Day.

This Culture of Stalking in retaliation may even extend to currently stalking Plaintiff for appearing before this Court. When Plaintiff recently return from a month's long absence on 2-11-2020 Plaintiff found "ISB Surveillance Van" among the emitters as he attempted to synch his phone to his household WiFi (Exhibit X-3).

He had never noticed this emitter in the near 3 years of living in this home. He did not notice this emitter before departing for the trip. Plaintiff Googled "ISB" to find that it stands for Investigative Services Branch. It is the secretive branch of the National Park Service which conducts surveillance, stakeouts, and spying for the National Park Service. It is in the Court's interest to determine if Plaintiff is being targeting with the same 'surveillance'—stalking for appearing before this Court as he has endured for finding and reporting hazards which could kill or seriously injure workers and visitors of Grand Canyon National Park.

Defendant lies to this Court in the hope of painting this 25-year former senior officer, attack helicopter pilot, and leader who served 5 years on this Nation's front lines and product of a culture of Integrity and protecting others as somehow infamous and fool the Court in to believing he is some sort of 'crime fighter'. Counsel never once challenges Plaintiff's pointing out instances of Defendant's perjuries, or attempts to hold up to the Court Defendant's integrity, truthfulness or honor. Plaintiff appreciates that Counsel begins his *Answer* by recognizing the "voluminous" instances of fraud in the DOI/NPS 'Culture of Fraud' and the many instances where Plaintiff—arguably one of the top safety professionals and accident investigators—particularly aviation in the entire NPS doggedly finds and reports dangers which could inarguably hurt of kill Grand Canyon workers and visitors. Plaintiff respectfully asks that this Court recognizes that Counsel does not ever once attempts to deny a single one of these. Nor does Counsel attempt to disprove any of the many instances of Defendant's lying—perjury. And that If they could have, they would have.

The Court surely recognizes that anyone who would risk the jeopardy of being indicted, tried, convicted, convicted, and imprisoned for multiple counts of felony perjury must really want to 'get' Plaintiff. For anyone wanting to 'get' Plaintiff so badly in front of a federal Court; stalking him in his home, in a forest, where he enjoys a sense of impunity would seem almost too irresistible. Plaintiff respectfully ask that the Court view Defendant's multiple instances of perjury itself as evidence the measure of Defendant's desire to harm Plaintiff.

The Court surely recognizes that Plaintiff could be charged with perjury if his evidence weren't true.

Defendant targeted—wanted to 'get' Plaintiff because Plaintiff found and reported those deadly, embarrassing hazards. They were bad for Defendant and others with their aspirations of promotion. They were bad for the DOI and NPS—respectfully, why else would You label a map showing a red stream of gamma radiation crossing a heavily trafficked public footpath and road "Not to be Released. FOIA Protected Document" if not to hide? Defendant dragged multiple perjuries into this Court out of habit—a sort of *immoral muscle memory* because in his DOI/NPS 'Culture of Fraud', he always got away with it (except where the DOI IG tagged him in DOI *IG Report 18-1188, Exhibit G*). He continued every next time emboldened by not being held accountable and without consequence for the last. Defendant prays that this Court finally draws the line by firmly demonstrating that You don't lie before a federal Court. Even Counsel would agree that that this is in this Court's *jurisdiction*.

*Falsus in uno, falsus in omnibus.*

In *Motion to Dismiss* and *Reply* Counsel heavily leans on "Plaintiff alleges this harassment is related to his pending EEOC claims." And that this, somehow, shields Defendant from any and all crimes he commits against Plaintiff from being tried before any tribunal other than the EEOC. The EEOC claim along with Plaintiff finding and reporting dangers, frauds, and not going along with the frauds are mentioned—not for adjudication but as reasons for the retaliation targeting of Plaintiff. Plaintiff filed for an *Injunction Against Harassment* as remedy because Defendant was caught by a co-worker stalking Plaintiff under elements of 18USC 2261A. If Defendant stalked Plaintiff holding a satchel of money and ran him down from behind—snatching the money and running off or stabbed or murdered Plaintiff. And someone called the police who caught Defendant (just as he was caught stalking Plaintiff's home); it would be ridiculous for Counsel to argue that because Plaintiff has "pending EEOC claims" against Defendant that these 18USC offenses can only be handled—not by the Court, but by an EEOC which is not only un-equipped to handle such crimes but is too slow moving to provide immediate protection for the safety of Plaintiff and public safety of others. So it is with Counsel's argument here.

7

This also has Constitutional denial of *equal protection* violations and implications as it is based entirely on Plaintiff's race and is clearly a defense unavailable against a white—non protected class Plaintiff.

Counsel attempted to 'big foot' the EEOC process by inserting the U.S. Attorney's Office along with the DOI Solicitor's Office into the EEOC case—attempting to pressure Plaintiff to make a deal for some "universal solution" in exchange for dropping Plaintiff's *equal protection* right before this Court "without prejudice" if Plaintiff agreed to pursue the stalking before the EEOC. Then, if that was unsatisfying, to return to this Court. Respectfully, Plaintiff clearly declined.

Your Honor, Counsel would not have offered to return this case to this Court if there was no case.

You Honor, it is hoped that this Court recognizes that even this non-lawyer, Pro-se Plaintiff has demonstrated enough evidence—cause and doubt which compels that *Motion to Dismiss* should be Denied. And that this case should move forward to a full hearing/trial where Defendant's rights will still be protected.  Where Defendant can defend himself against multiple charges of felony perjury. And where Counsel can still have the opportunity to ultimately prove his case.  And where Justice can be found before a Finder of Fact.

Your Honor, please—in the interest of Justice and public safety Deny *Motion to Dismiss* and set a date for a hearing/trial which will allow Plaintiff to secure professional legal counsel, depose witnesses, document production, and justly prove Defendant's (and others') Motive enroute to securing righteous Injunction remedy.

Thank You, Your Honor.


Respectfully Submitted.

Elston L Stephenson, OHST
Safety Health & Wellness Manager
Tort Claims Officer
Grand Canyon National Park
928-255-9727

# EXHIBIT X-1

# EXHIBIT X-1

## HOLY DOVE CHAPEL 60 MINS FROM GRCA



# EXHIBIT X-1

## HOLY DOVE CHAPEL 60 MINS FROM GRCA



# EXHIBIT X-2



Figure 3-3
Surface Gamma Dose Rates

OU1 Orphan Mine Site
OU1 EE/CA
Grand Canyon National Park, Arizona



**Legend**

**Gamma Dose Rates (μrem/hr)**
- 2.3 – 6.6
- 6.6 – 8
- 8 – 13.3
- 13.3 – 33.2
- 33.2 – 66
- 66 – 133
- 133 – 275
- > 275

**Site Features**
- 3-Strand Fence
- Cyclone Fence
- Investigation Areas
- Background Grids
- Canyon Rim
- Road
- Railroad
- Site-Specific Coordinate System

μrem = microrem

Canyon Background Area

Haul Road Area

Y axis

**Confidential Deliberative Privileged Draft Document Not to be Released - FOIA Protected Document**

Site-specific coordinate system is tied to the Arizona State Plane coordinate system.
The LiDAR feature information under layer is approximate and not tied directly to Site coordinate system.
LiDAR Source:
LiDAR implemented by AMEC in 2007 on behalf of Tech-Sym Corporation and Cotter Corporation.

# EXHIBIT X-3

# EXHIBIT X-2

## PLAINTIFF'S HOUSE SHOWING ISB SURVIELLANCE WIFI

●○○○○ Verizon 🤏    10:20 AM

**< Settings**    Wi-Fi

Wi-Fi

> hug2g682998

PERSONAL HOTSPOTS

Swede's iPhone    ●●○○○ 3G

CHOOSE A NETWORK...

hug5g682998

ISB Surveillance Van

Other...

Ask to Join Networks

Known networks will be joined automatically. If no known networks are available, you will have to manually select a network.

# EXHIBIT X-4

8/11/2019                                          DEPARTMENT OF THE INTERIOR Mail - Rights and Responsibilities Notification



Stephenson, Elston <elston_stephenson@nps.gov>

## Rights and Responsibilities Notification

**Smeck, Woody** <woody_smeck@nps.gov>                                              Fri, Jul 26, 2019 at 4:13 PM
To: Elston Stephenson <elston_stephenson@nps.gov>

Elston,

As we discussed today, I have entered your complaint into the DO16E Anti-Harassment Tracking System. The complaint
has been transmitted to the Regional HPOC for processing.

Attached please review and sign the Notification of Rights and Responsibilities Statement. I will need your signature on
the Notification today if possible, or no later than Monday morning when we meet at 8am in my office.

Thank you for your time today.


Woody Smeck
Acting Superintendent
Grand Canyon National Park
P.O. Box 129
Grand Canyon, AZ 86023

---
(928) 638-7945 office
(559) 788-9247 mobile

📄 **DOC.pdf**
491K



## NATIONAL PARK SERVICE
## HARASSING CONDUCT ALLEGATION ACKNOWLEDGEMENT FORM
## NOTIFICATION OF RIGHTS AND RESPONSIBILITIES

Employees who believe they have been subjected to harassing conduct have the **right** to:

1. Report the matter immediately to any NPS supervisor or management official, any employee relations specialist, or the Office of Inspector General;

2. In addition to filing a report, they also have additional avenues for individual relief and remedies and access to non-filing support options;

3. Present and pursue the allegation of harassing conduct free from restraint, interference, coercion, harassment, and reprisal.

4. Have their allegations taken seriously and handled appropriately.

Employees reporting harassing conduct have the **responsibility** to:

1. Fully cooperate with the presentation of information, to include scheduling of interviews or meetings, responding to correspondence, and providing requested material or information, in the processing of their allegations of harassing conduct.

2. Keep the Agency informed of their contact information.

3. Notify NPS of any questions or concerns about the Anti-Harassment Process.

**I understand my rights and responsibilities. I have been given a copy of RM-16E which explains, among other things, other avenues for relief and support.**

| | | |
|---|---|---|
| *Eileen Lilyas Stephen* | 7/28/2019 | GRCA |
| Employee Reporting Harassment Conduct | Date | Unit |
| *Wendy Mell* | 7/26/19 | LRCA |
| Person taking the complaint | Date | Unit |



Stephenson, Elston <elston_stephenson@nps.gov>

## Harassing Conduct Complaint Receipt

**Anti-Harassment Tracking** <anti_harassment_tracking@mailer.itc.nps.gov>          Fri, Jul 26, 2019 at 4:15 PM
Reply-To: anti_harassment_tracking@mailer.itc.nps.gov
To: elston_stephenson@nps.gov

Greetings,

This email serves as a receipt that a harassing conduct complaint was submitted, and assigned to
the appropriate representatives. We at the National Park Service take discrimination and
harassment very seriously. We appreciate your due diligence as a National Park Service
employee. If the National Park Service employee relations or other designated official has any
questions or clarification about this complaint, they will contact you directly.

**Complaint/Case Information Summary:**

Case Subject: Intermountain Region-GRCA-Race
Case Number: 868

Date Submitted: 07/26/2019.

### NATIONAL PARK SERVICE

### HARASSING CONDUCT ALLEGATION ACKNOWLEDGEMENT FORM NOTIFICATION OF

### RIGHTS AND RESPONSIBILITIES

**Employees who believe they have been subjected to harassing conduct have the <u>right</u> to:**

1. Report the matter immediately to any NPS supervisor or management official, any
employee relations specialist, or the Office of Inspector General;

2. In addition to filing a report, they also have additional avenues for individual relief
and remedies and access to non-filing support options (see below);

3. Present and pursue the allegation of harassing conduct free from restraint,
interference, coercion, harassment, and reprisal (see below);

4. Prompt notification upon completion of the anti-harassment process that the fact-finding has been completed but will not receive a copy of the resulting report or information about any disciplinary actions taken against any other employees(in accordance with RM 16E Section (2)(10));

5. Have their allegations taken seriously and handled appropriately.

**Employees alleging harassment have the responsibility to:**

1. Fully cooperate with the presentation of information, to include scheduling of interviews or meetings, responding to correspondence, and providing requested material or information, in the processing of their allegations of harassing conduct.

2. Keep the Agency informed of their contact information.

3. Notify NPS of any questions or concerns about the Anti-Harassment Process.

**What you need to know about retaliation.**

A manager or supervisor may not fire, demote, harass, or otherwise take any personnel action against an individual for reporting an allegation of misconduct under this policy. Retaliation might deter a reasonable person from opposing prohibited activities and discrimination, providing information about an allegation, or participating in an established complaint process. Protected activity under this policy could include reporting alleged misconduct, being a witness in an inquiry or investigation, complaint, or lawsuit, communicating with a supervisor or manager about employment discrimination or harassment, resisting sexual advances or harassing behavior from a supervisor or manager, or intervening to protect others who may have suffered discrimination. Participating in a complaint process is protected from retaliation under all circumstances.

Engaging in protected activity under this policy does not shield an employee from all personnel actions. Supervisors and managers can take personnel actions, including discipline and removal, if they are motivated by *non-retaliatory and non-discriminatory* reasons that would otherwise result in such consequences (e.g., transferring an employee for legitimate business reasons, closely monitoring the performance of an employee who is having performance issues).

The following are examples of personnel actions that would be unlawful retaliation if they were taken because of, or were motivated by, an employee's protected activity:

- Transferring the complainant or witness against his or her will;
- Ignoring or not communicating with the complainant or witness;
- Changing work assignments of the complainant or witness without a valid work-related rationale;
- Withholding work-related information from the complainant or witness;

- Disciplining the employee or giving a performance evaluation that is lower than it should be based on the employee's actual work performance;
- Engaging in verbal or physical abuse or other activities prohibited by this policy;
- Threatening to make, or actually making reports to authorities without a valid reason; and
- Increased scrutiny of work performance or conduct.

•

- **Additional Avenues for Relief or Remedies**

DO16E is designed to stop harassing conduct that has occurred as soon as possible and to deter its occurrence in the future. However, corrective action under DO 16E does not provide the remedies (*e.g.*, compensatory damages) that may be available through the EEO, grievance, or other processes.

If you believe you have experienced harassing conduct and want to seek relief or remedies, you should know that filing a report under 16E does *not* satisfy the requirements for filing an EEO complaint, negotiated grievance, or other procedure and obtaining remedies pursuant to them. Nor does it delay the time limits for initiating those procedures. If you wish to pursue statutory, administrative, or collective bargaining remedies for unlawful harassment, the following avenues are available.

**For an EEO complaint pursuant** to **29 C.F.R. § 1614** (available for all claims of illegal harassment other than those based on status as a parent, marital status and political affiliation), contact an EEO counselor in the NPS's Equal Employment Opportunity Offices within 45 days from the most recent incident of alleged harassment (or personnel action, if one is involved), as required in 29 C.F.R. § 1614.105(a)(1).

**For a negotiated grievance claim,** contact your local union representative to file a grievance in accordance with the provisions of the applicable Collective Bargaining Agreement.
**For an administrative grievance claim,** file a written grievance in accordance with the provisions of 370 DM 771, Administrative Grievance Procedures. For more information, ask your Employee Relations Specialist.

**For an appeal to the Office of Special Counsel (OSC)** regarding claims of harassment related to marital status and political affiliation, pursuant to 5 U.S.C. §2302(b)(1) and (b)(10), you may file a written appeal with the OSC as described in 5 C.F.R. §1800.1 and on www.osc.gov.

**For an appeal to the Merit Systems Protection Board** pursuant to 5 C.F.R. § 1201.22, file a written appeal with the Board within 30 days of the effective date of an appealable adverse action as defined in 5 C.F.R. § 1201.3, or within 30 days of the date of receipt of the agency's decision, whichever is later.

## Additional Support Resources Available To Employees

Experiencing harassing conduct can be a very serious, somber, and perhaps emotional experience. Employees who have experienced harassing conduct have multiple resources available that can provide assistance and advice, including:

- Speaking with the Ombuds

    **Scott Deyo**, 844-288-7046 (toll free),   scott_deyo@contractor.nps.gov
    **Sigal Shoham**, 844-775-7726 (toll free), sigal_shoham@ios.doi.gov

    or consulting with or engaging in alternative dispute resolution procedures through a
    CORE PLUS neutral;

    Employees are encouraged to contact the Ombuds or other CORE PLUS neutrals to discuss any workplace related concerns, including those related to harassing conduct. An Ombuds is impartial, informal, and confidential resource that works independently from management's chain of command to explore and aid in the resolution of individual and systemic issues affecting an organization. Conversations with Ombuds and other CORE PLUS neutrals are confidential and informal, and provide the employee a safe place to explore options for addressing their concerns. Ombuds and CORE PLUS neutrals are not obliged to report discussions (outside of imminent risk of harm), and as a result, engaging with an Ombuds or other CORE PLUS neutral does not constitute a report under this policy.

- Engaging the services provided by the Employee Assistance Program, call (800) 869-0276 or go to espyr.com, login: interioreap;

- Consulting with a union representative, if covered by a bargaining unit

- Informal networks and support available through the various Employee Resource Groups

Engaging with these resources *does not* constitute a report under this policy, as these entities do not have an obligation to inform management of allegations of harassing conduct.

For more information on the National Park Service Anti-Harassment Policy, **select here for the Reference Manual 16E.**

# EXHIBIT X-5

# EXHIBIT X-5

## INSPIRING OTHERS TO STALK GUN FOR PROTECTION

••••• Verizon 🤚     5:50 AM     🔋

< 8     G     G     GRCA Brian...   GCNP Jeann...   ①



Brian, Good Afternoon. I am going to put in for 2 hours work today. I had to remove the 'uranium buckets' from the Museum Collections building. Just finished up. Thank You.

Tue, Apr 16, 3:47 PM

GRCA Brian Drapeaux Dep Superintendent

Hi Elston. For tomorrow training it will be capped at 12 people because only two instructors are available. Tusayan has 2 instructors and 4 mannequins so class is capped at 12 students total. 6 per instructor. This is same for both tomorrow and the class scheduled for 4/26. GRCA doesn't have instructors or mannequins to spare.

Notifications should go out prior to the 8 am start so staff know.

G     🅐     🥊     🍳     🎙

••••• Verizon 🤚     7:49 AM     🔋

< 8     C     ①

CPR Instruct Teri Tallent

You'll see this sign as soon as You make the left off Hwy 64 onto Center Road...



The sharp left will come up in like 1 block after the sign. Then just follow the S curving road, pass by the Airfield, then You'll see this FMD building...the Conference Room is on the bottom floor right thru the double doors...

Please don't forget to leave your pistol and your taser in the car

Eric went through the gate and they didn't charge him and we will call

🍳     🥊     🅐     Text Message     ←

# EXHIBIT X-6

# EXHIBIT X-6

## ROSTER OF TRAINING STALKED BY MANAGER



| | A | B |
|---|---|---|
| 2 | | |
| 3 | Coombs, Beth | Commercial Services |
| 4 | Lenz, Bradly | Albright Learning Center |
| 5 | Chambless, Hannah | |
| 6 | Talley, Kimble | Albright Learning Center |
| 7 | Pattison, Justin | |
| 8 | Besom, Kim | Sciences and Natural Resources |
| 9 | Wavrin, Carolyn | Sciences and Natural Resources |
| 10 | Murdoch, Ty | Sciences and Natural Resources |
| 11 | Steller, Melissa | Sciences and Natural Resources |
| 12 | Jensen, Ahsa | Sciences and Natural Resources |
| 13 | Rosenberg, Jamie | Sciences and Natural Resources |
| 14 | Silvas, Nathan | Sciences and Natural Resources |
| 15 | Anderson, Oliver | Sciences and Natural Resources |
| 16 | Edmonson, Charles | Sciences and Natural Resources |
| 17 | Garcia, Santiago | Sciences and Natural Resources |
| 18 | Gibbs, Kristin | Albright Learning Center |
| 19 | Zylo, Mary | |
| 20 | Sanderson, Renee | |
| 21 | | |

South Rim April 17, 2019   South Rim April 26, 2019   Flagstaff April 17, 2019   Flagstaff April 23, 2 ...

# EXHIBIT G



OFFICE OF
**INSPECTOR GENERAL**
**U.S. DEPARTMENT OF THE INTERIOR**

# UNFOUNDED ALLEGATIONS OF IMPROPER LEADERSHIP DECISIONS AND HOSTILE WORK ENVIRONMENT AT GRAND CANYON NATIONAL PARK

**This is a revised version of the report prepared for public release.**

## SYNOPSIS

We investigated allegations that Grand Canyon National Park (GRCA) Superintendent Christine Lehnertz proposed a 1-day suspension for a GRCA senior official for an improper purpose; that she created a hostile work environment and engaged in bullying and retaliatory behavior against senior leaders, particularly male leaders, at the GRCA; and that she wasted nearly $180,000 in renovations to a park residence.

We found that Lehnertz legitimately proposed a 1-day suspension for the GRCA senior official for "Failure to Follow Supervisory Instruction" because the official did not provide Lehnertz a copy of an Employee Performance Appraisal Plan (EPAP) for one of his subordinate employees, despite multiple requests; did not provide written reports as requested by Lehnertz related to a high-priority initiative at the GRCA; and did not attend a scheduled meeting related to that initiative.

We found no evidence that Lehnertz created a hostile work environment or that she wasted nearly $180,000 in unnecessary renovations to a park residence.

We provided this report to the National Park Service Deputy Director Exercising the Authority of Director for any action deemed appropriate.

## DETAILS OF INVESTIGATION

We investigated allegations that questioned Grand Canyon National Park (GRCA) Superintendent Christine Lehnertz' leadership at the GRCA. The allegations stated that Lehnertz:

- Proposed a 1-day suspension for a GRCA senior official for an improper purpose

- Created a hostile work environment and engaged in bullying and retaliatory behavior against senior leaders, particularly male leaders, at the GRCA

- Wasted nearly $180,000 in renovations to a park residence

**Lehnertz Proposed Suspension of a GRCA Senior Official for Legitimate Disciplinary Reasons**

We found that on August 31, 2018, Lehnertz proposed a 1-day suspension without pay against the GRCA senior official for "Failure to Follow Supervisory Instruction." According to Lehnertz, the senior official did not:

1. Provide an employee performance appraisal plan (EPAP) for a subordinate employee as requested

2. Provide Lehnertz written progress reports regarding a high-priority park initiative as directed

3. Attend a required meeting to discuss development options for the initiative or request

approved leave

*The Senior Official Did Not Provide an EPAP for a Subordinate Employee as Requested*

The GRCA hired the senior official's subordinate employee on June 25, 2017, with a 1-year probationary period. The employee initially reported to Lehnertz but was transferred under the senior official's supervision in September 2017. Lehnertz said that at that time, she told the senior official he needed to complete a performance review and create an EPAP for the subordinate employee.

The DOI Performance Management System (370 DM 430) requires that a supervisor establish a subordinate's EPAP within 60 days of the beginning of the appraisal period, the employee's entrance on duty, the assignment of an employee to a new position, the assignment of an employee to a new or different supervisory position, or the assignment of an employee to a detail or temporary promotion scheduled to exceed 120 days.

Lehnertz said she asked the senior official for a copy of the subordinate employee's EPAP during meetings on June 25, 2018, and June 29, 2018, and by email and text message on July 2, 2018. Lehnertz said the senior official responded to each of her requests that he had an EPAP for the employee.

In the July 2 email, Lehnertz asked the senior official to provide her a copy of the signed EPAP "first thing this morning." Lehnertz said the senior official told her he was "working on it," but the signed EPAP was not on her desk when she arrived at the office on July 3. Later that day, Lehnertz asked the senior official again in an email if he had a signed EPAP for the subordinate employee.

The senior official responded to Lehnertz on July 6, stating, "After further review, I do not have a signed EPAP [for the employee]. . . . In our discussions, I was sure that I had one signed. . . . I was quite sure I had him sign the EPAP developed. Yes Chris, you did direct me to provide you a copy of a signed EPAP. My apologies for not complying with your directive."

On July 10, 2018, Lehnertz emailed an NPS regional manager stating she (Lehnertz) needed to take a disciplinary action against the senior official because he was not truthful about the signed EPAP. Later that same day, the senior official emailed the NPS regional manager, stating his belief that Lehnertz had lost objectivity regarding the subordinate employee.

The NPS regional manager said she talked to the senior official in July 2018 and told him to sign an EPAP for the subordinate employee immediately and that Lehnertz could hold the senior official accountable if the subordinate employee did not have a signed EPAP. According to the NPS regional manager, the senior official never completed the EPAP in response to Lehnertz' requests.

*The Senior Official Did Not Provide Lehnertz Written Progress Reports Regarding a High-Priority Park Initiative*

Lehnertz said developing this high-priority initiative was important not only to the GRCA but

also to the NPS. She said she assigned the senior official to lead the initiative in November 2017 and authorized and directed him to work with human resources to hire someone to fill a 1-year detail to help him develop it.

Lehnertz said that in February 2018, she had not seen any progress on the initiative, so she told the senior official they needed to meet every Monday to discuss the status. In addition, Lehnertz requested that the senior official provide her with written progress reports each week when they could not meet in person. Lehnertz said that over the next several weeks and months, the senior official inaccurately represented that the initiative was moving forward and that he did not complete the written reports as directed. Lehnertz said the senior official did not provide written reports on seven or eight dates; the Notice of Proposed Suspension listed February 5, 2018; April 2, 2018; April 9, 2018; April 16, 2018; April 30, 2018; May 14, 2018; June 25, 2018; and July 23, 2018.

According to Lehnertz, because the senior official did not make progress on developing the initiative, she hired an NPS regional director on a detail to the GRCA in September 2018 to develop it.

*The Senior Official Did Not Attend a Required Meeting or Request Approved Leave*

On May 16, 2018, Lehnertz emailed the senior official stating that he had not completed progress reports for the initiative for May 7 and May 14. She directed him to prepare to discuss options for development at their next regularly scheduled meeting on May 21. According to Lehnertz, the senior official did not attend the meeting, so she emailed him on May 22 stating that he did not attend the scheduled meeting and did not send her any text messages, voicemails, or emails regarding his absence. Lehnertz also wrote that the senior official must submit written updates to her and asked him how she could help or if there were barriers in their communication and understanding. The senior official did not reply to Lehnertz' email. Lehnertz stated that when she talked to the senior official about his absence from the May 21 meeting, he said, "I don't recall that."

*Lehnertz Proposed a 1-Day Suspension for the Senior Official*

In August 2018, Lehnertz discussed her concerns about the senior official with a GRCA human resources specialist. The human resources specialist provided Lehnertz three different notices, with discipline ranging from a written reprimand to a 3-day suspension.

Lehnertz said that before taking action against the senior official, she met with the senior official on August 31, 2018, to give him an opportunity to explain his actions related to his subordinate employee's EPAP and progress reports for the high-priority initiative. According to Lehnertz, the senior official said he had not completed the EPAP because he did not think it was his responsibility. Consistent with the advice the NPS regional manager had provided to the senior official in early July, Lehnertz said she reminded the senior official that the standard supervisory element of his performance plan required him to complete an EPAP for each of his subordinate employees. We found that the senior official's 2017 EPAP stipulated that he communicate performance standards that reflect job requirements to subordinates, give appraisals in a timely manner, and establish performance plans for the current year according to human resources

guidance.

Lehnertz said the senior official also told her he did not provide updates for the initiative because he did not think the GRCA needed it.

Based on the senior official's responses during the August 31 discussion, Lehnertz said she decided to propose a 1-day suspension for the senior official.

*The Senior Official's Response to the Proposed Suspension*

On October 3, 2018, the senior official met with an NPS regional director to orally respond to the proposed suspension. According to the regional director, the senior official said he did not provide a signed EPAP for his subordinate employee to Lehnertz because he believed Lehnertz would use the EPAP to terminate the employee. During his oral response, the senior official said, "I did not, would not, and will not, provide it to her so that she can use it as a weapon."

The senior official also told the regional director that he had reported his concerns about Lehnertz' requests for the EPAP to the U.S. Office of Special Counsel (OSC). According to the senior official, Lehnertz proposed the 1-day suspension because the senior official did not provide the EPAP to further the subordinate employee's termination. The senior official provided us copies of two OSC pre-determination letters, dated October 10 and October 15, 2018. In both letters, the OSC determined that an order to prepare an EPAP would not require the senior official to violate a law because it is routine for supervisors to prepare such documents. The letters also stated it was speculation by the senior official that Lehnertz would use the EPAP for an improper purpose. In each of the two letters, the OSC made a preliminary determination to close its inquiry into the senior official's complaint.

When we interviewed the senior official, he confirmed that Lehnertz had asked him for his subordinate employee's EPAP in June 2018. He said he initially told her he had it, but later told her he did not. The senior official stated he did not want to give the EPAP to Lehnertz because he thought Lehnertz would use the EPAP to terminate the subordinate employee.

We also asked the senior official about the progress reports for the high-priority initiative. The senior official told us he had previously admitted to the NPS regional director that he provided verbal updates but did not always provide the written reports to Lehnertz as directed. When asked why he did not provide the reports, the senior official replied, "I just didn't get to them at the time of the meeting."

Finally, in his oral response to the proposed suspension, the senior official stated his calendar indicated he was in Flagstaff, AZ, on May 21, 2018, at an annual review for the concessioners and that Lehnertz' calendar did not have any appointments scheduled for that date. The senior official said he did not recall if he took leave that day. When we asked the senior official about this meeting, he stated, "I'm still confused of the date, the circumstance of what may or may not have happened." The senior official later provided a copy of his calendar for May 21, 2018, which showed a meeting scheduled at 4:00 p.m. for updates related to the initiative in "Chris's Office."

We confirmed that the senior official was not on leave on May 21, 2018, and that he claimed 8 regular work hours on that day.

## Lehnertz Did Not Create a Hostile Work Environment at the GRCA

We interviewed 20 GRCA employees who worked directly with Lehnertz. Of those 20 employees, 15 were senior managers and 5 were nonsupervisory employees. Most of the employees indicated that Lehnertz was generally liked at the park and reported that Lehnertz did not treat men or women differently and held everyone to the same standard.

During our interviews, five employees—four managers and one nonsupervisory employee—expressed they had encountered differences and conflict with Lehnertz on occasion. Despite these occasions, four of these five employees identified positive aspects of Lehnertz' leadership and acknowledged that she championed an "inclusive and respectful" environment. The fifth employee stated that she had expressed concerns about her first-level supervisor to GRCA management and said the way Lehnertz handled her concerns caused her to mistrust GRCA management. Some managers observed that Lehnertz "drilled down" for information, explaining that she continuously asked questions to gather information if the presenter seemed ill-prepared or provided incorrect information, which made them feel "intimidated" at times.

Lehnertz said a colleague from the Pacific West Region made her aware that when she drilled-down for information, it felt like an accusation, rather than an inquiry. She added that a manager at the GRCA felt nervous when she asked many detailed questions. Lehnertz said that instead of discussing it with the manager individually, she discussed her management style with the GRCA management team and conveyed that "when I'm really getting into something, I'm gonna ask more and more detailed questions. And that it's okay to say, 'I don't have that information, but I'll get it.'" Lehnertz added that one of her personality traits is to drill "really deep on a question" when she is stressed and that she told the GRCA management team that she would try to "check" herself.

## Lehnertz Did Not Authorize Unnecessary Renovations to a Park Residence

On July 20, 2017, Lehnertz emailed GRCA managers informing them that she had toured the residence at 45 Kaibab Street in preparation for advertising the position for a deputy superintendent for operations. In the email, Lehnertz stated the home would be an important recruitment tool for the position. Lehnertz listed 19 deficiencies that she had identified during her walk-through, ranging from smaller issues like removing a coat rack in the entry hall, to larger projects like updating the kitchen and removing all carpet from the house. Lehnertz said that after informing the managers of the deficiencies, she was no longer involved in the renovations, except to request that the GRCA architect assist with the kitchen redesign.

An NPS housing official told us he managed the renovation project, to include resources, materials, personnel, and budget, and he did not have to obtain higher supervisory approval. The housing official said he inspected the house after the previous occupant moved out and made a list of necessary renovations. He recalled that Lehnertz' July 20 email included a list of updates for the house and that it instructed the housing official to coordinate with another NPS manager, who was on detail assignment. The housing official said most of the items referenced in

Lehnertz' email matched the list he had generated.

The housing official said he did not receive any further direction from Lehnertz about the renovation after receiving the July 20 email. He said he provided weekly status reports to management, which included Lehnertz, about all maintenance projects. He said neither the incoming deputy superintendent nor Lehnertz attempted to direct him to complete any aspect of the renovation.

According to the housing official, the renovation at 45 Kaibab Street began in August 2017 and ended in April 2018. He explained that the renovation took longer than anticipated because of unexpected safety issues, such as out-of-code electrical wiring, an underrated circuit breaker box, no fire alarm system, structural issues, and a sagging roof and doorways. The housing official estimated the house was built in 1978, and said it appeared to have been built in stages because one side of the house was heated with a propane furnace and the other was heated by electric baseboards. He said he used his staff, trail personnel (for landscape work), an electrician, and a seasonal carpenter (former NPS employee) to complete the renovation. The housing official provided documentation showing that the labor costs for the renovation were $135,192.83 and the cost of materials was $30,733.07, for a total renovation cost of $165,925.90.

When asked, the housing official told us that the renovations to 45 Kaibab Street impacted his employees' ability to work on other houses. He explained that he tried to keep the number of vacant homes below 35, and that when this renovation was completed, the number of vacant homes totaled approximately 50. The housing official noted, however, that because of the number of vacancies and hiring problems at the GRCA, he did not recall employees contacting him about needing a house during that time.

A GRCA maintenance employee, who worked directly on the housing project, told us that 45 Kaibab Street was "decent" and "livable" before the renovations, but he noted that after the renovations began, the maintenance crew found structural damage that needed repair. The maintenance employee said the renovations were needed to replace original work that had been completed in 1972. The renovations included installing a new kitchen, hardwood floors throughout the house, new stairs, vanities in two of the three bathrooms, and new toilets and tiles in all three bathrooms, and replacing the wiring throughout the house. He said the work also included opening the walls and ceiling in the kitchen, during which they identified and repaired structural deficiencies. The maintenance employee said all renovations were needed and none were unusual. He added that the costs were reasonable based on the work performed.

## SUBJECT

Christine Lehnertz, Superintendent, Grand Canyon National Park, National Park Service.

## DISPOSITION

We provided this report to the National Park Service Deputy Director Exercising the Authority of Director for any action deemed appropriate.

# Report Fraud, Waste, and Mismanagement



Fraud, waste, and mismanagement in Government concern everyone: Office of Inspector General staff, departmental employees, and the general public. We actively solicit allegations of any inefficient and wasteful practices, fraud, and mismanagement related to departmental or Insular Area programs and operations. You can report allegations to us in several ways.



| | | |
|---|---|---|
| **By Internet:** | www.doioig.gov | |
| **By Phone:** | 24-Hour Toll Free: | 800-424-5081 |
| | Washington Metro Area: | 202-208-5300 |
| **By Fax:** | 703-487-5402 | |
| **By Mail:** | U.S. Department of the Interior | |
| | Office of Inspector General | |
| | Mail Stop 4428 MIB | |
| | 1849 C Street, NW. | |
| | Washington, DC 20240 | |