Elston L Stephenson (Plaintiff  Pro se)
Case 3:19-cv-08268-DLR
P.O. Box 129
Grand Canyon, AZ 86023
October 15, 2020


U.S. District Court Clerk's Office
Sandra Day O'Connor U.S. Courthouse, Suite 130
401 W. Washington Street, SPC 1
Phoenix, AZ 85003-2118

Dear Court,

Please receive and consider this AMENDED MOTION FOR EMERGENCY INJUNCTION BARRING RETALIATION AGAINST PLAINTIFF in the case of STEPHENSON V DRAPEAUX.

Thank You


Sincerely,

Elston L Stephenson


## MOTION

Your Honor, respectfully, Plaintiff seeks an Emergency Injunction to stop pretextual retaliation against Plaintiff by the Department of Interior (DOI) for his vigorous Constitutional *pro se* representation in this case and reporting "Federal offense[s]" per 18USC §1512. DOI is clearly partnered with the U.S. Attorney in this case. The Court will find that DOI's actions intend to 'back door' Discovery and violate Federal Rule 26 after U.S. Attorney unwisely Motioned and received termination (Vacate) of the Rule 16 which would have routinely scheduled Discovery. The Court will find that Defendant's counsel is no ordinary counsel, but DOJ— 'the ultimate prosecutor'. DOI's efforts to force Plaintiff into interrogation violates his 5th Amendment Right. DOI opening Plaintiff's U.S. Mail—the Court's correspondences to Plaintiff, stealing them, reading them, destroying them—Obstructing Justice should shock and deeply offend the Court. Each standing alone merits Emergency Injunction. Combined, DOI's actions offend Justice and the Rule of Law, and beg for Injunction.

1

Evidence—particularly sworn testimony by one Grand Canyon National Park Superintendent that another Grand Canyon National Park Superintendent's actions and remarks were racially motivated against Plaintiff along with DOI's own Office of Civil Rights verdict that DOI violated the EEO Settlement Agreement brokered by a federal mediator represents Plaintiff's *reasonable probability of prevailing* in his EEOC case *v* DOI in its final stage as it awaits a hearing by a federal Administrative Judge before the EEOC. This case will shine a klieg light on the dark, well-kept secret of Grand Canyon's Racism for the world to see—something that DOI/NPS/GRCA will do—is trying to do anything to avoid. This, common precedent, too, merits an Emergency Injunction to protect Plaintiff. (Exhibits X-15, I)

### Mail Crimes and Obstruction of Justice

Your Honor, the Court will recall issuing its 12-5-2019 Order granting Plaintiff's *Motion For Extension of Time to Respond* "For good cause shown" extending the Response until 1-13-2020 against U.S. Attorney's/ Defendant's (DOI/NPS/GRCA's) *Motion to Dismiss*. It was likely a result of this loss, that DOI appears to have decided to cheat—to do anything to win; even it meant committing multiple felonies. The Order signaled to all that the Court perceived at least some merit to Plaintiff's case. After this Order, and despite 6 separate filings, Plaintiff never heard from the Court again. This—despite the fact that Plaintiff always asked the Clerk of the Court to time-date stamp a copy of Page 1 and mail it to Plaintiff in a stamped, self-addressed envelope. (Exhibit X-11)

Concerned, Plaintiff contemporaneously wrote to the Clerk of the Court on 6-2-2020 to say that he had not received their reliable time-date stamped 'Page 1' receipts. Plaintiff listed: MOTION FOR INJUCTION OF PROTECTION AGAINST RETALIATION, dated March 8, 2020; REPLY to U.S. Attorney's REPLY to Plaintiff's RESPONSE TO MOTION TO DISMISS, dated February 22, 2020; and MOTION FOR PRESERVATION ORDER, dated January 25, 2019 [2020] among the filings for which he had not received receipts. Plaintiff included

several stamped, self-addressed envelopes requesting 're-sends'. Plaintiff never received these as well, Your Honor. (Exhibit X-31)

Significantly Plaintiff's Motion for Mandatory Injunction ordering 5-year Court oversight of the GRCA safety program and ordering DOI to fix deadly safety dangers is now among the Obstructed Court documents.

In a September 16, 2020 meeting GRCA Deputy Superintendent 3 handed Plaintiff an oversized blue enveloped taped shut in the back (Exhibit X-11). He told Plaintiff that inside the envelope was correspondence from the Court that "someone" had opened. When asked by Plaintiff why someone would open mail addressed to Plaintiff, Deputy Superintendent 3 replied that they wanted to see if it was "official". In fact, months earlier—approximately December 2019, Plaintiff was told that Defendant, himself, had 'signed for' Court documents addressed to Plaintiff. Plaintiff never received those Court documents.

Plaintiff has never seen any documents from the Court after the 12-5-2019 Order granting Plaintiff's *Motion For Extension of Time to Respond*.

Plaintiff has not yet opened the taped envelope—preserving it as evidence because the fingerprints of whoever opened or handled Plaintiff's U.S. Mail and Court correspondence are sealed inside the envelope. Plaintiff, instead, wrote directly to the Secretary of the Interior to report these felonies on 9-29-2020 ( X-11).

On 10-1-2020 Plaintiff was hauled into another meeting with GRCA Deputy Superintendent 3 where, again, he was handed another U.S. Mail clearly addressed to him. Again, it was clearly addressed to Plaintiff. It was clearly addressed from the Arizona Motor Vehicle Division—Plaintiff's driver's license issued 6-12-2020. On 10-7-2020 Plaintiff drove to the DMV to speak with officials who told him that it was mailed sometime around 6-12-2020. Which means that someone associated with the GRCA Superintendent's Office illegally opened and illegally held (denied from Plaintiff) his U.S. Mail for 4 months. And likely only gave

Plaintiff his U.S. Mail only because Plaintiff had directly notified the Secretary of the Interior (cc-ing GRCA

Superintendent, and Deputy Superintendent 3) and sensing big trouble. (Exhibit X-22)

DOI/NPS/GRCA resorted to illegally opening Plaintiff's U.S. Mail—this Court's correspondences to

Plaintiff to read, collect information, and to illegally prevented Plaintiff from getting the Court's

correspondences (deadlines, orders, the ability to respond and strategize) in order to steal a court win.

DOI perpetrated an egregious violation of the Law, Plaintiff's Constitutional rights, and this Court.

Indeed, Your Honor, these are assorted felonies—"a Federal offense" meeting elements of at least

18USC §§§1701, 1702, 1703, 1708 Obstruction of Mails, Obstruction of Correspondences, Delay or

Destruction of Mail, and more seriously, Obstruction of Justice, Obstruction of Proceedings, and Obstruction

of Court Orders—at least 18USC §§1505, and 1509, and even Witness Tampering 18USC §1512(c).

These can be added to the long and growing list of DOI's "a Federal offense" and "any Federal

offense" per 18USC §§1512, and 1513.

These actions arrogantly attempt to desecrate the Rule of Law, and the foundation of our Judiciary

process. Other than physically restraining or threatening Plaintiff, it is difficult to imagine what additional

steps DOI/NPS/GRCA could have taken to obstruct Plaintiff from participating in this Court—to Obstruct

Justice, Your Honor.

These actions should outrage the Court. And all by themselves merit sanction such as Summary

Judgement in Plaintiffs favor for Restraining Order against Defendant, granting of Motion for Mandatory

Injunction Ordering DOI to fix safety dangers and 5-year Court Oversight of Grand Canyon National Park's

safety program, Summary Judgment granting Motions obstructed by DOI/NPS/GRCA, and a 'reset' this case

to the *Order Granting Extension to Respond*.

Respectfully, Your Honor, failing to respond sends a clear, bright 'green light' to similar bad actors.

Precedent.

4

At the very least, DOI/NPS/GRCA's actions merit the Court's imposition of an Emergency Injunction which protects Plaintiff from retaliation, future attacks, and allows time for a determination of the harm/damages caused by DOI/NPS/GRCA's attack on Plaintiff, the U.S. Mail, and this Court.

Plaintiff has filed a criminal complaint with the FBI and the U.S. Postal Service Postal Inspector.

## **Witness Tampering 18USC §1512 and Retaliating Against a Witness 18USC §1513**

Your Honor, as the Court knows, Witness Tampering, 18USC §1512(d) states that whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from (1) attending or testifying in an official proceeding (2) reporting to a judge of the United States the commission or possible commission of *a Federal offense* or attempts to do so shall be fined under this title or imprisoned not more than 3 years or both. And (g) no state of mind need be proved.

Respectfully, as the Court also knows, 18USC §1513(e) addresses retaliation "including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisonment not more than 10 years or both."

1. When Superintendent 4 (likely in conjunction with others) knowingly and deliberately presented OSHA with fraudulent, falsified documents (both in long memo and filling out and turning in the OSHA form 2H ) (Exhibit J) fraudulently testifying that legally required safety training had taken place (when he knew it hadn't) in order to 'beat the rap' in an OSHA citation, this constituted "a Federal offense"—namely all elements of 18USC §1001(a) fraud and false statements, perjury 18USC §1621, conspiracy 18USC §371, and depending on how the falsified and fraudulent documents were delivered; mail fraud and/or wire fraud 18USC §1341 and/or 18USC §1343—one separate count for each falsified and fraudulent document and statement. (Exhibit J)

2. When Defendant knowingly and materially lied multiple times in his sworn testimony to the U.S. Attorney in this case and to this Court, it constituted "a Federal offense", including perjury 18USC §1621, false statements 18USC §1001—one separate count for each falsified and fraudulent statement. And depending on how the fraud was delivered; mail fraud and/or wire fraud 18USC §1341 and/or 18USC §1343 (Exhibit X-16)

These are easily provable. Two quick examples:

In *Intervenor United States Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6)* page 3 line 9 before this Court, Defendant testifies that "He personally saw [Plaintiff's] GOV at a coffee shop parking lot an hour away from the Grand Canyon and contacted Plaintiff inside the shop..." On 2-19-2020 Plaintiff dutifully drove for 1 hour (obeying the speed limit) which took him 58.4 miles, just past Mile Marker 236 on Hwy 180—right in front of tiny, picturesque Holy Dove Chapel. Pictures (Exhibit X-17) clearly demonstrate that it could never be confused with "a coffee shop". Furthermore, although a hamlet of approximately a dozen homes occupies a nearby clearing; there is nothing but miles and miles of forest in either direction. This perjury can also be proved by taking Defendant's phone and Plaintiff's phone and deposing Defendant as to the date that this allegedly occurred, then comparing both phone's tracking or cell tower data. Further Defendant can be deposed to describe the so-called "coffee shop". When he fails that, the Court can always have him conduct a re-enactment with Court officials in tow. None of these will find the "coffee shop" because there is no "coffee shop". It never happened. Defendant is lying—"a Federal offense"...committing felony perjury.

When Defendant testifies in *Intervenor United States Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6)* page 6 line 2 before this Court that "Plaintiff had misused the vehicle and received discipline for the misuse" he was lying to the U.S. Attorney and this Court again—committing "any Federal offense"...committing felony perjury again. This is easily proved by deposing Defendant as to just what the "discipline" was and when, then subpoenaing the record of the "discipline". For added measure, this

"discipline" had to be approved by Defendant's superior—the GRCA Superintendent. The GRCA Superintendent can then be deposed for his or her testimony and documents bearing their signature.  None of these will be presented because it just didn't happen. Defendant was simply lying again—committing felony perjury.

3. When Defendant swore in EEOC case testimony "No. To my knowledge no safety plan [by Plaintiff] was ever submitted for approval", he's lying again—committing perjury. Not only does Superintendent 4 testifies that "[Plaintiff] had prepared a draft plan prior to my arrival. The plan was reviewed by the deputy superintendents. They provided me a copy of their handwritten comments and notations for revisions in June 2019", but Superintendent 3 testifies that being aware of multiple versions of the Plan by Plaintiff. She even provides a 4-1-2019 email from Superintendent 1 with her comments to the plan. It is entitled *comments on – Fwd: Plea (sic) Review/Input: Draft – GRCA Safety Plan*. As part of her testimony Superintendent 3 provides the original 3-26-2019 email from Plaintiff:   *Plea* [sic] *Review/Input: Draft – GRCA Safety Plan*. It addressed to "NPS GRCA Executive Team". Defendant is not only a Park Senior Executive Team (PSET) member but is meeting Chair. The email begins "Good Morning Everyone. Please receive and review this GRCA Safety Plan draft." Icons show the MicroSoft word attachment and the 110K size. Superintendent 3 goes even further still by including email chain entitled "PSET Material for Consideration 4/2/2019 – Red Cross Training, GRCA Safety Plan. This chain includes an active, lengthy email exchange between Defendant, himself, and Plaintiff about the safety plan.  Defendant begins his email of feedback/critique of Plaintiff's plan with "Hi [Plaintiff], Looking to formulate specific language for the GRCA Safety Plan…" He is clearly, actively engaged. The Court will find that once again Defendant is committing perjury—lying—committing "any Federal offense". (Exhibit X-18)

4. In his EEOC sworn deposition Defendant testified that Plaintiff's safety program was denied a budget "due to insufficient budget allocations". This was in July 2019—while at the virtually the same instant that he is telling this lie to the EEO Investigator, Defendant was single-handedly securing a $40,000 budget

for the tiny dysfunctional GRCA Safety Committee for the FY20 budget being worked on in time to begin the 2020 Fiscal Year (Exhibit X-19). Fraud. Perjury.

5. The Court will find that when DOI/NPS/GRCA violated a EEO Settlement Agreement, Defendant falsified (backdated) and submitted sworn documents to the DOI Office of Civil Rights (OCR) in a scheme to trick the officials into fraudulently believing that DOI/NPS/GRCA had, in fact, met its Agreement obligations and was not guilty of Violation. What Defendant did not know was that Plaintiff had scanned the unsigned and undated documents (complete with a time-stamp that the pdf was created) the day *after* the missed deadline by DOI/NPS/GRCA and forwarded them to the OCR as part of the Violation package. When Defendant forwarded the back dated documents in a plea that DOI had met its obligations, he was caught. Although the HRO politely called him out by stating Defendant's fraudulent documents "can best be described as bad faith" and "is highly questionable"; the straightforward legal term is felony frauds meeting all elements of 18USC §1001(a), and perjury under 18USC §1621. (Exhibit I)

6. According to DOI IG 18-1188 Defendant was being pressed and lying to Superintendent 1 and on the receiving end of disciplinary action, and questioned by DOI IG and NPS EEO investigators all at virtually the same time in part over his failing to perform EPAP on Plaintiff—not to mention, filing a frivolous IG Complaint against Superintendent 1 for this matter. Yet, when questioned by the NPS EEO Investigator; he fraudulently "stated that [Plaintiff] first asked for an EPAP from him in June 2018 and not previously". The Court will find that this 'first impression' portrayal is proven false by DOI IG's findings and is lying by omission—likely fraud on the part of Defendant. (Exhibit H)

7. When the person or persons deleted the wildland firefighter isolated and burned from the DOI/NPS automated Safety Management Information System (SMIS), they were guilty of fraud 18USC §1001—possibly insurance fraud as this injury tapped into OWCP to pay hospital bills, and wire fraud 18USC §1343, and conspiracy 18USC 371—felonies all. And "any Federal offense". (Exhibit P-1).

8. When Superintendent 1 and the NPS IMR Regional Safety Manager and uranium 'expert' to made their 'secret pact' to hide dangerous uranium readings from Plaintiff and GRCA workers; they guilty of multiple felony violations of the 'Right to Know Law' 29CFR §1910.1200—one for each worker exposed (Exhibit D). These also include at least fraud 18USC §1001, and conspiracy 18USC §371. These multiple felonies by multiple actors and many, many exposed victims can easily be proven by rigorous deposition. They represent egregious "a Federal offense".

9. When the NPS IMR Regional Safety Office sent out the doctored 'report' deleting the deadly reading levels with the intent to hide those deadly levels from Brand Canyon National Park workers and visitors, it was "a Federal offense" of at least fraud, conspiracy, and wire fraud. (Exhibits D thru D-3)

10. Respectfully, it is hoped that the Court will agree that fraud may also take the form of 'not doing'. When DOI/NPS/GRCA wrote and publicly released its 'Uranium Report', it does not mention *anywhere* the deadly levels documented (Exhibit D-3) or that they were doctored out of subsequent documentation (D-2). The 'report' misleads and suggests that the DOI investigation was voluntarily begun (Exhibit 34, pg. 8). In fact, the DOI investigation was begun in response to the news reporting of the uranium and Plaintiff filing an OSC complaint. Also, the report intentionally and fraudulently misleads that DOI/NPS/GRCA called on OSHA to assist (Exhibit 34, pg. 9). In fact, Plaintiff filed an OSHA complaint against DOI/NPS/GRCA when he realized that they doctored the report—deleting and hiding the deadly level readings. Nor does the report make any mention of the danger and violations of IMR's uranium 'expert' bring along and exposing his non-NPS employee wife. Not mentioned is/are the multitude of violations of law (e.g. CERCLA) by IMR's uranium 'expert' as he buries 3 five gallon bucket loads of uranium in shallow pits in the fenced in Superfund site of 'Lost Orphan Mine'. Or the fact that his 'dumping' of the uranium poses legal liability of making DOI/NPS/IMR/GRCA parties to the ongoing lawsuit and may cost $1,000,000s to clean up. Most importantly, the so-called 'report' states that the deadly levels were transmitted by IMR Safety to Headquarters NPS Safety on 7-10-2018. And that between a staff of experts at NPS Headquarters Safety and IMR Regional

Headquarters Safety; no one took action on the deadly readings at all. They only took action when forced by news reports in February 2019 and Plaintiff's OSHA complaint December 2018. (Exhibit 34, pg. 12)

DOI/NPS asks that the Court (and the public) believe that a uranium 'expert' responding to a uranium exposure did not document the readings that it was responding to determine. This is akin being asked to believe that the police responding to bank robbery did not get a description of the robbers or their getaway car.

Finally, shockingly, Plaintiff's dogged work in April 2018 discovered that nearly 25% of GRCA's AEDs were discontinued by the manufacturer in 2007. Manufacturer's maintenance services were discontinued in 2014. Plaintiff even contacts the manufacturer who tells him that the manufacturer had put out an advisory not to use the units after January 2018. Yet, this 'report' makes no recommendation, and DOI/NPS takes no action to notify potential users of this ubiquitous model Department-wide that they may be using a device which may be called on to save a life but has been discontinued for 12 years, maintenance for 4 years, and whose manufacturer recommends not using at all. (Exhibit X-35)

This 'report' not only represented fraud, but gross negligence.

11. Also in the genre of fraud by 'not doing'; when Grand Canyon National Park suffered 2 closely space helicopter accidents on 10-7-2020 and 10-28-2020, GRCA/NPS/DOI resorted to 'pencil whipping' accident reports to show 'nothing to see here' conclusions for each. These 'investigations' attempted to erased clear damage and deadly dangers posed to Park workers and visitors alike. Put simply, Your Honor; someone(s) could easily have been killed and one never could have known that from the so-called 'investigations'. The aim and result of these 18USC 1001 felony frauds by DOI/NPS/GRCA was to deliberately hide the dangers (similar to the 'uranium map') from the public; depriving them of knowledge to avoid

dangers protect themselves. And to avoid negative press of such dramatic embarrassing, dangerous failures. Evoking 18USC §1031; these were "schemes or artifice with the intent to defraud the United States".

As Plaintiff reports directly to the Secretary of the Interior and the DOI Inspector General "…in addition to felonies, this culture of loose integrity and looseness with propriety and the truth runs the risk of getting someone killed." (Exhibit S)

As the video shows in Helicopter Accident 1, on 10-7-2020 a KMax K-1200 helicopter's external load line contacts a 7.2kv/12.47kv powerline causing a disruption of power at the Indian Gardens water pumping station. This disruption of power knocked the computerized SCADA system which knocked the pumps offline. This resulted in the inability of Grand Canyon National Park to pump water to its estimated 2,500 residents and 1000s of daily visitors to South Rim Village for nearly a week. (Exhibit S-1)

As the video shockingly shows in Helicopter Accident 2, on 10-28-2020 a CH-47B carrying an external load of 5,000lbs of piping flails violently out of control before wildly and without warning jettisons the 5,000lbs of piping onto the area near the heavily trafficked Bright Angel Trail. It is uncontested that this could have killed many people. It is uncontested that if this 5,000 'dumb bomb' had landed on the Indian Gardens pumping station, the effect would have been 'Biblical'. Grand Canyon National Park would have been without water—likely for a year or more. (Exhibits S-2, S-3)

In both accidents, the helicopters could have crashed with people nearby.

As Plaintiff shares with the Secretary of the Interior; shockingly common to both accidents' fraudulent 'investigations', no 'investigator' even went down to the accident scene. Their fraudulent 'investigations' amounted to 'pencil whipping' from their desk and computers. Plaintiff personally hiked the 11 miles down and back to find (and video shows) the root cause of both accidents was overgrowth of trees to obscuring the landing zone (LZ). And that in the case of Accident 1, the mishap crew had been tempting fate by swinging their suspended loads to land them under the powerlines. (Exhibits S-4, S-5)

Another finding of his investigation was that NPS' second-tier/third-tier safety program suffers the most fatal flaw of having no root cause analysis system. To claim, as DOI/NPS does, to have a safety program and have no corporate, standardized root cause analysis system is, itself, a form of fraud which could cost lives. (Exhibit X-20)

12. The 'Uranium Map' dubiously classified "FOIA Protected" to hide the uranium/radiation exposure to Grand Canyon National Park patrons to Hermit's Rest and the year after year after year leeching of uranium into the aquifers leading 'who knows where' and likely drank by people, plants, and animals represents "any scheme or artifice with the intent (1) to defraud the United States" (Exhibit Z-13)

Your Honor, what is clear is that per 18USC §1512(d)(2) Plaintiff has been "reporting to a judge of the United States the commission or possible commission of [a multitude of] Federal offenses" along with 18USC §1513(e) "providing truthful information relating to the commission or possible commission of any Federal offense" to this Court, to law enforcement, and soon to the U.S. Congress.

And that DOI's "attempts to harass, hinder, delay, prevent, and dissuade [Plaintiff]" along with "the intent to retaliate...including interference with the lawful employment or livelihood" is punishable "by fine...or imprisoned not more than 10 years, or both." With respect to "schemes or artifice with the intent to defraud the United States", 18USC §1031(h)(1),(2) prescribes extensive redress for retaliation. DOI's overtures (including desperate attempts to force Plaintiff into interrogation) signal upcoming retaliation.

Respectfully, Your Honor, granting an Emergency Injunction will preclude the "fine, 10 years or both", 18USC §1512(d) and 18USC §1031(h)(1),(2) costs and time and in litigation, protect Plaintiff from *irreparable harm*, preserve this case, send a strong message, and provide prevention at near-no cost.

## Defendant's History of Weaponizing Bogus IG Investigations

In sworn testimony (Exhibit G) Defendant testifies (confesses) to filing several IG complaints against Superintendent 1. Superintendent 1's attorney in an *Outside Magazine Online* (Exhibit X-33) interview states that even though she was 100% exonerated, and the IG found Defendant guilty; she resigned one of the most coveted positions in the National Park Service because she did not want to be continually targeted with such bogus investigations.

The Court will find that Plaintiff found the article and contacted Superintendent 1's attorney after reading it because he had already been targeted by Defendant in 2 weaponized, bogus IG complaints and investigations. Superintendent 1's attorney recommended a Phoenix attorney and law firm. They discussed Plaintiff being target with bogus IG complaints and investigations by Defendant just as Superintendent 1 had. Sure enough; Defendant resorted to this tactic just like clockwork.

Evidence demonstrates that weaponizing of the DOI IG is Defendant's *modus operandi*—his 'go-to' when he is in trouble...when he is caught. He is a 'witness' in this latest DOI IG 'investigation' where DOI is attempting to force Plaintiff into interrogation. Defendant's serial weaponization of DOI IG complaints— particularly in the context of this case should be viewed by the Court skepticism and meriting Injunction.

DOI IG investigation Report 18-1188 is the DOI IG determination that when Superintendent 1 caught Defendant ("GRCA Senior Official") repeatedly, serially lying to her for nearly a year—telling her that he had conducted legally required professional planning and performance counseling on Plaintiff ("Subordinate Employee") when he hadn't (Exhibit G). As a result, she sought disciplinary action against him. The facts of IG Report 18-1188 show that he then filed a bogus IG complaint—again, by his own sworn testimony; one of many. (Exhibit G)

In neighborly chit-chat the neighbor across the street told Plaintiff that Defendant (who never talks to him) aggressively harangued Neighbor —trying to get him to say something incriminating against

Superintendent 1 and housing repairs which were a subject of the IG Complaint 18-1188 that he filed. This, even though Neighbor had nothing wrong to report. Defendant then lined Neighbor up as a 'witness' to the IG investigators.

The Court will find that this fits the exact same pattern as when Defendant filed a bogus IG Complaint against Plaintiff in the summer of 2019. IG investigators confirmed that Defendant relayed that a co-worker was a "witness" who complained to Defendant that Plaintiff had taken his government vehicle to California and to his home. Just as in 18-1188, Defendant fed this witness' name and accusations to DOI IG investigators. The co-worker had long since PCS'd to another park almost a year earlier. It is highly unlikely that she made the IG complaint so long after leaving. Evidence demonstrates that what Defendant knowingly hid from IG investigators is that Plaintiff was on an official duty TDY to attend OSHA training at UC San Diego on 10-29-2017, and that Defendant himself approved it—signing the ConCur government travel document months afterwards on 1-30-2018 as Plaintiff's supervisor. (Exhibit X-24)

Your Honor, Exhibit X-24 demonstrates that Defendant, himself—as Plaintiff's supervisor took part and in the thorough cost benefit analysis (GOV versus flying) and stopping at Plaintiff's home because the drive (approximately 14 hours with traffic) exceeded the DOI/NPS 10 hour limit. This was not some slip-of-the-mind on Defendant's part.

He weaponized the IG complaint against Plaintiff just as he had against Superintendent 1. Just as in this case before this Court, he thought that the 'driving his vehicle all the way to California—to his home' was salacious enough that DOI IG investigators would eat it up—just like 'driving his government vehicle to a "coffee shop" 1 hour away from Grand Canyon'.

And just as he had in 18-1188, Defendant fed a so-called 'witness' to DOI IG investigators.

Your Honor, Defendant's actions in both instances likely break several laws. But they also highlight the lack of credibility and ease of weaponization of the DOI IG complaint system; and the merit for granting an Injunction simply by virtue of the fact that Defendant is involved.

Exhibit X-27 is evidence of one instance where Defendant did not weaponize the DOI IG complaint system. He was, in fact, investigated for funneling government contracts to a firm to which he served as vice-president less than a year earlier. The DOI IG found sufficient evidence to refer the case to the U.S. Attorney for the Eastern District of Virginia, but the USA demurred.

Evidence and a catalog of Defendant's actions reveal Defendant to be a serial fraudster and perjurer deserving prosecution.


### Witness Tampering 18USC §1512(b),(d) Under the Familiar Weaponized Guise of an IG Investigation

Once again, Plaintiff is targeted with an IG 'investigation'.  Once again, it is an IG 'investigation' where Defendant is a 'witness' and involved.

Your Honor, this IG 'action' intensified after Plaintiff sought a restraining order against Defendant after Plaintiff was alerted by a co-worker of Defendant stalking his home. It has intensified only after Plaintiff vigorously and Constitutionally represented himself by "reporting to ta Judge of the United States the commission or possible commission of Federal offense."

That vigorous representation before this Court is the demonstration that Defendant's Motive for stalking Plaintiff's home was to try to dig up 'dirt' on Plaintiff because Plaintiff, in the course of his duties, discovered and would not go along with GRCA's dangerous/potentially deadly safety conditions, hiding of potentially deadly environmental issues exposing workers and visitors (uranium map), egregious racism and ethnic cleansing, and a DOI/NPS/GRCA 'Culture of Fraud' exemplified by the litany of felonies identified to the Court at the beginning of this Motion—"the commission or possible commission of Federal offenses."

On October 1, 2020 after weeks and countless desperate efforts of lying and trying to trick Plaintiff into patina of 'voluntarily appearing' in the interrogation scheme—when the gig was up GRCA Deputy Superintendent 3 lured Plaintiff into a 'meeting' under the pretense of "talking about safety" and dropped a Garrity Notice on him ordering him to attend his interrogation under the threat of being fired. (Exhibit XXX). This Garrity Notice was likely retaliation. It was written on September 29, 2020—likely in response to Plaintiff writing to the Secretary of the Interior to notify him of the U.S. Mail incident at 4:37am local time that day. (Exhibit X-13)

GRCA Deputy Superintendent 3 then dropped Written Counseling statement on Plaintiff and told "I'm not going to give this to you now. I will give issue it to you only if I have to."

This IG action and dangling of punishment over the head Plaintiff per 18USC §1512 " seeks to "intimidate" and "intentionally harass…hinder, delay, prevent, dissuade" Plaintiff from "attending or testifying in [this] official proceeding"—this Court, and "reporting to [Your Honor and others] the commission or possible commission of a Federal offense[s]".

The Court's Injunction will stop this and allow the safety dangers, environmental dangers, the abject racism, and the Federal offenses long kept secret to see the light of day and Justice, Your Honor.


### U.S. Attorney Unwisely Terminates Rule 16 Discovery [Conference]

U.S. Attorney—perhaps anticipating a quick victory against the helpless *Pro se*, instantly terminated the Rule 16 process—essentially throwing away Discovery (Exhibit X-25). Evidence (Exhibit X-26) clearly demonstrates that DOI is working with U.S. Attorney. Exposing Plaintiff to interrogation by DOI (DOI IG) violates the Constitution by attempting to permeate Plaintiff's case and act as a 'back door' Discovery and seeking to otherwise gain information and witnesses that U.S. Attorney unwisely forfeited. He should not be given another [back door] 'bite of the apple'. Allowing such an advantage (along with all the other

advantages that the U.S. Attorney enjoys) would be unfair, unjust, 'unlevel', and do *irreparable harm* Plaintiff. This 'back door' should firmly shut by Injunction, Your Honor.

### Limitless Scope of IG Interrogations and No Rights of the Interrogated

The IG investigator can ask a wide range of questions without bounds. The interrogated—with no right to have an attorney present, is compelled to answer. The breadth of Plaintiff's case clearly involves a wide-range of daily life at Grand Canyon National Park—which describes shocking revelations that DOI/NPS/GRCA have sought to keep secret from the public and constitutes Motive for Defendant and others targeting Plaintiff for intimidation and retaliation. These would be difficult—if not impossible for any line of questioning by the Inspector General regarding Defendant to avoid piercing Plaintiff's case and strategy even if IG wanted to. Once begun, Plaintiff has no right or opportunity to object to or refuse to answer any question. It is this piercing of Plaintifff's case in this Court by party DOI likely sharing with DOJ that violates Plaintiff's rights. And meriting the Court's granting an Emergency Injunction.

### "Nor Shall Be Compelled to Be a Witness Against Himself"

One purpose of an IG interrogation is to develop information to be used against the interrogated—to have the interrogated "be a witness against himself"—self-incrimination. In the context of the fact that this case is before this Court—an interrogation by the DOI-US Attorney team would constitute an extra-judicial proceeding—one in which Plaintiff would not even be allowed legal representation. DOI, already teamed up with U.S. Attorney can use the fruits of this pretextual 'investigation' and interrogation against Plaintiff in this case, before this Court.

Your Honor, respectfully, the Fifth Amendment is clear, here.

## Acts of Desperation to Force Plaintiff into Interrogation

Your Honor, Plaintiff filed a Notice to the Court on 9-28-2020 to make it aware of the U.S. Mail crimes and to make the Court aware that the Court's correspondences to Plaintiff were being Obstructed, and that Injunction would protect Plaintiff from "retaliation certain to come". This was not prescience on Plaintiff's part but an escalation pattern of frenetic desperate acts by GRCA Superintendent 6 and GRCA Deputy Superintendent 3 to trick, trap, and corner Plaintiff into taking part in a pretextual interrogation by the DOI IG. These only intensified when Plaintiff notified the Secretary of the Interior of the U.S. Mail and Obstruction of Court Orders crimes. (Exhibit X-11)

On approximately 8-27-2020 GRCA Deputy Superintendent 3 met Plaintiff in Plaintiff's office to order him to 'interview' with the third party (USPS) investigator contracted by the DOI IG. Deputy Superintendent 3 spent much time conning Plaintiff and attempting to minimize the matter saying that Plaintiff was "not the subject of the investigation, but a witness" and that the reason that a USPS investigator was investigating was because it was likely a Postal worker who had filed a complaint and that Plaintiff probably witnessed something that could help the investigation. Plaintiff was dubious and explained that he had an ongoing case in federal court and before the EEOC and was concerned about this not damaging the integrity of both cases, Discovery, and 5th Amendment right against self-incrimination. "Ohhhh, there is nothing to worry about", replied Superintendent 3. Plaintiff was still dubious. Plaintiff was having computer problems but told Deputy Superintendent 3 that he would consult with others, think it over and get back to him.

On 8-31-2020 provided Deputy Superintendent 3 a handwritten letter (still suffering computer problems) re-iterating the concerns about the integrity of both the case before this Court and the EEOC case along with 5th Amendment legal jeopardy before the U.S. Attorney. (Exhibit X-32)

On 9-2-2020 GRCA Superintendent 6 and GRCA Deputy Superintendent 3 flew (helicopter) from South Rim to North Rim where Plaintiff was Safety Officer for the Bison Project. As others were gathered together, Superintendent 6 and Deputy Superintendent 3 pulled Plaintiff away from others and handed him

the memo demoting him to direct report to Deputy Superintendent 3 and 'double-teamed' him on being 'interviewed' by the DOI IG (USPS) investigator. Plaintiff re-stated his concerns of maintaining the integrity of his federal U.S. District Court and EEOC cases, Discovery, and legal jeopardy posed by 5th Amendment/self-incrimination and very specifically told them that he was worried that this was a 'back door' try at Discovery and that because of the broadness of both cases, that it would be impossible for any interrogation to not break into his case before this Court and the EEOC case. Both repeated that Plaintiff was "not the target" but "a witness" to the investigation. Both tried to convince Plaintiff that his concerns were overblown. Superintendent 6—who was formerly the Assistant Solicitor for the Department of the Interior told Plaintiff that as a lawyer he did not see how the 'interview' would encroach on either case. Again, Plaintiff was dubious. And told the Superintendents that he would consult with others and get back to them.  On 9-7-2020 he provided a handwritten letter (still suffering computer problems) to both Superintendents once again explaining his reticence and concerns. (Exhibit X-33)

On 9-15-2020 Plaintiff authored and sent a letter to the Secretary of the DOI informing him of Plaintiff's concerns and requesting that the DOI IG 'investigation' await the conclusion of the case before this Court and the EEOC case (Exhibit X-30)


On 10-1-2020 Plaintiff was lured into a meeting with GRCA Deputy Superintendent 3 under the pretext of "discussing the safety program" and had the Garrity Notice dropped on him. Originally dated 10-29-2020 the Notice ordered Plaintiff to contact the DOI IG (USPS) investigator 10-2-2020 and 'interview' "within seven (7) calendar days from this notice" (10-5-2020). Because Plaintiff was handed the Notice on 10-1-2020, he requested the dates move later by 3 days. Upon skimming the Garrity Notice, Plaintiff asked why Deputy Superintendent 3 said (wrongly) that this was a Postal worker who filed a complaint... Superintendent 3 said "I may have gotten it mixed up with something else."

Plaintiff contacted—leaving a voicemail with the DOI IG investigator on 10-2-2020, made telephone contact with the DOIIG investigator while on Leave on 10-8-2020, 'interviewed' while on Leave on 10-9-2020.

According to the investigator, Defendant was the filed a complaint with the DOI IG's office stating that he was being made to feel "subjected to uncomfortable in the work environment because of a *Outside Magazine* article published in October 2019. And felt that the article identified Defendant as being involved in the resignation Superintendent 1 from her position as GRCA Superintendent. Plaintiff provided the investigator with information that Defendant was met with hostility—not because of an October article in *Outside Magazine*, but because of the public release of DOI IG report 18-1188 which indirectly, but positively identified Defendant lying and swindling Superintendent 1 in March 2019. And that Superintendent 1 resigned because of Defendant's actions and filing bogus DOI IG complaints against Superintendent 1. Defendant's actions were the cause of Defendants plight. (Exhibit X-36)

Plaintiff explained to the investigator that any hostility Defendant may have been exposed to was his own doing by his own actions of lying to and swindling Superintendent 1. And that this occurred well before any October 2019 article. Plaintiff provided the DOI IG investigator a text message exchange 7-5-2020

To end the interrogation the investigator instructed Plaintiff to search through emails and other documents regarding communications with reporters—self-incrimination documents, convert them into a pdf and send them to her. Precisely the 5th Amendment violations that Plaintiff predicted—along with any 'perjury allegations' which can only be prosecuted by Defendant's counsel.

The investigator began by reciting that Plaintiff's 'statement' was "voluntary". As the record demonstrates, and the Court knows; this was not voluntary.

Plaintiff took the opportunity to ask the investigator why the Superintendents would be lying and conjuring up 'stories' surrounding the circumstances of the 'interview'. She said that she did not know of the lies and could not offer an explanation.

Investigator said that she was contracted with National EEO Investigative Services Office (USPS) to conduct internal management investigations. That this function was common with NEEOISO. The Court will recognize that this something that Deputy Superintendent 3—the former NPS Assistant Director for Visitor

and Resource Protection (VRP) would know. His "this is likely a Postal worker who filed a complaint..." was contrived to dupe Plaintiff.

Exhibit X-37 is one last-ditch desperate attempt to coerce Plaintiff into interrogation by DOI as Plaintiff—home on Leave and seeking additional Leave to fortify his family against predicted COVID-19 'second wave'/Flu spread and post-election security. Not knowing that Plaintiff had conducted the 'interview'; GRCA Deputy Superintendent 3 tells him—already in California, that he will be documented as AWOL if he did not conduct the 'interview'.

The 'investigation' remains open as of this writing.


## Overt Acts

The Court will note several overt acts foretelling of DOI/NPS/GRCA's retaliation against Plaintiff. *Modus operandi* and theme in DOI/NPS/GRCA is pretext—lying, not telling the truth. In this 'Culture of Fraud' noting is what it seems or portrayed to be. The tactic is that once it is discovered, it will be too late to stop or reverse the real intent.

1. On 10-2-2020 GRCA Superintendent 6 and GRCA Deputy Superintendent flew all the way from the South Rim Village Headquarters of Grand Canyon National Park to the North Rim of Grand Canyon National Park in part to have a 'meeting' with Plaintiff. Plaintiff was the Safety Officer for the Bison Project corralling and shipping Bison from the oversized herd to sanctuaries across the country. It was a field assignment with the Team living in tents. This 'meeting' covered only two things; both GRCA Superintendent 6 and GRCA Deputy Superintendent 3 attempting to con Plaintiff in participating in a DOI IG interrogation and handing Plaintiff a memorandum removing him as subordinate direct reporting to GRCA Superintendent 6 and direct reporting him to GRCA Deputy Superintendent 3 instead.  Plaintiff was direct report to GRCA Superintendent 1 when he was hired. In private organizations, in the U.S. military, and as is the international safety

worldclass standards OHSAS 18001, and ISO 45001; the Safety Officer reports directly to the CEO. Stephenson was direct report to GRCA Superintendent 5, and then direct report to GRCA Superintendent 6.

It was a 'tell' that of the many important things going on at GRCA such as COVID-19 response, and the Bison Project itself that of the things that the Superintendents thought to include on a helicopter trip was the 8-28-2020 memo transferring Plaintiff to GRCA Superintendent. The pretextual memo mentioned Superintendent's workload and Deputy Superintendent's background in safety. What it hid was the *localizing of punishment* of Plaintiff. If Plaintiff is suspended with GRCA Superintendent 6 as his direct report, for example, the 'Appeal Authority' is GRCA Superintendent's direct report supervisor; the IMR Regional Director in Denver. By reducing Plaintiff as a direct report to GRCA Deputy Superintendent, the 'Appeal Authority' now becomes Superintendent 6—keeping any punishment or other action against Plaintiff on Grand Canyon National Park and sheltered from outside interference, processes, judgement, or jurisprudence.

GRCA Superintendent 3, formerly NPS Associate Director for Visitor and Resource Protection (VRP) is implicated in the deleting of the wildland firefighter (Exhibit P-1), and the fraudulent 'Uranium Report' (Exhibit X-36). Plaintiff should not be supervised by anyone implicated in the "Federal offenses" reported by Plaintiff for obvious retaliatory reasons.

2. The Court will find that the attacks on Plaintiff's mail were not just felonies, attacks on the U.S. Mail, this Court, and Justice—but they constituted overt acts directed at Plaintiff. The Court will recall that DOI intercepted Plaintiff's correspondences from the Court immediately after Plaintiff was granted an Extension, signaling to DOI/NPS/GRCA that it had a fight on its hands. Mentioned earlier, Plaintiff was handed an envelope containing opened Court documents on 9-16-2020. Plaintiff reported this directly to the Secretary of the Department of the Interior on 9-29-2020. Plaintiff was then presented with his opened U.S. Mail containing his Arizona driver's license from the Arizona DMV on 10-1-2020 after the Superintendent's Office held it for 4 months. And that no one else of the 300-500 person staff has reported opened mail. Just Plaintiff. There are only 4 persons with access to Plaintiff's U.S. Mail; the mail clerk, the Superintendent, 2 Deputy Superintendents, and the Superintendent's aide. This was a direct overt act against Plaintiff.

3. During the 10-1-2020 meeting. Plaintiff was told that several workers asked Deputy Superintendent 3 where Plaintiff was going as he made trips to the Flagstaff building to address COVID-19 air circulation concerns and attempts to secure HEPA filters for the workers. Deputy Superintendent 3 made sure to let Plaintiff know that he was being watched. Both the surveilling and the telling to Plaintiff that he is being surveilled are overt acts.

4. Your Honor, Plaintiff submits that the incessant lying, conning, and pressure to force Plaintiff into the DOI IG interrogation, too, was an overt act in an effort to corner Plaintiff into permeating his case before this Court, self-incrimination, and creating conditions to charge Plaintiff with perjury. These efforts constitute all of GRCA Superintendent 6 and GRCA Deputy Superintendent 3's encounters with Plaintiff since June 2020. Every single meeting between ending with an ambush dropping of a document on Plaintiff.

5. The conjuring, hatching, and executing the pretext against Plaintiff not only took forethought, conspiracy, and manhours; but constituted overt acts as it was executed.

6. In the 10-1-2020 meeting with Deputy Superintendent 3, Plaintiff was ordered to move his office from the FMD building near the center of gravity of worker activity and occupational risk to the GRCA Headquarters building. This would prevent workers from coming to Plaintiff to report safety health and wellness matters. This is also an attempt to increase surveillance of Plaintiff. This is an overt act.

7. The 'dangling' of the Written Counseling over the head of Plaintiff is an overt act.

These overt acts can be stopped and rendered moot by the Court issuing an Emergency Injunction protecting Plaintiff from further targeting. Only the Court can stop it

### Merits of Issuing Emergency/Preliminary Injunction

Your Honor, respectfully, as the Court knows; generally, considerations for granting Preliminary Injunction may be described as:  1. Whether Plaintiff will succeed on the merits of the case  2. Whether and to what degree not issuing Injunction may result in irreparable harm to Plaintiff  3. The harm to Defendant/non-movant if the Injunction is granted  4. The 'public interest' and the effects of granting or not granting Injunction on it.

Your Honor, as already briefly demonstrated to the Court; Defendant committed multiple acts of felony perjury in sworn testimony to the U.S. Attorney and to this Court. As also already demonstrated, Defendant has committed multiple acts of felony perjury in sworn testimony to the EEOC. As also already demonstrated, the Department of the Interior Inspector General investigated and determined that Defendant was serially lying to Superintendent 1 for nearly a year.  This is a short list, Your Honor.

Defendant has demonstrated and it has been documented before the Court that Defendant not only has no credibility; but should be prosecuted for multiple counts of perjury in this and other cases. It is the same with others (e.g. GRCA Superintendent 4) whom U.S. Attorney has entirely based his filings before this Court. This alone, suggests Plaintiff has a *reasonable probability of prevailing on the merits* of this case . When adding the U.S. Mail violations—and DOI's Obstruction of Justice; respectfully, Plaintiff's likelihood of succeeding are enhanced.

Your Honor, as has been introduced in Motion; they're coming for me. Right now. Plaintiff is a serious, dedicated, expertly trained safety professional of the highest caliber. He has been the beneficiary of exemplary mentors with uncompromising constitutions and sense of Integrity. The dangers, the corruption, the racism; they have existed at Grand Canyon for decades. For the first time in a long time workers are coming forward due to the responsiveness of Plaintiff. The dangers have been itemized. That is progress.

Publicizing these dangers has upset many bad actors. This can only continue if Plaintiff is sufficiently protected, and the bad actors are sufficiently dis-incentivized—Emergency Injunction.

Respectfully, Your Honor, without the Injunction Plaintiff will last 6 months at best. And things will go back to the way they have been for decades. And it is very likely that someone will be killed in an occupational accident.

An Injunction by a federal judge in this matter sends a powerful and invigorating message to Everyone, Your Honor—workers, bad actors, good actors…and even visitors.

Honor, there is no harm to forcing DOI/NPS/GRCA into obeying the Law.

Your Honor, Grand Canyon National Park is one of the most amazing places on the planet. It is the spiritual center for the Souls of all Native Peoples. It is a marquee icon and symbol for the United States and the world. With over 6,000,000 visitors per year (pre-COVID) and 2,500+ residents it is in the world's interest that an Emergency Injunction be granted, paving the way for Grand Canyon National Park to have the worldclass safety program commensurate with its global standing.

Begging your pardon, I'd like to add a Fifth, Your Honor if I may; granting the Injunction is righteous.


**Real Impacts to Real Lives**

Your Honor, as the Nation moves forward in these times of 'reconciliation', Grand Canyon—isolated and weighed by an unfortunate history may need a little shove by the courts. Left to their own devices; they have not done it.

An African-American family was recently ripped from Grand Canyon National Park (GRCA) under the most racist of circumstances. The worker, a female GS-13 supervisor was targeted for demotion to GS-12 and supervisory authority yanked just 1 day before completing her 1-year probationary period giving her

permanent status. Among the reasons she was given for her demotion; she was "acting too Black". This family, a wife, a husband and 2 small children moved all the way across the country—from the East Coast to take this job. They quickly became great neighbors in the community. She became an active recruiter and host of the NPS' 'Allies For Inclusion' program—organizing and sponsoring luncheons and hosting gatherings in her own home to foster diversity. The husband, too, worked at GRCA. They represented 2 of just 7 African-Americans of the 300-500 workers. They were forced to suddenly, and with much humiliation and trauma, pick up and move to the West Coast as a result of this racist episode in less than year. This racism likely cost US taxpayers $300,000+ in moving costs, job announcements /recruiting/hiring cost, loss of revenue from their still-unfilled government quarters, and more. But the sudden, violent trauma to the workforce and the community—especially the children as exemplified when a child friend so honestly chalked missing her African-American friend on the porch of the empty house in the days just after they exited cannot be over-stated. (Exhibit X-31). There are now just 5 African-Americans working at Grand Canyon National Park.

Exhibit X-28 is Plaintiff in detail demonstrating Grand Canyon National Park's deliberate, knowing discrimination against Native Americans by imposing draconian COVID-19 'return to work' restrictions on Navajo and Hopi tribal members as they returned to GRCA from Native Lands. No such restrictions were imposed on non-Native Americans taking day or weekend trips to Phoenix, Scottsdale or making stops along the way even though CDC and John's Hopkins statistics and leaked weekly 'Red Zone' reports of the White House Corona Virus Task Force to governors declared Maricopa (Phoenix), Coconino (Flagstaff/Grand Canyon), and other Arizona counties more contagious. Plaintiffs dogged research demonstrated that science-based COVID protections implemented by the Navajo Nation President (e.g. curfews, stay-at-home orders, lockdowns, etc.) made the Nation COVID-19 'safer' than the deep 'Red Zone' to the south.

Yet the deliberately racially and discriminatory targeting of GRCA Native American workers by GRCA Superintendent 6 and others required that Tribal members 'self-quarantine' for 14 days, and even disallowed them from returning altogether. This led to extreme hardships such as one Native American worker being

forbidden from returning to work—missing 2 months' pay. Although DOI had developed extensive measures such as 'Admin Leave', 'Safety Leave', 'Weather Leave'—not to mention Exceptional Family Member Program (EFMP); these were showered upon o non-Natives—but not to him and other Tribal members. He was stripped of his hard earned leave to 'pay' for the quarantine imposed on him after returning from the Nation to do his family duty and help care for his mother ailing with cancer.

Your Honor, as of this writing (just days ago) his mother was rushed and admitted to the Regional hospital as the cancer has spread throughout her body. This man's pleas for humanitarian remedy were rejected. As a result—and foreseeable; now wrongfully stripped of his Leave, he cannot visit her in what (also foreseeable) are likely to be her final days in a culture which reveres its elders. Forbidden to return to work and shorted 2 months' pay, he is short of money just when his family could use it most.

This humiliating, abject racism is so horrible—so inhuman that Plaint reached out to the President of the Navajo Nation for help. (Exhibit X-29)

Revealing was GRCA Superintendent 6's refusal to add Diversity to the GRCA 'Values' during a recent PSET GRCA Strategy meeting. Grand Canyon National Park's Racism and recent uptick toward racial and ethnic cleansing can be traced to this expression of its 'values'. Struggling to maintain 1% African-Americans working at the Park in a country of 13% clearly states the obvious. Grand Canyon National Park is an onclave which does not 'look like' America. Your Honor, it is time that Grand Canyon National Park joins America.

As the Country tackles systemic and systematic racism and discrimination in the abstract, rarely are examples of 'end-to-end' systems, monetary and human cost, and executive level actions so concretely documented as Grand Canyon's Racism.

Clearly these workers—the People come to Plaintiff for solutions to safety dangers, workplace fears and concerns whereas the do not come to anyone else. For instance, the 'uranium map' marked to keep

secret the exposure and poisonous uranium leaching into aquifers was brought to Plaintiff by a concerned worker after it was hidden for years. This is how these problems have become known.

DOI's efforts to go after Plaintiff described above, and very recent efforts such as moving Plaintiff's office into the GRCA Headquarters building are intended and will have the effect of intimidating workers into not merely stopping by as they do now to reveal dangers. And will provide a means of surveillance handy in identifying workers who provide intel on dangerous situations.

Your Honor, these are *irreparable harms* which will worsen if Injunction is not granted.

### Close

Your Honor, in the course of his serious and solemn duties as Safety Health and Wellness Manager of Grand Canyon National Park to keep his people and visitors safe, Plaintiff has not only doggedly identified major potentially deadly unmitigated safety, environmental, and social dangers; but crimes, felonies—"a Federal offense" by several DOI/NPS people in a RICO-like system where criminality, lying, falsifying records, swindling, perjury, unaddressed safety dangers are normalized and unpunished. They demonstrate and represent rot. Plaintiff identifies several senior officials, and shines light on disturbing facts which would cause the public second-thought about going to Grand Canyon National Park or supporting such a culture— creating great Motive to harm Plaintiff.

As happens in criminal and rot enterprises; Plaintiff is now in very real, very serious jeopardy of retaliation for 'shining a light'. The merits and necessity of Emergency Injunction are clear. The cost is none. But the effort should not stop there.

As the Court knows the credibility of the Inspector General system—like many of our institutions of long-held esteemed credibility (e.g. CDC, EPA, DOJ, FDA, OSHA—even the DOD) is/are currently in question.

28

Plaintiff hopes that the Court cannot turn its head away from obvious questions raised in evidence.

How was it possible that Defendant was able to manipulate this United States government Department level function so many times? Fine, dedicated, career people working there not withstanding; how credible can the DOI IG be as an institution/function when it was so clearly duped by this one person so many times? What does it say? How many other instances are there out there?

Much like solving the deadly safety, social, and environmental dangers identified by Plaintiff; healthy functioning systems of integrity (such as the OPM hiring and safety reporting systems) are supposed to vet and solve these. And when they don't; relief and *remedy* is desperately sought in alternative healthy functioning systems of integrity. Plaintiff has turned to this Court.

Plaintiff promised the Court very early on a superseding public interest in seeing this case to its conclusion. It is hoped that the Court will see that by-and-large Plaintiff has delivered—DOI/NPS/GRCA's acts of desperation are an acknowledgment of as much. Only this Court can see that Justice and the public interest are served—by granting an Emergency Injunction protecting Plaintiff.

The point of making Plaintiff 'disappear' is to make these dangers and ugly truths disappear Your Honor.

They opened and stole my U.S. Mail and Court's correspondences—its relationship to Plaintiff.

Thank You, Your Honor.

Respectfully Submitted

Elston L. Stephenson, OHST
Safety Health & Wellness Manager
Tort Claims Officer
Grand Canyon National Park
928-255-8727

**Injunction**

Plaintiff prays that the Court grants/orders an Injunction to the Department of the Interior (DOI) which:

1. Restores Plaintiff to direct report to the Grand Canyon National Park Superintendent

2. Plaintiff's office physically remains in FMD Building.

3. Removes Plaintiff from any past (as of 11-5-2019, Order granting *U.S. Motion to Intervene*), current, and future DOI IG and other DOI investigations involving persons also implicated in felonies—"a Federal offense"/"any Federal offense" identified by Plaintiff to this Court, "official proceedings",  "a judge of the United States", "law enforcement", "department or agency of the United States", or "Congress" per 18USC §§1512, 1513, and 1505.

4. Prevents the interference, obstruction, insertion in "official proceeding[s]", or the questioning or retaliation of Plaintiff regarding participation in this and any other "official proceeding".

5. All surveillance of Plaintiff is ordered to cease and desist. Any and all surveillance and/or tracking devices/software surveilling and tracking Plaintiff are ordered removed as of (1 day after date of order).

6. Any DOI punitive or adverse administrative action, or action "harmful to [Plaintiff] including lawful employment or livelihood" must be approved by this Court.

8. Participants in any actions in violation this order or 18USC §§1512, 1513, and 1505 will be subject to prosecution under 18USC §§1512, 1513, 1505 and other applicable laws as well as sanctions by this Court.

9. Violations of other laws will be prosecuted in accordance with the applicable USC as well as sanctions by this Court.