# EXHIBIT D-2

EXHIBIT D-2



# United States Department of the Interior

NATIONAL PARK SERVICE
Intermountain Regional Office
12795 W. Alameda Parkway
P.O. Box 25287
Lakewood CO. 80228-2822



IN REPLY REFER TO:
IMR-SHW

Memorandum

To:        Superintendent, Grand Canyon National Park

From:      IMR Occupational Safety & Health Manager

Subject:   **Radiation Program Assistance**

On or about June 11, 2018 this office received a request for assistance with a radiation issue at your location. After reviewing supplied documents NPS-GCNP-RMC-01 Dated June 20-22, 2000, and Revision #1 Dated July 18, 2000 a decision was made to deploy. I departed Lakewood, CO on June 13, 2018 and traveled to Southeast Utah Group Headquarters (SEUG) Moab, UT. to pick up equipment. I arrived at GRCA on June 14, 2018 at approximately 11:00 AM and proceeded to the Museum Warehouse and met with Colleen L. Hyde and Kim Besom. GRCA Safety Manager Elston Stephenson arrived shortly afterward. After in-briefing with Colleen and Kim, and short interview, I started a radiation survey as described below. After confirming the presence of radioactive ore samples in the Museum Collection, the Parks decision was to remove and dispose of the items of concern. Permission was received, to return these items to the Lost Orphan Mine where they originated. This was accomplished on June 18, 2018.

## Museum Collection:

A hasty survey was conducted of Archives Room cabinets, and three plastic buckets stored in the warehouse. Results were positive for radioactivity above background as noted below:

1.  2.02 mR/hr    Outside building, sunny day background
2.  1.85 mR/hr    Inside building
3.  13.9 mR/hr    Between cabinet NB16 and NB18

A further survey of the rest of the Museum Collection Building, offices and storage areas were negative for radioactivity above background. On Friday June 15, 2018 a second survey was conducted to identify and segregate the items of concern from the museum Collection. Readings were in keeping with the report of July 18, 2000 and these items were prepared for transport and

disposal.

## Basement of Headquarters Building:

An in-depth survey of the basement area where Radioactive Ore samples were originally stored was negative for radioactivity above background. No radiation issue noted.

## Power House

An in-depth survey of the Grand Canyon Power House was conducted and was negative for radioactivity above background. No radiation issue noted.

## Conex Adjacent to Fee's Building

This container is the storage location for Ore samples that are part of a legal proceeding. This location has signage stating it is a Radiation Storage Area. There is minor activity above background on contact of outside container wall. A key was not available for access so radiation levels inside are unknown. Container offers good shielding and protection to employees.

## Trail of Time

Trail of Time has several rock displays along its length. Entire trail was surveyed and was negative for radioactivity above background. No radiation issue noted.

## Recommendations:

As defined in Title 10, Section 20.1003, of the Code of Federal Regulations (10 CFR 20.1003 ), **ALARA is an acronym for "as low as (is) reasonably achievable.** This should be the standard for exposure to any radioactivity. Grand Canyon by its location and surrounding geology has an abundance of naturally occurring radioactivity.

By the nature of the items stored in the museum collection, there is still low levels of radioactivity. Core samples stored in one of the cabinets should be controlled for exposure. Some recommendations are:

1. No one under 18 years of age should be allowed to handle or work with these core samples or anything known or believed to be radioactive.
2. Consider relocating Core samples to an outdoor metal cabinet.
3. Real time digital Radon monitor for the Museum Collection archive room.

In addition to recommendations for the Museum Collection, I also recommend that the Conex

storage site be limited to Sample storage only, and not a combined use area. Access should be limited/controlled.

All survey and monitoring was conducted with the following equipment:

Ludlum Model 3001 Serial Number # 25015388
Ludlum Detector Model 44-2 Serial Number # PR369634
Ludlum Detector Model 44-9 Serial Number # PR368091
Check Source Cs-137, CS72 Jan 2017
Certificate of Calibration Dated 6 OCT 2017, Calibration due 6 OCT 2018 Ludlum Industries.


_____          _____
Bill Bouley,                                                             Date
IMR Occupational Safety & Health Manager
Radiation Safety Officer

# EXHIBIT D-3



## United States Department of the Interior

NATIONAL PARK SERVICE
Intermountain Regional Office
12795 W. Alameda Parkway
P.O. Box 25287
Lakewood CO, 80228-2822



IN REPLY REFER TO:
IMR-SHW

Memorandum

To:              Superintendent, Grand Canyon National Park

From:            IMR Occupational Safety & Health Manager

Subject:         **Radiation Program Assistance**

On or about June 11, 2018 this office received a request for assistance with a radiation issue at your location. After reviewing supplied documents NPS-GCNP-RMC-01 Dated June 20-22, 2000, and Revision #1 Dated July 18, 2000 a decision was made to deploy. I departed Lakewood, CO on June 13, 2018 and traveled to Southeast Utah Group Headquarters (SEUG) Moab, UT. to pick up equipment. I arrived at GRCA on June 14, 2018 at approximately 11:00 AM and proceeded to the Museum Warehouse and met with Colleen L. Hyde and Kim Besom. GRCA Safety Manager Elston Stephenson arrived shortly afterward. After in-briefing with Colleen and Kim, and short interview, I started a radiation survey as described below. After confirming the presence of radioactive ore samples in the Museum Collection, the Parks decision was to remove and dispose of the items of concern. Permission was received, to return these items to the Lost Orphan Mine where they originated. This was accomplished on June 18, 2018.

## Museum Collection:

A hasty survey was conducted of Archives Room cabinets, and three plastic buckets stored in the warehouse. Results were positive for radioactivity above background as noted below:

1. 2.02 mR/hr   Outside building, sunny day, background  . .
2. 1.85 mR/hr   Inside building
3. 13.9 mR/hr   Between cabinet NB16 and NB18
4. 800 mR/hr depending on the sample   On contact with the ore sample inside the bucket
5. 280 mR/hr to 320 mR/hr   On contact with outside of bucket - lid sealed
6. 0 above background   Distance of 5 ft. from bucket
7. 2.5 mR/hr - 3 mR/hr   On contact with outside of metal cabinet, on a seam

A further survey of the rest of the Museum Collection Building, offices and storage areas were negative for radioactivity above background. On Friday June 15, 2018 a second survey was conducted to identify and segregate the items of concern from the museum Collection. Readings were in keeping with the report of July 18, 2000 and these items were prepared for transport and disposal.

## Basement of Headquarters Building:

An in-depth survey of the basement area where Radioactive Ore samples were originally stored was negative for radioactivity above background. No radiation issue noted.

## Power House

An in-depth survey of the Grand Canyon Power House was conducted and was negative for radioactivity above background. No radiation issue noted.

## Conex Adjacent to Fee's Building

This container is the storage location for Ore samples that are part of a legal proceeding. This location has signage stating it is a Radiation Storage Area. There is minor activity above background on contact of outside container wall. A key was not available for access so radiation levels inside are unknown. Container offers good shielding and protection to employees.

## Trail of Time

Trail of Time has several rock displays along its length. Entire trail was surveyed and was negative for radioactivity above background. No radiation issue noted.

## Recommendations:

As defined in Title 10, Section 20.1003, of the Code of Federal Regulations (10 CFR 20.1003), **ALARA is an acronym for "as low as (is) reasonably achievable.** This should be the standard for exposure to any radioactivity. Grand Canyon by its location and surrounding geology has an abundance of naturally occurring radioactivity.

By the nature of the items stored in the museum collection, there is still low levels of radioactivity. Core samples stored in one of the cabinets should be controlled for exposure. Some recommendations are:

1. No one under 18 years of age should be allowed to handle or work with these core

samples or anything known or believed to be radioactive.
2. Consider relocating Core samples to an outdoor metal cabinet.
3. Install real time digital Radon monitor for the Museum Collection archive room.

In addition to recommendations for the Museum Collection, I also recommend that the Conex storage site be limited to Sample storage only, and not a combined use area. Access should be limited/controlled.

## Equipment:

All survey and monitoring was conducted with the following equipment:

Ludlum Model 3001 Serial Number # 25015388
Ludlum Detector Model 44-2 Serial Number # PR369634
Ludlum Detector Model 44-9 Serial Number # PR368091
Check Source Cs-137, CS72 Jan 2017
Certificate of Calibration Dated 6 OCT 2017, Calibration due 6 OCT 2018 Ludlum Industries.


Bill Bouley,                                          Aug 13, 2018
IMR Occupational Safety & Health Manager              Date
Radiation Safety Officer

# EXHIBIT S



Stephenson, Elston <elston_stephenson@nps.gov>

## Stephenson Federal Court Material v DOI/NPS - Falsified/Faked Aviation Accident Investigations

Stephenson, Elston <elston_stephenson@nps.gov>      Wed, Dec 11, 2019 at 7:29 AM
To: David Bernhardt <dwbernhardt@ios.doi.gov>, Mark Greenblatt <mark_greenblatt@doioig.gov>

Secretary Bernhardt, General Greenblatt

Good Morning.

Please receive this Motion that is before the U.S, District Court (Phoenix). And notification that I intend to take this to trial to stop the stalking of me and other harassing, targeting conduct. And regrettably, I have had to turn away the much appreciated IG Investigations to investigate the recent falsified 16E process and another bizarre extra-IG/legal Investigation targeting me because, although only a pre-law grad and not a lawyer; I could see that they presented at least 4th, 5th, and 14th Amendment violation problems as the U.S. Attorney is involved, and this matter is before a federal court. This is particularly true if the persons, processes, and 'investigations' involved are deposed.

Sir, please also urgently know that I have encountered what appears to be 2 instances of 'pencil whipping' aviation accidents. I have no indication that this is more widespread than the two that I have personally encountered.

Mr. Secretary, Inspector General, respectfully, I promise You if we don't conduct serious, legitimate investigations they will not withstand the litigations which will accompany accidents like these which are statistically certain to occur during the upcoming, massive Transcanyon Pipeline construction—particularly in the case of serious injury or loss of life.

Returning to the court matter; Sir, unfortunately, the GRCA Deputy Superintendent committed several instances of perjury with the U.S. Attorney's Office, and this federal U.S. District Court (Phoenix).

Sir, unfortunately, You will find in the Motion several other instances of falsifying statements and documents by the Deputy Superintendent and Superintendent 2 along with instances of others; falsifying the uranium reports by IMR, falsifying the 16E Investigation by Superintendent 2, falsifying OSHA statements and documents by Superintendent 2—nearly 2 dozen instances of falsified statements in EEOC deposition/testimony by Deputy Superintendent that all paint a picture of a culture that I have been reporting to You virtually since joining NPS. These are included to demonstrate and 'walk the Court' through a 'Pattern of Conduct' which culminated with the GRCA Superintendent feeling confident, in his sense of impunity to show up (stalk) my home in retaliation. And to illustrate to the court the impropriety by stating the obvious; if I were a female, no one would be arguing otherwise. He would likely be out of a job.

A court of law before a federal judge should firmly establish, find, and pronounce these, and the culture as fact.

Please, Sir; in addition to felonies, this culture of loose integrity and looseness with propriety and the truth runs the risk of getting someone killed.

Indications are that NPS may be faking aviation accident investigations. While this material is not yet ready for court; this 70% local finding is enough to beg for action in the interest of preventing dramatic, potentially catastrophic accidents.

Sir, I have recently encountered serious problems with NPS' 'investigations' of helicopter accidents. These problems; namely that no one has gone to the accident scenes to conduct their 'investigation' or interview key witnesses may have led to Grand Canyon National Park's most recent jettisoning—dumping 5,000lbs of piping from the air onto the Park of visitors below.

On October 7, 2019 a Kaman 'KMax' K-1200 helicopter contacted 7.2kv/12.47kv powerlines with the loadline of the lift it was attempting to extract from Grand Canyon's Indian Garden's pumping station which is responsible for providing water to the entire Park. The incident knocked the computerized SCADA pumping system offline and unable to pump water. Video shows the pilot was in great distress with his aircraft. Likely exceeding the 25deg pitch limits. (video attached)

Just 21 days later, on October 28, 2019 a Boeing CH-47 attempting to sling load 5,000lbs of water piping into the very same Indian Gardens pumping station experienced 'settling with power'/vortex ring state and frantically dumped/jettisoned the 5,000lb external load onto the Park below in an effort to prevent the huge aircraft from crashing into the ground.

Nearby are permanent rest spots and makeshift campsites/rest sites heavily trafficked by visitors. Luckily no one was injured or killed. (video attached)

Sir, I hiked the 11 miles down and back to Indian Gardens to conduct my investigation on October 26, 2019 when it became clear that no serious investigation had been conducted—no ground witnesses (such as the ones filming the video and reacting to the wire strike, the APS power company which is troubled by this, or the responding SCADA expert) had been interviewed. And most importantly; no 'investigator' went to the site—even though the incident was 'investigated'. What I found was shocking to any experienced or formally trained accident investigator or aviator. The landing zones (LZs) and pads were so overgrown with trees that lowering an external load was literally like threading a needle. It was surrounded by trees at least 20-30ft high. The LZ pads are literally covered with the shadows of the canopy of the trees above. (video attached). At 3,290ft MSL and accounting for DA; aircraft can easily be operating at conditions equalling 5,000-6,000 feet—the 'high' of the venerable 'hot, high, and heavy' condition that helicopter pilots worry about. (attached)

The video shows that crews have been flirting with disaster by flying so close to live electrical lines—likely for years.

More importantly however, the trees force the helicopters (with their 50ft lines + 10ft for loads) into 'out of ground effect' (OGE) hovers devouring precious power (power required) and leaving little-to-no power available margin in case of emergencies.

Conducting a serious investigation—going to the accident scene/site of the first incident would have resulted in the changes that would have averted the second accident.

A legitimate, serious investigation would have readily observed the trees as hazards and had them chopped down or greatly trimmed.

When the CH-47 arrived, the trees forced the aircraft into a 90ft ÷ OGE hover (50ft line + 10ft load ÷ 30ft tree). According to Hover Power Charts (attached) in the operator's manual (which depict 80ft as the top of the IGE range); forcing the aircraft into the overgrown LZ deprived it of the power available of 'in ground effect' IGE (less power required) would have provided. And would have taken less time (surgical skill) to place the load on the LZ.

Further, this task (delivering the piping) was an 'audible' hastily called for and with hastily/little planning. The deliberate mission was delivering material to Phantom Ranch at the very bottom of the Canyon. The 'low time' in 'type' pilot had just earlier been repeatedly landing loads at Phantom Ranch—a wide open LZ with no obstacles and the ability to execute in favorable IGE conditions. After several loads all day long, in favorable conditions in an LZ, literally the size of a football field, this inexperienced pilot likely developed a 'muscle memory'. When suddenly tasked with landing a load in higher DA, obstacled LZ, in OGE, 'Negative Habit Transfer' likely took over and this pilot in an aircraft which should never have had power problems—and mechanically attempting the same maneuver exceeded the 300ft/min rate of descent needed to induce vortex-ring-state, and hastily 'punched' his 5,000lb load of piping to prevent crashing into the ground. Again—with hikers and campers all around Indian Gardens; it was only luck that someone below did not get killed.

Conducting a legitimate investigation, instead of 'pencil whipping' or 'desktop investigating' on October 7, 2019 would have eliminated the trees and prevented the October 28, 2019 accident. A simple look at the charts shows that 10-15% power required (IGE) to hover could have been reduced. Keeping the pilot out of the near 100% power required (OGE)—and necessary for settling with power. And wasting likely thousands of dollars in lost material.

Sir(s), as I continue my investigation, I have found that the local power company, APS, has and has been harboring serious concerns—apparently for years concerning our dangerous operations around the live Indian Garden powerlines.

This 'settling with power' incident was entirely preventable, and is precisely among the potentials that I addressed in the 'white paper' that I wrote for NPS to address the upcoming onslaught of helicopter lift operations as part of the Transcanyon Pipeline Project. (attached). Again, Sir; it was only luck that no one got hurt or killed. Clearly, the pilot and ground crew mentioned and were concerned enough about the trees to continually mention them as they attempted this surgical maneuver. (video attached)

The CH-47 clearly and terrifyingly exceeds the ±30° pitch limit. The KMax exceeds or comes close to exceeding the ±25° pitch limit. (attached)

At the very least, having failed to conduct a proper accident scene investigation in the first instance; any formally trained, experienced, expert investigator would certainly conducted a proper accident scene investigation after two consecutive accidents at the exact same LZ less than 3 weeks later. Even a non-investigator layman would have begged the question "What the heck is going on at that LZ?!"

I have been vetting my findings with experts—namely the professionals at the Naval Safety Center's School of Aviation Safety, and others that I know. I particularly would like to get with the Aviation Aeromedical team to assess the repetitive task saturation and the onset of 'Negative Habit Transfer' (which fills the annals as root cause analysis of crashes) introduced by having that CH-47 pilot repeatedly, conducting open LZ, favorable PA/DA IGE conditions all day long, then being called into a 'hey you' hasty mission into more difficult conditions. Unfortunately, the School of Aviation Safety building is the site of the last week's Pensacola mass shooting. Luckily none of the SAS staff was injured. But it will take a while to complete my investigation and analysis.

Respectfully, applying HFACS (attached); we may see this again with the huge Transcanyon Pipeline construction.

Sir, it may also be that those tasked with investigating aviation accidents have neither the technical knowledge, formal training, or experience to be tasked with conducting such vital investigations. At all rates; the absence of a serious, thorough, professional investigation inarguably denies aviators and the aviation community vital lessons learned so as to prevent 'repeats'. This is a crucial legacy ethos of the aviation community as expressed in the 'white paper'.

Again Mr. Secretary, Inspector General, respectfully, I promise You if we don't conduct serious, legitimate investigations they will not withstand the litigations which will accompany accidents like these which are statistically certain to occur during the upcoming, massive Transcanyon Pipeline construction—particularly in the case of serious injury or loss of life.

Mr. Secretary, Mr. Inspector General, respectfully, my hope is that all can agree that the videos—having helicopters dancing with live powerlines and raining thousands of pound of steel (or whatever) without warning on Grand Canyon National Park and its visitors and workers is unacceptable.

Sir, I keep running into these lapses of integrity. Respectfully, they do not just pose moral imperatives, but safety as well.

Thank You, Sir.

Sincerely,

Elston

Elston L Stephenson, OHST
Safety Health & Wellness Manager
Tort Claims Officer
Grand Canyon National Park
928-255-8727

ps. Sir, please allow me multiple sends because of the size of attachments—such as the audio and video files

p.s.p.s. Sir, I will include my qualifications to validate my credentials along with 22 years as a safety expert and 19 years as an aviation accident investigation expert from which I make my assessment.

12 attachments

Stephenson Affidavit - 17.7  Video Helicopter Incident.3gp
464K

Stephenson GRCA Helicopter Accident Invest - Indian Gardens Elevated View.3gp
972K

Stephenson GRCA Helicopter Accident Invest - Indian Gardens Site Ground Level.3gp
962K

Stephenson Case 3-19-cv-08268-DLR Stip for Extension (Full without MTD)(12-3-2019).pdf
7347K

Stephenson - White Paper Pipeline Aviation Safety.pdf
421K

Stephenson GRCA Helicopter Accident Invest Diagram (Indian Gardens).pdf
48K

Stephenson GRCA Helicopter Accident Invest - CH-47 Hover Power Chart (Dash -10).pdf
71K

288K

📄 **Kaman K-MAX_K-1200 Operator's Manual (Limits Excerpt).pdf**
33K

📄 **TM_1-1520-240-10 (CH-47D Operator's Manual)(Limits Excerpt).pdf**
160K

📄 **Stephenson - Degrees + Safety Certifications 2.pdf**
728K

📄 **Stephenson - Safety Certifications 1.pdf**
2962K

# EXHIBIT X-35



Medtronic Emergency Response Systems
11811 Willows Road NE
P.O. Box 97006
Redmond, WA 98076-9706 USA

www.medtronic-ers.com
toll free 800.442.1142

tel 425.867.4000

Dear Valued Customer,

Created by Physio-Control, a division of Medtronic, the LIFEPAK® 500 automated external defibrillator has been the premier, top-of-the-line defibrillator for public safety professionals and first responders since 1997. As of January 26, 2007, Physio-Control will discontinue the LIFEPAK 500 AED product line.  However, we remain committed to supporting LIFEPAK 500 AEDs by offering service and parts replacement for at least the next seven years after discontinuation.

While supplies last, you can order the LIFEPAK 500 AED (catalog numbers 99401-001083, 99401-001085) and LIFEPAK 500 DPS AED (catalog numbers 99401-001087 and 99401-001089) by contacting your local sales representative or our customer support team at 1-800-442-1142.  All new units shipped will be consistent with the new AHA Guidelines 2005.  Guidelines 2005 upgrade kits are also available for existing, biphasic LIFEPAK 500 units.  For more information on Guidelines 2005 upgrades, log onto www.aedhelp.com/AHA.

You are a valued customer. A LIFEPAK defibrillator backs you with a strong legacy of Physio-Control quality and reliability. Our ultimate goal is to "work as one" with responders around the world to continue to save more lives.

Sincerely,

Brian Webster, President

# EXHIBIT X-20



# EXHIBIT G

**INVESTIGATION**



OFFICE OF
**INSPECTOR GENERAL**
U.S. DEPARTMENT OF THE INTERIOR

# UNFOUNDED ALLEGATIONS OF IMPROPER LEADERSHIP DECISIONS AND HOSTILE WORK ENVIRONMENT AT GRAND CANYON NATIONAL PARK

**This is a revised version of the report prepared for public release.**

## SYNOPSIS

We investigated allegations that Grand Canyon National Park (GRCA) Superintendent Christine Lehnertz proposed a 1-day suspension for a GRCA senior official for an improper purpose; that she created a hostile work environment and engaged in bullying and retaliatory behavior against senior leaders, particularly male leaders, at the GRCA; and that she wasted nearly $180,000 in renovations to a park residence.

We found that Lehnertz legitimately proposed a 1-day suspension for the GRCA senior official for "Failure to Follow Supervisory Instruction" because the official did not provide Lehnertz a copy of an Employee Performance Appraisal Plan (EPAP) for one of his subordinate employees, despite multiple requests; did not provide written reports as requested by Lehnertz related to a high-priority initiative at the GRCA; and did not attend a scheduled meeting related to that initiative.

We found no evidence that Lehnertz created a hostile work environment or that she wasted nearly $180,000 in unnecessary renovations to a park residence.

We provided this report to the National Park Service Deputy Director Exercising the Authority of Director for any action deemed appropriate.

## DETAILS OF INVESTIGATION

We investigated allegations that questioned Grand Canyon National Park (GRCA) Superintendent Christine Lehnertz' leadership at the GRCA. The allegations stated that Lehnertz:

- Proposed a 1-day suspension for a GRCA senior official for an improper purpose

- Created a hostile work environment and engaged in bullying and retaliatory behavior against senior leaders, particularly male leaders, at the GRCA

- Wasted nearly $180,000 in renovations to a park residence

**Lehnertz Proposed Suspension of a GRCA Senior Official for Legitimate Disciplinary Reasons**

We found that on August 31, 2018, Lehnertz proposed a 1-day suspension without pay against the GRCA senior official for "Failure to Follow Supervisory Instruction." According to Lehnertz, the senior official did not:

1. Provide an employee performance appraisal plan (EPAP) for a subordinate employee as requested

2. Provide Lehnertz written progress reports regarding a high-priority park initiative as directed

3. Attend a required meeting to discuss development options for the initiative or request

approved leave

*The Senior Official Did Not Provide an EPAP for a Subordinate Employee as Requested*

The GRCA hired the senior official's subordinate employee on June 25, 2017, with a 1-year probationary period. The employee initially reported to Lehnertz but was transferred under the senior official's supervision in September 2017. Lehnertz said that at that time, she told the senior official he needed to complete a performance review and create an EPAP for the subordinate employee.

The DOI Performance Management System (370 DM 430) requires that a supervisor establish a subordinate's EPAP within 60 days of the beginning of the appraisal period, the employee's entrance on duty, the assignment of an employee to a new position, the assignment of an employee to a new or different supervisory position, or the assignment of an employee to a detail or temporary promotion scheduled to exceed 120 days.

Lehnertz said she asked the senior official for a copy of the subordinate employee's EPAP during meetings on June 25, 2018, and June 29, 2018, and by email and text message on July 2, 2018. Lehnertz said the senior official responded to each of her requests that he had an EPAP for the employee.

In the July 2 email, Lehnertz asked the senior official to provide her a copy of the signed EPAP "first thing this morning." Lehnertz said the senior official told her he was "working on it," but the signed EPAP was not on her desk when she arrived at the office on July 3. Later that day, Lehnertz asked the senior official again in an email if he had a signed EPAP for the subordinate employee.

The senior official responded to Lehnertz on July 6, stating, "After further review, I do not have a signed EPAP [for the employee]. . . . In our discussions, I was sure that I had one signed. . . . I was quite sure I had him sign the EPAP developed. Yes Chris, you did direct me to provide you a copy of a signed EPAP. My apologies for not complying with your directive."

On July 10, 2018, Lehnertz emailed an NPS regional manager stating she (Lehnertz) needed to take a disciplinary action against the senior official because he was not truthful about the signed EPAP. Later that same day, the senior official emailed the NPS regional manager, stating his belief that Lehnertz had lost objectivity regarding the subordinate employee.

The NPS regional manager said she talked to the senior official in July 2018 and told him to sign an EPAP for the subordinate employee immediately and that Lehnertz could hold the senior official accountable if the subordinate employee did not have a signed EPAP. According to the NPS regional manager, the senior official never completed the EPAP in response to Lehnertz' requests.

*The Senior Official Did Not Provide Lehnertz Written Progress Reports Regarding a High-Priority Park Initiative*

Lehnertz said developing this high-priority initiative was important not only to the GRCA but

also to the NPS. She said she assigned the senior official to lead the initiative in November 2017 and authorized and directed him to work with human resources to hire someone to fill a 1-year detail to help him develop it.

Lehnertz said that in February 2018, she had not seen any progress on the initiative, so she told the senior official they needed to meet every Monday to discuss the status. In addition, Lehnertz requested that the senior official provide her with written progress reports each week when they could not meet in person. Lehnertz said that over the next several weeks and months, the senior official inaccurately represented that the initiative was moving forward and that he did not complete the written reports as directed. Lehnertz said the senior official did not provide written reports on seven or eight dates; the Notice of Proposed Suspension listed February 5, 2018; April 2, 2018; April 9, 2018; April 16, 2018; April 30, 2018; May 14, 2018; June 25, 2018; and July 23, 2018.

According to Lehnertz, because the senior official did not make progress on developing the initiative, she hired an NPS regional director on a detail to the GRCA in September 2018 to develop it.

*The Senior Official Did Not Attend a Required Meeting or Request Approved Leave*

On May 16, 2018, Lehnertz emailed the senior official stating that he had not completed progress reports for the initiative for May 7 and May 14. She directed him to prepare to discuss options for development at their next regularly scheduled meeting on May 21. According to Lehnertz, the senior official did not attend the meeting, so she emailed him on May 22 stating that he did not attend the scheduled meeting and did not send her any text messages, voicemails, or emails regarding his absence. Lehnertz also wrote that the senior official must submit written updates to her and asked him how she could help or if there were barriers in their communication and understanding. The senior official did not reply to Lehnertz' email. Lehnertz stated that when she talked to the senior official about his absence from the May 21 meeting, he said, "I don't recall that."

*Lehnertz Proposed a 1-Day Suspension for the Senior Official*

In August 2018, Lehnertz discussed her concerns about the senior official with a GRCA human resources specialist. The human resources specialist provided Lehnertz three different notices, with discipline ranging from a written reprimand to a 3-day suspension.

Lehnertz said that before taking action against the senior official, she met with the senior official on August 31, 2018, to give him an opportunity to explain his actions related to his subordinate employee's EPAP and progress reports for the high-priority initiative. According to Lehnertz, the senior official said he had not completed the EPAP because he did not think it was his responsibility. Consistent with the advice the NPS regional manager had provided to the senior official in early July, Lehnertz said she reminded the senior official that the standard supervisory element of his performance plan required him to complete an EPAP for each of his subordinate employees. We found that the senior official's 2017 EPAP stipulated that he communicate performance standards that reflect job requirements to subordinates, give appraisals in a timely manner, and establish performance plans for the current year according to human resources

3

guidance.

Lehnertz said the senior official also told her he did not provide updates for the initiative because he did not think the GRCA needed it.

Based on the senior official's responses during the August 31 discussion, Lehnertz said she decided to propose a 1-day suspension for the senior official.

*The Senior Official's Response to the Proposed Suspension*

On October 3, 2018, the senior official met with an NPS regional director to orally respond to the proposed suspension. According to the regional director, the senior official said he did not provide a signed EPAP for his subordinate employee to Lehnertz because he believed Lehnertz would use the EPAP to terminate the employee. During his oral response, the senior official said, "I did not, would not, and will not, provide it to her so that she can use it as a weapon."

The senior official also told the regional director that he had reported his concerns about Lehnertz' requests for the EPAP to the U.S. Office of Special Counsel (OSC). According to the senior official, Lehnertz proposed the 1-day suspension because the senior official did not provide the EPAP to further the subordinate employee's termination. The senior official provided us copies of two OSC pre-determination letters, dated October 10 and October 15, 2018. In both letters, the OSC determined that an order to prepare an EPAP would not require the senior official to violate a law because it is routine for supervisors to prepare such documents. The letters also stated it was speculation by the senior official that Lehnertz would use the EPAP for an improper purpose. In each of the two letters, the OSC made a preliminary determination to close its inquiry into the senior official's complaint.

When we interviewed the senior official, he confirmed that Lehnertz had asked him for his subordinate employee's EPAP in June 2018. He said he initially told her he had it, but later told her he did not. The senior official stated he did not want to give the EPAP to Lehnertz because he thought Lehnertz would use the EPAP to terminate the subordinate employee.

We also asked the senior official about the progress reports for the high-priority initiative. The senior official told us he had previously admitted to the NPS regional director that he provided verbal updates but did not always provide the written reports to Lehnertz as directed. When asked why he did not provide the reports, the senior official replied, "I just didn't get to them at the time of the meeting."

Finally, in his oral response to the proposed suspension, the senior official stated his calendar indicated he was in Flagstaff, AZ, on May 21, 2018, at an annual review for the concessioners and that Lehnertz' calendar did not have any appointments scheduled for that date. The senior official said he did not recall if he took leave that day. When we asked the senior official about this meeting, he stated, "I'm still confused of the date, the circumstance of what may or may not have happened." The senior official later provided a copy of his calendar for May 21, 2018, which showed a meeting scheduled at 4:00 p.m. for updates related to the initiative in "Chris's Office."

4

We confirmed that the senior official was not on leave on May 21, 2018, and that he claimed 8 regular work hours on that day.

**Lehnertz Did Not Create a Hostile Work Environment at the GRCA**

We interviewed 20 GRCA employees who worked directly with Lehnertz. Of those 20 employees, 15 were senior managers and 5 were nonsupervisory employees. Most of the employees indicated that Lehnertz was generally liked at the park and reported that Lehnertz did not treat men or women differently and held everyone to the same standard.

During our interviews, five employees—four managers and one nonsupervisory employee—expressed they had encountered differences and conflict with Lehnertz on occasion. Despite these occasions, four of these five employees identified positive aspects of Lehnertz' leadership and acknowledged that she championed an "inclusive and respectful" environment. The fifth employee stated that she had expressed concerns about her first-level supervisor to GRCA management and said the way Lehnertz handled her concerns caused her to mistrust GRCA management. Some managers observed that Lehnertz "drilled down" for information, explaining that she continuously asked questions to gather information if the presenter seemed ill-prepared or provided incorrect information, which made them feel "intimidated" at times.

Lehnertz said a colleague from the Pacific West Region made her aware that when she drilled-down for information, it felt like an accusation, rather than an inquiry. She added that a manager at the GRCA felt nervous when she asked many detailed questions. Lehnertz said that instead of discussing it with the manager individually, she discussed her management style with the GRCA management team and conveyed that "when I'm really getting into something, I'm gonna ask more and more detailed questions. And that it's okay to say, 'I don't have that information, but I'll get it.'" Lehnertz added that one of her personality traits is to drill "really deep on a question" when she is stressed and that she told the GRCA management team that she would try to "check" herself.

**Lehnertz Did Not Authorize Unnecessary Renovations to a Park Residence**

On July 20, 2017, Lehnertz emailed GRCA managers informing them that she had toured the residence at 45 Kaibab Street in preparation for advertising the position for a deputy superintendent for operations. In the email, Lehnertz stated the home would be an important recruitment tool for the position. Lehnertz listed 19 deficiencies that she had identified during her walk-through, ranging from smaller issues like removing a coat rack in the entry hall, to larger projects like updating the kitchen and removing all carpet from the house. Lehnertz said that after informing the managers of the deficiencies, she was no longer involved in the renovations, except to request that the GRCA architect assist with the kitchen redesign.

An NPS housing official told us he managed the renovation project, to include resources, materials, personnel, and budget, and he did not have to obtain higher supervisory approval. The housing official said he inspected the house after the previous occupant moved out and made a list of necessary renovations. He recalled that Lehnertz' July 20 email included a list of updates for the house and that it instructed the housing official to coordinate with another NPS manager, who was on detail assignment. The housing official said most of the items referenced in

Lehnertz' email matched the list he had generated.

The housing official said he did not receive any further direction from Lehnertz about the renovation after receiving the July 20 email. He said he provided weekly status reports to management, which included Lehnertz, about all maintenance projects. He said neither the incoming deputy superintendent nor Lehnertz attempted to direct him to complete any aspect of the renovation.

According to the housing official, the renovation at 45 Kaibab Street began in August 2017 and ended in April 2018. He explained that the renovation took longer than anticipated because of unexpected safety issues, such as out-of-code electrical wiring, an underrated circuit breaker box, no fire alarm system, structural issues, and a sagging roof and doorways. The housing official estimated the house was built in 1978, and said it appeared to have been built in stages because one side of the house was heated with a propane furnace and the other was heated by electric baseboards. He said he used his staff, trail personnel (for landscape work), an electrician, and a seasonal carpenter (former NPS employee) to complete the renovation. The housing official provided documentation showing that the labor costs for the renovation were $135,192.83 and the cost of materials was $30,733.07, for a total renovation cost of $165,925.90.

When asked, the housing official told us that the renovations to 45 Kaibab Street impacted his employees' ability to work on other houses. He explained that he tried to keep the number of vacant homes below 35, and that when this renovation was completed, the number of vacant homes totaled approximately 50. The housing official noted, however, that because of the number of vacancies and hiring problems at the GRCA, he did not recall employees contacting him about needing a house during that time.

A GRCA maintenance employee, who worked directly on the housing project, told us that 45 Kaibab Street was "decent" and "livable" before the renovations, but he noted that after the renovations began, the maintenance crew found structural damage that needed repair. The maintenance employee said the renovations were needed to replace original work that had been completed in 1972. The renovations included installing a new kitchen, hardwood floors throughout the house, new stairs, vanities in two of the three bathrooms, and new toilets and tiles in all three bathrooms, and replacing the wiring throughout the house. He said the work also included opening the walls and ceiling in the kitchen, during which they identified and repaired structural deficiencies. The maintenance employee said all renovations were needed and none were unusual. He added that the costs were reasonable based on the work performed.

## SUBJECT

Christine Lehnertz, Superintendent, Grand Canyon National Park, National Park Service.

## DISPOSITION

We provided this report to the National Park Service Deputy Director Exercising the Authority of Director for any action deemed appropriate.

# Report Fraud, Waste, and Mismanagement



Fraud, waste, and mismanagement in Government concern everyone: Office of Inspector General staff, departmental employees, and the general public. We actively solicit allegations of any inefficient and wasteful practices, fraud, and mismanagement related to departmental or Insular Area programs and operations. You can report allegations to us in several ways.



| | | |
|---|---|---|
| **By Internet:** | www.doioig.gov | |
| **By Phone:** | 24-Hour Toll Free: | 800-424-5081 |
| | Washington Metro Area: | 202-208-5300 |
| **By Fax:** | 703-487-5402 | |
| **By Mail:** | U.S. Department of the Interior | |
| | Office of Inspector General | |
| | Mail Stop 4428 MIB | |
| | 1849 C Street, NW. | |
| | Washington, DC 20240 | |

# EXHIBIT X-24

**[DRAFT] TDY TRAVEL - COST COMPARISON FORM [DRAFT]**



| | |
|---|---|
| Traveler Name (Last, First, MI): | STEPHENSON, Elston |
| Travel Authorization #: | TANUM0000UJPQ |
| Permanent Duty Station: | Grand Canyon NP, AZ |
| TDY Travel Location(s): | San Diego, CA |

## Itinerary 1 (Actual Trip)

**Primary Mode of Transportation (Enter only one):**

| | | | | | | |
|---|---|---|---|---|---|---|
| Number of Travelers: | | 1 | | | | |
| Trip Start Date: | | 10/29/2017 | | | | |
| Trip End Date: | | 11/3/2017 | | | | |

### Total Trip Cost (Enter only relevant costs)

**Transportation Costs**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | Ticket / Fare Price | $ - | x # travelers | 1 | = | $ | - |
| 2 | Booking Fee | | | | = | $ | - |
| 3 | Number of Miles | 1150 | at $ per mile | $ 0 | = | $ | 195.50 |
| 4 | Parking | | | | = | $ | - |
| 5 | Taxi / Shuttle | | | | = | $ | - |

**Other Costs**

| | | | | |
|---|---|---|---|---|
| 6 | Lodging (see Per Diem Worksheet) | = | $ | 425.00 |
| 7 | M&IE (see Per Diem Worksheet) | = | $ | 352.00 |
| 8 | Other 1 (identify) | = | $ | - |
| 9 | Other 2 (identify) | = | $ | - |

| | | |
|---|---|---|
| Total Cost (sum of all lines above) | $ | 972.50 |

Comments: Please explain any costs that should be taken into consideration when comparing itineraries.

GOV or POV ?   GOV avail - use .17 rte

## Itinerary 2 (Comparison trip)

**Primary Mode of Transportation (Enter only one):**

| | | | | | | |
|---|---|---|---|---|---|---|
| Number of Travelers: | | 1 | | | | |
| Trip Start Date: | | 10/29/2017 | | | | |
| Trip End Date: | | 11/3/2017 | | | | |

### Total Trip Cost (Enter only relevant costs)

**Transportation Costs**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | Ticket / Fare Price | $ 466 | x # travelers | 1 | = | $ | 465.60 |
| 2 | Booking Fee | | | | = | $ | 8.26 |
| 3 | Number of Miles | 180 | at $ per mile | $ 1 | = | $ | 95.40 |
| 4 | Parking | | | | = | $ | - |
| 5 | Taxi / Shuttle | | | | = | $ | - |

**Other Costs**

| | | | | |
|---|---|---|---|---|
| 6 | Lodging (see Per Diem Worksheet) | = | $ | 425.00 |
| 7 | M&IE (see Per Diem Worksheet) | = | $ | 352.00 |
| 8 | Other 1 (identify) | = | $ | - |
| 9 | Other 2 (identify) | = | $ | - |

| | | |
|---|---|---|
| Total Cost (sum of all lines above) | $ | 1,346.26 |

Comments: Please explain any costs that should be taken into consideration when comparing itineraries.

Flight from Flagstaff - San Diego estimate from CONCUR.
No parking cost in Flagstaff
POV at high rate to keep GOV from sitting at airport

I certify that I used the electronic travel system to obtain the above cost estimates, and that all of the information included in this form is accurate and complete. I acknowledge that, by signing this form, I agree to be reimbursed for the total cost of the less expensive itinerary and will seek no additional payment to recoup the difference in cost between the two itineraries.

_____
Traveler Signature

1/12/2018
Date

I certify that the traveler completed this form in accordance with DOI / Bureau policy, and authorize the use of the following itinerary ("X" one):

Itinerary 1: [✓]
Itinerary 2: [ ]

If the comparison includes personal leave, I hereby authorize the traveler to complete the personal deviation in conjunction with his / her official travel.

_____
Approving Official Signature

1/30/18
Date

Mail - Stephenson, Elston L - O...   ×   Mail - Stephenson, Elston L - O...   ×   Mail - Stephenson, Elston L - O...   ×   (C) Inspector General | DOI OIG   ×   View Associated Vouchers

← → C   🔒 cge.concursolutions.com/TravelManagerFrame.asp?MenuClicked=VoucherED/MenuItem=LinkedItm=gWoSuSsWSQ3Rq-fvds6AAY9VKIBs7nNka775TP9ygr6bu=qiMqwouhiY73Xv-FCt3gRoSKt36GUIYICu3VzGKc8tmid=gWqxMrdaSpA-tuos1UVOGk

**Concur** ▼

| CONCUR·GOV | Travel | Authorizations | Vouchers |

View Vouchers    New Voucher    Search Vouchers

# View Associated Vouchers

Traveler:ELSTON STEPHENSON  VCH: TV0000MPNT [TANUM0000UPQ]  **[Final Voucher]**

Summary  Profile  General  Expenses & Receipts  Exceptions  Accounting  Totals

‹ Previous                                                                          Next ›

## Document Summary for TV0000MPNT (View-only)

ℹ This tab contains panels summarizing each area of the document. From here users can ...

View more ✓ | Page Help

                                                                          Final Voucher

### Traveler Details

Traveler ID: 40213433    Traveler Name: ELSTON STEPHENSON    Organization: DOI/PNFSM

### ∧ Document Information Details

TA Num: TANUM0000UPQ    Purpose: Training Attendance

Travel Dates: 10/29/2017 - 11/05/2017    Currency: U.S. Dollar    Type: Trip By Trip

**Document Details:**

| Alert | Trip No. | Location Purpose | Itinerary Location | From | To | Per Diem Rates | Estimated Cost | Trip Comments |
|---|---|---|---|---|---|---|---|---|
| | 1 | Training Attendance | SAN DIEGO, CA | 10/29/17 | 11/03/17 | 153.00 / 64.00 (10/01/17-12/31/17) | 1372.21 | Driving GOV Amended TA to show stayed in Palmdale, CA (2nd residence; on return trip home. No per diem/lodging on 11/3-4/2017 Misc. Expense - fuel for GOV Employee didn't know about fleet fuel card and put on GOV CC (non-reimbursed) |
| | 1 | Training Attendance | PALMDALE CA | 11/03/17 | 11/05/17 | 173.00 / 64.00 (10/01/17-12/31/17) | 1372.21 | Driving GOV Amended TA to show stayed in Palmdale, CA (2nd residence; on return trip home. No per diem/lodging on 11/3-4/2017 Misc. Expense - fuel for GOV Employee didn't know about fleet fuel card and put on GOV CC (non-reimbursed) |

### ∧ Reservations

                                                                View Reservation History      No Reservations

| Reservation Type | Vendor/Carrier | Date | Last Date to Ticket | Cost | Lodging Location | Ticket #/Res. # | Date & Time | Emissions | Traveler |
|---|---|---|---|---|---|---|---|---|---|

### ∧ Expenses Details

Total Per Diem Expenses: 1,116.00    Total Non-Per Diem Expenses: 256.21

| Details | Alert | Receipts | Date | Source | Expense Description | Expense Category | Cost | Payment Method | PerDiem |
|---|---|---|---|---|---|---|---|---|---|
| ‹ | | SECDO/re-Force...docx | | | | | | | |

Note: Booking your airfare at least 10 days in advance of your departure will result in lower cost airline tickets

**FLAGSTAFF, AZ TO SAN DIEGO, CA**
**SUN, OCT 29 - FRI, NOV 3**

Hide matrix   Print / Email

| | All<br>20 results | American<br>Airlines | Multiple |
|---|---|---|---|
| Lowest Published<br>20 results | | 465.60<br>6 results | 1,473.60<br>14 results |

**Shop by Fares**   Shop by Schedule

For complete selection of available fares, click the Show Fares link and click the View More Fares button.

| Flight Number Search | Sorted By: Policy - Most Compliant |
|---|---|

Displaying  20 out of 20 results
Previous 1 2  Next | All

| American Airlines | 07:00a FLG → 11:48a SAN | 1 stop PHX | 4h 48m | ⚠ | $465.60 |
| | 12:45p SAN → 04:21p FLG | 1 stop PHX | 3h 36m | | |

Lesser policy violation

Least Cost Logical Fare                                                                 Show all details ∨

| American Airlines | 10:20a FLG → 03:13p SAN | 1 stop PHX | 4h 53m | ⚠ | $465.60 |
| | 12:45p SAN → 04:21p FLG | 1 stop PHX | 3h 36m | | |

Lesser policy violation

Least Cost Logical Fare                                                                 Show all details ∨

---

Note: Booking your airfare at least 10 days in advance of your departure will result in lower cost airline tickets

**PHOENIX, AZ TO SAN DIEGO, CA**
**SUN, OCT 29 - FRI, NOV 3**

Hide matrix   Print / Email

| | All<br>400 results | Southwest | American<br>Airlines | Multiple | Delta | United | Alaska<br>Airlines |
|---|---|---|---|---|---|---|---|
| Govt. Contract Discounted<br>51 results | | 270.40<br>51 results | — | — | — | — | — |
| Govt. Contract<br>104 results | | 382.40<br>104 results | — | — | — | — | — |
| Non-Contract Government<br>185 results | | 708.00<br>109 results | 270.40<br>9 results | 279.00<br>55 results | 343.60<br>9 results | 361.60<br>4 results | — |
| Lowest Published<br>60 results | | 294.96<br>36 results | 368.00<br>6 results | 368.00<br>9 results | 456.60<br>1 results | 376.60<br>4 results | 448.40<br>4 results |

**Shop by Fares**   Shop by Schedule

For complete selection of available fares, click the Show Fares link and click the View More Fares button.

| Flight Number Search | Sorted By: Policy - Most Compliant |
|---|---|

Displaying  292 out of 296 results
Previous | Page 1 of 30 | Next | All

| Southwest | 09:45a PHX → 10:55a SAN | Nonstop | 1h 10m | $270.40 |
| | 11:30a SAN → 12:40p PHX | Nonstop | 1h 10m | View Fares |

Govt. fare(s) available / Least Cost Logical Fare                                       Show all details ∨

| Southwest | 09:45a PHX → 10:55a SAN | Nonstop | 1h 10m | $270.40 |
| | 09:25a SAN → 10:35a PHX | Nonstop | 1h 10m | View Fares |

Govt. fare(s) available / Least Cost Logical Fare                                       Show all details ∨

10/19/2017                         Grand Canyon Village, AZ to San Diego Directions - MapQuest

## YOUR TRIP TO:

San Diego

**8 HR 40 MIN | 575 MI** 🚗            1150 RT

**Est. fuel cost: $44.10**

*Handwritten: 10.19.17 @ 1209 left*
*.17 gov avail*
*.535 No gov avail*

Start of next leg of route

○  **1.** Start out going **north** on Maswik S toward Maswik Laundry Rd.

↱  **2.** Take the 1st **right** onto Maswik Laundry Rd.
   *If you are on Aspen Rd and reach Cliffrose Rd you've gone about 0.1 miles too far.*

   Then 0.05 miles                                             0.05 total miles

↰  **3.** Turn **left** onto Maswik Lodge Rd.

   Then 0.07 miles                                             0.12 total miles

↱  **4.** Take the 1st **right** onto S Village Loop.
   *If you are on S Village Loop and reach Cliffrose Rd you've gone about 0.1 miles too far.*

   Then 0.13 miles                                             0.25 total miles

↰  **5.** Take the 2nd **left** to stay on S Village Loop.
   *S Village Loop is just past Victor St.*

   Then 0.23 miles                                             0.48 total miles

↱  **6.** Take the 1st **right** onto Center Rd.
   *Center Rd is just past Village Loop Byp.*

   *If you reach Navajo St you've gone about 0.1 miles too far.*

   Then 1.61 miles                                             2.09 total miles

↱  **7.** Turn **right** onto US-180 E/AZ-64.
   *US-180 E is 0.4 miles past Market Plaza Rd.*

   Then 4.37 miles                                             6.46 total miles

↗  **8.** Enter next roundabout and take the 2nd exit onto State Route 64/US-180 E/AZ-64.

   Then 0.65 miles                                             7.11 total miles

↑  **9.** Enter next roundabout and take the 1st exit onto AZ-64.

   Then 49.71 miles                                            56.82 total miles



SAN DIEGO BEACH & BAYVIEW COTTAGES

SAN DIEGO, CA 92147
619-435-1227

**Account:** 50010128090
**Arrival:** 10/29/2017
**Departure:** 11/03/2017
**Rate:** $140.00
**Room:** N009

STEPHENSON, CW4 ELSTON

41551 BENTANA DR
PALMDALE, CA 93551

| DATE | DESCRIPTION | COMMENT | CHARGE/PAYMENT | BALANCE |
|------|-------------|---------|----------------|---------|
| -10/29/2017 1020 | MC PAYMENT | MC PAYMENT | $-700.00 | $-700.00 |
| 10/29/2017 4000 | ROOM CHARGE | #N009 STEPHENSON, CW4 ELS⁻ | $140.00 | $-560.00 |
| 10/30/2017 4000 | ROOM CHARGE | #N009 STEPHENSON, CW4 ELS⁻ | $140.00 | $-420.00 |
| 10/31/2017 4000 | ROOM CHARGE | #N009 STEPHENSON, CW4 ELS⁻ | $140.00 | $-280.00 |
| 11/01/2017 4000 | ROOM CHARGE | #N009 STEPHENSON, CW4 ELS⁻ | $140.00 | $-140.00 |
| 11/02/2017 4000 | ROOM CHARGE | #N009 STEPHENSON, CW4 ELS⁻ | $140.00 | $0.00 |

**BALANCE DUE:** $0.00

Stephenson Lodging

Signature: _____

I agree that my liability for this bill is not waived.

Stephenson Gas Depart

Welcome To Loves#553

Date: 10/29/17
Time:   01:51
Invoice # 21298

MCFL    Card Sale
5###########5502

Pump  Gallons  Price
  5    4.286   $2.439

Product
 Unleaded

TOTAL SALE        $ 10.45

Terminal :
Approved#  021298
REF:       79917

Thank You !!!

GSE 76 PALMDALE
0009459157
15483 PALMDALE RD
VICTORVILLE      , CA
10/29/2017 /01721056
06:22:41 AM

5502
MC FLEET

INVOICE 061934
AUTH 00-066956
REF320171029170619

PUMP# 4
REGULAR      14.266G
PRICE/GAL    $3.119

FUEL TOTAL  $  44.50

CREDIT      $  44.50

COMPLETION
SWIPE Exp.Late xx/xx
Batch: 32 Seq No: 3
Term ID: 4
Workstation ID: 65
Your opinion
counts  Enter to
win 1 of 65 $25
gas gift cards
Provide feedback
www.gasvisit.com
Learn how to earn
10 cents/gallon in
fuel statement
credits. Go to
drivesavvy.com or
see details at the
pump. Restrictions
apply. Offer
expires 12/31 17.
3881

AUTOPORT
NORTH ISLAND
BLDG 484
SAN DIEGO CA

TPOG876254-001
NEX FUEL 110285
BUILDING 484
SAN DIEGO    CA 9213

DATE    10/10/17
TIME     4:49 PM
AUTH# 0262/9

MC FLEET
STEPHENSON/ELSTON

PUMP   PRODUCT  PPG
  08    UNLD  $2.799

GALLONS   FUEL TOTAL
 18.758     $52.50

THANK YOU
FOR SHOPPING AT YOUR
NAVY EXCHANGE

Fuel on govt cc/travel his card

# Stephenson Gas Return

GSE 76 PALMDALE
0009459157
15403 PALMDALE RD
VICTORVILLE      , CA
11/05/2017 701725435
04:52:50 PM

5502
MC FLEET

INVOICE 164902
AUTH 00-659992
REF190321105171649

PUMP# 9
REGULAR          17.663G
PRICE/GAL        $3.319

FUEL TOTAL    $   58.62

CREDIT        $   58.62

COMPLETION
SWIPE Exp.Date:****
Batch: 15 Seq Num: 32
Term ID: 9
Workstation ID: B5
Your opinion
counts! Enter to
Win 1 of 60 $25
gas gift cards
Provide feedback
www.gasvisit.com
Learn how to earn
30 cents/gallon in
fuel statement
credits. Go to
drivesavvy.com or
see details at the
pump. Restrictions
apply. Offer
expires 12/31/17.
5135



STORE #386
14875 S. Hwy 95
Lake Havasu, AZ 86404
(928) 764-1505

11/05/2017 Tkt #99457692

Type: SALE        (#ORIGINAL)

| Qty Name | Price | Total |
| --- | --- | --- |
| UNL-REGULAR |  | 28.50 |
| Pump: | 5 |  |
| Gallons: | 11.589 |  |
| Price / Gal: | 2.459 |  |

Subtotal                  28.50
Sales Tax                  0.00
Total                     28.50

Received:
MASTERCARD FLEET           28.50
************5502   SWIPED
Auth No: 067300
INV014596

Pumps 1-16 & 25-32
Auto Diesel Tax Rate @ 18c

Pumps 17 through 24
Truck Diesel Tax Rate @ 26c

Reg:3 Clerk:Dennis

AUTOFORT
NORTH ISLAND
BLDG 484
SAN DIEGO CA

1P0GB76254-001
NLX FUEL 110285
BUILDING 484
SAN DIEGO    CA 9213

DATE      11/03/17
TIME       1:31 AM
AUTH# 095116

MC FLEET
STEPHENSON/ELSON

PUMP   PRODUCT   PPG
 12      UNLE    $2.889

GALLONS    FUEL TOTAL
16.229      $46.89

THANK YOU
FOR SHOPPING AT YOUR
NAVY EXCHANGE

Fuel on govt cc / his travel card

# EXHIBIT X-27



# Investigative Report
## of
# Brian Drapeaux

## Date Posted to Web: December 2, 2014

This is a revised version of the report prepared for public release.



**OFFICE OF**
# INSPECTOR GENERAL
**U.S.DEPARTMENT OF THE INTERIOR**

Memorandum

To:         Kevin K. Washburn
            Assistant Secretary – Indian Affairs

From:       Mary L. Kendall
            Deputy Inspector General

Subject:    Report of Investigation – Drapeaux, Brian
            Case No. PI-PI-12-0084-I

    The Office of Inspector General has concluded an investigation regarding a complaint submitted by the Bureau of Indian Affairs (BIA) supervisory contract specialist, who alleged that improprieties existed with the Bureau of Indian Education (BIE) organizational assessment (OA) procurement process. Specifically, she stated that she had been replaced as the contracting official after addressing a conflict of interest pertaining to BIE Chief of Staff Brian Drapeaux. Drapeaux had been employed by the OA contract recipient, Personal Group, Inc. (PerGroup), within 12 months of participating as a technical advisor on the project.

    Our investigation determined that Drapeaux was employed by PerGroup on several occasions, the last one from June 2009 to September 2010. Drapeaux began employment with DOI on September 13, 2010. While the initial OA contract awarded to PerGroup was under development, Drapeaux and BIE Director Keith Moore advised a key OA evaluation panel member on what actions to take, and Drapeaux also helped write the statement of work. The supervisory contract specialist tried to remediate the conflict of interest by cancelling the initial contract and requiring key decisionmakers, including Drapeaux, to sign a procurement integrity certification before moving forward with a new procurement. The supervisory contract specialist also stipulated that, upon award, PerGroup could not participate in the OA contract at any level, whether as contractor or subcontractor.

    Because of the supervisory contract specialist's insistence on these stipulations, the matter was elevated to key Indian Affairs officials, all of whom appeared to disregard the supervisory contract specialist's warnings and admonitions about the OA conflict of interest. Despite their involvement with the procurement, Drapeaux, Moore, and BIE Assistant Deputy Director for Administration David Talayumptewa would not sign the certification. The procurement was reassigned from the supervisory contract specialist to a contract specialist with no contracting experience and no warrant. The contract was eventually awarded to All Native, Inc., an 8(a) certified company. Despite the supervisory contract specialist's stipulation, PerGroup was designated as a subcontractor on the contract, responsible for 41 percent of the contractual work.

**This is a version of the report prepared for public release.**

We are providing this report to you for whatever administrative action you deem appropriate. Please send a written response to this office within 90 days advising us of the results of your review and actions taken. Also attached is an investigative accountability form that should be completed and returned with your response. Should you need additional information concerning this matter, please contact me at 202-208-5745.

Attachment

## SYNOPSIS

On November 23, 2011, the Office of Inspector General initiated an investigation resulting from a complaint by the Bureau of Indian Affairs (BIA) supervisory contract specialist, Gallup, NM. The specialist alleged improprieties in the Bureau of Education's (BIE) organizational assessment (OA) procurement process. Specifically, she stated that she addressed a conflict of interest created when BIE Chief of Staff Brian Drapeaux served as a technical advisor on the OA project after having been employed by contract recipient Personal Group, Inc. (PerGroup) within 12 months of accepting his BIE position. She alleged that her actions led to her removal as the contracting official and replacement by a less experienced employee, even though BIE senior officials knew of the conflict.

During our investigation, we found that Drapeaux had worked for PerGroup within 12 months of his BIE employment. We also found that this situation created a conflict of interest once Drapeaux became closely involved in the procurement process because PerGroup competed for and received the contract award. We also found that the contract specialist's efforts to mitigate that conflict, first through termination of the award and then through stipulations excluding PerGroup from participating at any level in a sole-source contract to a small, disadvantaged 8(a) company, resulted in the procurement action being transferred away from her and given to another contract specialist with limited experience and no warrant of authority. Subsequently, PerGroup was included in the OA contract as a subcontractor, despite the conflict of interest involving Drapeaux and the contract specialist's efforts to mitigate the situation. Also, Drapeaux and another BIE official, Director Keith Moore, maintained a longstanding friendship with the PerGroup president, an eventual subcontractor to the OA contract. These senior BIE officials appear to have acted in violation of Federal ethics regulations governing impartiality (5 C.F.R. § 2635.502) and the use of public office for private gain (5 C.F.R. § 2635.702). Finally, other BIE officials who knew of these conflicts of interest chose to ignore them during the procurement process.

## BACKGROUND

In 2009, the Office of Management and Budget (OMB) asked the Bureau of Indian Education (BIE) to conduct an organizational assessment (OA). The following year, on October 4, 2010, when BIE had not made progress on the assessment, BIE Director Keith Moore and then-new Chief of Staff Brian Drapeaux met with the chief of the Interior Branch, OMB Natural Resources Division. She expressed exasperation with BIE.

According to Moore, Secretary of the Interior Ken Salazar also considered BIE to be underperforming. To be responsive to Secretary Salazar and to OMB, Moore and Drapeaux made the assessment a high priority, intending it to become one of BIE's educational cornerstones. They anticipated that the assessment would have two phases. The first phase would determine if BIE leadership and middle management performed at appropriate levels. The second phase would determine why schoolchildren in BIE schools failed to achieve.

To move forward, Moore tasked David Talayumptewa, BIE Assistant Deputy Director for Administration since 2009, with oversight of all necessary contractual activities. This included writing the statement of work (SOW) and helping Drapeaux and Moore understand the

1

requirements of the multiphased project. He also charged Talayumptewa with completing the procurement, both because of his experience and because he and Drapeaux trusted Talayumptewa. Talayumptewa's familiarity with the supervisory contract specialist's work led Talayumptewa to recommend her as the contracting officer. Moore acknowledged knowing little about contracting, and so he relied on Talayumptewa.

## DETAILS OF INVESTIGATION

We initiated this investigation on November 23, 2011, due to concerns expressed by the BIE supervisory contract specialist regarding procurement improprieties related to the assessment contract for which she was responsible. She alleged being removed from oversight of this procurement after she terminated the original contract due to a conflict of interest with Chief of Staff Brian Drapeaux, who had worked for the awardee, Personal Group, Inc. (PerGroup), within 12 months of his BIE employment. Her efforts to mitigate the conflict and ensure that the contract was awarded without violating law, rule, or regulation led to her replacement by a new employee with limited experience and no warrant of authority.

Senior managers Moore and Drapeaux acknowledged having longstanding relationships with colleagues outside of BIE. They both freely discussed being aspects of the assessment with these individuals. Drapeaux said he occasionally had coffee during the past 10 years with Moore, as well as with the Dean of Education at the University of South Dakota and the PerGroup president. As colleagues, they discussed such topics as education, Indian Country, economic development, and related matters. He described their relationships as well established, adding that their children played basketball together and ran track and cross-country races.

The president and majority stockholder of PerGroup, an organization interested in and ultimately responsible for aspects of the assessment, hired Drapeaux as the company's vice president from 2004 to 2007 and from June 24, 2009, to September 10, 2010. Drapeaux left to become BIE Chief of Staff on September 13, 2010, working for Moore. Moore also knew the PerGroup president, describing him as a professional colleague with whom he shared numerous discussions about "all things Native."

Both Moore and Drapeaux also acknowledged maintaining friendships with the Dean of Education for the University of South Dakota, who had met Moore at the South Dakota State Department of Education when his colleague was the Secretary of Education and Moore the Indian education coordinator. The Dean of Education and the PerGroup president also knew each other through their personal and professional relationships with Moore and Drapeaux. The PerGroup president acknowledged to investigators that his ties to Moore and Drapeaux might suggest to outsiders that PerGroup was favored for the contract.

### Conflict of Interest Identified

We interviewed the principal individuals involved in the initial OA contract to determine the sequence of events leading up to identification of the conflict of interest and the contract's termination.

The BIE contract specialist confirmed that the contract had been awarded to PerGroup on March 7, 2011. The award was protested on the basis that Drapeaux was a former vice president of PerGroup. The contract specialist considered it appropriate to terminate the contract because Drapeaux also had served as a technical evaluator during the procurement process. She said he assisted her and Talayumptewa with review of the statement of work (SOW), the Independent Government Estimate, and any market research information or suggested sources they had for the SOW requirements. Drapeaux was not a voting member of the evaluation panel, however. According to the BIE contract specialist, the contract was terminated on April 1, 2011, because of Drapeaux's involvement and his employment with PerGroup.

Drapeaux acknowledged that a panel evaluated the OA proposals and that sometime during this process Talayumptewa told him that PerGroup was among the competitors. When investigators first asked Drapeaux about the contract, he said that PerGroup had not informed him of its participation in the competition. Later, however, he said that he could not recall if PerGroup had informed him of its intention to compete. Whether or not he was told, he said the bid had not raised any red flags because he knew the PerGroup president to be someone who would do a good job and that having him on the contact would give the organization trustworthy people to work with.

Frustrated by cancellation of the contract, Drapeaux also told investigators that his PerGroup employment made no difference to the contractual process. He said that he previously asked Talayumptewa to inform the contract specialist of his PerGroup employment and that his employment had not been an issue until someone filed a complaint. He had not spoken with the contract specialist directly, however, and denied serving as a technical advisor and evaluator for SOW. He said that Moore also did not participate in the contract process.

Moore explained that the contract specialist had asked him to participate on the OA evaluation panel but that he had recused himself after realizing that he knew several bidders. He felt that his participation could pose a conflict but did not discuss his recusal with the contract specialist. He also said that he asked Talayumptewa to let the contract specialist know about Drapeaux's previous PerGroup employment but that he did not report this to her directly.

Moore said that he wanted to ensure that nothing stopped PerGroup from competing for the contract, and that he, Drapeaux, and Talayumptewa had discussed the assessment early on to define what they wanted assessed and to ensure that the results of their contract would not duplicate another large scale assessment of BIE support functions being conducted under a contract with the Bronner Group[1] that was ongoing at that time.

We asked Moore if he ever discussed BIE's focus with PerGroup before the OA request for proposals. Moore explained that the Assistant Secretary's office told him that senior BIE managers were not trustworthy, and so he had turned to those he knew he could trust because of his longstanding relationship with them, namely with the Dean of Education and the PerGroup president. Moore acknowledged calling the Dean of Education every couple of weeks to use him as a sounding board for issues he faced. Moore advised that their discussions would have

---

[1] "U.S. Department of Interior – Indian Affairs Final Report: Examination, Evaluation, and Recommendations for the Support Functions" by Bronner Group, LLC, 2012.

covered the state of BIE, but not the assessment, and that he would not have shared SOW information.

We also asked Drapeaux if he advised PerGroup or gave them any procurement details. He said that he did not give the PerGroup president any insight into the process.

We explained to Drapeaux that his previous employment and his new role at BIE not only created concerns about an actual conflict of interest, but also created appearance issues. Drapeaux acknowledged this, but said that he did not agree with the perception or the complaint because he felt his previous employment issue should have been addressed earlier in the procurement process and that addressing it later upset him because it caused the project to lose time.

Investigators also spoke with the PerGroup president and the Dean of Education. The PerGroup president said that the BIE contract specialist informed him on May 9 that the contract had been terminated. The Dean of Education told investigators that he had telephone conversations about the assessment with Moore every few weeks. Moore told him that BIE was accepting bids and that PerGroup was one of several companies bidding on the contract. The Dean of Education knew of PerGroup because he lived in Pierre, SD, where PerGroup was based. The Dean of Education also said that he and Moore agreed that everything had to be aboveboard.

**Contract Cancellation Followed By 8(a) Award**

After cancelling the initial contract, the contract specialist informed BIE managers that they could meet the OA objective by identifying an 8(a) qualified company to whom the contract could be directly awarded without competition. Shortly after this, on June 8, 2011, Talayumptewa sent the contract specialist an email, identifying Ho-Chunk, Inc., as the 8(a) company requested by Moore. According to Drapeaux, Moore had feared that the conflict-of-interest complaint and subsequent contract cancellation would force the assessment process to start over. When the contract specialist suggested making the award to an 8(a) company without competition, Drapeaux recommended Ho-Chunk, whose owner, he said, he had known for more than 18 years. Moore agreed, made the selection, and communicated his decision to Talayumptewa.

Moore confirmed for investigators that he and Drapeaux conducted research, identifying Ho-Chunk and its subsidiary, All Native, Inc. (ANI). Moore said Drapeaux's Ho-Chunk connection came from his PerGroup work. Moore said he told the contract specialist that Ho-Chunk was the 8(a) company for the procurement.

The decision to award the contract to Ho-Chunk surprised the contract specialist, she said, because Moore previously said that he wanted to wait until Drapeaux's 12-month separation from PerGroup had elapsed so that PerGroup could compete for the contract. When Talayumptewa asked her if BIE should initiate contact with Ho-Chunk, the contract specialist replied that only she should make contact. Because of the earlier conflict of interest, she did not want BIE to conduct any market research for the new SOW or otherwise contact Ho-Chunk and thus jeopardize the contract.

4

On June 8, 2011, the contract specialist responded back to Moore with an email that she also copied to Drapeaux, Talayumptewa, and former BIA Office of Acquisition and Property Management-Indian Affairs Director Kathy Daum. In the email, she requested clarification of Moore's previous request to delay the procurement until after Drapeaux's cooling-off period. She also informed him that she would be sending a procurement integrity certification form for Moore, Drapeaux, and Talayumptewa to sign for the protection of all parties, including the Government. The certification required them to attest that they had no conflicts of interest (e.g., financial interests, business relationships, or other conflicts) with Ho-Chunk, its subsidiaries, or its subcontractors. Her email further stipulated that she would require the prime contractor, Ho-Chunk, to identify any subcontractors. She indicated that PerGroup would not be allowed to participate in the contract at any subcontracting tier level due to the organizational conflict of interest identified under the previous contract.

When investigators questioned Drapeaux about the contract specialist's email, he said that he had tried to stay out of conversations surrounding the award. He agreed to comply with the stipulations, he said, and claimed to be completely out of the procurement loop by the time Ho-Chunk was selected on June 8, 2011. Questioned further, he admitted that he had made decisions behind the scenes but claimed that he did not talk with Ho-Chunk employees. He and Moore trusted that Ho-Chunk and PerGroup could complete the OA without a problem.

Moore said he questioned the contract specialist as to whether the certifications were based on policy or were her own requirement. She responded that her decision stemmed from the Federal Acquisition Regulations (FAR), which allowed the contracting officer to establish requirements to protect the integrity of the procurement. Moore told investigators that he could not remember the contract specialist explaining why she wanted the certifications, although he said that he did not give her an opportunity to explain because of his irritation with the process.

The contract specialist told investigators that her June 8 response emphasized the need to mitigate the appearance of a conflict of interest and to put some protections in place, essentially the procurement integrity certification. She did this because she feared BIE managers would try to back door the new process by including PerGroup.

Asked by investigators if the contract specialist stipulated any limitation regarding Ho-Chunk's status as the 8(a) contractor, Moore said that he and the contract specialist exchanged emails in which she gave detailed information. He noted that a red flag went up for him and that he became concerned that if he made any contracting mistake, an IG investigation would result. Moore said that he also told Drapeaux to step away from the project and to quit being so involved. Drapeaux stated, however, that he was not involved with the assessment contract after the contract specialist's initial directions.

Meanwhile, the contract specialist sent a follow-up email to Moore, Talayumptewa, and Drapeaux on June 16, 2011, reminding them to respond to her information request and to sign the certification. No one returned the completed form, but Moore emailed her to request a meeting to discuss the contract. She heard nothing from Moore until July 12, after sending him another email inquiry. Moore's July 12, 2011 email chain formally cited Drapeaux's recusal for the first time in writing. Drapeaux told investigators that he had not known that he needed a

formal announcement, reasoning that others should have known he was recused because of the OA procurement termination.

Contrary to Moore's statement that Drapeaux had been recused, however, investigators found that Drapeaux sent an email to Moore on August 8, 2011, stating that he had marked up the statement of objectives to be sent to All Native, Inc. (ANI), the 8(a) subsidiary of Ho-Chunk that would complete the OA. Drapeaux also said that Ho-Chunk was ready to start work.

Moore explained that Drapeaux's recusal only meant that he had been recused from internal conversations about the contract, but that Moore would continue to rely on Drapeaux's expertise, considering Drapeaux to be his strongest ally and colleague. Supervisory Contracting Specialist (later the Chief of Contracting) David Brown also confirmed that Drapeaux was involved in the procurement process, even though PerGroup was a subcontractor.

Moore also told investigators that he took the contract specialist's email concerning the certifications to the Solicitor's Office to determine if the request was standard and if he was obligated to sign. He was told that the contract specialist's request was not standard, but could not recall who told him this.

Moore said that the difficulty with the procurement bewildered him. He wondered why the contract specialist had not identified the need for certifications at the beginning of the procurement. He further said that Drapeaux's employment was a nonissue for him even though the contract specialist felt that she should have known up front. He said he felt that he had already disclosed the issue. He reported telling Talayumptewa that he wanted to ensure that all aspects associated with getting the contract in place occurred in a legal and proper manner. Moore said, however, that he had been unwilling to sign the certifications.

Drapeaux said that his interview with OIG investigators was the first time he recalled seeing the certification form. He added that if he had seen the form, he would have advised Moore and Talayumptewa to sign it because he realized it would not impact the contract. He subsequently said that he dropped the ball regarding the form and would have recommended signing it, had he not stopped performing tasks associated with the contract.

Drapeaux did not recall discussing the certification with Moore and could not explain how the procurement moved forward since the contract specialist's stipulations were not met. Drapeaux questioned why the contract specialist had not required the certifications from the beginning. The PerGroup president indicated that he heard nothing about the assessment after the award cancellation until he was contacted by the BIA contracting office. He also heard from the Dean of Education that BIE intended to award the contract to an 8(a) certified company. The PerGroup president did not know how the Dean of Education knew but suggested that the information may have come through his friendship with Moore, which dated back to their mutual employment by the State of South Dakota.

The PerGroup president, in turn, referred the information concerning the 8(a) opportunity to Ho-Chunk, because PerGroup lacked 8(a) certification and he knew that Ho-Chunk wanted to work under such a contract. The PerGroup president contacted a project manager for ANI, to tell her

what he knew about the project. He also conveyed to Ho-Chunk that PerGroup would be interested in working on the project if Ho-Chunk received the award.

The PerGroup president explained that he had met the Ho-Chunk chief executive officer through his attorney several years before. At that time, they agreed to team up on joint ventures. PerGroup and Ho-Chunk signed a nondisclosure agreement in September 2010 and a teaming agreement with ANI in August 2011.

The PerGroup president learned from ANI that ANI was working on the statement of objectives for the contract. ANI approached PerGroup to ask what it could offer. The PerGroup president did not know if ANI had approached the Dean of Education to request his participation at that point.

The PerGroup president said PerGroup helped ANI draft a proposal responding to the statement of objectives. PerGroup had responsibility for 44 percent of the labor on the contract; the Dean of Education had responsibility for 6 or 7 percent; and ANI had responsibility for the remaining 50 percent. PerGroup agreed to develop a survey and collect data—BIE stakeholders, including education line officers, assistant deputy directors, and BIE employees at all levels, were to be surveyed for their opinions of BIE leadership and structure. Once stakeholder data had been collected, PerGroup would give the information to ANI.

The Dean of Education said that he learned about ANI's involvement from the PerGroup president in July or August 2011. The PerGroup president told him that ANI was interested in the procurement but that neither PerGroup nor the Dean of Education needed to compete because they would be ANI subcontractors. The Dean of Education said that he met with ANI and PerGroup in Vermillion, SD, because ANI wanted to know about the first contract, as well as discuss the Dean of Education's background and possible involvement in the new contract. After the meeting, he learned that ANI received the contract award and wanted his involvement.

**BIE Contract Specialist Replaced**

The contract specialist said that about August 23, 2011, she learned from Property Management-Indian Affairs Director Kathy Daum that the OA procurement was being reassigned because Moore, Talayumptewa, and Drapeaux felt they did not have to sign the certifications. The contract specialist previously had consulted with Daum about the conflict of interest surrounding Drapeaux's PerGroup employment and, at that time, Daum had supported the contract's cancellation.

Daum told investigators that the contract specialist' requirement for the signed certifications had seemed reasonable to her since contracting officers are financially and criminally liable for their procurement actions, which gives them latitude to make such decisions. Daum also said that she had agreed with the contract specialist that PerGroup should not be involved at any level in the new procurement and that she would not have awarded the contract to Ho-Chunk/ANI, knowing its connection with PerGroup and Drapeaux. Daum agreed that the contract was ultimately awarded improperly.

Responding to the contract specialist' request for signed certifications, Moore told Daum that he had elevated the issue to Paul Tsosie, Chief of Staff to the Assistant Secretary – Indian Affairs (AS-IA), who had assigned it to Special Assistant Jeannette Hanna. In response, Daum told Moore, Tsosie, and the other managers that the contract specialist had the right and authority to require the signed certifications.

Moore later confirmed for investigators that he had elevated the issue to Tsosie after trying to work through Daum and George Skibine, then Deputy Assistant Secretary for Management – Indian Affairs. Moore wanted Tsosie to know the steps taken by BIE and told him that BIE was again struggling with the contracting office. Asked if he ever discussed the contract specialist's concerns with Tsosie, Moore said he did not recall doing so, although he did recall sharing his own perspective. When investigators asked about the procurement's elevation to AS-IA, Drapeaux replied that BIE's relationship with the contracting office was a complete disaster and needed to be addressed by AS-IA.

Investigators asked Tsosie how he responded to the July 12 email. He said he received a copy but did not give it much attention. Asked further if he was responsible for emails concerning the contract, he said he received numerous emails but did not intend to get involved in the details of the contract. He added that even though it would have been a good idea, it was not his responsibility.

Tsosie recalled writing a return email stating that he wanted to be in the room for any discussions. According to Tsosie, he tasked Hanna with getting the project back on track. Tsosie said he was not aware that Moore and Drapeaux refused to sign certifications but vaguely remembered Moore saying that his team was being asked to do things that no one else was asked to do. He could not remember if he responded to Moore.

Jeanette Hanna said she received the contract specialist's emails, but did not read them in detail because she was involved only at the highest levels. She had been tasked with getting the project back on track by prompting the two sides to communicate effectively to award the contract.

Investigators asked Moore if BIE, BIA, and AS-IA senior officials discussed the contract specialist's conflict-of-interest concerns. Moore said they had not because they were down to the deadline of getting the contract in place. When asked if the senior officials disregarded the laws, rules, and regulations outlined by the contract specialist because of a time shortage, Moore said that he regarded Skibine, the contract specialist's supervisor, as the expert when he needed to interpret and respond to the contract specialist's analysis.

Daum said that, ultimately, because the contract specialist would not act on the procurement without the signed certifications, she moved the contract to the Central Office, where the procurement was assigned to Brown and a new contract specialist. Daum said she was not told to take the procurement away from the contract specialist who had previously been assigned to the job, but had been pressured to move the contract forward. She felt the reassignment was the best alternative to award the contract. When asked if these steps were proper, Daum indicated that they were not but that such things happened a lot.

The contract specialist stated that after the new contract specialist received the assignment, he had called her for documents. They briefly discussed her view. He told her that he did not agree with the actions being taken but that he was new and did not have a warrant, so was doing as he was told. The contract specialist said that she then emailed Brown to inform him of the situation. He seemed caught off guard and uninformed of the circumstances, she said, but still did not prevent the contract from going forward.

In speaking with investigators, the new contract specialist did not mention telling the former contract specialist of his concerns with the procurement. He did indicate being tentative about his involvement because he was new, the procurement set-aside was for $840,000, and he had no contracting experience.

When asked why the contract specialist was taken off the OA procurement, Drapeaux said he did not know but speculated that Daum did not like her work. He reiterated that he did not put any stock or confidence in any of the contracting officials assigned to BIE. Moore echoed this analysis when investigators pointed out that after the July 12 email, the contract specialist was no longer included in email strings about the procurement. Moore said he did not know why she was no longer included, but that he had been fed up with the situation, and possibly said to Skibine that the contract specialist needed to be removed.

Moore said that he shared with Skibine and with others the contracting struggles BIE had experienced. When we told Moore that the contract specialist had been replaced by a new contract specialist with no prior contracting experience and no warrant, Moore said that he had no authority to remove the former specialist and no knowledge of the new contract specialist's qualifications.

Tsosie also said he had no role in the contract specialist's removal or in deciding who the contractors should be. Hanna, likewise, had no knowledge of who had directed the contract specialist's removal. She did say that she told Vicki Forrest, former BIA Deputy Director, Office of Trust Services, that she might need another contracting officer if she wanted to keep both sides talking. Hanna said that she did not directly advise transferring the contract specialist, nor did she expect her comment to have a detrimental effect.

As the person responsible for the OA procurement after the contract specialist's removal, Brown said he knew that the contract specialist had required certifications to be signed—a judgment call, he said—but did not know that she had stipulated PerGroup's noninvolvement in the contract. He thought that was not her call since he believed that the OA procurement process had been transferred away from her by then.

*Agent's Note: The OA procurement process was still assigned to the contract specialist at the time that she required the certifications; it had not yet been transferred.*

Brown later conceded that if the procurement was still assigned to the contract specialist, she could have stipulated PerGroup's noninvolvement.

When asked who from BIE had recommended the 8(a) company that was awarded the contract, Brown identified Drapeaux and Talayumptewa. Questioned about their involvement since

9

Drapeaux worked on the SOW, Brown replied that the OA contract was awarded to ANI. He indicated that the subcontractors they hired were up to them and that BIE's contract was with All Native, rather than All Native and their subcontractors. Brown said he did not know how PerGroup got involved with the contract but considered PerGroup to be a small business and a subcontractor.

Investigators then asked Brown if he had taken any action when he saw PerGroup's name on the ANI proposal. He said that he fell back on knowledge that the prime contractor was All Native and that whatever subcontractors they used were up to them because the Government would hold ANI responsible.

When asked why the OA procurement was transferred to the new contract specialist, who had no contracting experience, Brown said that the action was not abnormal. He conceded that assigning the new contract specialist to the procurement may have been a mistake, even though he said there was no malice in the process.

When challenged on his assertion that the procurement transfer was not abnormal, especially if the contract specialist acted in the best interest of the Government, Brown emphasized that time had been of the essence. He cited the FAR, stating that the contracting officer should avoid creating unnecessary delays, burdensome information requirements and excessive documentation. Investigators also cited FAR guidance to avoid "any conflict of interest or even the appearance of a conflict of interest." Brown said that both statements were in the FAR and that he made a business decision by choosing expediency.

**BIE Officials Overlooked PerGroup's Inclusion as OA Subcontractor**

Keith Moore acknowledged that PerGroup ended up as a subcontractor due to Drapeaux's ties to both PerGroup and Ho-Chunk. Moore stated that PerGroup was not given any preference in the procurement process, but said that he felt irritated with the process that forced them to earn the contract. After the hours and hours of legwork that went into meeting the deadline, he noted, the applicants still could not get the contract. Even though they followed the process, he said, the contract was taken from them.

He indicated that he probably suggested to Drapeaux and Talayumptewa that PerGroup be involved as a subcontractor. He told them that if subcontractors were needed, PerGroup had earned the opportunity.

Investigators asked Drapeaux how PerGroup ended up as a subcontractor despite conflict-of-interest warnings given to senior managers. He said he did not know, but indicated that he introduced PerGroup and Ho-Chunk while working for PerGroup. He denied influencing PerGroup's participation on the contract. Asked if he discussed the assessment during events he attended with the PerGroup president, the Dean of Education, and Moore, he said he probably discussed the need for an assessment. Drapeaux said that it became evident that if they were going to do a good job—they simply needed to build a team of individuals who were experts in their fields and could help move BIE forward. Drapeaux denied building a team for the assessment, saying that he did not strategize with PerGroup or the Dean of Education to get them

10

on the contract and that he personally had not benefited in any way. He did say that he may have reviewed the statement of objectives to ensure no duplication with the Bronner Group assessment but did not mention it to ANI.

Talayumptewa said that once he found out that the contract went to Ho-Chunk, with PerGroup as a subcontractor, he and the contracting officer's technical representative called Moore to find out what was going on. Talayumptewa said Moore told him that the contract had been processed through Brown's office in Reston, VA. Talayumptewa acknowledged that the situation was contrary to what he knew the contracting regulations to be and that it bothered him. Talayumptewa said that he told Moore not to deal with PerGroup because of the conflict of interest, but Moore said that the Reston office had approved of PerGroup as a subcontractor.

The new contract specialist said he also discussed the conflict of interest with Brown, who told him that a separation existed because BIE was dealing with ANI, not PerGroup. The new contract specialist then determined that a conflict of interest did not exist because PerGroup was a subcontractor. Nevertheless, the new contract specialist agreed that the relationship between BIE leadership and PerGroup presented an appearance problem. Recognizing that the assessment had been reassigned from the contracting specialist, who was an experienced contracting veteran, to an employee with 1 month of Federal experience, no experience in the contracting field, and no warrant, the newly hired contracting specialist acknowledged that the action was kind of weird.

Questioned by investigators, the PerGroup president said he did not know if Moore or Drapeaux had any influence on ANI selecting PerGroup as a subcontractor. He did not recall having participated in any discussions with Moore, Drapeaux, and ANI regarding the partnership between ANI and PerGroup.

Three ANI representatives confirmed, however, that the PerGroup president had informed them of the 8(a) opportunity and also of the conflict of interest, which, he indicated, had been resolved. ANI's Vice President for Business Development said the PerGroup president told him that Drapeaux would not be involved in the source selection, so the conflict of interest was a nonissue. Moore also explained that PerGroup ended up being a subcontractor because the PerGroup president had brought the OA procurement opportunity to ANI.

ANI's project manager said the PerGroup president also told her about the conflict of interest, but said Drapeaux was not involved in the decisionmaking, so it was not an issue. She said she did not know how PerGroup became a subcontractor, although the PerGroup president earlier told investigators that he first contacted ANI's project manager to tell her about the project.

The ANI director of operations said ANI's project manager informed him of the PerGroup conflict of interest with Drapeaux. He also said that the project manager told him that Drapeaux was not involved in the decisionmaking, so the conflict of interest was not an issue. The ANI director of operations then stated that if he had been aware that the conflict of interest still existed, he would have told his team not to pursue the contract or would have asked if there was another business with which ANI could partner on the contract. The ANI director of operations also said that it would not have been worth it for ANI to take a chance on dealing with a

company burdened with a conflict of interest, when ANI regularly deals with contracts valued at $20 or $30 million. He added that he did not know how ANI learned about the assessment or how PerGroup became a subcontractor.

**Concerns Regarding Implementation of the Second OA Contract**

During the course of our investigation, we learned that the BIA contracting officer's technical representative had concerns that ANI and PerGroup held conversations about the OA contract without the contracting officer's representative and the ANI contract manager being involved. The contracting officer's technical representative said that PerGroup and either Moore or Drapeaux discussed how to conduct focus groups that were to be convened to review and discuss the validity of the OA findings and that they had input on creating the list of participants for the group. She explained that the conversations between PerGroup and Moore or Drapeaux were inappropriate and that she needed to be informed of all transactions so that contractors were not told or promised

something that was not in the SOW. The contracting officer's technical representative said that Moore and Drapeaux agreed to comply with her requirements, although she still had concerns because Drapeaux and PerGroup were friends and that, at a meeting in Phoenix, AZ, they had acted like they knew each other well.

The contracting officer's technical representative also expressed concern about documents pertaining to other outside contractors that had been requested by PerGroup under the contract and that might give it an unfair advantage for future bids. She consulted with the new contract specialist, who looked into the issue and determined that, since the requested information was available to the public, BIE could share it with ANI and PerGroup. The new contract specialist explained to investigators that ANI and PerGroup had only requested summary information, rather than anything that was privileged or proprietary, from these outside contractors. Moore also explained that PerGroup had asked to review BIE contracts to determine if BIE could save money by having the work completed by BIE employees. Moore said that those contracts cost a lot of money, so BIE wanted to diminish the number of contracts it held.

Investigators found that the concern of the contracting officer's technical representative had no bearing on the details of this investigation.

**SUBJECT(S)**

Brian Drapeaux, Chief of Staff, Bureau of Indian Education
Keith Moore, former Director, Bureau of Indian Education

**DISPOSITION**

The U.S. Attorney's Office for the Eastern District of Virginia has declined to prosecute this case. We are referring this report to Laura Davis, Chief of Staff for the Secretary of the Interior, for any action deemed appropriate.

# EXHIBIT H

 United States Department of the Interior

**NATIONAL PARK SERVICE**
**INTERMOUNTAIN REGION**
12795 West Alameda Parkway
PO Box 25287
Denver, Colorado 80225-0287



IN REPLY REFER TO:
P4217 (IMDE-EEO)

May 22, 2019

<u>*CONFIDENTIAL: TO BE OPENED BY ADDRESSEE ONLY*</u>
*By U.S. Certified Mail #: N/A*

Elston Stephenson
41551 Ventana Drive
Palmdale, California 93551

Mr. Stephenson:

In accordance with Department of Interior regulations, enclosed is a copy of the *Report of Counseling* for Equal Employment Opportunity Complaint # NPS-18-0460. This is a report of inquiry prepared by EEO Counselor Mr. Ron Chen, on behalf of the Intermountain Region, into the allegations you brought forth on June 11, 2018. This matter is also in relation to your allegation of a Settlement Agreement breach/non-compliance you brought forth on October 29, 2018 in connection with your original complaint (NPS-18-0460), where the Department of the Interior – Office of Civil Rights ruled that the Agency was in non-compliance of said Settlement Agreement.

You will receive or may have already received further information from the National Park Service, Office of Equal Opportunity Programs in Washington, D.C., concerning your formal complaint of discrimination. In the meantime, you should be aware that the *Report of Counseling* may contain information about other individuals that is subject to the non-disclosure provision of the Privacy Act of 1974 (Public Law 93-579). You must ensure the privacy of those persons. Violation of the privacy act could result in criminal penalty.

Should you have any questions, please feel free to contact me at 303-969-2598.

Sincerely,

*Roosevelt T. Wilson*
Roosevelt T. Wilson
Regional Equal Opportunity Manager

Enclosure: Report of Counseling, w/attachments

attributable to that. However, Deputy Superintendent Drapeaux cited an email from the AP to her dated May 22, 2018 and she replied to it that same day. Deputy Superintendent Drapeaux stated Superintendent Lehnertz's reply was that the AP needed to submit some references so that the documentation would be complete and in order for her to sign the appointment letter.

### d. Evaluation and Appraisal;

1) Deputy Superintendent Drapeaux acknowledged the AP first began working at GRCA in June of 2017. However, Deputy Superintendent Drapeaux said he only became the AP's supervisor at the end of September of 2017.

Deputy Superintendent Drapeaux stated the AP first asked for an EPAP (performance appraisal) from him in June of 2018 and not previously. Deputy Superintendent Drapeaux said he had also provided the AP with performance counseling beginning in October of 2018 and it has been ongoing.

Issue 2: Whether Complainant was subjected to retaliation for his prior EEO activity when he was subjected to an investigation on or about 06/15/18.

Deputy Superintendent Drapeaux reiterated he is the AP's first-line supervisor and that the AP is a member of GRCA's senior executive staff. Deputy Superintendent Drapeaux noted the AP is therefore a part of the management. Deputy Superintendent Drapeaux explained that the senior executive management staff is especially sensitive to and proactive in fostering a respectful and, inclusive workforce and workplace given GRCA's history. Deputy Superintendent Drapeaux stated the management consequently endeavors to be extremely aware of any practices or behavior that might be construed as antithetical to this.

Deputy Superintendent Drapeaux stated it was against this background that he had an informal discussion with the AP about his behavior towards women in June of 2018. Deputy Superintendent Drapeaux said he had at least seven complaints from different women about the AP's behavior towards them going back to September of 2017. Deputy Superintendent Drapeaux stated these complaints have been ongoing. Deputy Superintendent Drapeaux said that as a supervisor, when he becomes aware of any employee complaints of potential harassment then it is incumbent upon him to look into them and he did so with each of these complaints. Deputy Superintendent Drapeaux stated none of them triggered a formal administrative investigation or inquiry. Nonetheless, Deputy Superintendent Drapeaux reported that in looking into these complaints it became apparent that multiple women view the AP's behavior towards them as either bullying or treating or regarding them in a subordinate manner. Deputy Superintendent Drapeaux said this has been problematic on a few levels.

Deputy Superintendent Drapeaux said he did not find the AP's behavior in each of these instances warranted disciplining him, but it raised a number of issues that meant he needed to engage in with the AP in an ongoing dialogue to make him aware of how his behavior is perceived and what he needs to do in order to modify it. Deputy Superintendent Drapeaux said there were a number of reasons for this.

Deputy Superintendent Drapeaux noted that as a preliminary matter, it is the particular responsibility of the members of GRCA's senior executive staff, of which the AP is a member, to promote a respectful,

INVESTIGATION



OFFICE OF
**INSPECTOR GENERAL**
**U.S.DEPARTMENT OF THE INTERIOR**

# UNFOUNDED ALLEGATIONS OF IMPROPER LEADERSHIP DECISIONS AND HOSTILE WORK ENVIRONMENT AT GRAND CANYON NATIONAL PARK

**This is a revised version of the report prepared for public release.**

Report Number: 18-1188                    Web Posting Date: March 5, 2019

approved leave

*The Senior Official Did Not Provide an EPAP for a Subordinate Employee as Requested*

The GRCA hired the senior official's subordinate employee on June 25, 2017, with a 1-year probationary period. The employee initially reported to Lehnertz but was transferred under the senior official's supervision in September 2017. Lehnertz said that at that time, she told the senior official he needed to complete a performance review and create an EPAP for the subordinate employee.



The DOI Performance Management System (370 DM 430) requires that a supervisor establish a subordinate's EPAP within 60 days of the beginning of the appraisal period, the employee's entrance on duty, the assignment of an employee to a new position, the assignment of an employee to a new or different supervisory position, or the assignment of an employee to a detail or temporary promotion scheduled to exceed 120 days.

Lehnertz said she asked the senior official for a copy of the subordinate employee's EPAP during meetings on June 25, 2018, and June 29, 2018, and by email and text message on July 2, 2018. Lehnertz said the senior official responded to each of her requests that he had an EPAP for the employee.

In the July 2 email, Lehnertz asked the senior official to provide her a copy of the signed EPAP "first thing this morning." Lehnertz said the senior official told her he was "working on it," but the signed EPAP was not on her desk when she arrived at the office on July 3. Later that day, Lehnertz asked the senior official again in an email if he had a signed EPAP for the subordinate employee.

The senior official responded to Lehnertz on July 6, stating, "After further review, I do not have a signed EPAP [for the employee]. . . . In our discussions, I was sure that I had one signed. . . . I was quite sure I had him sign the EPAP developed. Yes Chris, you did direct me to provide you a copy of a signed EPAP. My apologies for not complying with your directive."

On July 10, 2018, Lehnertz emailed an NPS regional manager stating she (Lehnertz) needed to take a disciplinary action against the senior official because he was not truthful about the signed EPAP. Later that same day, the senior official emailed the NPS regional manager, stating his belief that Lehnertz had lost objectivity regarding the subordinate employee.

The NPS regional manager said she talked to the senior official in July 2018 and told him to sign an EPAP for the subordinate employee immediately and that Lehnertz could hold the senior official accountable if the subordinate employee did not have a signed EPAP. According to the NPS regional manager, the senior official never completed the EPAP in response to Lehnertz' requests.

*The Senior Official Did Not Provide Lehnertz Written Progress Reports Regarding a High-Priority Park Initiative*

Lehnertz said developing this high-priority initiative was important not only to the GRCA but

2