# EXHIBIT X-34

# Grand Canyon National Park

## 2019 Safety and Health

## Review Report

## July 19, 2019



**TIMOTHY RADTKE**    Digitally signed by TIMOTHY RADTKE
Date: 2019.07.18 14:02:16 -06'00'

Timothy Radtke, Director, Office of Occupational Safety and Health
US Department of the Interior
Co-Team Leader - Uranium Ore Review Team Lead

**MICHAEL MAY**    Digitally signed by MICHAEL MAY
Date: 2019.07.18 15:19:10 -04'00'

Michael K. May, MBA, CSP, Chief, Office of Risk Management,
National Park Service
Co-Team Leader - Safety and Health Review Team Lead

**KATE SAWYER (Affiliate)**    Digitally signed by KATE SAWYER (Affiliate)
Date: 2019.07.23 14:35:08 -06'00'

Captain Kate Flanigan Sawyer, MD, Chief Medical Officer,
US Department of the Interior
Automated External Defibrillator Program Review Lead/Uranium Ore Team Member

**STACY WERTMAN**    Digitally signed by STACY WERTMAN
Date: 2019.07.23 12:27:17 -07'00'

Stacy C. Wertman, Chief, Office of Safety, Health and Wellness, Pacific West Region
National Park Service
Accident Review and Job Hazard Analysis Program Review Lead

**MICHAEL QUINN**    Digitally signed by MICHAEL QUINN
Date: 2019.07.18 15:19:10 -06'00'

Commander Michael M. Quinn, Chief Industrial Hygienist
US Department of the Interior
Uranium Ore Review Team Member


Hillary A. Smith, Mining Engineer – Mining and Abandoned Mineral Lands Program
Lead National Park Service
Uranium Ore Review Team Member

**MARIA SAID**    Digitally signed by MARIA SAID
Date: 2019.07.23 11:40:30 -04'00'

Commander Maria Said, MD, Epidemiology Branch Chief
National Park Service
Safety and Health Review Team Member

**ASHLEY-MARIE HINES**    Digitally signed by ASHLEY-MARIE HINES
Date: 2019.07.18 15:00:30 -04'00'

Ashley Hines, Administrative and Budget Specialist, Office of Risk Management and
Office of Public Health
National Park Service
Writer/Editor

**VERONICA DICKERSON**    Digitally signed by VERONICA DICKERSON
Date: 2019.07.23 12:52:26 -04'00'

Veronica Dickerson, Environmental Protection Specialist, Environmental Compliance and
Cleanup Branch
National Park Service
Uranium Ore Review Team Liaison

Table of Contents

1. Executive Summary

2. Park History and Overview

3. Abbreviations

4. Part I.  Uranium Ore Radiation Review

5. Part II.  Automated External Defibrillator Program Review

6. Part III.  Job Hazard Analysis Program Review

7. Appendix 1 - Delegation of Authority

8. Appendix 2.  Uranium Ore Technical Report

Executive Summary

The Grand Canyon Safety and Health Review Team (Team) received a delegation of authority from the National Park Service Acting Associate Director, Visitor and Resource Protection to review three distinct areas of the Grand Canyon National Park (GRCA) occupational safety and health program. Those areas were: determining if radiation levels—at the time uranium ore samples were stored in the Park's Museum Collection Facility—posed a health hazard to employees and visitors; a review of the Park's Automated External Defibrillator (AED) program to determine strengths and areas for improvement; and a review of an employee on-duty injury to determine if it was investigated per Department of the Interior and National Park Service policies and if the Park routinely used Job Hazard Analysis (JHA) to identify hazards associated with the operation that led to the injury.

Uranium ore samples were collected and stored in various locations within the park since the 1950s with plans to conduct research on the materials. In 2001, the ore samples were collected from multiple locations in the Park and moved to the Museum Collection Facility. In June 2018, the samples were removed from the Museum Collection facility and placed in the Orphan Mine located in GRCA. Following the removal, the Occupational Safety and Health Administration (OSHA) conducted sampling and determined only background levels of radiation existed in the facility. The term background level is a determination that the radiation level is consistent with what would exist in the environment in that location.

A contract Certified Health Physicist (CHP) accompanied the Team and determined: (1) radiation levels reported in the Intermountain Region's 2018 [GRCA] Trip Report were severely overstated, falsely indicating a serious health hazard existed; (2) levels in the Museum Collection Facility at the time of the review were deemed not to pose a health hazard to employees and visitors; and (3) the CHP's "dose reconstruction" determined the radiation levels in the facility, and elsewhere on the Park where uranium ore was previously stored, were at levels below what would be considered a health hazard when the materials were present in those locations. The CHP's "Ore Dose Assessment Report" received favorable peer review by the National Institute for Occupational Safety and Health.

The Team's review of the Automated External Defibrillator (AED) Program revealed areas for improvement, particularly in the AEDs maintained outside of the Law Enforcement/Emergency Medical Technician (EMT) program. The Team found that the Park's standard operating procedure on the management of the AED program did not conform to the requirements of the National Park Service AED policy outlined in Reference Manual 51, Emergency Medical Services. A Park employee alleged a visitor died of sudden cardiac arrest as a result of AEDs not being positioned per Codes of Federal Regulation. That allegation was not substantiated by the Team. The visitor had been in cardiac arrest for an unknown length of time when a Park employee discovered the visitor already in duress and was very likely beyond the time limits of successful defibrillation. When applied, the AED issued a "No Shock" instruction.

In March 2018, a maintenance supervisor operating a demolition saw to cut aluminum pipe on the Trans Canyon Water Pipeline, was injured when the saw kicked back, resulting in a laceration to the employee's forehead. The Park Safety and Health Manager responded to the incident to initiate an investigation, but stated he was not allowed to access the accident site.

However, Park leadership asserts that they believed the Safety and Health Manager was actively investigating the accident and was unaware he was not granted access to the site. The Team's review of the accident revealed no comprehensive accident report was generated or entered into the accident investigation database or elsewhere that indicated a thorough investigation was ever conducted. The Team was unable to make a firm determination if the Safety and Health Manager was in fact prevented or discouraged from conducting an accident investigation. Upon learning of the incident and the potential seriousness of the injury that could have occurred, the Intermountain Region offered to dispatch a regional Serious Accident Investigation Team, but the Park did not accept the offer indicating it could conduct an investigation with its resources.

The review of the Job Hazard Analysis (JHA) program, particularly focused on the JHAs used by Facility Maintenance personnel in conducting maintenance on the Park's Trans Canyon Pipeline, found that a JHA was developed in 2007 and contained over 80 lines, which is extremely comprehensive. However, the JHA had not been reviewed annually and updated as required. Due to extremely short staffing in the Facility Management Division to include those trained, experienced, and available to conduct maintenance repairs on the Trans Canyon Pipeline, Facility Management Division leadership were often forced to assign untrained and inexperienced personnel from other maintenance functions to work on the pipeline, which supplies water to both the North and South rims of the Park. The Team found that these employees did not receive training in emergency situations to include a review of the specific JHA.

During the Team's short visit to the Park, it observed a culture where employees and supervisors exhibited immense passion to work safely. The greatest issue noted was a sense that communication seemed to fail at multiple levels and a lack of role clarity existed. For instance, the Park's Safety Committee was extremely passionate about serving as an advocate and champion for the safety and health issues Park employees wanted changed. However, the Safety Committee's approach was in total opposition to the work the Park Safety and Health Manager wanted the Safety Committee to conduct, which led to a complete severing of productive communication whatsoever. Here, a simple charter outlining the Safety Committee's roles and responsibilities and reporting structure would have alleviated the issue, but had not been accomplished, allowing the issue to continue unresolved.

The Team noted a general lack of implementation of basic safety and health programs; however, it would be unfair to attribute this observation to Grand Canyon National Park in isolation. This is a continuing issue across the National Park Service and one that the organization is trying to correct through its National Safety, Health, and Wellness Strategy and its implementation mechanism, the *eTool*. The work to build fully implemented, sustainable safety and health programs is an ongoing effort across the National Park Service.

Abbreviations

AED – Automated External Defibrillator
DOI – Department of the Interior
GRCA – Grand Canyon National Park
IMR – Intermountain Region
JHA – Job Hazard Analysis
NIOSH – National Institute Occupational Safety and Health
NPS – National Park Service
OSHA – Occupational Safety and Health Administration
WASO – Washington Area Support Office

Grand Canyon National Park History and Overview

Grand Canyon National Park (GRCA) was established as a National Monument in 1908 by President Theodore Roosevelt under Presidential Proclamation #794 and designated as a National Park by an act of Congress on February 26, 1919. The Park was designated as a World Heritage Site in 1979. The Park measures 1,217,403.32 acres, 1,904 square miles, and 277 river miles. The Park's South Rim rises to 7,000 feet elevation while the North Rim rises to 8,000 feet above sea level.

The Park preserves an iconic geologic landscape and resources ranging from 1,840 to 270 million years old, including diverse paleontological resources; unconsolidated surface deposits; a complex tectonic and erosion history; and Pliocene to Holocene volcanic deposits. The Colorado River established its course through the canyon about six million years ago, and likely evolved from pre-existing drainages to its current course. Geologic processes, including erosion of tributaries and slopes, and active tectonics continue to shape the canyon today. The geologic record in Grand Canyon is an important scientific chronicle and is largely responsible for its inspirational scenery.

The oldest human artifacts found date to the Paleoindian period and are nearly 12,000 years old. There has been continuous use and occupation of the park since that time. Archaeological evidence from the following prehistoric culture groups is found in GRCA: Paleoindian, Archaic, Basketmaker, Ancestral Puebloan (Kayenta and Virgin branches), Cohonina, Cerbat, Pai, and Southern Paiute. Historical-period cultural groups the Hopi, Navajo, Pai, Southern Pauite, Zuni and Euro-American. The Park has recorded more than 4,403 archaeological resources with intensive survey of approximately six percent of the park area. The Park's Traditionally Associated Tribes and historic ethnic groups view management of archaeological resources as preservation of their heritage.

The park is home to an array of wildlife including 373 species of birds, 91 species of animals, 18 species of fish, 58 species of reptiles and amphibians, 8,480 species of invertebrates, 23 non-native animal species, 20 endemic animal species, seven endangered species including the California condor, three Threatened species, and 10 Extirpated species including Grizzly Bears. The Park also possesses 1,750 species of vascular plants, four Endemic species, and 205 Exotic species.

The Park's 2018 recreation visitation was 6,380,495, the second consecutive year recreation visitation exceeded six million.

I. **Review of Potential Radiation Exposure from Uranium Ore Samples Stored at Grand Canyon National Park**

**Executive Summary**

An investigation was initiated by the National Park Service, with assistance from the Department of the Interior and Federal Occupational Health, to assess concerns regarding potential employee and visitor exposure to ionizing radiation resulting from uranium-containing ore specimens previously maintained within the museum collection at Grand Canyon National Park (GRCA). The investigation included a site visit, document review, employee interviews, field radiation measurements, and an exposure evaluation based on historical information. The investigation results indicate that health risks are low and that employees and members of the visiting public were not exposed to unsafe levels of radiation.

The investigation team documented the time line and identified several findings related to how the ore specimens were historically stored and the process utilized to remove them from the Museum Collections Building. These findings indicate that the radiation survey conducted by the NPS Intermountain Radiation Safety Officer was inaccurate and overstated the radiation levels associated with the ore specimens. The findings also suggest that several opportunities for improvement exist regarding how GRCA manages its safety program.

**Introduction**

The U.S. Department of the Interior (DOI) Office of Occupational Safety and Health (OSH) conducted an investigation to evaluate possible radiation exposures resulting from the storage of uranium ore specimens in the museum collection at Grand Canyon National Park (GRCA). This investigation was initiated at the request of the National Park Service (NPS) Acting Associate Director for Visitor and Resource Protection in response to concerns raised by park officials regarding the safety of the ore specimens and their previous storage and display within park buildings. Specifically, the review team was tasked with investigating *the exposure of park employees or visitors to radioactivity from uranium ore stored in the park's collection, [providing] a determination if the health and safety of any park staff or visitors may have been materially impacted, and recommending next steps.*

This report summarizes the investigation on process and relevant findings. The accompanying technical report – **Evaluation of Exposures to Uranium Ore Specimens** – provides a historical evaluation of employee and visitor risk resulting from the storage and display of the uranium ore specimens and recommendations for controlling additional exposures. The technical report and this summary do not address actions taken by park management or staff beyond the historical management of the specimens and their removal from park buildings in June 2018.

**Background**

A total of 25 ore samples were held by GRCA beginning in the late 1950s. The ore specimens were managed as part of the park's museum collection until they were removed from the Museum Collections Building (i.e. Building 2C) and relocated to the Orphan Mine Site within the park on June 18, 2018. Subsequently, the GRCA Safety Manager raised concerns regarding the radiation measurements taken by the Intermountain Regional Radiation Safety Officer (RSO) once the "Trip Report" was provided to the park. As a result, investigations were initiated by regulatory and health authorities including the Occupational Safety and Health Administration (OSHA) and the Arizona Department of Health Services (ADHS) Bureau of Radiation Control.

**Investigative Process**

An investigation team composed of representatives from the DOI Office of Occupational Safety and Health, NPS Office of Risk Management, NPS Office of Public Health, NPS Environmental Quality Division, and NPS Geological Resources Division was assembled and assigned with assessing the health and safety risks that the ore specimens may have presented to park staff and visitors. A consulting Certified Health Physicist (CHP) was engaged via an interagency agreement with Federal Occupational Health (FOH) to provide radiation health expertise and conduct the exposure evaluation. The investigation team, including the CHP, visited GRCA during the week of March 4, 2019 to collect field radiation measurements, inspect locations where the ore samples were previously stored, verify the current location of the specimens at the Orphan Mine site, conduct interviews, and gather documentation to support the exposure evaluation process.

**Chronological Narrative**

Based on a review of relevant records, email correspondence, and interviews, the investigation team assembled the following timeline related to how the ore specimens were managed by GRCA including storage locations and movements. This information was used to support the historical dose estimates provided in the technical report.

**Late 1950s**
A total of 25 uranium ore samples, primarily from the Orphan Mine site, were obtained by GRCA and logged into the park's museum collection. The specimens were stored and displayed in the current Community Library space (formerly the Naturalist Building).

**1966**
The ore specimens were relocated to the newly constructed Visitor Center, now the GRCA Park Headquarters Building. Most of the specimens were stored in the basement boiler room or in the Museum Collections room. Two specimens were displayed in the Visitor Center display area from 1966-2000.

**2000**
The 25 ore specimens were removed from the Visitor Center and transferred to the new Museum Collections Building.  The majority of the specimens (20) were placed within storage cabinets within the Natural History Room.  One larger specimen was stored on an open shelf within the same room near six (6) additional small uranium ore samples that were not cataloged as part of the museum collection.  Four specimens were placed in three marked plastic buckets and placed on the floor in the Natural History Room adjacent to a taxidermy cabinet.

**2000-2017**
A total of 31 ore samples remained stored in the Natural History Room within the Museum Collections Building.  During this time, NPS staff, part-time interns (minors), visiting researchers, and members of the general public (adults and children) accessed the area for varying lengths of time.

**June 20-22, 2000**
Rocky Mountain Consultants, Inc. conducted a radiation assessment of the ore specimens including radioactivity levels.  A report of their findings and recommendations was provided to GRCA in July 2000.

**November 2017**
A visitor entered the Museum Collections Building with a personal radiation detection instrument (i.e. a Geiger counter). The instrument reacted to the uranium ore samples and other areas of the building.  Due to concerns that radiation exposures may be occurring, the museum staff moved the three buckets from the Natural Collections Room to a hallway near the south exit door.

**June 11, 2018**
The GRCA Safety Manager, accompanied by contractors conducting a safety, health, and environmental audit, entered the Museum Collections Building to conduct a routine inspection. Museum staff raised concerns regarding the safety of the three buckets and specimens stored in the cabinets within the building. As a result, the GRCA Safety Manager contacted the NPS Intermountain Regional (IMR) Office to request assistance. The IMR Safety, Health, and Wellness Manager (Regional Safety Manager) determined that assistance was necessary and dispatched the IMR Radiation Safety Officer (RSO) to GRCA to evaluate the issue. GRCA management instructed all employees to vacate the building pending the RSO's evaluation.

**June 12, 2018**
A copy of the 2000 Rocky Mountain Consultants, Inc assessment report was provided to the Regional Safety Manager and RSO.

**June 13, 2018**
The RSO departed from Lakewood, CO for GRCA. He stopped enroute at the NPS Southeastern Utah Group (SEUG) Headquarters in Moab, UT to pick up a Ludlum Model 3001 Multi - Detector Digital Radiation Survey Meter. This RSO determined that the instrument was necessary for measuring the radioactive activity of the uranium ore specimens.

**June 14, 2018**

The RSO arrived at GRCA to meet with the museum collections staff and the GRCA Safety Manager. The RSO and his wife - a reportedly trained radiation safety technician who accompanied him throughout the trip and assisted with his work tasks - subsequently conducted a self-described "hasty survey" of the Museum Collections Building taking several radiation readings inside and outside the building while noting the values. The GRCA Safety Manager and two museum staff members were present during the survey. The RSO determined that radiation readings from the ore specimens were above background levels. The RSO recommended that the park remove the ore specimens from the building.

**June 15, 2018**

The RSO returned to the Museum Collections Building in the morning to conduct a more focused radiation survey of the ore specimens and to segregate those producing higher than background levels of radiation. Measurements were taken, but the survey focused on identifying areas/objects with higher radioactivity levels (i.e. above background). The RSO moved the three buckets of uranium ore from the hallway near the south exit door to an isolated shelving unit near the back of the Large Objects Room pending additional instructions. The other ore specimens, which were in small cardboard boxes, were transferred into a plastic tote. The RSO wore rubber gloves while handling the ore. Collections staff and the GRCA Safety Manager observed this process.

The RSO next conducted surveys of the Park Headquarters Building basement, Grand Canyon Power House, and the exterior of a storage container (i.e. Conex Box) located near the Fee Building. All areas were negative for increased radioactivity (i.e. above background) except near the storage container. The RSO later met with the GRCA Superintendent to provide an update and discuss options for the transfer and/or disposal of the ore specimens.

**June 16, 2018**

The RSO conducted an additional radiation survey along the Trail of Time walking path near the Canyon's south rim. The survey did not indicate radiation above background levels.

**June 18, 2018**

The GRCA Superintendent, in consultation with NPS Environmental Compliance and Cleanup Branch (ECCB), authorized the RSO to remove the ore samples from the Museum Collections Building and place them in sealed and labeled containers inside of the fence enclosing the Orphan Mine Site until arrangements for proper disposal could be made. The RSO loaded the buckets and tote into the back of the GRCA Safety Manager's government-owned pickup truck. The RSO wore rubber gloves covered with cotton utility gloves while handling the specimens and used a mop handle to place the buckets in the bed of the pickup. The RSO, his wife, and the Grand Canyon Safety Manager then drove to the Orphan Mine Site (approximately 3 miles) and all proceeded to enter the locked, fenced enclosure.

Once on site, the RSO became concerned that the buckets would be conspicuous to park visitors and employees, and that the buckets might be pilfered if left in plain sight. The RSO then proceeded, without further consultation or direction, to remove the ore specimens from the

buckets and boxes/tote and bury them in the ground using a shovel and covering them with 1-2 inches of soil. The RSO and GRCA Safety Manager then departed the mine site. The RSO conducted a radiation scan on the pickup prior to leaving the enclosure area. They then proceeded to the vehicle maintenance yard to rinse off the vehicle, buckets, and shovels. The RSO returned the buckets and shovels to the Museum Collections Building Large Objects Room. The RSO then departed the park.

**July 9, 2018**
The Regional Safety Manager responded to a request for information from the NPS Office of Risk Management regarding the removal of the ore specimens including field radiation levels recorded by the RSO. The Regional Safety Manager discussed the request with the RSO who provided him a draft trip report. The draft report did not contain any radiation measurements.

**July 10, 2018**
The Regional Safety Manager discussed the radiation measurements with the RSO via phone. The Regional Safety Manager then added the measurement information to the draft trip report provided by the RSO. The RSO reported that most of the values were "based on memory". The Regional Safety Manager then emailed the requested information, including radiation levels, to the NPS Office of Risk Management.

**August 13, 2018**
The Regional Safety Manager provided a copy of the trip report, including radiation values, to GRCA management including the GRCA Safety Manager.


**Findings**

Based on a review of pertinent records, information provided during interviews, site observations, and conclusions presented in the technical report, the investigation team identified 13 findings. Each finding represents a single event or condition based on factual information as determined by the investigation team. Findings are essential steps in the incident sequence based on the weight of evidence, professional knowledge, and judgment.

1. The radiation measurements provided in the RSO's August 23, 2018 Trip Report were inaccurate and indicate radiation levels approximately 200 times higher than expected based on background levels and historical survey data.

2. Past radiation exposures from the uranium ore specimens stored at GRCA were approximately 3.5% of the OSHA quarterly dose limit of 1.25 rem and were within permissible exposure limits for employees.

3. Past exposures to uranium ore specimens at GRCA for visitors are a small fraction of the natural background radiation the average American receives annually and well within (<5%) of the Nuclear Regulatory Commission's dose limits for members of the public.

4. Exposure modeling indicated that past exposures to uranium ore specimens at GRCA are a small fraction of the natural background radiation and do not not represent a health risk.

5. The RSO was unfamiliar with the operation of the Ludlum Model 3001 Multi-Detector Digital Survey Meter and did not have prior experience or specific training related to the instrument.

6. The Ludlum Model 3001 instrument was within its annual calibration guidelines at the time of the survey with a most recent manufacturer's calibration date of October 6, 2017.

7. The Ludlum Model 3001 rate meters and detector were more than likely improperly configured during the June 2018 survey conducted by the RSO.

8. The RSO used the radiation meter in a qualitative manner and did not take adequate field notes to document the radiation readings.

9. The GRCA Safety Manager was present for a portion of the radiation survey but did not document any of the radiation readings taken by the RSO.

10. The RSO's wife (not an NPS employee) participated in the radiation survey and removal of the ore specimens from the Museum Collections Building and transfer to the Orphan Mine site.

11. The GRCA Safety Manager had limited contact with the Regional Safety Manager and RSO after the specimens were transferred to the Orphan Mine Site and did not seek additional information or clarification when he suspected that the radiation measurements in the RSO's trip report were inaccurate.

12. Current radiological conditions within the Museum Collections Building and the Park Headquarters Building did not exceed established limits and did not pose a significant health hazard.

13. Low levels of residual alpha and beta particle contamination were present within three mineral specimen storage cabinets in the Natural History Room. This low-level radiological contamination is not a routine exposure hazard because the cabinets are kept shut and are not opened on a routine basis.

**Other Findings**
The investigation team identified six other findings, which while not directly related to the incident, may result in unsafe or unhealthful work conditions if left uncorrected.

1. GRCA personnel had  not received safety and health training regarding the chemical, physical, and biological hazards associated with museum objects.

2. GRCA had not completed job hazard analyses (JHAs) or developed standard operating procedures (SOPs) for museum operations.

3. GRCA had not documented a personal protective equipment (PPE) hazard assessment for museum operations.

4. GRCA had not conducted a comprehensive exposure assessment to identify potential health and safety hazards within the Museum Collections Building or objects contained within the park's collection.

5. The Museum Collections Building had not been subject to required annual safety inspections since 2014.

6. The GRCA Safety Manager had not received any formal training in radiation safety and health.

7. The GRCA Safety Manager released the three buckets that previously contained ore specimens to the Arizona Department of Health Services.

**Recommendations**

The investigation team recommends that the following actions be taken by NPS and GRCA based on the identified findings to reduce organizational and employee risk, and to further determine the appropriateness of the response to this incident.

1. Develop written policies and procedures to ensure that employees and managers are aware of potential hazards within their workplace and take appropriate actions to mitigate risk. This includes, but is not limited to: completion of JHAs for all job tasks; conducting formal exposure assessments to determine the types of hazards present, potential routes of exposure, and appropriate protective measures; development of SOPs for routine work tasks; and, completion of a written PPE hazard assessment.

2. Provide appropriate safety and health training for regional/park staff and managers based on their workplace exposures and potential exposures. For the museum collection staff, training should include the chemical, physical, and biological hazards associated with their work arising from museum objects. For the GRCA Safety Manager, provide formal training in radiation safety and control methods. For the RSO, ensure that training regarding the use and limitations of instruments is provided.

3. Implement an ongoing facility inspection program to identify, document, and correct hazards in the workplace. These inspections should be conducted on a periodic basis, but not less than annually.

4. Decontaminate the interior of cabinets N.B16, N.B17, and N.B18 and N.E01 within the Natural History Room. Although this condition is not an immediate health concern, museum collections staff should wear disposable nitrile gloves to prevent cross-contamination when accessing these areas.

Review of Automated External Defibrillation Program
Grand Canyon National Park
2019

## Summary

This review was conducted to evaluate the current automated external defibrillation (AED) program at Grand Canyon National Park (GRCA).  Concerns had been raised by GRCA staff regarding insufficient maintenance of AED units, unclear procedures, and general lack of awareness and understanding of the GRCA AED program.  Further, a park employee alleged that a visitor died of sudden cardiac arrest as a result of AEDs not being positioned per Codes of Federal Regulation and/or inadequate AED maintenance. An assessment of the GRCA AED program, which included a review of documentation, an evaluation of current procedures, and interviews with key staff, revealed that this allegation was not substantiated, and there is insufficient information to conclude that the health and safety of any park employee or visitor had recently been materially impacted by the AED program. However, the investigation did reveal that there are several significant programmatic gaps that need to be addressed.  Per National Park Service (NPS) policy documents and best practices documents, AED programs require compliance with several elements that include:

- Support of the program by leadership
- Understanding legal aspects for EMS and non-EMS responders
- Needs Assessment of AED program that is evaluated on a periodic basis
- Medical oversight
- On-going Training of responders in CPR and the use of the AED and accessories
- Routine evaluation of placement and number of AEDs
- Maintaining hardware and support equipment on a regular basis and after each use
- Development and regular review of the program and standard operational protocols (SOPs)
- Development of an emergency response plan and protocols
- Educating all employees regarding the existence and activation of the AED program
- Development of quality assurance plans
- Development of measurable performance criteria, documentation and periodic program review

The current GRCA AED program does not sufficiently address each of these elements in a systematic, programmatic manner. Recommendations are presented in this review that incorporate the above essential (and required) program components; and guidance is provided on how to fill the identified gaps, which if addressed, will lead to improved outcomes and decreased liability for GRCA, the NPS, and the US Department of the Interior.

## Introduction

An AED is a device designed to improve the survival rate for victims of cardiac arrest. AEDs enable minimally trained personnel to safely restore a victim's heart from ventricular fibrillation (completely disorganized electrical activity, and its consequent absence of effective pumping activity) to the victim's previous electrical and pumping activity. Early defibrillation and cardiopulmonary resuscitation (CPR) can dramatically improve survival after cardiac arrest. Successful resuscitation depends on the rapid response of bystanders – both trained and untrained – to initiate CPR and locate the nearest AED before the arrival of emergency medical services.[1] Because the effectiveness of these devices used in conjunction with CPR has been demonstrated, it is common to observe AEDs in public locations.

The importance of providing access to AEDs is illustrated by the following facts:
- Sudden cardiac arrest (SCA) is a leading cause of death in the U.S., accounting for more than 356,000 deaths outside the hospital each year[2]
- Traditional first aid, including cardiopulmonary resuscitation (CPR), isn't enough if the victim is suffering a SCA.[3]
- Without intervention, such as CPR/AED, less than 10% of SCA victims survive[4]
- It is unlikely that a SCA victim will recover without defibrillation within a ten-minute window; for each minute that a person is in cardiac arrest, their chance of survival decreases by 10%[5]
- When CPR and AEDs are used within three to five minutes from the onset of collapse, the survival rate of a sudden cardiac arrest victim is as high as 50 to 70 percent.[6]
- Less than half of SCA victims get the immediate help they need before emergency responders arrive, in part because emergency medical services take, on average, between 4 and 10 minutes to reach someone in cardiac arrest[7]
- Waiting for the arrival of emergency medical system personnel results in only a 5-7% survival rate[8]

[1] Kilaru, Austin, et al. Use of Automated External Defibrillators in US Federal Buildings, Journal of Occupational and Environmental Medicine, 2014; 56: 86-91.

[2] Benjamin et al.

[3] AED State Laws, https://www.aedbrands.com/resource-center/choose/aed-state-laws/

[4] Weisfeldt ML, Sitlani CM, Ornato JP, et al. Survival after application of automatic external defibrillators before arrival of the emergency medical system: evaluation in the resuscitation outcomes consortium population of 21 million. J Am Coll Cardiol. 2010;55(16):1713–1720.

[5] Larsen MP, Eisenberg MS, Cummins RO, Hallstrom AP. Predicting survival from out-of-hospital cardiac arrest: a graphic model. Ann EmergMed. 1993;22:1652–1658..

[6] Ibrahim WH. Recent advances and controversies in adult cardiopulmonary resuscitation. *Postgrad Med J.* 2007;83(984):649–654.

[7] Benjamin et al.

[8] OSHA publication 3185-09N (2003), https://www.osha.gov/Publications/3185.html

- Survival from cardiac arrest doubled when a bystander stepped in to apply an AED before emergency responders arrived.[9]

While there is no legal requirement to have an AED program in Federal facilities, it is often recommended that employers consider the use of AEDs in public areas and in the workplace to respond to a SCA.  All fifty states have enacted various laws and/or regulations requiring that certain public gathering places have AEDs available.[10]

The National Park Service (NPS) is committed to the existence of an AED program in the park.  The NPS Reference Manual– 51 (RM-51), Chapter 10 Automated External Defibrillators states, "The goal of an AED program is to increase the rate of survival of people suffering from sudden cardiac arrest.  The key is to minimize the time from the onset of cardiac arrest to defibrillation.  This can only be accomplished when the site has an appropriate number of AEDs placed in strategic and easily accessible locations and the appropriate number of people trained to use them."   The document adds "AEDs are designed to be used by both medical and non-medical personnel who have been properly trained." [11]

Per the Grand Canyon National Park EMS Plan, "The goal of an AED program is to increase the survival rate for people suffering from sudden cardiac arrests.  Grand Canyon National Park will continue to work through the park's AED Program to increase the number and availability of AEDs park-wide.  This will include placement in areas where the necessity is highest (e.g., visitor centers, administration buildings, campgrounds, etc)."  Additionally, the GRCA EMS Plan notes: "To maintain the current level of service and to continue to strive for efficiency and safety within the park EMS program there are some factors which need to be addressed, including;

- Install automatic external defibrillators (AEDs) in all park office building and establish an AED program for Grand Canyon National Park.  Some work units have taken the initiative to purchase an AED for the workspace, however it would be beneficial to have uniform coverage throughout park office buildings.  Without rapid access to an AED, the chance of survival in a cardiac arrest patient decreases dramatically by delaying critical, lifesaving defibrillation.. Having an AED in all major park offices and/or large concession facilities will increase survival rates of patients with cardiac arrest."[12]

These two documents clearly demonstrate that GRCA appreciates the need for rapid access to AEDs, and is dedicated to the existence of an AED program that is utilized not solely by EMS

[9] Weisfeld et al.
[10] Laws on Cardiac Arrest and Defibrillators, http://www.ncsl.org/research/health/laws-on-cardiac-arrest-and-defibrillators-aeds.aspx
[11] National Park Service Emergency Medical Services Reference Manual RM-51, 2009, https://docs.google.com/a/nps.gov/viewer?a=v&pid=sites&srcid=bnBzLmdvdnxsZXNlc3xneDo2OWZkNTNhOTNjZGZmNzZi
[12] Grand Canyon National Park EMS Plan, March 2012

but is also accessible by lay responders. This latter type of program is referred to in RM-51 as "Open Accessibility," but is more commonly called a Public Access Defibrillation (PAD) program.

PAD Program:

RM-51 touches on --but does not clearly delineate-- the difference of utilizing AEDs by EMS versus having a Public Access Defibrillation (PAD) program in which AEDs are used by trained lay responders. The concept of a PAD program is to decrease time to defibrillation, before EMS arrives to the scene--because with sudden cardiac arrest, every minute counts and defibrillation should occur within 3-5 minutes of collapse. A PAD program relies on lay responders (non-EMS) who have been trained in CPR and the appropriate use of AEDs. If a federal entity chooses to have a PAD program, the program should be developed so that the lay responders have the training as well as properly maintained devices to successfully react to an event, and that liability for the lay responder and the federal facility is limited. For this reason, the Department of Health and Human Services and General Services Administration published a best practices document entitled "Guidelines for Public Access Defibrillation Programs in Federal Facilities." [13]

## Leadership/Program Management

Currently, the Grand Canyon National Park's AED program is coordinated and managed by Emergency Medical Services (EMS) under policies outlined in the National Park Service Director's Order #51: Emergency Medical Services[14] (DO), in conjunction with RM-51.[15] These policy documents establish and define standards and procedures for the National Park Service Emergency Medical Services program. Per the DO, "The policies, procedures, and standards in this document are to be implemented uniformly throughout the NPS." [16]

According to RM-51, "It is the responsibility of each Park Superintendent to ensure that the Park EMS Program is in compliance with DO-51 and RM-51." Program accountability lies within the individual Park Superintendent, and the GRCA EMS Plan is administered by the Division of Visitor and Resource Protection, with the Branch Chief of Emergency Services designated as the EMS program manager. GRCA has an EMS coordinator who is responsible for managing the GRCA AED program.

[13] Guidelines for Public Access Defibrillation Programs in Federal Facilities,
https://www.govinfo.gov/content/pkg/FR-2009-08-14/pdf/E9-19555.pdf
[14] NPS Director's Order #51: Emergency Medical Services, https://www.nps.gov/policy/DOrders/DO-51.html
[15] Ibid
[16] Ibid

**Governing/Guidance Documents, Legal considerations**

As noted within the NPS Director's Order #51 (NPS DO) in reference to RM-51, "The policies, procedures, and standards in this document are to be implemented uniformly throughout the NPS." [17] Thus, it is expected that GRCA's AED program would be in line with the AED chapter in RM-51. *(Note: The AED program document outlined in the GRCA EMS Plan dated March 2012 is not equivalent/insufficient to the requirements of RM-51).* Additionally, because the GRCA AED program encompasses not only AEDs specifically for EMS providers, but also includes a public access component, it is recommended that GRCA leadership become familiar with applicable laws and best practices surrounding AED programs to better understand how liability can be minimized. The references below are not an exhaustive list of applicable AED laws and best practices, and are provided solely to illustrate the importance of understanding and implementing essential components of an AED program. It is recommended that GRCA consult a solicitor to address any legal questions.

Federal Statute:

- For lay responders ("Good Samaritans"): The Cardiac Arrest Survival Act (CASA) was passed by Congress in 2000. Congress found that "limiting the liability of Good Samaritans and acquirers of AED devices in emergency situations may encourage the use of AED devices in emergency situations, and result in saved lives."[18] CASA grants civil immunity to any person who uses or acquires an AED, provided that any resulting harm was not due to the failure of an acquirer to (1) notify emergency response personnel of the device's placement, (2) properly maintain and test the device, or (3) to provide appropriate AED training to an employee, unless the AED user was not an employee or expected user of the device. Immunity does not attach if the harm was caused by willful, grossly negligent, reckless misconduct, or flagrant indifference to the victim's safety, or if the AED user is a licensed health care professional or provider acting in the scope of employment.[19]

- For EMS: EMS providers are not covered by CASA as they have a duty to act as health care providers acting in the scope of employment, but they would likely be covered by the Federal Tort Claims Act (FTCA) provided they meet certain criteria. RM-51, Chapter 16 outlines legal aspects as they related to EMS providers.

State of Arizona laws:

---

[17] Ibid
[18] Cardiac Arrest Survival Act of 2000,  https://www.govinfo.gov/content/pkg/FR-2009-08-14/pdf/E9-19555.pdf
[19] Ibid

According to RM-51, the state may not impose its regulatory power upon the NPS without specific congressional consent. However, in the CASA act, there could be some action for civil liability in a state where there is no applicable Federal law. Therefore it is recommended that GRCA consult with a solicitor to determine if GRCA must adhere to the following state of Arizona laws regarding the use of AEDs:

> Arizona Revised Statutes § 36-2262
> Except as provided in section 36-2264, a person or entity that acquires an automated external defibrillator shall:
>
> > 1. Enter into an agreement with a physician who shall oversee the aspects of public access to defibrillation.
> >
> > 2. Require each trained user who uses an automated external defibrillator on a person in cardiac arrest to call telephone number 911 as soon as possible.
> >
> > 3. Submit a written report to the bureau of emergency medical services and trauma systems in the department of health services within five working days after its use.
> >
> > 4. Ensure that the automated external defibrillator is maintained in good working order and tested according to the manufacturer's guidelines.[20]

Best Practices:

CASA also delegated the Secretary of Health and Human Services (HHS) to establish guidelines for implementation of AEDs in Federal buildings. These guidelines are contained in the document *Guidelines for Public Access Defibrillation Programs in Federal Facilities*,[21] (hereafter referred to as *HHS Guidelines for Federal PAD programs*) and serve as a general framework for Public Access Defibrillation (PAD) programs in Federal facilities. In parallel with RM-51 for EMS providers, this document is widely considered "good and accepted practice" or the "Standard of Care" for PAD programs.

This document notes that each PAD program should include the following major elements:

- *Support of the program by each of the facility's occupant agencies*
- *Training and retraining personnel in CPR and the use of the AED and accessories*
- *Obtaining medical direction and medical oversight from nationally recognized institutions or agencies*

[20] Arizona Revised Statutes Automated External Defibrillators, https://www.azleg.gov/ars/36/02262.htm
[21] HHS Guidelines for Federal PAD Programs

- *Understanding legal aspects*
- *Development and regular review of the PAD program and standard operational protocols (SOPs)*
- *Development of an emergency response plan and protocols, including a notification system to activate responders*
- *Integration with facility security and EMS systems*
- *Maintaining hardware and support equipment on a regular basis and after each use (Note: AEDs are not building equipment and, as such, are not inventoried or maintained by GSA or property management personnel)*
- *Educating all employees regarding the existence and activation of the PAD program*
- *Development of quality assurance and data/information management plans*
- *Development of measurable performance criteria, documentation and periodic program review*
- *Review of new technologies*[22]

[22] Ibid

**Discussion/Recommendations:**

Based on a review of documents and interviews with key personnel, it is clear that there are gaps in the GRCA AED program that need to be addressed in order to bring the program into compliance with RM-51 and in order to reduce liability for GRCA. It is understood that the RM-51 policy requires all NPS AED programs to be implemented uniformly, thus this review will focus heavily on how the GRCA AED program can better align with RM-51. The *HHS Guidelines for Federal PAD programs*, albeit a guideline document, serves as best practices for PAD programs within the federal government, thus this document will also be referred to in this review, where applicable, to address gaps in the GRCA AED program.

Starting with key points outlined in RM-51, essential AED program components, findings, and recommendations include:

1. **AED Needs Assessment/Update GRCA EMS Plan chapter on AED program:**

Per the NPS DO, "The EMS Needs Assessment is the fundamental tool used in the development of a park's EMS program. Each superintendent must assess the emergency medical resources available to them, and ensure that their EMS program has been developed and maintained so that all persons have access to emergency medical care as per current standards. It is important that each park's EMS program be evaluated on a continuous basis and to make adjustments as necessary. The EMS Needs Assessment will be completed or updated by the Park EMS Coordinator and submitted every three years to the superintendent or designee."

RM-51 adds, "Each park manager will complete an EMS Needs Assessment and develop and implement a program to meet identified needs, in accordance with this Reference Manual."

RM-51 outlines the criteria that should be considered in a Needs Assessment:

> *"As part of the overall EMS Needs Assessment, the following criteria should be considered in determining the need for an AED program:*
>
> > • *Probability of use of an AED due to cardiac arrest is at least one use in 5 years.*
> > • *Is the EMS call-to-shock time interval of less than 5 minutes reliably achieved with conventional EMS services and if not, can NPS AEDs be brought to the same location within that time frame?*
> > • *Do large numbers of people frequent the area?*
> > • *Does this location have an at-risk workforce and/or visitor population? Risk factors include:*

23

*1. Men age 40 or older*
*2. Post-menopausal women*
*3. High blood pressure*
*4. High cholesterol*
*5. Sedentary lifestyle*
*6. Diabetes*
*7. Personal history of heart disease*
*8. Family history of heart disease*
• *Is this location considered a high-risk location? High-risk locations include:*
   *1. High activity/recreation area*
   *2. Areas where people experience high levels of stress*
   *3. Areas where people spend long periods of time*
• *Hazardous materials/conditions (chlorine, electrical, etc).*
• *Physical layout of the facility.*
   *1. Multiple floors*
   *2. Size of office space or number of rooms"*[23]

Grand Canyon National Park conducted a needs assessment and established its own EMS plan (GRCA EMS Plan), dated March 2012. [24] As noted previously, Page 12 of the GRCA EMS Plan states:

> *"To maintain the current level of service and to continue to strive for efficiency and safety within the park EMS program there are some factors which need to be addressed, including;*
>
> • *Install automatic external defibrillators (AEDs) in all park office building and establish an AED program for Grand Canyon National Park.  Some work units have taken the initiative to purchase an AED for the workspace, however it would be beneficial to have uniform coverage throughout park office buildings.  Without rapid access to an AED, the chance of survival in a cardiac arrest patient decreases dramatically by delaying critical, lifesaving defibrillation.. Having an AED in all major park offices and/or large concession facilities will increase survival rates of patients with cardiac arrest."* [25]

RECOMMENDATIONS:

• Per the NPS DO, the EMS Needs Assessment is to be updated every three years, however, it is unclear if a more recent Needs Assessment has been conducted.  It is recommended that GRCA conduct an updated Needs Assessment for the AED

---

[23] RM-51
[24] GRCA EMS Plan
[25] Ibid

program using the criteria in RM-51 for consideration. GRCA should determine if the goal continues to exist for uniform coverage throughout park office buildings, and determine if there is a need for additional AEDs in the park. The criteria in RM-51 is not limited to dense visitor areas—other areas for consideration include high-risk areas, locations with hazardous materials/conditions, and physical layout. GRCA should also analyze EMS response times from dispatch to arrival at patient, and consider areas where EMS would be unable to arrive within about 5 minutes. As part of conducting this assessment, it is recommended that the needs assessment evaluation includes consultation with personnel from Safety, Visitor and Resource Protection, Concessions, Interpretation, Facilities Management, and other key operational programs to ensure a thorough understanding of park-wide AED needs, and to assure the most efficient use of resources and the best outcomes possible.

- After conducting a Needs Assessment, it is recommended that GRCA create an updated AED Program document (within the GRCA EMS Plan) to be in line with the requirements of RM-51. Currently, the AED Program document within the GRCA EMS Plan is not uniform with RM-51, it provides insufficient detail on necessary AED program components, it is incomplete as it does not address necessary AED program components, and continued use of this document as currently written is not recommended.

## 2. **Medical Oversight:**

RM-51 states, *"All park units that have an AED will have a Medical Advisor that provides oversight to the AED program. The Medical Advisor's duties are as follows:*

> • *Provide medical direction for determining equipment selection and use of the AED.*
> • *Write a prescription for new AED purchases. The Food and Drug Administration has classified the AED as restricted, prescription devices.*
> • *Provide and review guidelines for emergency procedures related to the use of the AED.*
> • *Evaluate and review all AED patient encounters"*

Medical direction for the GRCA EMS program as well as the GRCA PAD program is provided by Drew Harrell, MD, a board certified physician in Emergency Medicine. Dr. Harrell acknowledged his participation in and support of this program in a letter dated 25 March 2019. The GRCA AED program manager noted that Dr. Harrell is required to review every event in which an AED is used. While several EMS patient care records and general reports were provided for review, medical oversight reports were not provided; thus it is unclear if this is occurring.

RECOMMENDATIONS:

- Ensure that the Medical Advisor is consulted and involved in all of the duties listed above.

- RM-51 outlines cardiac arrest protocols for EMS; however the Medical Advisor should also review protocols and emergency procedures related to the use of the publicly accessible AEDs, as these are different from EMS.


3. **Training**:

According to RM-51, CPR/AED training is recommended for all park employees. The GRCA EMS Plan similarly notes, "All park employees are encouraged to participate in CPR classes. It is the park's goal to have all permanent employees certified in basic life support."[26]

The AED program manager at GRCA noted that almost all training is conducted at the park, and separate courses are offered to different types of employees. The GRCA EMS Plan indicates that non-uniformed employees take the Heartsaver AED course, and uniformed employees take Heartsaver AED/First aid course. Visitor protection or other certified primary care EMS providers take the Basic Life Support for Healthcare Providers course.

All EMS providers at GRCA receive their training at regular intervals (every two years). According to the AED program manager, lay responders do not have a formal training schedule. The AED program manager noted that due to low staffing/hiring vacancies not being filled, the number of classes offered to lay responders has diminished significantly in the past few years. The AED program manager did not have a list of trained lay responders.


RECOMMENDATIONS:

- Determine if the goal still exists to have all permanent employees certified in basic life support. If not, determine which category of employees and how many employees should be trained.

- Develop a formal training program and recertification schedule for lay responders. The greater the number of well-trained lay responders that are available, the more effective a PAD program will be. Training for lay responders should be conducted at the frequency as recommended by nationally recognized training organizations, at least every two years. If the park is unable to conduct the training due to low staffing

[26] Ibid

levels, it is recommended that training be outsourced to an outside entity to ensure adequate numbers of employees are certified in basic life support.

- AED program manager should maintain a list of all trained responders (not just EMS providers), their expiration dates, and their contact information.

- Training should include general information about the GRCA AED program, and ensure that responders are aware of locations of all AEDs throughout the park.

## 4. Placement and Number of AEDs

A park employee alleged that a visitor died of sudden cardiac arrest as a result of AEDs not being positioned per Codes of Federal Regulation. Specifically, the allegation to the Office of Special Council noted, "The GCNP Desert View Ranger's Office and Waste Water Treatment Facility do not have automated external defibrillators located and accessible within three to five minutes in the event of an emergency, as required by 29 CFR § 1915.87 App. (A)(4)(a)."[27] This allegation is inaccurate. The regulation described in 29 CFR Part 1915 is a shipyard standard and therefore does not apply to general industry operations in the park. Further, this regulation does not state that AEDs must be located and accessible within three to five minutes in the event of an emergency. This maritime regulation states that a first aid provider must be able to reach an injured/ill employee within five minutes of a report of a serious injury, illness, or accident such as one involving cardiac arrest, acute breathing problems, uncontrolled bleeding, suffocation, electrocution, or amputation.[28] Appendix A of this same document does state, "Ensure that AEDs are located so they can be utilized within three to five minutes of a report of an accident or injury," however this is a non-mandatory Appendix entitled "First Aid Kits and Automated External Defibrillators (Non-Mandatory)."[29] The general industry standards for medical first aid that would apply to the operations at GRCA are contained in 29 CFR 1910.151, *Medical Services and First Aid*,[30] and in this regulation, there is no mention of AEDs.

Despite the lack of regulatory backing for the park employee's allegation, further investigation also revealed a concern among other GRCA employees regarding inadequate placement of AEDs. Placement is a critical aspect of an AED program. As noted previously, chances of survival for a victim of sudden cardiac arrest decreases by 10% for each minute that a person is in cardiac arrest, and when an AED is used within 3-5 minutes of an event, survival rates increase dramatically.

RM-51 states,

[27] McMullen, Catherine. "Informal resolution of OSC reported safety violations at Grand Canyon." Email received by Michael May, February 26, 2019.

[28] https://www.osha.gov/laws-regs/regulations/standardnumber/1915/1915.87

[29] https://www.osha.gov/laws-regs/regulations/standardnumber/1915/1915.87AppA

[30] https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=9806&p_table=STANDARDS

> *"Optimal locations and numbers of AEDs are such that trained individuals can access them and reach the patient within a target response time of three to five minutes (3 minutes is optimal, 5 minutes is considered acceptable). This is defined as the time it takes a responder to go from his/her work area to retrieve an AED and then, walking at a rapid pace, to reach the victim. When locating an AED, the responder should consider placing them in areas where the risk assessment is highest (i.e., visitor centers, administration buildings, campgrounds, etc). Consider equipping all EMS first response vehicles and ambulances with an AED that are not already equipped with an ALS defibrillator."*

RM-51 notes that the optimal locations and numbers of AEDs are such that an AED can be applied within 3-5 minutes.  RM-51 also points out that areas of high risk should be considered. The *HHS Guidelines for Federal PAD programs* notes that "there is no single 'formula' to determine the appropriate number, placement, and access system for AEDs," but "there are several major elements that should be considered"[32] that include the items listed in RM-51.  One element that should be stressed for consideration of AED placement is EMS response times.  In the three patient care reports provided for review, the time from dispatch to EMS arrival to the patient was 32, 35, and 39 minutes.  While this may not be a representative average of all GRCA EMS response times, it is clear that GRCA should fortify the PAD AED program to ensure a more timely AED placement by lay responders to victims of sudden cardiac arrest.  As noted previously, updated Needs Assessment is essential in determining adequate placement and number AEDs.

Other considerations for placement include:
- The defibrillator should be easy to reach in a location free of obstacles. This could include a location near existing emergency equipment, such as fire extinguishers and first-aid kits. When considering location, avoid areas that expose the defibrillator to moisture, dust, or extreme temperatures. Recommended storage temperature is 15° to 35° C (59° to 95° F). Storage at higher temperatures will shorten the life of the battery and electrodes."[33]

- *HHS Guidelines for Federal PAD programs* has similar recommendations, and adds the criteria of placing AEDs in a secure location to minimize the potential for tampering, theft, and misuse.  An additional important consideration for AED placement is one that is well marked, publicized and known among trained staff.


Number of AEDs:

---

[32] HHS Guidelines for Federal PAD Programs
[33] Operating Instructions for Physio Control Lifepak CR Plus Defibrillator, https://www.physio-control.com/uploadedFiles/Physio85/Contents/Workplace_and_Community/Products/CRPlus_OI_3201686-011.pdf.

The document "GRCA AED Inventory," indicates that there are a total of 60 AEDs at the park; 32 of these are EMS AEDs located in law enforcement patrol vehicles, and 28 are placed throughout the park in publicly accessible locations such as headquarters building, maintenance building, clinic, and information desk. *[Note: Additionally, the three concessionaires who operate in Grand Canyon National park have a contractual obligation to provide and maintain a number of AEDs in public access locations in places such as lodges, general store, and trading post. The concessionaire AED programs have not been reviewed as part of this evaluation.]*

According to the AED Inventory spreadsheet, all of the AEDs in the inventory are the Lifepak CR Plus (CR+) model, manufactured by Physio Control, with the exception of one unit at the Albright Training Center, which is manufactured by Zoll. All of the CR+ AEDs are relatively new as they replaced the older Physio Control model, the Lifepak 500 (LP500), which was discontinued in 2007. According to the AED program manager, the replacement of LP500 AEDs was phased out between 2006 and 2018. At the time of this review, however, a photograph dated March 24, 2019 of a deployed AED was an LP500, thus it is unclear if the inventory spreadsheet is current and accurate.

RECOMMENDATIONS:

- Based on results of updated Needs Assessment, determine if additional AEDs need to be added or moved to a new location, and ensure all AEDs are placed in optimal locations.
- Analyze EMS response times from dispatch to arrival at patient, and consider placing AEDs in high risk areas where EMS would be unable to arrive within about 5 minutes.
- Consider creating and widely distributing a map where all AEDs are located within the park to educate GRCA staff on locations of all AEDs.
- Ensure AEDs are clearly marked and known among trained staff
- Update AED inventory spreadsheet on a monthly basis and expand spreadsheet to incorporate all items in RM-51 Exhibit 5, "Sample Monthly AED Check and Maintenance Log" into the spreadsheet

### 5. **Supplies**

According to RM-51, the following supplies should be stored with each device: A razor, barrier device, spare battery, disposable gloves, and two sets of electrodes. RM-51 adds additional supplies for consideration: a biohazard bag, small towel, and a set of concise instructions for performing CPR, and pen and paper.

The *HHS Guidelines for Federal PAD programs* recommends all of the above items and recommends the addition of 4x4 gauze pads to clear and dry skin to assure proper electrode-to-skin contact, and a pair of medium size bandage or blunt end scissors if clothing needs to be cut.

To clarify the language of "spare battery": The Physio Control Lifepak CR+ AED uses an internal rechargeable lithium battery that can be recharged by connecting the AED to the Physio-Control CHARGE-PAK battery charger; therefore, the spare battery referred to in RM-51 is, in this situation, a CHARGE-PAK battery charger.  The battery charger provides a trickle charge for the internal battery and can provide a charge for approximately two years, as long as the defibrillator is not used. The battery charger should always remain connected to the Physio Control AED to ensure that the battery is fully charged and prepared for sudden cardiac arrest medical emergency.  Per the manufacturer's recommendations, "It is important to keep a fresh CHARGE-PAK battery charger in the defibrillator, even when the defibrillator is stored."[34]

RECOMMENDATIONS:

- Ensure all AEDs contain all supplies listed in RM-51 and consider adding the additional items recommended in the *HHS Guidelines for Federal PAD programs.*
- Ensure that these supplies are checked (and replenished if needed) each time the AED is inspected.

6. **Maintenance Procedures**

Survival from cardiac arrest depends on the reliable operation of automated external defibrillators; and regular maintenance of the AED is a critical indicator of its reliability.  In a 2011 analysis of over 1,000 AED device failures, low batteries and other instances of the machine powering off unexpectedly (attributed to batteries), contributed to nearly one quarter of all AED failures, resulting in hundreds of deaths.[35]  Having an AED program can have the unintended consequence of introducing liabilities based on an employee's failure to use the AED when someone suffers a sudden cardiac arrest, or failure to administer aid with the AED properly. From a liability standpoint, the Cardiac Arrest Survival Act of 2000 stresses the importance of properly maintaining and testing the AED,[36] thus immunity may not apply if harm to the victim arises due to failure to properly maintain the AED.   Further, while there is no law requiring AEDs in federal facilities, if the entity chooses to have an AED program, the program would be exposed to liability for not ensuring that there are comprehensive policies and procedures in place, responders are properly trained, and the AED is properly maintained. Trends in AED legislation and civil litigation are generally for the failure of a premises owner to have an AED when required (under state statute or municipal/county ordinance), the negligent failure to

---

[34] Operating Instructions for Physio Control Lifepak CR Plus Defibrillator
[35] DeLuca LA, Simpson A, Beskind D, et al. Analysis of Automated External Defibrillator Device Failures Reported to the Food and Drug Administration. doi:10.1016/jannemergmed.2011.07.022.
https://www.annemergmed.com/article/S0196-0644(11)01338-2/pdf
[36] Cardiac Arrest Survival Act of 2000

properly find or use an AED when it is already present on the premises, or for a defect or malfunction in the device itself.

Issues around routine maintenance contributed to the largest number of complaints by GRCA interviewees. Further, it was suggested by several employees that a visitor died of sudden cardiac arrest not only as a result of inadequate placement of AEDs, but also possibly due to expired AED batteries and/or pads. A review of this particular event revealed that when the AED was applied, the cardiac rhythm was not shockable, and the AED did not advise a shock to the victim. There is no evidence that the batteries or pads were expired at the time, no evidence that there was a malfunction of the AED, and no evidence that this visitor or any other visitor or park employee had recently been materially impacted by the GRCA AED program.

There is evidence, however, of insufficiently maintained AEDs throughout the park. While a thorough check of each AED at GRCA was not conducted as part of this review, documentation of inadequately maintained AEDs was provided. For example, in 2018, an employee found an AED at GRCA headquarters building that had not been inspected in four years (since 2014), and the battery had expired in 2015. After that was discovered, documentation on 5 additional AEDs was provided that demonstrated lack of maintenance (no routine inspections; and four out of five had expired pads, and three out of four had an expired battery). Additional documentation showed expired pads and batteries found on an AED as recently as March 16, 2019 at the Back Country office.

It is not clear that the monthly inspections are being conducted in a uniform and consistent manner. There does not appear to be a formal "checklist" for an AED inspection. The current GRCA AED Inventory spreadsheet is insufficient to meet the requirements of RM-51, nor the manufacturer's recommendations. Per this spreadsheet, the AEDs are currently checked once per year, and there are many empty boxes under this section indicating that some AEDs had not been checked in 2018. Further, some of the AEDs which had expired components (per the documentation provided), had been listed as "checked in 2018." This appears to be inaccurate data collection.

RM-51 clearly identifies the process for maintaining the AED:

> "Maintenance and performance checks of all AEDs and associated equipment are to be performed per manufacturer's recommendations. Each NPS area will designate a person(s) responsible for this task.
> Each AED should have a written checklist to assess the preparedness of the AED and supplies. Per the NPS Records Schedule, A7615 Health and Safety, completed checklists should be kept on file in the park for a minimum of 15 years.
> (See Exhibit 5 for a sample AED Log). This checklist may be used as a supplement to regularly scheduled, more detailed maintenance check recommended by the manufacturer.

*At minimum, the checklist should include the following:*
- *Date of inspection*
- *Verification of placement*
- *Verification of battery installation*
- *Checking status/service indicator light*
- *Inspecting exterior components and sockets for damage*
- *Inventory of supplies*
- *Name of the person who inspected the unit"*

Maintenance recommendations from the manufacturer states:

*On a regular basis, you should do the following:*
- *Check to make sure that the OK symbol is visible in the readiness display.*
- *Check the Use By date on the electrode packet (visible through the defibrillator lid in the upper right corner) and all other electrode packets. If the date has passed, replace the electrode packet and the battery charger.*
- *Check other emergency supplies stored with your defibrillator.*

*When establishing your local inspection schedule, consider how often your defibrillator will be used and how familiar the operators are with using a defibrillator. For example, if the defibrillator is used only rarely, monthly inspections may be appropriate. [37]*
(A sample Lifepak CR+ inspection checklist can be found in the manufacturer's operating instructions)

Physio-Control also notes: "All AED batteries and pads have an expiration date. CR+ AED pads last for 2 years. The CHARGE-PAK battery charger and pads should be replaced after each use of the defibrillator."[38]

A thorough maintenance program also includes the responsibility of handling recalls and potential software updates or upgrades

A common concern among interviewed employees was a lack of understanding who is responsible for checking and maintaining the AED units. Per the sample AED policy in RM-51, "AED Coordinators will be responsible for ensuring that monthly inspections of AEDs are made and that the AED is fully functional." . However, it does not appear that the AED Coordinator currently has a reliable method for ensuring AED units are checked on a routine basis, and the AED Coordinator has no authority to task NPS staff to provide monthly inspection results.

---

[37] Operating Instructions for Physio Control Lifepak CR Plus Defibrillator
[38] Ibid

RECOMMENDATIONS:

- Establish a formal plan for systematic, routine maintenance, monitoring, and reporting inspection results of all AEDs (PAD and EMS) on a periodic basis, but no less than once per month.
- The same maintenance checklist should be adopted for use for all AEDs (PAD and EMS) incorporating all of the items listed in RM-51 and the manufacturer's User's Checklist.
- Identify who will be checking each AEDs every month at every location, and develop a back-up plan for handling issues such as absences, vacations, and job turnover. This individual would be responsible for providing maintenance checklists to the AED Coordinator, and would also notify the AED Coordinator in the event of any issues related to the AED.
- The AED Coordinator is responsible for ensuring that monthly inspections of AEDs are made and that the AED is fully functional. Create a method to make certain that maintenance checklists are provided to the AED Program Manager on a monthly basis, or consider an alternate method such having the data entered at the site on a shared spreadsheet that would be reviewed by the AED Program Manager
- Ensure there is a formal process for reordering and replacing expired equipment in a timely manner (and that each site is aware of the process)
- Develop a plan for handling recalls and software updates
- Maintain a log of any deficiencies and actions taken to repair them


## 7.  AED Policy and Protocols

Concerns related to roles and responsibilities of the AED program were commonly voiced by GRCA staff as part of this review.  Both non-EMS employees and EMS personnel noted a significant lack of communication about response procedures, a lack of authority to task others with AED responsibilities, and a lack of understanding regarding procedures related to AEDs that are considered "public facing."

A clear AED policy and protocol for all types of responders will assist in alleviating these issues. AED policy and protocol documents set the criteria for the operation of the AED program and all of its components.  RM-51 states, *"Each NPS area must have a current written policy available to all participants that contains the protocols and procedures for their AED program. This policy should address roles and responsibilities, protocols, and procedures for program. (See sample AED Policy in Exhibit 6.)"*[39]

[39] RM-51

*(Note: there is a chapter within the GRCA EMS Plan entitled "Automated External Defibrillator (AED) Program," however this document does not appear to be a policy, does not include a protocol, and it does not sufficiently address all essential aspects of an AED program.)*

The sample AED policy provided in RM-51 provides an example of roles and responsibilities of the program. This sample AED policy also refers to using an AED per "attached protocols." RM-51 has cardiac arrest protocols for EMTs, Parkmedics, and Paramedics, but there is no protocol in this document for lay responders. An example of a protocol for a lay responder can be found in the *HHS Guidelines for Federal PAD programs* document, which outlines the need for AED policies and protocols, provides a sample AED protocol for lay responders, and addresses the use of an AED treatment algorithm until EMS arrives and assumes care of the patient. The *HHS Guidelines for Federal PAD programs* document adds the following essential information regarding protocols:

- *Protocols should clearly address procedures for activating local EMS personnel as well as a notification system to activate lay responders.*
- *Responders must be familiar with and trained in the context of the approved procedures in the facility and strictly adhere to these procedures when an emergency occurs.*
- *Responsibility for each aspect of the program should be clearly articulated in protocols.*
- *Emergency response and AED usage protocols signed by a physician constitute legal authorization for properly trained and certified individuals to use AEDs in a particular manner as outlined in the protocol.*
- *Protocols should be reassessed periodically in accordance with a regular schedule of reviews as determined in consultation with the PAD's supervising physician. A current protocol that takes into consideration both new treatment recommendations and any changes in the FDA labeling of the AED should be integrated into the PAD training and education and re-training programs.*

RECOMMENDATIONS:

- Develop GRCA specific AED policy that contains the protocols and procedures for the AED program. This policy should also address roles and responsibilities of all personnel involved in the program (see sample AED policy in RM-51)
- Review the *HHS Guidelines for Federal PAD programs* document for lay responder protocols and develop protocols for lay responders (EMS personnel will be following cardiac arrest protocols outlined in RM-51). Verify that protocols are current per the American Heart Association Guidelines for CPR and Emergency Cardiovascular Care (updates can be found at https://eccguidelines.heart.org/index.php/circulation/cpr-ecc-guidelines-2/, and an example of an algorithm can be found on page 12 at

https://eccguidelines.heart.org/wp-content/uploads/2015/10/2015-AHA-Guidelines-Highlights-English.pdf)

- Review protocols periodically to ensure they continue to accurately reflect emergency response procedures at GRCA.
- Ensure the physician who provides medical oversight reviews and approves all policy, protocols, and emergency procedures related to the use of the AED.

## 8. Post-Event Considerations

RM-51 outlines necessary steps after an event in which the AED is used:

> *The following measures are to be taken:*
> *• Return the AED to a state of readiness as soon as possible with the replacement of the pads, pocket mask, and other peripheral supplies as necessary.*
> *• Provide the data to the Park EMS Medical Advisor.*
> *• Review the case with the AED Medical Advisor, Park EMS Coordinator and involved rescuers within 30 days of the incident. The information gathered from the incident review process is intended to be used to help improve the AED program. At a minimum, the review should include protocol and procedure implementation, scene safety, and a review of the AED recorded data.*

As noted earlier, the AED manufacturer recommends that the battery charger and pads should be replaced after each use of the defibrillator.

In addition to these steps, an important post-event consideration is the psychological effect on all responders (EMS and lay responders). While RM-51 outlines the procedures for Critical Incident Stress Debriefing for EMS, it is unclear if all lay responders involved in use of CPR/AED, or other emergency situations, are included in the Critical Incident Stress Management process.

RECOMMENDATIONS:

- Include RM-51 post-event considerations in GRCA AED protocols
- Address options for psychological services for all responders and include this information in the AED protocol

## 9. Quality Assurance/Continuing Quality Improvement

Per the DO, 4.3.8 Continuous Quality Improvement:

*"The continuous quality improvement (CQI) process is essential to the success of the Service's EMS program. Ongoing program evaluation will help to ensure that EMS program management and patient care are being provided at an optimal level. Accountability for quality assurance lies with the superintendents and the Chief, U.S. Park Police. These responsibilities are detailed in RM-51, Chapter 8, 3.11 "Quality Assurance/Continuous Quality Improvement."*

While this particular requirement is for the training and provider aspects of an EMS Program, and is intended for EMS in general, there is a need for some type of quality assurance/continuing quality improvement specifically for the AED program.

The *HHS Guidelines for Federal PAD programs* recommend the development of quality assurance plans as a major element of a PAD program that involves the development of measurable performance criteria, documentation and periodic program review. PAD programs should be reviewed on a regular basis and improved, where possible.

RECOMMENDATIONS:

- Develop and implement a quality assurance program specific to the GRCA AED program
- Establish a periodic review (consider a review by an external source) of the AED program on a routine basis and implement changes as necessary

### III. Employee Accident and Job Hazard Analysis Program Review

A job hazard analysis (JHA) is a hazard assessment tool that focuses on job tasks as a way to identify hazards before they result in an injury or occupational illness (Fig 1). A JHA centers on the relationship between the worker, the task, the tools, and the work environment. Ideally, after uncontrolled hazards are identified, employers and employees will take the necessary steps to eliminate or reduce the hazards to an acceptable risk level.

The Occupational Safety and Health Administration (OSHA) provides the following list of job factors that determine the need for JHAs in priority order:

1. Jobs with the highest injury or illness rates;
2. Jobs with the potential to cause severe or disabling injuries or illness,
3. Jobs in which one simple human error could lead to a severe accident or injury;
4. Jobs that are new to your operation or have undergone process changes in; and
5. Jobs complex enough to require written instructions.

The review of the GRCA Job Hazard Analysis, a component of the Park's overall hazard assessment program, included a review of a workplace injury that occurred on March 13, 2018 where a water utility crew member suffered a head laceration when the power demolition saw he was operating "kicked back" during a water pipe cutting operation and contacted his forehead. Speculation arose that maintenance employees were not conducting job hazard analysis prior to performing hazardous work, as required by 29 CFR § 1910.132(d)(2). There was also speculation/allegations that the Park did not adequately investigate the incident.

In order to accomplish this review, interviews were conducted with individuals directly involved with the incident, division supervisors, and the park's management team. These interviews included both past and present staff. Additionally, documentation was collected and analyzed and included witness statements, the June 2018 Intermountain Region's Environmental, Health, and Safety Audit Report for GRCA, videos and photographs of the incident scene, the injured employee's accident report, the injured employee's Form CA-1, *Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation,* Trans Canyon Pipeline waterline break data, and the Trans Canyon Pipeline repair JHA.

### Background

At approximately 3:15 PM on March 13, 2018, a supervisor, operating a demo saw, sustained a 1.5-inch laceration to his forehead when the demolition saw kicked back while making a final through-cut on an unpressurized, six-inch aluminum water pipe. The supervisor's three crew members immediately administered first aid measures and called for an emergency helicopter evacuation out of the canyon. The injured supervisor was then transferred to a mobile ambulance and transported to a local emergency department for further evaluation and treatment. The employee returned to work a few days later. *Note: The demolition saw was not available for inspection during the evaluation.*

Sample Completed Job Hazard Analysis – RM 50B, Section 3

## JOB HAZARD ANALYSIS – FORM 2:1

### JOB HAZARD ANALYSIS (JHA)

| | | | |
|---|---|---|---|
| Park Unit: Best National Park | Division: Maintenance Division | Branch: Auto Shop | Location: Headquarters area |

Date: February 28, 2003          New JHA Revised JHA

JOB TITLE: Changing flat tire on 2000 Dodge Durango     JHA Number: 1

| Job Performed By: Motor Vehicle Operator | Analysis By: Safety Committee | Supervisor: Auto Shop Foreman | Page __1__ of __2__ |
|---|---|---|---|
| | | | Approved By: Auto Shop Foreman |

Required Standards and General Notes: Read the owners manual pages 165 to 172. Study diagram and instructions on the bottom of the cover for the jack and tool storage area showing proper jack placement and the way to use the jack extension and handle.

Required Personal Protective Equipment: (Summer conditions) Gloves and coveralls

Tools and Equipment: (Summer conditions) Spare tire, jack, jack handle and extension, lug wrench, emergency markers

| Sequence of Job Steps | Potential Hazards/Injury Sources | Safe Action or Procedure |
|---|---|---|
| 1. Parking car | 1. SB – worker struck by passing car | 1. Park car as far from the edge of roadway as possible. Park vehicle on a firm level surface. Turn on flashers. Set the parking brake and place the gear selector in PARK. Set out emergency markers. Chock both the front and rear of the tire diagonally opposite the jacking position. |
| 2. Getting equipment | 2. none | 2. The jack and the tire changing tools are stowed in the floor compartment behind the rear seat, just forward of the lift gate opening. Jack usage instructions are shown on a label mounted on the underside of the cover. Put on gloves and coveralls. |
| 3. Getting the spare tire | 3. CI – fingers caught between car body & winch knob.  O – while operating winch | 3. Use the jack wrench extension on the winch nut to lower the spare tire. Turn the wrench in a counterclockwise direction to lower the tire. Continue to turn the wrench until the spare tire is on the ground and can be pulled out from under the car. |
| 4. Properly place jack and remove wheel cover | 4. CB – fingers can be caught between the wheel and the spade end of the wheel wrench  O – force needed to loosen wheel nuts | 4. Keep the fingers and hands clear of the pinch points between the tire and the spade end of the wheel wrench when prying off the wheel cover.  Using the wheel wrench, loosen, but do not remove, the wheel nuts by turning them counterclockwise one turn while the wheel is still on the ground.  Always place jack on a firm level surface. When changing a front tire, place the jack under the frame rail as close as possible behind the tire. When changing a rear tire, place the jack under the axle as close as possible to the shock bracket. |

38

**Findings:**

**Finding 1:** The Trans Canyon Pipeline Repair JHA was developed in 2007.

**Finding 2:** The Trans Canyon Pipeline Repair JHA—which contained over 80 steps—did not address the specific "kick back" hazard that resulted in the supervisor's injury.

**Finding 3:** The minimum required personal protective equipment (PPE) in the Trans Canyon Pipeline Repair JHA includes: gloves, a hard hat, full body clothing, steel toe boots, eye protection, and ear protection.

**Finding 4:** Due to excessively short personal staffing (> 40% vacant positions), the Facility Management Division (FMD) was limited in qualified and trained demolition saw users.

**Finding 5:** This was the seventh water line break since January 1, 2018 and those interviewed from the crew complained of fatigue.

**Finding 6:** Facility Management Division leadership often resorted to assigning untrained employees to assist in conducting pipeline repair.

**Finding 7:** Weather Underground's historical data for March 13, 2018 indicated the temperatures to be in the high 50s to low 60s °F.

**Finding 8:** On the day of the incident, the injured supervisor was the only qualified demolition saw operator, pipe fabricator, and welder on duty.

**Finding 9:** The injured supervisor was wearing safety glasses at the time of the incident, but was not wearing a hard hat or face shield.

**Finding 10:** The supervisor was injured when the demolition saw he was operating to cut aluminum water pipe kicked-back, causing the rotating blade to contact his forehead.

**Finding 11:** The supervisor received immediate first aid from other crew members and was safely extricated from the canyon via a short-haul helicopter evacuation operation.

**Finding 12:** The pipeline repair crew was provided critical incident stress management.

**Finding 13:** GRCA Superintendent's office declined the Intermountain Region's (IMR) offer to conduct a regional serious accident investigation because IMR's investigation process had not been finalized and GRCA believed it could handle the incident review internally.

**Finding 14:** The injured supervisor was able to return to work two days later after receiving seven stitches.

**Finding 15**: The June 2018 Intermountain Region Environmental, Health, and Safety Audit Report for GRCA indicated that most safety programs were not implemented and in draft form, while some needed developed and/or updating.

**Finding 16**: Interviewees stated that JHAs were often not reviewed by the pipeline repair crew members before emergency repairs, even though team members may have been selected at random to assist.

**Contributing Factors and Recommendations**

**Contributing Factor 1**: Although steps were taken to ensure that the pipeline was not pressurized with water, the pipeline still contained stored potential energy due to a bend in the pipeline section being cut. This energy is believed to have been released and transferred through the demolition saw on the final cut that resulted in the saw's "kick back" resulting in the saw blade contacting the supervisor's forehead. The Trans Canyon Pipeline Repair JHA did not address the kick back as a potential hazard during this operation and thus, did not contain a mitigation measure for prevention.

*Recommendation 1a:* The Facility Management Division (FMD) should consult with an outside party or sister park to reevaluate the pipeline repair operation to determine if there are alternatives or best practices for cutting this type of pipeline under specific conditions. This may include the use of different cutting tools, cutting techniques, and/or methods to reduce the release of potentially stored energy.

*Recommendation 1b:* At the time of this report, the 2007 JHA for this operation included over 80 steps, primarily addressing the helicopter short haul operation. Very little information was provided for the actual process for finding a damaged pipeline, accessing the pipeline, and using a cutting tool on the pipeline. FMD and the park aviation manager should look at separating these two operations in to separate JHAs, but maintaining the separate JHAs together for quick review, training, updating, and reference. Additionally, FMD and the Park safety and health manager should ensure that training on the JHA process and its use is provided to FMD and its personnel involved in this operation so they can update this specific JHA to ensure appropriate steps are documented, hazards identified, and appropriate mitigations included.

**Contributing Factor 2**: An impact resistant face shield was not required to be worn as part of the personal protective equipment ensemble while using the demolition saw.

*Recommendation 2:* Until this operation can be eliminated and/or engineering controls established to protect individuals from potential hazards, personal protective equipment will be required. The Team believes that the use of a hard hat with an impact resistant face shield at the time of the accident may have prevented the injuries to this employee. It should be noted that the JHA for this operation did require the use of a hard hat, but was normally not worn due to it being cumbersome and potentially increasing the effects of heat illness. If it has been determined in a documented personal protective equipment assessment that a hat hard is cumbersome and/or not needed as part of a protective ensemble during this operation, then there may be options available on the market for a standalone impact resistance face shield that fits directly to an

individual's head. Weather Underground's historical data for March 13, 2018 indicated the temperatures to be in the high 50s to low 60s °F.

**Contributing Factor 3:** Complacency and fatigue may have played a role in this employee's injury.

*Recommendation 3a:* FMD, with the assistance of the Park Safety and Health Manager, should ensure workplace hazard and/or risk assessments are conducted, documented, and reviewed regularly. Training may also need to be provided to FMD personnel to ensure they understand the process and options for conducting a hazard and/or risk assessment. FMD should consider using risk assessment tools such as a Green/Amber/Red or Severity/Probability/Exposure assessment.

*Recommendation 3b:* Park management team and FMD should develop a priority list for backfilling positions within FMD and work with their SHRO on getting the positions filled within FMD.

*Recommendation 3c:* FMD should not utilize untrained staff to support repair work on the Trans Canyon pipeline. FMD, with assistance from the Park Safety and Health Manager, should develop and/or outsource a training program to provide qualified and/or competent person training to individuals assigned to repair work on the Trans Canyon pipeline. This will include specialties such as welding, pipe fabrication, and use of mechanized cutting tools.

*Recommendation 3d:* FMD should ensure crews frequently responding to waterline breaks have an adequate rest/work cycle to reduce the likelihood of fatigue and an increased probability of injury.

**Response to Delegation of Authority Scope of Work**

Based on interviews conducted, the Team believes that GRCA personnel responded appropriately to the injured employee by providing first aid measures, extrication from the canyon, and transport to a local emergency department for further medical care. Additionally, steps were taken to preserve the incident scene, provide critical incident stress debriefing and wellbeing checks, and a safety stand down was initiated by Park leadership.

Although, initial steps were taken to secure and document the incident scene and collect witness statements from the pipeline crew, a formal "after action and/or lessons learned process" was not conducted. The Safety Management Information System (SMIS) accident report contained minimal information and/or recommendations on how to prevent similar incidents from occurring in the future. The Team could not confirm why the Park Safety and Health Manager believed his initial steps to conduct an investigation were met with resistance. Information obtained from management interviews indicated that leadership believed that an investigation was being conducted; however, there appeared to be no follow-up on the status of this investigation. Additionally, the Intermountain Region offered to deploy a regional Serious Accident Investigation Team to GRCA to conduct a formal accident investigation; however, this offer was declined by GRCA leadership.

*Recommendation:* The GRCA Safety and Health Manager, in conjunction with the GRCA Management Team, should develop an accident/incident reporting and investigation process as outlined in RM-50B *Occupational Safety and Health Program*. The process should be communicated to all staff, systematically implemented, and reviewed. When conducted properly, the investigation process reveals the chain of events that may have led to an accident, analyzes the direct and indirect causes of the event, and identifies correctable opportunities. The investigation process also provides information to park management to help prioritize park, regional and/or nationally implemented corrective actions and program activities.

The reporting phase of this process will support the park's safety management programs by providing notification of previously unrecognized hazards to park management for evaluation and development of corrective actions, identification of trends in workplace accidents, and communication of hazards and recommended corrective actions to employees and supervisors in the park and within the rest of the National Park Service.

**Response to OSC Informal Resolution**

Per the Safety and Health Manager, most divisions developed and used JHAs in a very efficient manner; however, the Safety and Health Manager believed the FMD did not perform this risk assessment process well during the time this incident occurred. Since the time of the incident and following the transition of a new acting FMD Chief, the Safety and Health Manager stated the safety culture within the maintenance division had improved dramatically and JHAs were in the process of being developed, updated, and used for training and refreshers in a far more efficient and effective manner than at any point in his two years in the park. However, it should be noted that the Team identified that the specific JHA developed in 2007 for Trans Canyon Pipeline repair was in need of a thorough review and update and at the time of our review still did not address the specific "kick back" hazard that resulted in the employee's injury.

The Team believes the FMD would benefit from a JHA training focused on the review of current jobs and potential hazards, the written JHA development process, and the importance of employee involvement.

Appendices

Appendix I - Letter of Delegation



United States Department of the Interior
NATIONAL PARK SERVICE
1849 C St NW
Washington, DC 20240



**FEB 2 1 2019**

VIA ELECTRONIC MAIL: NO HARD COPY TO FOLLOW

Memorandum

To:     Michael May, Chief, Office of Risk Management, National Park Service
        Tim Radtke, Director, Office of Occupational Safety and Health, Department of Interior

From:   Louis Rowe, Associate Director (A) Visitor and Resource Protection

Subject: Delegation of Authority (DOA) — Grand Canyon Safety Incidents Review

*Note: This DOA was originally drafted January 31, edited Feb 7 for clarity and Feb 20, the skills needed and the level of independence were refined.*

This memorandum formalizes your appointments as Co-Team Leaders for the Safety Issue Review Team assigned to the Grand Canyon. The issues you are assigned to review are as follows, and in the following order of priority:

Tim Radtke – Department of Interior
*   The exposure of park employees or visitors to radioactivity from uranium ore stored in the park's collection, a determination if the health and safety of any park staff or visitors may have been materially impacted, and recommended next steps.

Michael May – National Park Service
*   A workplace injury incident that occurred on March 13, 2018 where the forehead of a member of the water utility crew was lacerated when utilizing a power saw and whether the park took appropriate action in responding to the incident, including conducting after action and lessons learned reviews.
*   The program for deploying and maintaining automated external defibrillators (AED) and if the program is adequate, if the health and safety of any park employee or visitor has recently been materially impacted by that program, and recommended next steps.
*   Other general Safety program observations and recommendations.

Your and your team's duties include but are not limited to:

1. Organizing, managing, and conducting the review in accordance with Departmental Manual 485 Chapter 7 and National Park Service Reference Manual 50B, when applicable.
2. Providing in-briefings and out-briefings with affected personnel and agency officials including the Park Superintendent and the Intermountain Region's Associate Regional Director for Facilities and Lands.
3. Conducting on-site interviews with relevant staff that have knowledge of the situation, and coordinating an information exchange between team members and other entities, notably, the Occupational Safety and Health Administration (OSHA) investigator Patti Downs, Industrial Hygienist assigned the uranium incident; the Arizona Department of Health Services (ADHS) Bureau of Radiation Control Chief, Brian Goretzki; Grand Canyon Facility Management Division; Visitor and Resource Protection Division; and Grand Canyon Safety Officer; and the Intermountain Region Safety Office and other parties previously charged with investigating the incidents.
4. Collecting and analyzing any documentation including previous reports, previous recommendations, and previous actions taken by park management and employees.
5. Coordinating with Grand Canyon's Superintendent's Office to address an employee town hall meeting to provide employees with a synopsis of the situation and answer questions.
6. Maintaining liaison with the affected park and regional office, including the public information officers working with the media and public on these matters.
7. Approving requests and allocating funding for resources to assist with the investigation.
8. Requesting technical, logistical, or other support to conduct the investigation as required.
9. Providing briefings to myself and others.
10. Providing the following formal briefings/reports to myself and the Intermountain Region's Associate Regional Director for Facilities and Lands within 30 days of the site visit, although sooner is desirable. Brevity and timeliness is expected in any deliverables provided it does not compromise the quality and comprehensiveness of the review.
    o For the Uranium Ore Exposure Incident – Incident Review Report – Uranium Exposure - with findings, and recommendations to abate or mitigate those findings appended. The Review Team will identify multiple alternatives in the recommendations where possible. The exposure analysis and similar technical portions will be in a standalone appendix of the report and will be prepared by a qualified independent contractor, then peer-reviewed by an agency outside of the National Park Service.
    o For the Other Incidents – Incident Review Report – Other Issues - with findings, and recommendations to abate or mitigate those findings appended. The Review Team will identify multiple alternatives in the recommendations where possible.
11. Meeting with the park superintendent and regional representatives to discuss the merits of different alternatives, and provide technical expertise to support implementation of alternatives that are complex or require coordination with external agencies. Conduct additional investigations and performing additional follow-up actions as requested by me, the Park Superintendent, or Regional Director.

Your team, at a minimum, should include an Industrial Hygienist from DOI, an Occupational Safety and Health Manager from another region or agency, and a Radiation Safety Specialist

and/or Health Physicist from another Federal Agency.  You may also request a mining engineer with experience in uranium ores from the NPS Geological Resources Division.

Requests for time extensions on report submittals must be made through me. All reports will be considered draft until they are accepted by the agency DASHO in consultation with the Regional Director of the Intermountain Region.

You will be provided with an accounting code to pay for all travel and associated costs.

cc:    NPS Designated Agency Safety and Health Official (DASHO)
       Chief, Office of Risk Management, WASO
       Regional Director, Intermountain Region
       Associate Regional Director, Facilities and Lands, Intermountain Region
       Regional Safety Manager, Intermountain Region
       Park Superintendent, Grand Canyon National Park

# EXHIBIT Z-13



**Canyon Background Area**

**Haul Road Area**

2 Millirems an hour is threshold

zero

Y axis

**Legend**

**Gamma Dose Rates (µrem/hr)**

- 2.3 - 6.6
- 6.6 - 8
- 8 - 13.3
- 13.3 - 33.2
- 33.2 - 66
- 66 - 133
- 133 - 275
- > 275

**Site Features**

- 3-Strand Fence
- Cyclone Fence
- Investigation Areas
- Background Grids
- Canyon Rim
- Road
- Railroad
- Site-Specific Coordinate System

µrem = microrem

F:\GIS\Projects\Orphan_Mine_Grand_Canyon\Report_Maps\EECA\EECA_Jan2015\Figure3-3_Gamma_Exposure_Rates11x17.mxd

**Confidential Deliberative Privileged Draft Document Not to be Released - FOIA Protected Document**

Site-specific coordinate system is tied to the Arizona State Plane coordinate system.
The LiDAR feature information under layer is approximate and not tied directly to Site coordinate system.
LiDAR Source:
LiDAR implemented by AMEC in 2007 on behalf of Tech-Sym Corporation and Cotter Corporation.



Figure 3-3
Surface Gamma Dose Rates

OU1 Orphan Mine Site
OU1 EE/CA
Grand Canyon National Park, Arizona